UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
THOMAS KEMPKES,

                 Plaintiff,

     – against –

MARY C. MARVIN, individually, GLENN D.
BELLITO, individually, ROBERT J. UNDERHILL,
individually, ANNE W. POORMAN, individually,
WILLIAM H. BARTON, individually, and the VILLAGE
OF BRONXVILLE, N.Y.,

                 Defendants.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

07-cv-11351 (KMK)

**AFFIDAVIT OF
HOWARD M. MILLER**

STATE OF NEW YORK   )
                       ) ss:
COUNTY OF NASSAU   )

       HOWARD M. MILLER, being duly sworn deposes and says:

       1.     I am a member of Bond, Schoeneck & King, PLLC, counsel for

Defendants in this matter, and submit this affidavit in support of Defendants' motion to

dismiss the First Amended Complaint.

       2.     Annexed hereto as "Exhibit 1" is a copy of the First Amended Complaint

filed by Plaintiff in *Kempkes v. Downey, et al.*, 07-CV-1298 (KMK) (GAY). This

document is properly before the Court because it was annexed to the initial Complaint

filed in the instant action (*see* ECF Docket No. 1), and was incorporated by reference into

the Amended Complaint filed herein at Paragraph 7. *Thomas v. Westchester County

Health Care Corp.*, 232 F. Supp. 2d 273, 275 (S.D.N.Y. 2002).

       3.     Annexed hereto as "Exhibit 2" is a copy of a letter dated October 8, 2007

from Jonathan Lovett to John F. O'Reilly, which constitutes the closing statement made

on behalf of Plaintiff in the matter of the disciplinary charges dated August 21, 2006 preferred against Police Officer Thomas Kempkes. The Court may take judicial notice of and properly consider the complete record of the disciplinary proceeding on the charges preferred against the Plaintiff. *Colandrea v. Town of Orangetown*, 490 F. Supp. 2d 342, 348 (S.D.N.Y. 2007); *Thomas v. Westchester County Health Care Corp.*, 232 F. Supp. 2d 273, 276 (S.D.N.Y. 2002).

4.      Annexed hereto as "Exhibit 3" is a copy of the written decision issued by the Village of Bronxville Board of Trustees, sitting as the Village Board of Police Commissioners, in the matter of the disciplinary charges dated August 21, 2006 preferred against Police Officer Thomas Kempkes. The Board's decision in the disciplinary proceeding was incorporated by reference into the Amended Complaint at ¶ 10. The Court may also take judicial notice of and properly consider the complete record of the disciplinary proceeding on the charges preferred against the Plaintiff. *Colandrea v. Town of Orangetown*, 490 F. Supp. 2d 342, 348 (S.D.N.Y. 2007); *Thomas v. Westchester County Health Care Corp.*, 232 F. Supp. 2d 273, 276 (S.D.N.Y. 2002).

5.      Annexed hereto as "Exhibit 4" is a copy of the First Amended Complaint filed by Plaintiff in this action.

Howard M. Miller

Sworn to before me this
16th day of June 2008.

Notary Public

SUSAN M. MAJIKAS
Notary Public, State of New York
No. 01MA5040164
Qualified in Nassau County
Commission Expires March 6, 20 /1

2

60600.1

EXHIBIT 1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------x
THOMAS KEMPKES,

                        Plaintiff,

        -against-

BRIAN M. DOWNEY, individually, MARY
C. MARVIN, individually, GLENN D.
BELLITO, individually, ROBERT J.
UNDERHILL, individually, ANNE
W. POORMAN, individually, WILLIAM
H. BARTON, individually, and the
VILLAGE OF BRONXVILLE, N.Y.,

                    Defendants.
------------------------------------------------------------x

U.S. DISTRICT COURT FILED
MAR 27 2007
S.D. OF N.Y.

07 Civ. 1298 (GAY)

**FIRST AMENDED COMPLAINT**

**Jury Trial Demanded**

*Amended summons issued*

Plaintiff THOMAS KEMPKES, by his attorneys Lovett & Gould, LLP, for his first amended complaint respectfully states:

## NATURE OF THE ACTION

1. This is an action for compensatory and punitive damages, proximately resulting from Defendants' conduct as engaged in under color of the laws of the State of New York, for violations of Plaintiff's rights as guaranteed him by the First and Fourteenth Amendments to the United States Constitution, 42 U.S.C. §1983.

## JURISDICTION

2. The Court's jurisdiction is invoked pursuant to 28 U.S.C. §§1331, 1343.

1

**THE PARTIES**

3. Plaintiff THOMAS KEMPKES is a citizen of the United States, a domiciliary of the State of New York, and a resident of the Northern Counties. At all times relevant to this complaint he was employed as a permanent, tenured Police Officer by the Defendant Village. As such he has a vested property interest in that position of employment. Since on or about September 6, 2002, and by reason of a job-related injury, Plaintiff has been entitled to and (except as indicated, *infra*), the recipient of pecuniary and related benefits pursuant to Section 207-c of the New York State General Municipal Law. With respect to those benefits Plaintiff also had a vested property interest with respect to which he could not lawfully suffer any deprivation without, as already determined in the Supreme Court, Westchester County [Matter of Kempkes v. Downey, Index #06/14958], first being accorded a pre-deprivation due process hearing.

4. Defendant BRIAN M. DOWNEY (hereinafter "Downey"), who is sued in his individual and personal capacities only, at all times relevant to this complaint was the duly appointed Chief of Police of the Defendant Village. As such he had final discretionary decision-making authority with respect to the unilaterally taken actions attributed to him *infra*.

5. Defendant VILLAGE OF BRONXVILLE (herein "Village") is a municipal corporate subdivision of the State of New York, duly existing by reason of and pursuant to the laws of said State. The Village's duly constituted legislative body, its so-called Board of Trustees (hereinafter "Board"), is comprised of Defendants MARY C. MARVIN, GLENN D. BELLITO, ROBERT J. UNDERHILL, ANNE W. POORMAN, and WILLIAM H. BARTON, each of whom (hereinafter collectively referred to as the

2

"Board") is sued in his/her individual and personal capacities only. Collectively the members of the Board establish the official policies, customs and practices of the Village, except to the extent that Downey is empowered to do so by reason of his final, discretionary decision-making authority.

## THE FACTS

6. On July 7, 2006, without having accorded Plaintiff a pre-deprivation due process hearing Downey unilaterally revoked, for the reasons set forth *infra*, Plaintiff's 207-c status and terminated his Section 207-c benefits by written notice that Plaintiff was:

> "suspended without pay pending the investigation into potential
> disciplinary charges being pursued against [him]. . .related to
> [his] failure to remain at home, while injured, on Thursday
> July 6, 2006."

The Board, with actual knowledge of that deprivation, has, for the reasons set forth *infra*, approved, condoned and/or ratified it.

7. On or about August 21, 2006, Downey unilaterally preferred against Plaintiff, for the reasons set forth *infra*, disciplinary charges the hearing with respect to which commenced before the Board on December 13, 2006. As a result the Board, with actual knowledge of Downey's preferral of those charges, has, for the reasons set forth *infra*, approved, condoned, and/or ratified his action in doing so.

3

8. In that connection and during Plaintiff's opening statement at the ensuing disciplinary hearing, as made to the Board in the presence of Downey, Plaintiff urged through counsel:

"I think the reason he [Plaintiff] is honored to be charged as he is, is because he is disliked and is being treated differently than others for a number of reasons. One, he has repeatedly expressed his concern over his tenure. . .that the police department is systematically discriminating based on gender.

You don't have, you never had a single female police officer in the history of the Village of Bronxville. He has expressed, repeatedly, his concern that the Village Police Department has a racial bias. You do not have, nor ever had a[n] Hispanic member of the police department. He has repeatedly expressed his concern intradepartmentally about racial bias because for years, you ha[d] one token Black officer and now you have two token Blacks.

He has expressed his concern that the Chief of Police and his immediate [predecessor]. . .have put the public health and safety at risk by sending [Plaintiff] out on patrol in a car where they knew he was disabled and couldn't possibly intercede if somebody were in the act of committing a robbery, or a burglary, or a rape. He expressed concern that that was putting people at risk and other officers at risk. . .He expressed concern that the Chief of Police had provided a bed or a cot for a police Sergeant who was so drugged up on prescription medication that he's allowed to

4

sleep while on desk duty and get paid full salary.

He's expressed concern that the individual involved in [this set of disciplinary charges], Lieutenant Satriale. . .has endangered the welfare of a minor, taking an under-aged youth drinking with him at a local bar.

. . .Another thing about which he expressed concern, would be what is commonly referred to as DWH and DWB. Driving while Hispanic and driving while Black.

The statistics of the police department will overwhelmingly show that lower class Hispanics, lower class Blacks are routinely stopped and summoned [*sic*.], where White residents of the Village don't get any summons, even if they are stopped.

The same carries through with respect to criminal prosecutions. If you're Black you get prosecuted for less significant things than Whites who happen to be well-connected and wealthy in Bronxville, who are not prosecuted at all."

In fact Downey's revocation of the 207-c benefits and preferral of the disciplinary charges, as well as the Board's subsequent ratification, approval and condonation of same were motivated at least in substantial respect by reason of Plaintiff's pre-revocation and pre-hearing expression of the concerns referenced at the outset of his disciplinary hearing.

9. By way of follow-up to his defense attorney's remarks, on December 21, 2006, Plaintiff wrote to the Village's Mayor and each of the Village's Trustees advising:

5

"Re: <u>Systemic discrimination by the Village</u>

Dear Mayor Marvin:

Although I am employed by the Village of Bronxville as a police officer, I am writing to you exclusively in my capacity as a concerned and knowledgeable citizen.

The Village's Police Department, under the leadership of Chief Downey, does not have among its sworn members a single female officer.

Under Chief Downey's stewardship the Police Department has managed to avoid hiring any person of Hispanic ethnicity.

Under the Chief's administration there are but two African-American officers in the Department.

Historically there has never been a female Police Officer and/or an Hispanic Police Officer employed by the Village. Historically there was for years only one, token African-American Police Officer.

It is my opinion, based upon personal observation, that our limited police resources are used to detain/prosecute Hispanics and African-Americans for what is commonly referred to as "DWB" and "DWH". Caucasian motorists are not similarly treated.

Since it is nearly 2007 I propose that the Village, acting through its very capable administration, hurtle into the twenty-first century and begin providing Equal Protection to all persons regardless of gender, ethnicity, national origin and/or skin color.

Allow, for purposes of change, the rights guaranteed by reason of the

6

First and Fourteenth Amendments to the United States Constitution to

apply to all persons within the Village - - not just the Caucasian

constituents who voted you into office on a temporary basis.

Kindly make this correspondence part of the Village Board's official

record at its upcoming public meeting. I trust that you will find that the

vast majority of the Village's residents do not believe that maintaining

systemic and pervasive discriminatory practices is wise."

10. As a proximate result of Plaintiff's reiteration of his concerns both at the

commencement of the disciplinary hearing and thereafter, as referenced in the preceding

paragraphs "8" and "9", *supra*, Downey retaliated against Plaintiff and thus with respect

to the pay period ending February 2, 2007, and continuing to date unilaterally reduced

Plaintiff's net bi-weekly salary (with respect to which Plaintiff had a vested property

right) by approximately $570. The Board, by reason of the service upon the Village of

Plaintiff's original complaint herein, with actual knowledge of that retaliatory action, has

approved, condoned and/or ratified it.

11. Also as a proximate result of Plaintiff's reiteration of his said concerns both at

the commencement of the disciplinary hearing and thereafter, Defendants have further

retaliated against Plaintiff by denying him health insurance coverage for his spouse - - to

whom he was married subsequent to December 13, 2006.

12. Under the premises Defendants' conduct and/or retaliatory conduct has caused

Plaintiff to suffer: pecuniary losses and benefits; a loss of Section 207-c benefits; public

humiliation; public embarrassment; emotional upset; anxiety; punishment for the exercise

7

of his rights to free speech and to petition government for the redress of grievances; and has otherwise been rendered sick and sore.

### AS AND FOR A FIRST CLAIM

13. Repeats and realleges as if fully set forth the allegations of fact contained in paragraphs "1" to "12", inclusive.

14. Under the premises Defendants' retaliatory reduction in Plaintiff's net bi-weekly salary violated his rights as guaranteed by the First Amendment to the United States Constitution.

### AS AND FOR A SECOND CLAIM

15. Repeats and realleges as if fully set forth the allegations of fact contained in paragraphs "1" to "12", inclusive.

16. Plaintiff's disciplinary proceeding was instituted, approved, and/or prosecuted by Defendants despite the Board and Downey's actual knowledge that with absolute impunity:

> i) Sworn members of the Village's Police Department routinely and in violation of federal law enforce racially discriminatory practices concerning "DWB" and "DWH";
>
> ii) Criminal prosecutions instituted by sworn members of the Police Department impermissibly target, by selective prosecution, lower income Blacks and Hispanics on the basis of race and/or ethnicity;
>
> iii) Lt. Satriale has committed the crime of Endangering the Welfare of a

Minor;

iv) Downey has knowingly fostered an unlawful gender discriminatory practice, violative of federal law, of excluding females from sworn positions in the Police Department;

v) Downey has knowingly fostered an illegal racial/ethnic practice, violative of federal law, of excluding Hispanics from sworn positions in the Police Department

v) Downey has maintained a departmental policy, violative of federal law, of permitting only token representation amongst sworn officers by reason of race, and;

vi) Downey has provided a cot for an on-duty police Sergeant assigned to desk so that because of that superior officer's impairment resulting from his ingestion of certain prescription medications he can sleep while on duty, ignore his job duties, and receive full pay without performing law enforcement services.

17. Under the premises Defendants' institution and/or prosecution of the subject disciplinary charges against Plaintiff constitutes a selective prosecution and/or otherwise violates Plaintiff's right to Equal Protection as guaranteed by the Fourteenth Amendment to the United States Constitution, 42 U.S.C. §1983.

## AS AND FOR A THIRD CLAIM

18. Repeats and realleges as if fully set forth the allegations of fact contained in paragraphs "1" to "12", inclusive.

9

19. Under the premises Defendants' retaliatory prosecution of Plaintiff with respect to the subject disciplinary proceeding violates Plaintiff's rights a guaranteed by the First Amendment to the United States Constitution, 42 U.S.C. §1983.

## AS AND FOR A FOURTH CLAIM

20. Repeats and realleges as if fully set forth the allegations of fact contained in paragraphs "1" to "12", inclusive.

21. Under the premises Defendants retaliatory deprivation of Plaintiff's entitlements under Section 207-c of the New York State General Municipal Law violated his rights as guaranteed by reason of the First Amendment to the United States Constitution, 42 U.S.C. §1983.

## AS AND FOR A FIFTH CLAIM

22. Repeats and realleges as if fully set forth the allegations of fact contained in paragraphs "1" to "12", inclusive.

23. Under the premises Defendants' retaliatory denial of health insurance coverage to Plaintiff for the benefit of his spouse violated Plaintiff's rights as guaranteed by reason of the First Amendment to the United States Constitution, 42 U.S.C. §1983.

WHEREFORE a judgment is respectfully demanded:

    a. Awarding on the First, Second, Third, Fourth and Fifth Claims as against the individually named Defendants such punitive damages as the jury may impose,

b.  Awarding on the First, Second, Third , Fourth and Fifth Claims as

against all Defendants such compensatory damages as the jury may

determine,

c.  Awarding as against all Defendants reasonable attorney's fees and

costs, and,

d.  Granting such other and further relief as to the Court seems just and

proper.

Dated: White Plains, N.Y.
      March 26, 2007

LOVETT & GOULD, LLP
By: _____
     Jonathan Lovett (4854)
Attorneys for Plaintiff
222 Bloomingdale Road
White Plains, N.Y. 10605
914-428-8401

11

EXHIBIT 2

# LOVETT & GOULD, LLP
### ATTORNEYS AT LAW

JONATHAN LOVETT

JANE BILUS GOULD

222 BLOOMINGDALE ROAD

WHITE PLAINS, N.Y. 10605

KIM PATRICIA BERG+

DRITA NICAJ+

+also admitted in New Jersey

914-428-8401
FAX 914-428-8916

October 8, 2007

**Via Fax: 914-592-4457**

John F. O'Reilly, Esq.
Hitsman, Hoffman & O'Reilly LLC
220 White Plains Road
Tarrytown, New York 10591

      Re: <u>Village of Bronxville (Kempkes)</u>

Dear Mr. O'Reilly:

      By way of closing statement on behalf of Thomas Kempkes I refer the Village Board to: i) my opening statement in the disciplinary; ii) my client's letter to the individual Board members which was marked as an exhibit at the hearing; and the pending federal civil rights complaint.

      In that connection I have zero confidence that municipal corporate officials such as your clients will be fair in disposing of this matter. They manifestly could care less that the Police Department under Downey's tenure was overtly racist in enforcing the law (DWB, DWH), and racist/sexist with respect to staffing (two token Blacks, no females ever, no Jews, no Hispanics). Against that background of condoned bigotry and a total lack of respect for civil rights generally, there appears no likelihood that the Board members would be likely to comprehend, much less accord my client, Due Process.

      Couple these circumstances with our extensive adversarial relationship, including the debacle that was the Village of Mamaroneck, and I see no point in wasting my client's money and/or my time tilting at this particular municipal corporate windmill.

                        Sincerely,

                        Jonathan Lovett

JL:clp
Cc: Chris Kurtz, Esq.

EXHIBIT 3

VILLAGE OF BRONXVILLE
BOARD OF POLICE COMMISSIONERS
-------------------------------------------------------------- X
   In the Matter of Disciplinary Charges Dated    :
   August 21, 2006

                                     :

           - preferred against -

                                       :

   Police Officer Thomas Kempkes          :
-------------------------------------------------------------- X

## PRELIMINARY STATEMENT

     The Village of Bronxville Board of Trustees sitting as the Village Board of Police Commissioners (hereafter "the Board") pursuant to NY Unconsolidated Laws § 5711-q. issues this decision on the disciplinary charges preferred against Village Police Officer Thomas Kempkes (hereafter "Officer Kempkes") dated August 21, 2006.

     The Board conducted hearings on the disciplinary charges on December 13, 2006, January 4, 2007 and January 10, 2007. The disciplinary charges were prosecuted on behalf of the Police Department by Attorneys Terry O'Neil and Christopher Kurtz of the law firm Bond, Schoeneck & King, PLLC. Attorney Jonathan Lovett of the law firm Lovett & Gould LLP represented Officer Kempkes in this matter. The Board was assisted in the conduct of the disciplinary proceeding by Attorney John F. O'Reilly. Each and all members of the Board were present throughout the course of the disciplinary hearings and participated in the determination of this disciplinary matter.

     The disciplinary charges were admitted in the record of the hearing as Village Police Department Exhibit ("DE") 1)[1]. Each party was provided the opportunity and did present witnesses and evidence in support of its position with respect to the disciplinary charges. The witnesses and evidence were subject to examination and cross examination by counsel for the parties, and members of the Board questioned witnesses and the evidence throughout the course of the hearings.

---

[1] Documents introduced in the record of this disciplinary proceeding on behalf of the Police Department will be referenced herein as "DE " followed by the appropriate exhibit number. Documents introduced in the record of this disciplinary proceeding on behalf of Officer Kempkes are identified as Charged Party Exhibit and are referenced herein as "CP" followed by the appropriate exhibit number.

The record of the testimony presented at the hearings was duly transcribed by a certified court reporter, and the transcript was reviewed by the Board in the course of its deliberations on the disciplinary charges[2]. In addition, the parties presented documents that were admitted as exhibits throughout the course of the hearings, which were considered by the Board in deciding the disciplinary charges. The Board also included in the record of the disciplinary proceeding the communications and documents listed below. The parties were notified of the Board's intention to include communications and documents in the record of the disciplinary proceeding by letter dated August 30, 2007 in anticipation of a hearing then scheduled for September 4, 2007. Counsel for the parties subsequently jointly agreed to cancel the September 4, 2007 hearing. The Board at its September 4, 2007 meeting determined to include the following communications in the record of the Disciplinary Proceeding:

- Letter dated January 31, 2007 from Mr. Lovett to Mr. O'Reilly.
- Letter dated February 7, 2007 from Mr. O'Neil to Mr. O'Reilly with attachments (corrected) Exhibit "A" 5711-q McKinney's Consolidated Laws of NY Annotated & Unconsolidated Laws and Exhibit "B" November 9, 1964 resolution of Village Board of Trustees concerning Police Manual.
- Letter dated February 13, 2007 from Mr. O'Reilly to Mr. Lovett.
- Letter dated February 20, 2007 from Mr. Lovett to Mr. O'Reilly.
- Print of e-mail bearing the "Sent" date of February 22, 2007 from Mr. Lovett (jlovett@bestweb.net) to Mr. Kurtz.
- Print of e-mail bearing the "Sent" date of March 1, 2007 from Mr. Kurtz (kurtzc@bsk.com) to Mr. O'Reilly.
- Print of e-mail bearing the "Sent" date of March 2, 2007 from Mr. O'Reilly (john@hholaw.com) to Mr. Kurtz.
- Letter dated March 9, 2007 from Mr. Kurtz to Mr. O'Reilly.
- Notice of Hearing dated August 3, 2007.
- Letter dated August 16, 2007 from Mr. O'Reilly to Mr. Lovett and Mr. O'Neil.
- Letter dated August 28, 2007 from Mr. Kurtz to Mr. O'Reilly.
- Letter dated August 29, 2007 from Mr. Lovett to Mr. O'Reilly.

---

[2] Reference to testimony of a witness in the transcript of the hearings is indicated in this decision by "R." followed by the appropriate page number(s). Unless otherwise expressly stated, reference to testimony on identified pages of the transcript is not intended to represent the cited page as the only testimony provided by a witness on the subject.

2

- Letter dated August 29, 2007 from Mr. Kurtz to Mr. O'Reilly with attachment certified copy of an extract of the minutes of the Village Board meeting held on November 9, 1964.

- Letter dated August 30, 2007 from Mr. O'Reilly to Mr. Lovett and Mr. O'Neil.

- Print of e-mail bearing the "Sent" date of August 30, 2007 from Mr. O'Reilly to Mr. Lovett.

- Print of e-mail bearing the "Sent" date of August 31, 2007 from Mr. Lovett (jlovett@bestweb.net) to Mr. O'Reilly.

Mr. Lovett by letter dated September 10, 2007 requested documentation of the public notice and minutes of the September 4, 2007 Board meeting. Mr. O'Reilly responded by letter dated September 27, 2007, which included documents regarding the public notice and minutes.

The Board received Closing Statements from counsel for each party as follows. Mr. Lovett provided on behalf of Officer Kempkes a one page letter dated October 8, 2007. Mr. O'Neil and Mr. Kurtz provided a thirty page Closing Statement dated October 8, 2007. The Board considered the closing statements made on behalf of each party in reaching its decision in this matter.

As more fully explained below, the Board was provided with a letter dated March 12, 2007 from Mr. Kurtz and with documents pertaining to Officer Kempkes' employment in the Village Police Department. The March 12, 2007 letter and the documents provided with the letter were not seen by the Board or in any manner considered until after the Board's reached a decision as to Officer Kempkes' guilt or innocence on the charges and specifications as stated below.

The Board has carefully considered the evidence and arguments made by the respective counsel at the hearing, in the documents referenced above and in the closing statements. The Board recognizes that the Police Department has both the burden of producing evidence in support of each charge and specification and that the Police Department also has the burden of persuading the Board that Officer Kempkes is guilty of the charges and specifications presented. The determinations as set forth herein are based on the testimony and documentary evidence admitted in the record of this proceeding, and on personal observations of the witnesses in the course of their testimony before the Board and evaluation of the credibility of the witnesses.

3

## DECISION ON SPECIFICATION AND CHARGES

For the reasons stated herein, the Board finds that the Specifications set forth below have been established and that Officer Kempkes is guilty of the following Charges stated in the August 21, 2006 disciplinary charges.

**CHARGE I    VIOLATIONS OF THE POLICE DEPARTMENT'S RULES AND REGULATIONS, DUTIES, RULES OF CONDUCR.**

Specification 1   On July 6, 2006, Officer Kempkes was scheduled to work the 8:00 a.m. – 4:00 p.m. tour of duty.

Specification 2   Officer Kempkes, did not report to work for his regularly scheduled tour on July 6, 2006 reportedly due to an alleged on-the-job injury incurred on September 6, 2002.

Specification 3   At approximately 10:50 am on July 6, 2006, Lieutenant Christopher Satriale directed Sergeant Eugene Mitchell to call Officer Kempkes' home telephone number and to order Officer Kempkes to report to police headquarters to read his Department e-mails and to check his mail slot at the police desk. Sergeant Mitchell placed the call to Officer Kempkes' home as directed at approximately 10:52 am. No one answered the telephone.

Specification 4   Sergeant Mitchell left a message on Officer Kempkes' home answering machine directing him to contact police headquarters.

Specification 5   At approximately 11:10 am on July 6, 2006, Lieutenant Satriale visited Officer Kempkes' home at 967 California Road in Eastchester, New York and rang the front doorbell. No one answered the door.

Specification 6   At approximately 11:15 am on July 6, 2006, Lieutenant Satriale directed Sergeant Mitchell to place a call to Officer Kempkes' home telephone. Sergeant Mitchell placed the call as directed at approximately 11:19 am. No one answered the telephone Sergeant Mitchell left a message on Officer Kempkes' home answering machine directing him to come to the front door of his home to meet Lieutenant Satriale. In this message Sergeant Mitchell also directed Officer Kempkes to contact police headquarters.

Specification 7   At approximately 11:50 am on July 6, 2006, Lieutenant Satriale directed Detective Stephen Gallo to call Officer Kempkes' cellular telephone. At approximately 11:53 am, Detective Gallo placed the call as directed. No one answered the call. Detective Gallo left a message on Officer Kempkes' cellular telephone voicemail directing him to call police headquarters.

Specification 8   On July 6, 2006, Lieutenant Satriale rang the front doorbell of Officer Kempkes' home several times between approximately 11:10 am and 12:25 pm. No one answered the door.

Specification 9    Lieutenant Satriale remained stationed outside of Officer Kempkes'
home until approximately 12:25 pm, at which time he was relieved by
Detective Gallo.

Specification 11   On July 6, 2006, Detective Gallo observed Officer Kempkes return to
his home at approximately 1:00 pm. As previously directed by
Lieutenant Satriale, Detective Gallo asked Officer Kempkes where he
had been. Officer Kempkes told Detective Gallo that he "brought his
car in for service and got a slice of pizza in Chester Heights," or
words to that effect.

Specification 12   During a departmental disciplinary interview held on July 7, 2006,
Officer Kempkes stated, in sum and substance, that he engaged in the
following activities away from his home during assigned tour of duty
on July 6, 2006:

1. Went to Zuccarlli's Deli in Eastchester for breakfast at about
   9:30am;

2. Went to Giovanni's Body Shop in Tuckahoe to have breakfast
   with his friend Giovanni;

3. Went to the frame store belonging to the cousin of his girlfriend
   Melissa;

4. Hung out with his friend Rob Esposito;

5. Went to George Nuko's gas station in Yonkers to meet a friend;

6. Drove his car around in an attempt to replicate an earlier smoke
   problem in the engine;

7. Drove his car to the Audi dealer in Mount Vernon and picked
   up a loner car; and

8. Got pizza in the Chester Heights section of Eastchester.

Specification 13   Section A(6) of the Department's Sick Leave Policies and
Procedures provides that, except in an emergency, a sick or injured
officer must notify headquarters of the need to leave his home or
place of confinement during scheduled tour. Section A(6) also
provides that officers must notify the Department upon return to their
home or place of confinement.

Specification 14   On or about March 10, 1999, Officer Kempkes acknowledged that he
received a copy of the Department's Sick Leave Policies and
Procedures by affixing his signature to a Department form for such
purpose.

Specification 15   On July 6, 2006, Officer Kempkes did not call police headquarters to
notify the Department that he needed to leave his home during his
regularly scheduled tour of duty.

Specification 16 Officer Kempkes' failure to notify police headquarters before leaving his home during his regularly scheduled tour of duty on July 6, 2006 constitutes a violation of Section A(6) of the Department's Sick Leave Policies and Procedures.

## CHARGE II   VIOLATION OF THE POLICE DEPARTMENT'S RULES AND REGULATIONS, DUTIES, RULES OF CONDUCT

Specification 1   Specifications 1-15 of Charge I are hereby repeated and realleged as if more fully set forth herein.

Specification 2   The conduct of Officer Kempkes described above constitutes a violation of Section(s) 5.2.1, 5.2.3, 10.1.3 and /or 10.1.8 of the Department's Rules and Regulations, Duties, Rules of conduct.

## CHARGE III   DISOBEDIENCE AND/OR AND ACT OF DELINQUENCY SERIOUSLY AFFECTING HIS GENERAL CHARACTER OR FITNESS FOR OFFICE AND/OR MISCONDUCT

Specification 1   Specifications 1-15 of Charge I and Specifications 1-2 of Charge II are hereby repeated and realleged as if more fully set forth herein.

Specification 2   The conduct of Officer Kempkes described above constitutes disobedience and/or and act of delinquency seriously affecting his general character or fitness for office and/or misconduct.

## CHARGE VI   VIOLATION OF THE POLICE DEPARTMENT'S RULES AND REGULATIONS, DUTIES, RULES OF CONDUCT

Specification 1   Specifications 1-15 of Charge I are hereby repeated and realleged as if more fully set forth herein.

Specification 2   In or about November, 2005, Lieutenant Satriale informed Officer Kempkes that leaving his home to get food during his regularly scheduled tour of duty while absent from work due to injury did not qualify as an acceptable reason to leave home pursuant to the Sick Leave Policies and Procedures.

Specification 3   Officer Kempkes' conduct in leaving his home during his regularly scheduled tour of duty on July 6, 2006 to "get food" in violation of Lieutenant Satriale's November 2005 directive constitutes a violation of Sections(s) 5.2.1, 5.2.3, 10.1.3, 10.1.4 and/or 10.1.8 the Department's Rules and Regulations, Duties and Rules of Conducer.

## CHARGE VII   DISOBEDIENCE AND/OR AN ACT OF DELINQUENCY SERIOUSLY AFFECTING HIS GENERAL CHARACTER OR FITNESS FOR OFFICE AND/OR MISCONDUCT

Specification 1   Specifications 1-15 of Charge I and Specification 1-2 of charge VI are hereby repeated and realleged as if more fully set forth herein.

Specification 2     The Conduct of Officer Kempkes described above constitutes disobedience and /or an act of delinquency seriously affecting his general character or fitness for office and /or misconduct.

**CHARGE X**     **VIOLATION OF THE POLICE DEPARTMENT'S RULES AND REGULATIONS, DUTIES, RULES OF CONDUCT**

Specification 1     Specifications 1-15 of Charge I and Specifications 1-9 of charge VIII are hereby repeated and realleged as if more fully set forth herein.

Specification 2     During a departmental disciplinary interview on July 7, 2006, Officer Kempkes told Lieutenant Satriale that he did not call headquarters before leaving his home during his tour of duty on July 6, 2006 because " he did not think that he had to call since he was on a workers' compensation leave of absence," or words to that effect.

Specification 3     During the time period between March 9, 2005 and January 26, 2006 Officer Kempkes notified headquarters on or about twenty-eight (28) occasions before leaving his home during his assigned tour of duty while absent from work on a "workers compensation leave."

Specification 4     Officer Kempkes further stated during the July 7, 2006 departmental disciplinary interview that he "decided not to comply" with the department's Sick Leave Policy and Procedures because "you guys never checked on me so [he] decided it was o.k." to leave home during his assigned tour of duty while absent on a "workers' compensation leave", or words to that effect.

Specification 5     Officer Kempkes gave a false and/or misleading answer during the July 7, 2006 departmental disciplinary interview when he said that he did not know that, except in an emergency, he was required to call headquarters before leaving his home during his regularly scheduled tour of duty on July 6, 2006.

Specification 6     The conduct of Officer Kempkes described above constitutes a violation of Section(s) 5.2.1 and /or 10.1.20 of the Department's Rules and Regulations, Duties, Rules of conduct.

**CHARGE XI**     **DISOBEDIENCE AND/OR AND ACT OF DELINQUENCY SERIOUSLY AFFECTING HIS GENERAL CHARACTER OR FITNESS FOR OFFICE AND/OR MISCONDUCT**

Specification 1     Specifications 1-15 of Charge I, Specification 1-9 of Charge VIII and Specifications 1-5 of Charge X are hereby repeated and realleged as if more fully set forth herein.

Specification 2     The conduct of Officer Kempkes described above constitutes disobedience and/or and act of delinquency seriously affecting his general character or fitness for office and /or misconduct.

7

The Board declines to find Officer Kempkes guilty of the Charges set forth as Charge IV, V, VIII and IX. The Board's finding with respect to the Specifications asserted in connection with Charges IV, V, VIII and IX is set forth below.

## OPINION

The events underlying this disciplinary action are established by the evidence demonstrating the matters set forth in Specifications 1 through 9 and 11 through16 stated under Charge I.

As established by the testimony of Officer Kempkes (R. 21-100) and Lt. Christopher Satriale (R. 117-276), Officer Kempkes was scheduled to work the 8:00 a.m. to 4:00 p.m. tour of duty on July 6, 2006. Officer Kempkes did not report to work for active duty on his scheduled tour of duty on July 6, 2006 because he reported disabled due to an on-the-job injury incurred on September 6, 2002 (R. 32, 87; DE 8, 10-12). According to Officer Kempkes, prior to July 6, 2006, he last reported for active duty on February 28, 2005 but did not work a full day on that occasion (R. 84-85). Officer Kempkes absence from duty after September 6, 2002 was due to injuries he incurred while on duty on that day (DE 5, 7 and 8).

As demonstrated by the testimony of Lt. Satriale (R. 117-276), Sgt. Eugene Mitchell (R. 276-290) and Detective Stephen Gallo (R. 294-341), attempts were made to contact Officer Kempkes at his residence in Eastchester, New York[3] during the period of his scheduled tour of duty on July 6, 2006. The Eastchester, NY location was referred to as Officer Kempkes' home and/or residence by both parties throughout the course of the disciplinary proceeding. There was no evidence presented to show that Officer Kempkes' home or residence for the purpose of this disciplinary matter was a location other than the Eastchester, NY address.

The attempts to contact Officer Kempkes on July 6, 2006 began when Lt. Satriale directed the on-duty Desk Officer (Sgt. Mitchell) to call Officer Kempkes' home telephone number and order him to report to police headquarters to read his Police Department e-mails and to check his mail slot at the police desk. This direction was given at approximately 10:50 a.m. on July 6, 2006 (R. 137, 278). A similar direction to report to the Police Department had

---

[3] At the request of Officer Kempkes and by stipulation of the parties made during the course of the hearings, the particular street address of his home in Eastchester is not specified. The parties agreed to use the designation Eastchester, NY to identify Officer Kempkes' home address (R. 69-70).

been given to Officer Kempkes on several prior occasions to attend to his mail slot and Department emails during the period when Officer Kempkes had not reported for active duty (R. 137).

Sgt. Mitchell placed a telephone call to Officer Kempkes' home as directed at approximately 10:50 a.m. on July 6, 2006, but no one answered the call (R. 278). Sgt. Mitchell left a message on Officer Kempkes' home answering machine directing him to contact police headquarters (R. 278). Sgt. Mitchell subsequently informed Lt. Satriale of the inability to reach Officer Kempkes at his home by telephone (R. 279). There was no evidence produced in the record to dispute that the telephone number called by Sgt. Mitchell is the home telephone number for Officer Kempkes.

Thereafter, at approximately 11:10 a.m. on July 6, 2006, Lt. Satriale went to Officer Kempkes' home in Eastchester, NY (R. 139-141, 278-279). Lt. Satriale used the doorbell at Officer Kempkes' home which caused the dogs inside the home to bark (R. 141). There was no response at the door (R. 141). After having used the doorbell and received no response, Lt. Satriale walked around to the back of the home to check if there was anyone in the back or on the rear deck (R. 142) and then returned to the front of the residence (R. 142).

At approximately 11:15 a.m. on July 6, 2006, Lt. Satriale directed Sgt. Mitchell to place a second call to Officer Kempkes (R. 142, 278-279). Sgt. Mitchell placed the call to Officer Kempkes home telephone number, again did not receive an answer, and left another message on the answering machine. The second message directed Officer Kempkes to come to the front door of the Eastchester residence to meet Lt. Satriale (R. 279, 142-143). Sgt. Mitchell contemporaneously created an email to Lt. Satriale recounting the two phone calls he was ordered to make to Officer Kempkes and the results of same (DE 13; R. 143, 280-282).

At approximately 11:50 a.m., Lt. Satriale called Detective Gallo and directed him to call Officer Kempkes on his cell phone (R. 148, 296). At approximately 11:53 a.m., Detective Gallo placed a call to Officer Kempkes' cell phone as ordered, but no one answered (R. 296-297). Detective Gallo proceeded to leave a message on Officer Kempkes' cell phone voicemail directing him to call police headquarters (R. 297). There was no evidence produced in the record to dispute that the telephone number called by Detective Gallo is the

cell phone number for Officer Kempkes. Detective Gallo then called Lt. Satriale to inform him of the results of his call to Officer Kempkes' cell phone (R. 297, 149).

During the period that Lt. Satriale was located at Officer Kempkes' home, Lt. Satriale did not see or receive a response from Officer Kempkes (R. 150).

At approximately 12:25 p.m., Detective Gallo was instructed by Lt. Satriale to leave police headquarters and relieve Lt. Satriale from his post at Officer Kempkes' home in Eastchester (R. 297-298, 149). Detective Gallo traveled from the Bronxville police headquarters in a Department vehicle for approximately five minutes to the Eastchester location (R. 298, 149-150) and upon arrival spoke briefly with Lt. Satriale. Lt. Satriale informed Detective Gallo that Officer Kempkes had not appeared or responded to attempts to contact him at his home (R. 299). Detective Gallo was ordered by Lt. Satriale to remain at the Eastchester residence until Officer Kempkes' appeared or until Detective Gallo was given further instructions (R. 299, 150). Before leaving, Lt. Satriale made another attempt to contact Officer Kempkes at the home location by knocking on the door and ringing the bell, but no response was received (R. 150, 299). Lt. Satriale subsequently left Detective Gallo alone at Officer Kempkes' Eastchester home and returned to police headquarters (R. 150-151, 299).

At approximately 1:00 p.m. on July 6, 2006, Detective Gallo observed Officer Kempkes driving a car (a late model, dark color Audi) into the driveway at the Eastchester home location (R. 300). Officer Kempkes admitted in the course of his testimony that he had left his Eastchester home sometime approximately before 8:00 a.m. and returned at around lunch time or 1:00 p.m. (R. 71). In response to a question by Detective Gallo about his location that day, Officer Kempkes told Detective Gallo that he had dropped his car off for service at Audi and gotten a slice of pizza in Chester Heights (R. 300-301, 79-80). Officer Kempkes told Detective Gallo that he (Kempkes) did not have to be home because he was out on "compensation" not sick leave (R. 302). Detective Gallo asked Officer Kempkes if he had previously received the cell phone voicemail message left for him, Officer Kempkes stated that he had not (R. 301). Shortly thereafter, Detective Gallo returned to police headquarters and reported to Lt. Satriale (R. 302). Detective Gallo informed Lt. Satriale of his meeting and

conversation with Officer Kempkes upon his return home and his responses to where he had been. (R. 151).

Following Detective Gallo's report, both he and Lt. Satriale went to the Audi dealership (Classic Automobile) on MacQuestern Parkway in Mount Vernon, which is the location where Officer Kempkes indicated brought his car for service that morning (R. 151-152, 303). Lt. Satriale and Detective Gallo met with the Audi service manager (R. 152, 303), who confirmed that Mr. Kempkes had brought a car in for service and provided Lt. Satriale with a service order from that day (July 6th) showing that Thomas A. Kempkes did bring a 2005 Audi A6 in for service at approximately 12:44 p.m. (DE 14; R. 155).

Upon Detective Gallo's return to police headquarters, he wrote an email/supplemental report to Lt. Satriale which detailed the orders he had received and actions he had taken with respect to Officer Kempkes earlier that day. (DE 17; R. 304-305).

Sometime after 1:00 p.m. on July 6, 2006, Officer Kempkes went to police headquarters and spoke with Lt. Satriale (R. 157-158). At that time, Officer Kempkes requested to be represented during in his meeting with Lt. Satriale and Lt. Satriale agreed to reconvene the next morning at 10:00 a.m. (R. 158). On July 7, 2007 Lt. Satriale conducted a disciplinary interview with Officer Kempkes (R. 158-159). Officer Joseph Panzarino in his capacity as President of the Bronxville PBA was also present at the interview (R. 159). Officer Kempkes was asked about his whereabouts on the morning of July 6, 2006 (R. 162). Lt. Satriale testified that Officer Kempkes stated he "did not recall exactly what time he left his home in the morning", that Officer Kempkes related that "at around 9:30 [a.m.] he went to Zuccarelli's Deli in Eastchester for coffee", that "after leaving Zuccarelli's he went down to Giovanni's Auto Body Shop in Tuckahoe to have breakfast with his friend Giovanni", that "after breakfast he recalled going to Melissa's[4] cousins frame shop to meet with a friend of his, Robert Esposito", and then went "to George Niko's Service Station in Yonkers for awhile" and "when deciding to leave Niko's Service Station he wanted to attempt to have the car that he was driving recreate a smoke condition that he experienced previously, so he drove around for awhile until the car did in fact smoke, and that's what brought him to Classic Automobile" (R. 162-163). Officer Kempkes dropped off his car at Classic Automobile and

---

[4] Melissa was subsequently identified as Officer Kempkes' girlfriend (R. 163-164).

was provided with a loaner, and then "went to Chester Heights which is a section of Eastchester and got a slice of pizza and then went home and found Detective Gallo in his driveway." (R. 163).

Officer Kempkes testified that he did not contact the Police Department prior to 8:00 a.m. on July 6, 2006 (R. 32). Officer Kempkes also testified that he did not call the Police Department before leaving his home on July 6, 2006 (R. 72) and he further testified that he that he did not recall contacting the Police Department at any time between 8 a.m. and 1:00 p.m. on July 6, 2006 (R. 73) In his testimony, Officer Kempkes related that after he left his Eastchester NY residence in the morning of July 6, 2006, he had breakfast, he stopped by his friend's place of business to talk, he went by another friend's place, he drove his car around, he went to another friend's, he went to the car dealership to bring his car in for service, he got a slice of pizza and then he went home (R. 73).

There was no evidence presented to contradict the facts set forth above. These facts constitute the basis for the Board to find that the matters stated in Specifications 1 through 9 and 11 through 12 set forth under Charge I of the August 21, 2006 Disciplinary Charges (DE 1) are established for purposes of this disciplinary proceeding.

The allegations of misconduct stated against Officer Kempkes with respect to his actions on July 6, 2006 center on whether he violated Section A(6) of the Police Department's Sick Leave Policy and Procedures ("Sick Leave Policy") (DE 3A). The Board is satisfied that Officer Kempkes was provided with a copy of the Sick Leave Policy on March 10, 1999 based on his signature on the Written Directive Distribution List (DE 3B, R. 34) and the explanation regarding the utilization of the list and distribution of Sick Leave Policy provided by Police Chief Brian Downey (at the time Lt. Downey) (R. 291-294; DE 16). Officer Kempkes in his interview with Lt. Satriale on July 7, 2006 acknowledged awareness of the Sick Leave Policy (R. 164-165).

The Board finds that a reading of the provisions of the Sick Leave Policy as a whole establishes that it applies to a police officer who is unable to report to active duty when the officer is sick or injured, regardless whether the sickness or injury is due to a job related or non-job related cause. The Sick Leave Policy expressly states as its "Purpose": "To establish uniform procedures for reporting sick and follow-up actions when members become sick or

injured". There is no distinction stated in the Sick Leave Policy for a job-related sickness or injury and/or a non-job related sickness or injury. The Sick Leave Policy includes in the follow up actions (Section A) for a police officer who is sick or injured the requirement that the officer:

> 6. First notify the Department, except in an emergency, of the need to leave home or place of confinement during the scheduled tour.

The reasons for the notification requirement are obvious. The Police Department has a strong and appropriate interest in knowing the location and activities of a member of the Department during the time period the officer is scheduled for and paid to work but does not report for active duty due to injury or sickness. There are many reasons the Police Department may need to contact a police officer or have the office report to police headquarters even though the officer is unable to perform active police duty. Among the reasons to have the officer report to police headquarters is to perform activities such as deal with mail, other paperwork or perform administrative functions and keep current with the activities of the Police Department. Thus, the Police Department is entitled to rely on the availability of a police officer at his home or a known location for such contacts during the scheduled period of time when the officer would be working active police duty but for his or her injury or illness and the officer continues to be paid by the Department. The Sick Leave Policy and section A(6) is clearly directly related to an important public interest.

There was nothing provided to the Board to explain why the Department's interest in having an officer available at his home or other known location and for the Department to receive notification if the officer is leaving the location is or should be different depending on whether the officer is not able to work due to injury or illness. Further, there was nothing provided to the Board to explain why the Department's interest is different if the reason for the inability to work is for a job-related or non job-related cause.

The evidence shows that Officer Kempkes had complied with the requirements of the Sick Leave Policy on occasions prior to July 6, 2006 when he was unable to work due to injuries incurred on September 6, 2002. Lt. Satriale testified without contradiction that Officer Kempkes had notified the Police Department on

approximately twenty-eight occasions prior to July 6, 2006 of his need to not be in his home or place of confinement during his scheduled work tour and when he was unable to work due to the job-related injury (R. 160-161). The Department produced "sick leave logs" (DE 15) which recorded twenty-nine occasions when Officer Kempkes reported to the Police Department that he was not located in his residence or place of confinement during a scheduled work tour when he was unable to work. The sick leave logs cover the period starting March 9, 2005 and ending January 25, 2006. As previously stated, the record shows Officer Kempkes' absence from work during this period was due to injuries he incurred while on duty on September 6, 2002. The September 6, 2002 injuries are the same reason provided by Officer Kempkes for his inability to work on July 6, 2006. The testimony of Lt. Satriale shows that Officer Kempkes was provided with the sick leave logs during his interview with Lt. Satriale on July 7, 2006 to show that prior to July 6, 2006 he (Officer Kempkes) had complied with the notification requirement while unable to work due to a job related injury (R160, 166-167). Again, there is nothing in the record to show that Officer Kempkes disputed the record of his prior conduct memorialized in the sick leave logs (DE 15) showing that he provided the required notice pursuant to the Sick Leave Policy when he found it necessary to not be in his residence or place of confinement prior to July 6, 2006 while unable to work due to injuries incurred in a job related event.

Further evidence of Officer Kempkes' knowledge of the requirement to notify the Department prior to leaving his residence or place of confinement during the period of a tour of duty he is not able to work due to injury or illness was provided in Lt. Satriale's recounting of his conversation with Officer Kempkes in November 2005 regarding his leaving his residence or place of confinement for purposes of getting breakfast or lunch (R. 164). Lt. Satriale testified without contradiction that he informed and directed Officer Kempkes in the November 2005 conversation that he was not to leave his home or place of confinement "anymore for breakfast or lunch, to make sure he had food at home to prepare or to eat during his regular tour of duty. That was not an authorized reason to leave his home when he was being paid to work" (R. 164). As stated previously, the record shows that Officer Kempkes absence from duty in November 2005 and prior to that time was due to injuries Officer Kempkes

incurred on September 6, 2002, the same reason he was unable to work on July 6, 2006.  There is nothing in the record of the disciplinary proceeding to dispute that in November 2005 Officer Kempkes was given the direction by Lt. Satriale, or to show that he was not subject to the November 2005 direction on July 6, 2006.

The Police Department produced further evidence of Officer Kempkes' knowledge of the Sick Leave Policy requirement to provide notification to the Department prior to leaving his home or place of confinement during the time period the officer is unable to work due to illness or injury in DE 4 and 9.  The Board considered this evidence (produced at the December 13, 2006 and January 4, 2007 hearings) as relevant at this point in its deliberation only to the issue of Officer Kempkes' knowledge of the requirements of the Sick Leave Policy with respect to the required notification to the Department.  By way of background only, DE 4 and 9 concern events which apparently occurred on May 9, 2003 when Officer Kempkes reported unable to report for a scheduled tour of duty due to "foot pain" and was found not to be in his residence or place of confinement (DE 18, 19) and had not notified the Department prior to or in connection with leaving his home or place of confinement. The August 5, 2003 Memorandum by Police Chief Brian Downey to "All Sworn Personnel" with the subject "Command Discipline" (DE 9) states that Officer Kempkes had agreed to accept forfeiture of twenty hours compensatory time and a twelve day suspension without pay for violation of section A(6) of the Sick Leave Policy when he failed to first notify the Department of the need to leave his home or place of confinement during his scheduled tour of duty on May 9, 2003, when Officer Kempkes reported sick or injured.  Officer Kempkes' agreement to accept the forfeiture of twenty hours compensatory time and a twelve day suspension without pay is set forth in DE 4.

Officer Kempkes in his interview with Lt. Satriale on July 7, 2006 (R. 83-85) and during the course of the disciplinary hearings articulated the view that he was not required to follow the terms of the Sick Leave Policy section A(6) because he was on GML 207-c status. However, Officer Kempkes testified that he had not been granted GML 207-c as of July 6, 2006 (R. 84) and the record shows that he was not granted GML 207-c until July 27, 2006 (DE 8).  Officer Kempkes GML 207-c request was based on a foot injury he incurred while

15

on duty on September 6, 2002 (DE 5) and as stated above this injury was the reason given by Officer Kempkes for his absence from duty after that date.

Based on the evidence produced during the course of the disciplinary hearing, including the evidence summarized above, the Board finds that Officer Kempkes knew on July 6, 2006 and prior to that date that he was obligated by the Sick Leave Policy to notify the Department before leaving his home or place of confinement during a scheduled tour of duty when he was unable to work due to injury or sickness, and whether the condition was due to a job-related or non-job related event. Officer Kempkes at no point during his interview with Lt. Satriale on July 7, 2006 stated or indicated that he was unaware of the existence of the Sick Leave Policy (R. 167). Based on review of the entire record, the Board believes that the reason that Officer Kempkes did not provide the notification to the Police Department before his sojourn on July 6, 2006 when he was scheduled to work is summarized in his admission to Lt. Satriale that "you guys weren't checking up on me, so I thought I was Ok" (R. 167). There was nothing provided to the Board to dispute that Officer Kempkes made this admission to the Lt. Satriale on July 7, 2006.

Based on the foregoing, the Board finds that Specifications 13 through 16 set forth under Charge I are established and that Officer Kempkes violated the requirements of the Sick Leave Policy section A(6). Therefore, Officer Kempkes is guilty of Charge I.

The Board finds based on the foregoing that Specifications 1 through 9 and 11 through 16 under Charge I are established for purposes of Charge II, Specification 1. Charge II Specification 2 is addressed to violation of cited provisions of the Police Department Rules and Regulations, Duties, Rules of Conduct. The Board has reviewed the parties' submissions with respect to the adoption of rules and regulations applicable to members of the Village Police Department. The document entitled Village of Bronxville Bronxville Police Department Rules and Regulations Duties Rules of Conduct (hereafter "Rules and Regulations") was admitted in the record of this proceeding as DE 2. Officer Kempkes acknowledged receiving a copy of the Rules and Regulations in 1992 (R. 31). The rule provisions that are the subject of the disciplinary charges preferred against Officer Kempkes are all contained in the Rules and Regulations (DE 2).

16

A document entitled Police Manual with a date of March 25, 1964 was admitted in the record of this proceeding as CP E.  The Police Manual was the subject of a resolution of the Village Board of Trustees dated November 9, 1964 which provided that the Police Manual shall be effective December 1, 1964 (Exhibit "B" attached to the letter dated February 7, 2007 from Mr. O'Neil to Mr. O'Reilly).  Counsel for the Police Department represented in his February 7, 2007 letter that the Police Manual was provided to Christopher Harold, Esq., an attorney for Officer Kempkes in an arbitration proceeding, as evidenced by a letter dated April 3, 2006 (DE 20) from Attorney Kurtz to Mr. Harold.  There is no provision of the Police Manual cited in the disciplinary charges that are the subject of this proceeding.

Counsel for the Police Department points out in his February 7, 2007 letter that the Police Manual adopted by the Village Board of Trustees in 1964 expressly delegates to the Village Police Chief authority to supplement the rules and manual of procedure stated in the Police Manual and that the delegation of this authority to the Police Chief is authorized by and consistent with the provisions of NY Unconsolidated Laws § 5711-q.  The Police Department further states that the Rules and Regulations (DE 2) was promulgated by then Police Chief Carl H. Steinmuller as a supplement to the Police Manual pursuant to the delegation provided in the Police Manual and the terms of Unconsolidated Laws § 5711-q.  Likewise, the Police Department maintains, the Sick Leave Policy (DE 3A) was promulgated by then Police Chief DiVernieri as an appropriate exercise of the delegation provided in the Police Manual and the terms of Unconsolidated Laws § 5711-q.

Mr. Lovett in his letter dated February 20, 2007 to Mr. O'Reilly and copied to Mr. O'Neil and his email dated February 22, 2007 sent to Mr. Kurtz and copied to Mr. O'Reilly, disputed the Department's position concerning the Police Manual and the Rules and Regulations and requested that the Board schedule a hearing with respect to the issues.  Mr. Kurtz responded by letter to Mr. O'Reilly dated March 9, 2007 and copied to Mr. Lovett.  The Board by notice dated August 3, 2007 scheduled a hearing for September 4, 2007 and by letter dated August 16, 2007 informed the parties of the purposes of the September 4 hearing. In a letter dated August 28, 2007 from Mr. Kurtz to Mr. O'Reilly and copied to Mr. Lovett and a letter dated August 29, 2007 from Mr. Lovett to Mr. O'Reilly and copied to Mr. Kurtz, the parties suggested that the September 4, 2007 hearing was not necessary if a certified copied of the resolution of the Village Board of Trustees dated November 9, 1964 was

provided. Thereafter, by letter dated August 29, 2007, Mr. Kurtz forwarded a certified copy of the November 9, 1964 resolution of the Village Board of Trustees concerning the Police Manual. Based on the representations made by counsel for the parties stated above, and as confirmed in Mr. Lovett's email communication dated August 31, 2007 to Mr. O'Reilly, the September 4, 2007 hearing was cancelled. The Board met on September 4, 2007 and decided to include in the record correspondence and documents received from the parties since the last hearing date as stated above, including the certified copy of the November 9, 1964 resolution of the Village Board of Trustees concerning the Police Manual.

Having reviewed the submissions of the parties as set forth above, the Board is satisfied that the Police Manual (CP 5) was duly adopted by the Village Board of Trustees in 1964 and that the Rules and Regulations (DE 2) constitute an appropriate exercise of the authority delegated to the Police Chief by the Board of Trustees in 1964 and consistent with the provisions of Unconsolidated Laws § 5711-q.

The Rules and Regulations (DE 2) in Section 5.2.1 (General Duties) provides in relevant part:

> A member of the Force will be responsible at all times for ... professional adherence to Department rules and regulations....

The Rules and Regulations (DE 2) in Section 5.2.3 (Specific Duties) provides in relevant part:

> A member of the Force will...obey all lawful orders....

The Rules and Regulations (DE 2) in Section 10.1.3 (Rules of Conduct) provides in relevant part:

> A member of the Department found guilty of any of the following acts will be considered in violation of the rules and regulations which govern the Police Department of the Village of Bronxville, New York, and will be subject to disciplinary action.
>
> 3. Disobedience of an order.

The Rules and Regulations (DE 2) in Section 10.1.8 (Rules of Conduct) provides in relevant part:

> A member of the Department found guilty of any of the following acts will be considered in violation of the rules and regulations which govern the Police Department of the

Village of Bronxville, New York, and will be subject to disciplinary action.

>8. Leaving duty assignment without being properly relieved or without proper authorization.

The Board finds that Specification 2 under Charge II is established based on the findings with respect to Specification 1 under Charge II. Therefore, Officer Kempkes is guilty of the matters set forth in Charge II.

The Board finds based on the foregoing that Specifications 1 through 9 and 11 through 16 under Charge I are established for purposes of Charge III, Specification 1. The Board finds that the conduct demonstrated in those specifications constitute disobedience and/or an act of delinquency seriously affecting his general character or fitness for office and/or misconduct, as set forth in Specification 2 under Charge III. Therefore, Officer Kempkes is guilty of the matters set forth in Charge III.

The Board finds based on the foregoing that Specifications 1 through 9 and 11 through 16 under Charge I are established for purposes of Charge VI, Specification 1. The Board also finds that in November 2005, Lt Satriale informed Officer Kempkes that leaving his home during a scheduled tour of duty for purposes of getting breakfast and/or lunch was not an authorized excuse to leave home under the Sick Leave Policy. Officer Kempkes acknowledged that Lt. Satriale spoke with him about leaving home to eat prior to July 6, 2006 (R. 83). Lt. Satriale is a superior officer and the second ranking officer in the Police Department (R. 118-119). Specification 2 under Charge VI is established by the record of this proceeding.

As discussed above, among the reasons for leaving and activities engaged in when Officer Kempkes left his home without notice to the Police Department on July 6, 2006, during the period he was scheduled to work, was to get coffee at Zuccarelli's Deli in Eastchester, to have breakfast with his friend Giovanni at his body shop in Tuchahoe, and to get pizza in the Chester Heights section of Eastchester. The facts demonstrate that on July 6, 2006 Officer Kempkes showed a disregard for the direction given to him by Lt. Satriale in November 2005 and that he therefore violated Rules and Regulations (DE 2) sections 5.2.1, 5.2.3, 10.1.3 and 10.1.8 which are quoted above. Section 10.1.4 of the Rules and Regulations provides in relevant part:

19

A member of the Department found guilty of any of the
following acts will be considered in violation of the rules and
regulations which govern the Police Department of the
Village of Bronxville, New York, and will be subject to
disciplinary action.

4. Insubordination or disrespect toward a Superior Officer.

Officer Kempkes engaged in violation of the rule provisions set forth in Specification
3 under Charge VI. Therefore, Officer Kempkes is guilty of the matters set forth in Charge
VI.

The Board finds based on the foregoing that Specifications 1 through 9 and 11 through
16 under Charge I and Specifications 1 and 2 under Charge VI are established for purposes of
Charge VII, Specification 1. The Board therefore finds that Officer Kempkes engaged in
actions that constitute disobedience and/or an act of delinquency seriously affecting his general
character or fitness for office and/or misconduct as stated in Specification 2 under Charge VII.
Therefore, Officer Kempkes is guilty of the matters set forth in Charge VII.

The Board finds based on the foregoing that Specifications 1 through 9 and 11 through
16 under Charge I are established for purposes of Specification I under Charge X. During his
the disciplinary interview on July 7, 2006, Officer Kempkes told Lt. Satriale that he did not
call police headquarters prior to leaving his home on July 6, 2006 because he did not need
to comply with the Sick Leave Policy since he was out on workers' compensation (R. 165-166).
As recited above, Lt. Satriale showed Officer Kempkes a document evidencing approximately
28 occasions prior to July 6, 2006 when Officer Kempkes called police headquarters to get
permission to leave his home during his scheduled tour of duty and while on workers
compensation (DE 15; R. 166-167) related to the same event (September 6, 2002) that caused
Officer Kempkes to be unable to work on July 6, 2006, which Officer Kempkes acknowledged in
his testimony (R. 86-87). However, the evidence demonstrates that Officer Kempkes decided on
his own that he did not need to comply with the Sick Leave Policy on July 6, 2006 because the
Police Department had not been checking on him and he thought he get could away with
leaving his home on July 6, 2006 (R. 167), and his non-compliance not for any reason
associated with the nature or cause of his disabling condition. Therefore, the responses given
by Officer Kempkes to Lt. Satriale during the course of the disciplinary interview on July 7,

2006 were false and/or misleading. The Board finds that the matters stated in Specifications 2 through 5 under Charge X are established.

The Board finds that Officer Kempkes violated Rules and Regulations (DE 2). The Rules and Regulations (DE 2) in Section 10.1.20 (Rules of Conduct) provides in relevant part:

> A member of the Department found guilty of any of the following acts will be considered in violation of the rules and regulations which govern the Police Department of the Village of Bronxville, New York, and will be subject to disciplinary action.
>
> 20. Knowingly make a false report, written or oral.

The Board finds that Officer Kempkes violated Rules and Regulations sections 5.2.1 (quoted above) and 10.1.20 based on the matters established in Specifications 1 through 5 under Charge X, and Specification 6 is found to be established. Officer Kempkes is therefore guilty of the matters set forth in Charge X.

The Board finds based on the foregoing that Specifications 1 through 9 and 11 through 16 under Charge I are established for purposes of Specification I under Charge XI and that Specifications 1 through 5 under Charge X are also established for purposes of Specification I under Charge XI. The Board finds that Officer Kempkes committed actions that constitute disobedience and/or an act of delinquency seriously affecting his general character or fitness for office and/or misconduct as stated in Specification 2 under Charge XI. Therefore, Officer Kempkes is guilty of the matters set forth in Charge XI.

The Board declines to find Officer Kempkes guilty of Charge IV and Charge V. The Board recognizes that the responses given to Detective Gallo by Officer Kempkes upon his return home on July 6, 2006 about his location before returning home were less complete than the information provided to Lt. Satriale in the disciplinary interview on July 7, 2006. However, the Board does not believe that the responses concerning location to Detective Gallo rise to the level of knowingly false or knowingly misleading. Because the predicate for Charges IV and V are knowingly making a false report to Detective Gallo, the Board will not find Officer Kempkes guilty of those charges.

In the Board's view, Charges VIII and IX rely on Officer Kempkes' conduct in May 2003 for which he accepted a disciplinary penalty on or about August 5, 2003. As previously

21

stated, the Board to this point considered the evidence related to the May 9, 2003 events and the August 5, 2003 agreement for the limited purpose of establishing Officer Kempkes knowledge of the requirements of the Sick Leave Policy and his obligation to provide notice to the Police Department before leaving his home or place of confinement during the period of a tour of duty he is unable to work. Therefore the Board will not find Officer Kempkes guilty of Charge VIII and Charge IX.

In his opening statement to the Board on the first day of the disciplinary hearing on December 13, 2006, Mr. Lovett on behalf of Officer Kempkes claimed that the disciplinary matter is related to concerns Officer Kempkes has purportedly expressed about gender, national origin and racial discrimination in employment practices in the Police Department. Mr. Lovett also claimed that the disciplinary charges are related to concerns Officer Kempkes has purportedly expressed about national origin and racial discrimination in law enforcement actions taken by the Police Department. Mr. Lovett also suggested that Officer Kempkes was the subject of discipline because he had expressed concerns about health and safety based on purported inaction on and/or cover up of misconduct committed by various other officers in the Police Department.[5]

There was no evidence provided to the Board showing in any manner that Officer Kempkes had expressed any of the concerns claimed by Mr. Lovett or to show any connection between the purported concerns and the disciplinary charges. Further, there was nothing produced during the hearing other than Mr. Lovett's words to show that any of the matters about which Officer Kempkes has purportedly expressed concern are anything other than the figment of someone's imagination concocted only for purposes of this disciplinary proceeding.

Similarly, Mr. Lovett in his email communication dated February 22, 2007 to Mr. Kurtz and copied to Mr. O'Reilly stated that the post hearing submission on behalf of Officer Kempkes would address the issues regarding the Rules and Regulations and the Police Manual. No arguments regarding the Rules and Regulations and the Police Manual were presented in October 8, 2007 post hearing submission on behalf of Officer Kempkes.

---

[5] By letter dated December 21, 2006, Mr. Thomas Kempkes wrote a letter to the Mayor and copied members of the Board, the United States EEOC, Gannett Suburban Newspapers and News 12 in which many of the same claims made by Mr. Lovett in the Officer Kempkes disciplinary proceeding are repeated. Mr. Lovett makes reference to this letter in his post hearing submission on behalf of Officer Kempkes dated October 8, 2007.

## PENALTY

The Police Department provided the Board with a packet of documents concerning Officer Kempkes and his employment history for purposes of review in connection with the imposition of a penalty based the findings of guilt set forth above. The email communication dated March 1, 2007 from Mr. Kurtz to Mr. O'Reilly, with a copy to Mr. Lovett, states that a packet of documents regarding a submission for a potential penalty phase was forwarded that day to Mr. Lovett for his review. The email communication requests that the parties have until March 12, 2007 to agree on a joint submission for purposes of the penalty phase or to provide individual submissions.

The Police Department by letter dated March 12, 2007 from Mr. Kurtz to Mr. O'Reilly, with a copy to Mr. Lovett, was provided with documents concerning Officer Kempkes employment in the Police Department. The March 12, 2007 letter and the attachments were not given to the Board until after the Board made the determination on the specifications and charges as set forth above. By letter dated August 16, 2007 from Mr. O'Reilly to Mr. Lovett and Mr. O'Neil, Mr. Lovett was informed that had until August 31, 2007 to file with Mr. O'Reilly for consideration by the Board "[a] written response, including any challenges to accuracy or authenticity, to a letter of March 12, 2007 of Christopher T. Kurtz, Esq. and the enclosures thereto (the "Kurtz Documents"); and …. any documents (the "Lovett Documents") relevant to the penalty phase of the Disciplinary Proceeding". No submission was made on behalf of Officer Kempkes responding to or challenging the March 12, 2007 letter and attachments. There was nothing provided on behalf of Officer Kempkes regarding his employment for purposes of consideration of the appropriate penalty.

The March 12, 2007 letter and attachments has been considered by the Board only for purposes of the determination of appropriate penalty. The March 12, 2007 letter recites the documents that are attached as follows:

- Chart prepared by Bond, Schoeneck & King, PLLC regarding the disciplinary history of Officer Kempkes.
- Memorandum dated February 5, 1993 regarding Officer Kempkes.
- Memorandum dated December 2, 1993 regarding Officer Kempkes.
- Letter of Reprimand dated April 6, 1995 to Officer Kempkes.
- Letter of Reprimand dated June 19, 1995 to Officer Kempkes.

- Letter of Reprimand dated April 7, 1998 to Officer Kempkes.
- Memorandum dated August 5, 2003 regarding Officer Kempkes.

The Board has considered the Command Discipline dated February 5, 1993, the Command Discipline dated December 2, 1993, the Command Discipline dated April 7, 1998, and the Command Discipline dated August 5, 2003 as relevant to its determination of penalty. The Board recognizes that the 1993 and 1998 events are remote in time to the July 2006 events that are the subject of the instant disciplinary proceeding. More relevant to a determination of penalty is the Command Discipline dated August 5, 2003 because it concerns violation of the same provision of the Sick Leave Policy and the same failure to follow established requirements when an officer is not able to work due to injury or sickness. The severity of the penalty accepted by Officer Kempkes in the August 5, 2003 Command Discipline (forfeiture of twenty hours compensatory time and a twelve day suspension) had to communicate to Officer Kempkes the importance of adherence to the requirements of the Sick Leave Policy. Notwithstanding, Officer Kempkes failed on July 6, 2006 to satisfy the notification requirement and invented self-serving excuses for this failure on July 7, 2006.

The Board's discretion with respect to the penalty that may be imposed as a result of this finding of guilt is prescribed by Unconsolidated Laws § 5711-q.9. The penalties allowed by the law are reprimand, suspension and forfeiture for a period of twenty days, or dismissal. The Board believes that the misconduct committed by Officer Kempkes on July 6 and July 7, 2006 as decided above, viewed in the light of the Police Department's repeated dealings with him on adherence to basic requirements stated in the Sick Leave Policy in section A(6) and the relevant prior disciplinary history cited above, leaves dismissal as the only option for appropriate penalty. Officer Kempkes has demonstrated disregard for his obligation as a police officer to follow the basis requirement that he notify the Police Department when leaving his home at a time he is scheduled to work but not on active police duty because of illness or injury. His actions on July 6 and July 7, 2006 evidence disregard for the command and authority of superior officers in the Police Department. The excuses he attempted to foist on Lt. Satriale in the disciplinary interview on July 7, 2006 were belied by the facts and Officer Kempkes' own prior conduct in following the requirements of the Sick Leave Policy. Having had direct experience with the enforcement of the Sick Leave Policy notice requirement, Officer Kempkes would certainly have sought advice from a superior officer if

24

he truly believed the notice provision no longer applied to his situation.  Notwithstanding his prior experience with Sick Leave Policy and the instructions from Lt. Satriale in November 2005, Officer Kempkes left his home in the morning of July 6, 2006 on July 6, 2006 because he did not think the Police Department would check on him.  When caught, Officer Kempkes decided to try to bamboozle Lt. Satriale on July 7, 2006 with nonsensical, self-serving interpretations of the Sick Leave Policy.  Officer Kempkes demonstrated on July 6, 2006 and July 7, 2006 that he doesn't care about his obligations as a police officer under the Rules and Regulations and at no point showed any remorse for his behavior.

It is well established that police officers have extraordinary responsibilities under the law, and enjoy special privileges in their employment.  For example, a police officer like Officer Kempkes enjoys privileges not afforded to other public employees (with the exception of paid fire fighters) when they are unable to work due to illness or injury, including the continuation of salary at full pay.  A police officer like Officer Kempkes also enjoys special privileges not provided to other public employees with respect to due process rights and procedures in disciplinary matters such as are stated in Unconsolidated Laws § 5711-q.  At the same time, a police officer is held to a high standard of professionalism and ethics.  A police officer is required to comport himself in accordance with the command structure of a paramilitary organization like a police department, and to obey the department rules, regulations, policies and orders.  The public has a right to expect that a police officer will comport him or herself to the highest standards of respect and integrity in adhering to the rules/regulations of the police department and orders from superior officers.  Officer Kempkes has repeatedly demonstrated a willingness to place his personal interests above these important responsibilities.  Allowing Officer Kempkes to continue employment is contrary to the Board's and Village's interest in maintaining public confidence and respect for the members of the Police Department, and therefore the penalty imposed is dismissal.

## <u>RESOLUTION</u>

The foregoing constitutes the Decision and imposition of Penalty with respect to the August 21, 2006 disciplinary charges preferred against Police Officer Thomas Kempkes by the Village Board of the Village of Bronxville sitting as the Village Board of Police Commissioners.

DATED: November _19_, 2007

SO RESOLVED:

_Mary Marvin_
Mayor Mary Marvin

_Anne W Poorman_
Member Anne Poorman

_Glenn Bellitto_
Member Glenn Bellitto

_Robert Underhill_
Member Robert Underhill

_William Barton_
Member William Barton

26

EXHIBIT 4

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------x

THOMAS KEMPKES,

                        Plaintiff,

        -against-

MARY C. MARVIN, individually,
GLENN D. BELLITO, individually,
ROBERT J. UNDERHILL, individually,
ANNE W. POORMAN, individually,
WILLIAM H. BARTON, individually,
and the VILLAGE OF BRONXVILLE, N.Y.,

                        Defendants.
------------------------------------------------------x



**FIRST AMENDED
COMPLAINT**

**Jury Trial Demanded**

        Plaintiff THOMAS KEMPKES, by his attorneys Lovett & Gould, LLP, for his

complaint respectfully states:


### NATURE OF THE ACTION

        1. This is an action for compensatory and punitive damages, proximately resulting

from Defendants' conduct as engaged in under color of the laws of the State of New

York, for violations of Plaintiff's rights as guaranteed him by the First Amendment to the

United States Constitution, 42 U.S.C. §1983.


### JURISDICTION

        2. The Court's jurisdiction is invoked pursuant to 28 U.S.C. §§1331, 1343.

## THE PARTIES

3. Plaintiff THOMAS KEMPKES is a citizen of the United States, a domiciliary of the State of New York, and a resident of the Northern Counties. At all times relevant to this complaint, except as otherwise expressly indicated, he was employed as a permanent, tenured Police Officer by the Defendant Village.

4. Defendant VILLAGE OF BRONXVILLE (herein "Village") is a municipal corporate subdivision of the State of New York, duly existing by reason of and pursuant to the laws of said State. The Village's duly constituted legislative body, its so-called Board of Trustees (hereinafter "Board"), is comprised of Defendants MARY C. MARVIN, GLENN D. BELLITO, ROBERT J. UNDERHILL, ANNE W. POORMAN, and WILLIAM H. BARTON, each of whom (hereinafter collectively referred to as the "Board") is sued in his/her individual and personal capacities only. Collectively the members of the Board also serve, by reason of their election to the Board, as members of the Village's Board of Police Commissioners. As Commissioners they establish the official policies, customs and practices of the Village Police Department, and have plenary power to discipline sworn members of the Department, in accordance with Section 5711q of the New York State Unconsolidated Laws.

## THE FACTS

5. On February 21, 2007, Plaintiff filed in this Court Kempkes v. Downey, 07 Civ. 01298 (KMK/GAY)(hereinafter "Kempkes I"), alleging First and Fourteenth Amendment claims. A copy of the complaint in that law suit is annexed hereto and made a part hereof.

2

6. On March 13, 2007, Defendants (including each of the individuals named in the instant filing) moved to dismiss the complaint pursuant to FRCP 12.

7. In response Plaintiff served an amended complaint on March 27, 2007.

8. On April 16, 2007, Defendants again moved to dismiss pursuant to FRCP 12.

9. On October 12, 2007, the Hon. George A. Yanthis issued a report and recommendations denying in substantial respect Defendants' motion.

10. Thirty-five days thereafter and on November 19, 2007, Defendants terminated Plaintiff's employment by a final administrative determination that was approved and signed by Defendants Mary Marvin, Anne Poorman, Glen Bellitto, Robert Underhill and William Barton. The signature page ("26") of that determination is also annexed hereto and made a part hereof.

11. The termination of Plaintiff's employment was motivated in whole and/or in substantial respect to retaliate against Plaintiff for his having filed <u>Kempkes I</u>.

12. As a result of Defendants' conduct Plaintiff has been forced to suffer: substantial pecuniary losses; retaliation for having engaged in First Amendment protected conduct; public embarrassment; public humiliation; anxiety; emotional upset; and he has otherwise been rendered sick and sore.

## AS AND FOR A CLAIM

13. Repeats and realleges as if fully set forth the allegations of fact contained in paragraphs "1" to "12", inclusive.

3

14. Under the premises Defendants' retaliatory conduct violated Plaintiff's rights as guaranteed by the First Amendment to the United States Constitution, 42 U.S.C. §1983.

WHEREFORE a judgment is respectfully requested:

a. Awarding such punitive damages against the individually named Defendants as the jury may impose,

b. Awarding such compensatory damages against all Defendants as the jury may determine,

c. Awarding as against all Defendants reasonable attorney's fees and costs, and,

d. Granting such other and further relief as to the Court seems just and proper.

Dated: White Plains, N.Y.
    March 12, 2008

LOVETT & GOULD, LLP
By:_____
Jonathan Lovett (4854)
Attorneys for Plaintiff
222 Bloomingdale Road
White Plains, N.Y. 10605
914-428-8401

4

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------x

THOMAS KEMPKES,

                                    Plaintiff,

                -against-

BRIAN M. DOWNEY, individually, and
the VILLAGE OF BRONXVILLE, N.Y.,

                                    Defendants.

------------------------------------------------------------x

**ORIGINAL**

**07 CIV. 1298**

07 Civ.   (     )

**COMPLAINT**   **WP4**

**Jury Trial Demanded**

Plaintiff THOMAS KEMPKES, by his attorneys Lovett & Gould, LLP, for his

complaint respectfully states:

## NATURE OF THE ACTION

1. This is an action for compensatory and punitive damages, proximately resulting

from Defendants' conduct as engaged in under color of the laws of the State of New

York, for violations of Plaintiff's rights as guaranteed him by the First and Fourteenth

Amendments to the United States Constitution, 42 U.S.C. §1983.

## JURISDICTION

2. The Court's jurisdiction is invoked pursuant to 28 U.S.C. §§1331, 1343.

1

## THE PARTIES

3. Plaintiff THOMAS KEMPKES is a citizen of the United States, a domiciliary of the State of New York, and a resident of the Northern Counties. At all times relevant to this complaint he was employed as a permanent, tenured Police Officer by the Defendant Village. As such he has a vested property interest in that position of employment. Since on or about September 6, 2002, and by reason of a job-related injury, Plaintiff has been the recipient of benefits pursuant to Section 207-c of the New York State General Municipal Law. With respect to those benefits Plaintiff also had a vested property interest with respect to which he could not suffer any deprivation without first being accorded a pre-deprivation Due Process hearing.

4. Defendant BRIAN M. DOWNEY (hereinafter "Downey"), who is sued in his individual and personal capacities only, at all times relevant to this complaint was the duly appointed Chief of Police of the Defendant Village.

5. Defendant VILLAGE OF BRONXVILLE (herein "Village") is a municipal corporate subdivision of the State of New York, duly existing by reason of and pursuant to the laws of said State.

## THE FACTS

6. On July 7, 2006, without having accorded Plaintiff a pre-deprivation Due Process hearing Defendants unilaterally revoked Plaintiff's 207-c status and terminated his Section 207-c benefits by written notice that Plaintiff was:

> "suspended without pay pending the investigation into potential disciplinary charges being pursued against [him]. . .related to

2

[his] failure to remain at home, while injured, on Thursday

July 6, 2006."

7. On or about August 21, 2006, Downey preferred against Plaintiff disciplinary

charges the hearing with respect to which commenced on December 13, 2006.

8. In that connection and during Plaintiff's opening statement at the hearing he

urged, through counsel:

"I think the reason he [Plaintiff] is honored to be charged as he is,

is because he is disliked and is being treated differently than others for

a number of reasons. One, he has repeatedly expressed his concern over

his tenure. . .that the police department is systematically discriminating

based on gender.

You don't have, you never had a single female police officer in the

history of the Village of Bronxville. He has expressed, repeatedly, his

concern that the Village Police Department has a racial bias. You do not

have, nor ever had a[n] Hispanic member of the police department. He

has repeatedly expressed his concern intradepartmentally about

racial bias because for years, you ha[d] one token black officer and now

you have two token Blacks.

He has expressed his concern that the Chief of Police and his

immediate [predecessor]. . .have put the public health and safety at risk by

sending [Plaintiff] out on patrol in a car where they knew he was disabled

and couldn't possibly intercede if somebody were in the act of committing

a robbery, or a burglary, or a rape. He expressed concern that that was

3

putting people at risk and other officers at risk. . .He expressed concern that the Chief of Police had provided a bed or a cot for a police Sergeant who was so drugged up on prescription medication that he's allowed to sleep while on desk duty and get paid full salary.

He's expressed concern that the individual involved in [this set of disciplinary charges], Lieutenant Satriale. . .has endangered the welfare of a minor, taking an under-aged youth drinking with him at a local bar.

. . .Another thing about which he expressed concern, would be what is commonly referred to as DWH and DWB. Driving while Hispanic and driving while Black.

The statistics of the police department will overwhelmingly show that lower class Hispanics, lower class Blacks are routinely stopped and summoned [*sic*.], where White residents of the Village don't get any summons, even if they are stopped.

The same carries through with respect to criminal prosecutions. If you're Black you get prosecuted for less significant things than Whites who happen to be well-connected and wealthy in Bronxville, who are not prosecuted at all."

9. By way of follow-up to his defense attorney's remarks, on December 21, 2006, Plaintiff wrote to the Village's Mayor and each of the Village's Trustees advising:

"Re: <u>Systemic discrimination by the Village</u>

Dear Mayor Marvin:

4

Although I am employed by the Village of Bronxville as a police officer, I am writing to you exclusively in my capacity as a concerned and knowledgeable citizen.

The Village's Police Department, under the leadership of Chief Downey, does not have among its sworn members a single female officer.

Under Chief Downey's stewardship the Police Department has managed to avoid hiring any person of Hispanic ethnicity.

Under the Chief's administration there are but two African-American officers in the Department.

Historically there has never been a female Police Officer and/or an Hispanic Police Officer employed by the Village. Historically there was for years only one, token African-American Police Officer.

It is my opinion, based upon personal observation, that our limited police resources are used to detain/prosecute Hispanics and African-Americans for what is commonly referred to as "DWB" and "DWH". Caucasian motorists are not similarly treated.

Since it is nearly 2007 I propose that the Village, acting through its very

5

capable administration, hurtle into the twenty-first century and begin

providing Equal Protection to all persons regardless of gender, ethnicity,

national origin and/or skin color.

Allow, for purposes of change, the rights guaranteed by reason of the First

and Fourteenth Amendments to the United States Constitution to apply to

all persons within the Village - - not just the Caucasian constituents who

voted you into office on a temporary basis.

Kindly make this correspondence part of the Village Board's official

record at its upcoming public meeting. I trust that you will find that the

vast majority of the Village's residents do not believe that maintaining

systemic and pervasive discriminatory practices is wise."

10. As a proximate result of Plaintiff's expression of concerns, as referenced in

the preceding paragraphs "8" and "9", *supra*, Defendants retaliated against Plaintiff and

with respect to the pay period ending February 2, 2007, unilaterally reduced Plaintiff's

net bi-weekly salary by approximately $570.

11. Under the premises Defendant's conduct and/or retaliatory conduct has caused

Plaintiff to suffer: pecuniary losses; a loss of Section 207-c benefits; public humiliation;

public embarrassment; emotional upset; anxiety; punishment for the exercise of his rights

to free speech and to petition government for the redress of grievances; multiple property

6

deprivations without benefit of a mandatory pre-deprivation hearing; and has otherwise been rendered sick and sore.

## AS AND FOR A FIRST CLAIM

12. Repeats and realleges as if fully set forth the allegations of fact contained in paragraphs "1" to "11", inclusive.

13. Under the premises Defendants July 2006 termination of Plaintiff's Section 207-c benefits violated his right to Due Process as guaranteed by the Fourteenth Amendment to the United States Constitution, 42 U.S.C. §1983.

## AS AND FOR A SECOND CLAIM

14. Repeats and realleges as if fully set forth the allegations of fact contained in paragraphs "1" to "11", inclusive.

15. Under the premises Defendants' January/February 2007 punitive reduction of Plaintiff's net bi-weekly salary violated his right to Due Process as guaranteed by the Fourteenth Amendment to the United States Constitution, 42 U.S.C. §1983.

## AS AND FOR A THIRD CLAIM

16. Repeats and realleges as if fully set forth the allegations of fact contained in paragraphs "1" to "11", inclusive.

7

17. Under the premises Defendants' retaliatory reduction in Plaintiff's net bi-weekly salary violated his rights as guaranteed by the First Amendment to the United States Constitution.

### AS AND FOR A FOURTH CLAIM

18. Repeats and realleges as if fully set forth the allegations of fact contained in paragraphs "1" to "11", inclusive.

19. Under the premises Defendants' institution and/or prosecution of the subject disciplinary charges constitutes a selective prosecution and/or otherwise violates Plaintiff's right to Equal Protection as guaranteed by the Fourteenth Amendment to the United States Constitution, 42 U.S.C. §1983.

WHEREFORE a judgment is respectfully demanded:

    a. Awarding on the First, Second, Third and Fourth Claims as against Downey such punitive damages as the jury may impose,

    b. Awarding on the First, Second, Third and Fourth Claims as against both Defendants such compensatory damages as the jury may determine,

    c. Awarding as against both Defendants reasonable attorney's fees and costs, and,

   d.  Granting such other and further relief as to the Court seems just and

      proper.

Dated: White Plains, N.Y.
       February 20, 2007

                                    LOVETT & GOULD, LLP
                                    By: _____
                                        Jonathan Lovett (4854)
                                    Attorneys for Plaintiff
                                    222 Bloomingdale Road
                                    White Plains, N.Y. 10605
                                    914-428-8401

                                    9

## RESOLUTION

The foregoing constitutes the Decision and imposition of Penalty with respect to the ,ast 21, 2006 disciplinary charges preferred against Police Officer Thomas Kempkes by , Village Board of the Village of Bronxville sitting as the Village Board of Police Commissioners.

DATED: November _19_, 2007

SO RESOLVED:

_____
Mayor Mary Marvin

_____
Member Anne Poorman

_____
Member Glenn Bellitto

_____
Member Robert Underhill

_____
Member William Barton

26

CERTIFICATE OF SERVICE

I hereby certify that on August 8, 2008, the foregoing document was filed with the Clerk of the Court and served in accordance with the Federal Rules of Civil Procedure, and/or the Southern District's Local Rules, and/or the Southern District's Rules on Electronic Service, and/or the individual rules of practice of District Court Judge Kenneth M. Karas upon the following parties and participants:

      LOVETT & GOULD, LLP
      222 Bloomingdale Road
      White Plains, New York 10605

      _____
      Howard M. Miller (HMM4538)
      BOND, SCHOENECK & KING, PLLC
      *Attorneys for Defendants*
      1399 Franklin Avenue, Suite 200
      Garden City, New York 11530
      (516) 267-6300; hmiller@bsk.com