UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

THOMAS KEMPKES,

Plaintiff,

– against –

MARY C. MARVIN, individually, GLENN D. BELLITO, individually, ROBERT J. UNDERHILL, individually, ANNE W. POORMAN, individually, WILLIAM H. BARTON, individually, and the VILLAGE OF BRONXVILLE, N.Y.,

Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

07-cv-11351 (KMK)

**REPLY AFFIDAVIT OF HOWARD M. MILLER**

STATE OF NEW YORK )
) ss:
COUNTY OF NASSAU )

HOWARD M. MILLER, being duly sworn deposes and says:

1. I am a member of Bond, Schoeneck & King, PLLC, counsel for Defendants, and submit this reply affidavit in support of Defendants' motion to dismiss the first amended complaint.

2. Annexed hereto as "Exhibit 1" is a copy of the complete transcript of the disciplinary hearing held *In the Matter of the Disciplinary Proceedings Against Police Officer Thomas Kempkes* on December 13, 2006, January 4, 2007, and January 10, 2007. The Court may take judicial notice of and properly consider the complete record of the disciplinary proceeding on the charges preferred against the Plaintiff on a motion to dismiss. *Colandrea v. Town of Orangetown*, 490 F. Supp. 2d 342, 348 (S.D.N.Y. 2007); *Thomas v. Westchester County Health Care Corp.*, 232 F. Supp. 2d 273, 276 (S.D.N.Y. 2002).

Howard M. Miller

Sworn to before me this
8th day of August 2008.

Notary Public

Jessica C. Satriano
Notary Public, State of New York
No. 02SA6176548
Qualified in Nassau County
Commission Expires October 29, 20 11

61213.1

# Exhibit 1

VILLAGE OF BRONXVILLE
BOARD OF POLICE COMMISSIONERS
- - - - - - - - - - - - - - - - - - - - - - -X
IN THE MATTER OF DISCIPLINARY CHARGES DATED
AUGUST 21, 2006,


- PROFFERED AGAINST -

POLICE OFFICER THOMAS KEMPKES,

- - - - - - - - - - - - - - - - - - - - - - -X
                     177 Pondfield Road
                     Bronxville, New York
                     December 13, 2006
                     6:30 p.m.


D I S C I P L I N A R Y

H E A R I N G


CARBONE & ASSOCIATES, LTD.
Wanda J. Sepulveda
111 North Central Park Avenue
Hartsdale, New York 10530
(914) 684-0201



A P P E A R A N C E S:

LOVETT AND GOULD, ESQS.
Attorneys for OFFICER KEMPKES
222 Bloomingdale Road
White Plains, New York 10605
BY: JONATHAN LOVETT, ESQ.

BOND, SCHOENECK AND KING, PLLC
Attorneys for THE VILLAGE OF BRONXVILLE POLICE DEPARTMENT
1399 Franklin Avenue
Garden City, New York 11530
BY: TERENCE M. O'NEIL, ESQ.
BY: CHRISTOPHER T. KURTZ, ESQ.

THE BOARD OF COMMISSIONERS:
MARY C. MARVIN - MAYOR
GLENN D. BELLITTO - DEPUTY MAYOR
WILLIAM BARTON, JR. - TRUSTEE
ANNE POORMAN - TRUSTEE
ROBERT UNDERHILL - TRUSTEE

A P P E A R A N C E S:

HITSMAN, HOFFMAN AND O'REILLY, LLC
COUNSEL TO THE BOARD
570 Taxter Road
Elmsford, New York, 10523
BY: JOHN F. O'REILLY, ESQ.

MAYOR MARVIN: Good evening; the Village Board of Trustees of the Village of Bronxville convenes this evening as the Board of Police Commissioners, for purposes of conducting a disciplinary hearing, pursuant to New York Unconsolidated Law Section 5711-q.

This hearing concerns disciplinary charges dated August 21, 2006, proffered against Village Police Officer Thomas Kempkes.

I am Mayor Mary Marvin, and for the record, I will ask each member of the board to introduce him or herself. Mr. Barton; please.

MR. BARTON: William Barton.

MS. POORMAN: Anne Poorman.

MR. BELLITTO: Glenn Bellitto.

MR. UNDERHILL: Robert Underhill.

MAYOR MARVIN: I will also introduce attorney, John O' Reilly; who is here to assist the Board of Police Commissioners in the performance of its duties and responsibilities in this proceeding.

At this point; I will ask each to note their appearance for the record, starting with the Village Police Department.

MR. DOWNEY: Police Chief Brian Downey.

MR. KURTZ: Bond, Schoeneck and King, by attorney Terence O'Neil and Christopher Kurtz.

MR. LOVETT: Jonathan Lovett, of Lovett and Gould.

MR. KEMPKES: Police Officer Thomas Kempkes.

MAYOR MARVIN: Before continuing, I will ask Mr. Lovett, for the record; whether Officer Kempkes has elected to have the hearing open to the public or not.

MR. LOVETT: Open.

MAYOR MARVIN: At the request of Officer Kempkes, this hearing is open.

Members of the public who are present are expected to exercise appropriate decorum. We ask that cell phones be switched off, and that there are

no private conversations.

This hearing is being transcribed by a court reporter. A copy of the transcripts will be provided to each party.

I; as Mayor, will serve as Chair for the purposes of the hearing. As such; I will speak for the Board with respect, to ministerial matters, and issues such as objections as they may arise during the course of the hearing. The Board does reserve the right to caucus on issues and may do so as requested by any member.

The Board; as whole, expects that the hearing will be conducted in a professional and efficient manner.

As previously indicated; we the Board will call on Mr. O'Reilly to assist in carrying out the hearing functions as needed.

I will now ask Madam Reporter to mark as Exhibit 1, the Notice of Hearing; which is dated October 26, 2006, served on both parties and respective attorneys.

(Whereupon, a Notice of Claim was

received and marked as Exhibit 1 for identification, as of this date.)

MAYOR MARVIN: The Board is now prepared to hear opening statements; Mr. O'Neil.

MR. O'NEIL: Good evening; Mayor, Board of Trustees, Chief, Mr. Lovett, Officer Kempkes.

This case; first and foremost as you know; involves the Police Department. The police departments are very different than any other type of employment in the State of New York. They are a paramilitary organization. They have very special rules, in fact; the Public Employment Relations Board in the courts of this state, have excluded from negotiations the disciplinary procedures in most instances.

Any place where there is a charter provision, or special laws that govern police departments, they prohibited unions from negotiating in regard to these disciplinary procedures. They have done so, by saying, that this is public policy

and there's an interest that ought to be protected. That the discipline within these departments have to be jealously guarded.

That's why you are here. It's a very unusual type of procedure. It's something that none of the boards that I ever represented relish in doing. I'm sure this one doesn't either. But, it's a responsibility as police commissioners, you must serve.

The evidence will show that this case is about an officer; who is someone who is not coming to work. I say that, because it really doesn't matter whether he's not coming to work because he's sick, because he's injured, because he's on worker's comp. Because in any of those instances -- or whether he's getting General Municipal Law Section 207 coverage. In any of those instances, the important factor is he gets his full salary.

Minimally, he gets his full salary, and any insurance to cover any medical

expenses connected with his injuries. And under better circumstances; he gets his full salary and some of the fringe benefits that go along with it.

The conduct here, is basically three-fold. That he failed to give notice to the Department of the need to leave his home during a time he was sick or injured and during his regular tour. Something that's relatively common in police. If you ever have spoken, have relatives -- I'm not asking you to be on the record; but, they almost all say, when they're out sick or out injured, they have to be home during the tour they are regularly scheduled to work.

This case is about that. It's also about when he was caught not having given the notice and having left his residence. Giving some false and misleading information to a detective who had gone there to investigate his whereabouts.

Finally; it's about insubordination. Since; he had previously been told that he couldn't leave his

residence without getting the clearance to do so by the Department, one of the reasons that he admits to having left the residence was to get food.

He even was even told specifically by the lieutenant, that was not a legitimate reason to leave during his regularly scheduled tour.

There will be some issues about, and you'll see from the charges when they go into evidence that, he's alleged to have violated many things. The general order that governs sick leave policies and procedures. Various provisions of the rules and regulations of the Department. And, independent of both of those allegations; he's also alleged to have violated general principals that are covered by Section 5711-q of the General Municipal Law; which governs police departments in the County of Westchester; Village Police Departments.

Acts of delinquency that seriously effect general character; misconduct and disobedience. Those are three of the

factors mentioned in 5711-q.

We will show that he did this. He had done this before. Having been disciplined before for doing precisely the same thing. Given the fact that he had accepted discipline for this previously, and given the fact; in a relatively short period of time he committed the same act, we submit that he should be discharged for these offenses. Thank you.

MAYOR MARVIN: Mr. Lovett; would you like to make your opening statement?

MR. LOVETT: Certainly; I didn't want to interrupt my adversary's statement. I am loathe to do that. But, I think that within the four corners of the charges and now, in connection with the opening statement; we've already got reversible error.

Putting in evidence that are making allegations that my client was previously convicted, before there is a determination as to guilt or innocence, in this case is reversible. But; it's in the case and so be it.

In the grand scheme of things, you take a look at all the charges and specifications; it still amounts to precious little. I say that because, while Mr. O'Neil asked for termination of employment; assuming hypothetically, he can prove everything that is set forth in the charges.

This is not a termination case under the case law. The premiss for the charges in a large part relates to a sick leave policy which is; at best ambiguous on it's face. I think that whether the Board does or not subsequently; a court will find that the fleeting reference to injured in the sick leave policy, was not meant by anybody to be job disability, where the person is covered under 207C of the General Municipal Law. Police, fire fighters and corrections officers all have special benefits under the General Municipal Law. Police and correction officers under 207C, and firefighters under 207A.

And, the current state of the law

simply is, if you're job injured you have an entitlement to those benefits, and during the course of time you are receiving the benefits you get full salary, no withholding. That's one category of disability.

If you look at the rule and regulational procedure the Village is operating on in this case, talks primarily about sickness with respect, to injury. I think anyone familiar with 207C and the world of police and job related disabilities, will readily draw a distinction between what's referenced in the sick policy; which is, you have a cold, you have bronchitis, you fell and injured your knee, you broke your pinky.

As opposed to a third category; which is what we ought to be dealing with here, is disability under 207C of the General Municipal Law.

My client; for years, based on a writing from the Chief of Police had 207C status continuously, and as such without warping and straining the sick leave

policy; which Mr. O'Neil is going to have to do; that does not include my client's circumstance. There is no provision in the police department that has ever forbade anyone out on 207C, job disabled, from leaving their house during their supposed tour of duty.

So; we're about to involve ourselves in what is going be a needless waste of your time and the tax payer's money. The real issue here -- I rather doubt that I will be allowed to introduce evidence on that only because of past experience.

The real issue; it seems it me, is what my client has done over the years and why he's being targeted for all of the specifications which almost -- which come from the same very teeny nucleus of facts as to him being out of his residence on a particular day at a particular time; for either an automobile related issue or for buying a slice of pizza.

I think the reason he is honored to be charged as he is; is because he is

disliked and is being treated differently than others for a number of reasons. One, he has repeatedly expressed his concern over his tenure as a police officer that the police department is systemically discriminating based on gender.

You don't have, you never had a single female police officer in the history of the Village of Bronxville. He has expressed; repeatedly his concern that the Village Police Department has a racial bias. You do not have, nor ever had a Hispanic member of the police department. He has repeatedly expressed his concern intradepartmentally about racial bias because for years, you have one token black officer and now you have two token blacks.

He has expressed his concern that the Chief of Police and his immediate subordinates in the past, have put the public health and safety at risk by sending Officer Kempkes out on patrol in a car where they knew he was disabled and couldn't possibly intercede if somebody

were in the act of committing a robbery, or a burglary or a rape. He expressed concern that, that was putting people at risk and other officers at risk. They didn't care. They left him out in the police car; as well. He expressed concern that the Chief of Police had provided a bed or a cot for a police Sergeant who was so drugged up on prescription medication that he's allowed to sleep while on desk duty and get paid full salary.

He's expressed concern that the fellow involved in this Lieutenant Satriale, has A; submitted a false police report, which is a Class A misdemeanor to this department. And, B; has endangered the welfare of a minor, taking an underaged youth drinking with him at a local bar.

In short; it's his expressions of concern that have gotten him in trouble. Another thing about which he expressed concern about, would be what is commonly referred to as DWH and DWB. Driving while Hispanic and driving while Black.

The statistics of the police department will overwhelmingly show that lower class Hispanics, lower class Blacks are routinely stopped and summoned, where White residents of the Village don't get any summons, even if they are stopped.

The same carries through with respect, to criminal prosecutions. If you're Black you get prosecuted for less significant things than Whites who happen to be well-connected and wealthy in Bronxville; who are not prosecuted at all.

That's his background. I think it's fair to you, you ought to know where we're coming from on that. I think you should disregard entirely what Mr. O'Neil said about the prior conviction. Although; I think the cat is out of the bag. As they say; don't pay attention to the pink elephant that just ran in front of you. That just imbeds it more deeply in your minds.

It is ultimately a case of pettiness; assuming it were legal to proffer these charges. I believe it's not

for a number of constitutional reasons. Assuming it were legal, this is a gigantic tempest in a gigantic tea pot. It's a waste of time and money. Members of the force, police department have done serious things including a commission of crimes with impunity including; Lieutenant Satriale being a participant in the beating in a bar of an individual by another cop. Who was criminally prosecuted and Satriale walked free. Another matter about which my client expressed concern.

So; you're not dealing in a vacuum. And, I think when we get done you ought to believe that the sick rule at issue primarily in this case has absolutely no applicability to my client. I ask that you make a determination of not guilty and dismiss the charges. Thank you.

MR. O'REILLY: Is there anyone that either gentleman intend to call as witnesses other than the Police Chief and Officer Kempkes?

MR. LOVETT: Possibly, the PBA

president, he's entitled to be here.

MR. O'REILLY: How is that?

MR. LOVETT: Because he is the PBA president.

MR. O'REILLY: The PBA is not a party to this.

MR. LOVETT: The PBA represents my client and he's entitled to be present.

MR. O'NEIL: My question is whether Mr. Lovett represents the client or whether the PBA represents the client. Frankly my experience with most unions is that you bring in outside counsel. If Mr. Lovett is in the union, it's usually off the hook in that regard. That's my experience. I don't know what the issue is here with the PBA.

MR. LOVETT: While that may be your experience you're wrong. I represent my client as an attorney. And, the PBA president is here to support him as the PBA president, since he is a member of the PBA. So; to exclude him would be yet another error. He may not even testify. It's another tempest in a tea pot brewing.

MR. O'REILLY: Just to be clear, are you here representing the PBA?

MR. LOVETT: No.

MR. O'REILLY: Thank you.

MAYOR MARVIN: Let's caucus.

(Whereupon, a short recess was taken by all parties.)

MAYOR MARVIN: Our determination is; since the PBA is not party to this, Mr. Lovett, you have stated for the record you are not representing the PBA; we need to and must treat the PBA president like any other potential witness. We would ask the president to go out to the hall with the other witness.

MR. LOVETT: I can't even do that. I might not call him as a witness if you put us in that position, so; he can stay.

MAYOR MARVIN: For the record; there is no intention to call him as a witness; therefore he can stay as a member of the public.

MAYOR MARVIN: Then we start; Mr. O'Neil.

MR. O'NEIL: We call Officer

Kempkes.

P. O. T H O M A S K E M P K E S, the Respondent in this case, having been first duly sworn by Wanda J. Sepulveda, a Notary Public of the State of New York, was examined and testified as follows:

DIRECT EXAMINATION BY MR. O'NEIL:

Q Please state your name and address for the record.

A Police Officer Thomas Kempkes, Shield number 40, 200 Pondfield Road, Bronxville, New York, 10709.

Q Officer Kempkes; by whom are you employed?

MR. LOVETT: Objection; I don't even know the charges in evidence. How can you proceed without any charges?

MR. O'NEIL: I was going to have him identify them, since he was served with them. Do you want to put them in as a joint exhibit?

MR. LOVETT: I don't want to put them in as a joint exhibit. I have to get somebody to identify who signed this.

MR. O'NEIL: I'm not sure we have to do that. I'm still asking him the

question, over his objection. I can ask him by whom he is employed.

MAYOR MARVIN: Overruled.

A Village of Bronxville.

Q In what capacity?

A Police officer.

Q How long have you held that position?

A Since 1992.

MR. O'NEIL: I'd like to mark this for identification.

(Whereupon, an eleven page document was received and marked as Department Exhibit 1 for identification, as of this date.)

Q Officer Kempkes; I'm going to ask you whether you can identify that document for us. Have you ever seen it before?

(Whereupon, the witness peruses a document.)

A Excluding the front page; yes.

Q You never saw the front page before?

A Yes; I have seen it.

Q Was that served upon you?

A Yes.

Q Who served that upon you?

A Chief Downey.

MR. O'NEIL: I'd like to move that be received in evidence.

MR. LOVETT: No evidence of who signed or when it was signed. Jump over the canyon -- someone is going to hit the bottom. You need a minimal foundation. I suspect what happened is; Counsel forgot to move this into evidence before hand. He's trying to recover himself because he's got a witness on the stand who is incompetent to identify who signed whatever.

MR. O'NEIL: I didn't ask him who signed it. I asked if he was ever served this. He said, he has been. There are other witness we are going to call along the way; who will be able to say that they are the ones who signed it.

I think he can identify it. He's competent to identify it. And he also testified now, that he's been served with it.

MR. LOVETT: He testified to that. But; you have no foundation. While I love having errors made early on in the proceedings, you don't even have the charges in evidence, there's a problem. We're supposed to go through the hearing, and later on; maybe there's a witness who lays a competent foundation for these to go in. I think it's backward; but, if that's the way Mr. O'Neil wants to proceed I'll follow him.

MR. O'REILLY: Officer Kempkes; could you take a look at the documents. It's eleven pages. Have you seen --

MR. LOVETT: Object to your questioning him. You're the Board's attorney. You assuming the role of prosecutor and that too; is reversible --

MR. O'REILLY: I'm just asking for clarification for the record, so; the Board can make an informed decision.

MR. LOVETT: The Board can't make an informed decision without a competent foundation that hasn't been laid.

MR. O'NEIL: With all due respect;

I don't think you need any foundation for this document. The document speaks for itself. He's indicated he has been served with it. If there's anyone on this Board who is confused about what it is; they can ask that question. It would appear to be charges.

MAYOR MARVIN: Mr. O'Neil; please continue.

MR. O'REILLY: We need to make a ruling.

Officer Kempkes; have you seen this before; all eleven pages. Is that correct?

MR. LOVETT: Objection to you interceding as if you were the prosecutor. Tonight you are not in that role.

MR. O'REILLY: I'm aware of that --

MR. LOVETT: -- I asked for foundation --

MAYOR MARVIN: Officer Kempkes; have you seen all eleven pages?

MR. LOVETT: -- Excuse me, you try to make a record that -- Mr. O' Reilly; that is my objections.

MR. O'REILLY: So noted; Officer Kempkes please answer.

(Whereupon, the witness peruses documents.)

A Yes; I have.

MR. O'REILLY: This is the eleven page document that you received from --

MR. LOVETT: Objection to you interceding --

MR. O'REILLY: We understand you have a standing objection --

MR. LOVETT: I don't have a standing objection.

MR. O'REILLY: From whom did you received these documents, Officer Kempkes?

MR. LOVETT: Same objection.

MR. O'REILLY: So noted; your answer please?

A From the Chief.

MAYOR MARVIN: I will admit this into evidence. Eleven page document; Officer Kempkes receive from the Chief of Police.

MR. LOVETT: I take exception to that. With all due respect to you as

Mayor, you are not the majority of the Board. And, you can not unilaterally act in a proceeding like this. It's got to be by a majority of the Board; as with any decision in connection with the administration of this proceeding.

MAYOR MARVIN: I spoke earlier; as far as administrative proceedings that I; as Mayor can make them --

MR. LOVETT: I understand what you said, but that ain't the law. So; you can make whatever you want in the way of ruling at your own risk. I don't care. I'm just taking exception, making a record.

MR. O'REILLY: Is there any member of the Board who disagrees with the Mayor's ruling, no.

MAYOR MARVIN: We'll go forward.

MR. LOVETT: One member of the Board said no.

MAYOR MARVIN: Let's poll the Board.

MR. UNDERHILL: I agree.

MS. POORMAN: I agree with the

Mayor.

MR. BELLITTO: I agree; as well.

MR. BARTON: I agree.

MAYOR MARVIN: Thank you.

MR. O'REILLY: For the record; Department Exhibit 1 is admitted into evidence for the purposes of this hearing.

(Whereupon, Department Exhibit 1 previously marked for identification was received in evidence.)

MR. O'NEIL: I would ask that this be marked as Department Exhibit 2.

(Whereupon, a Rules and Regulations document was received and marked as Department Exhibit 2 for identification, as of this date.)

Q Officer Kempkes; you have been handed a document marked for identification as Department Exhibit 2; and ask that you take a look at that. Can you identify that for us; please?

(Whereupon, the witness peruses a document.)

MR. LOVETT: I'd like to note for the record; there is no page thirteen or page thirteen is out of order. The

document may have been scrambled up.

MAYOR MARVIN: I don't have a thirteen, either.

MR. O'NEIL: The original of the document is not paginated. The pages you're making reference to are faxed pages along the top. If you look where there would be a page thirteen; it goes from article three to article four. We believe there are no missing pages.

MAYOR MARVIN: Just missed numbers; not a missing page.

MR. LOVETT: It should all be the same copy.

MR. O'NEIL: We'll double check.

MR. LOVETT: The page I have, thirteen followed by page twenty-seven. And page twenty-seven is article ten, and page thirteen is also part of ten. The page may have come through wrong on the fax. The sequence -- perhaps it's accurate.

MR. O'NEIL: If you want to look at the Chief's copy, you can. It would appear what you said is true. He went

through the pages. Article ten was the thirteenth page, and it was out of order. We believe they go consecutively as they are stapled together now.

MR. LOVETT: Well; since you simply expressed a belief. I don't know how much predicate my client is supposed to identify a document which was misassembled, numbered incorrectly and now you have a belief that the pages are correct.

MR. O'NEIL: Please don't represent this as being misassembled by anyone. We indicated that the page numbers that are a product of the fax should be ignored. Follow the article numbers. The document is not paginated.

MR. LOVETT: Following the article numbers doesn't tell us if something has been omitted. Maybe the article starts on one page and concluded on another page that is missing.

MR. BARTON: Check the table of contents; if it says something. It does not go beyond Section 3.10.

MR. O'REILLY: Officer Kempkes, when you've had an opportunity to review that; please answer the question.

A It appears to be the rules and regulations of the department.

Q Have you seen them prior to tonight?

A Yes; I have.

Q When were they first in your possession, since you have been a police officer?

A It was sometime in 1992.

MR. O'NEIL: I'd like to move that this be received into evidence; at this time.

MR. LOVETT: Over my objection.

MAYOR MARVIN: We will put this into evidence.

MR. LOVETT: I take exception to the Mayor's unilateral rule.

MR. O'REILLY: Members of the Board; will you please express your view as to whether you agree with the Mayor?

MR. UNDERHILL: I agree.

MR. BELLITTO: I agree.

MS. POORMAN: I agree.

MR. BARTON: I agree.

MR. O'REILLY: Department Exhibit 2 is now in evidence.

(Whereupon, Department Exhibit 2 previously marked for identification was received in evidence.)

Q Officer Kempkes; I'm going to draw your attention to the date of July the 6th, 2006. Do you know whether you were scheduled to work that day?

A I believe I was.

Q Did you actually show up for work that day?

A No.

Q Why not?

A Because I sustained a work related injury. I had been out.

Q Do you know what tour you were scheduled to work that day?

A I believe it was Tour two.

Q What hours does Tour two cover?

A 8:00 a.m. to 4:00 p.m.

Q Prior to 8:00 a.m., did you make any contact with the police department?

A No.

MR. O'NEIL: I ask the reporter to mark these two documents as Department Exhibit 3A and B.

3A being the document that is marked policy and procedure. And B, being the document that is entitled Written Directive Distribution List.

(Whereupon, a Policy and Procedure and a Written Directive Distribution List was received and marked as Department Exhibit 3A and 3B for identification, as of this date.)

Q Officer Kempkes; I'm going to ask you to look at the document that's been marked as Department 3A. I'm going to ask you to ignore the bottom of the page that says; attachment 1. This was part of a larger document.

I'm going to ask you to also look at the document that's been marked for identification as Department 3B. I'm going to ask you to take a look at them.

(Whereupon, the witness peruses a document.)

A Yes.

Q On Exhibitf 3B; does your

signature, initials appear anywhere on there?

A Yes; it does.

Q Is it next to where the typed named is of P. O. Kempkes?

A Yes.

Q Did you sign and date that on, or about the date that's indicated there? (Indicating).

A Yes.

Q Can you read the date; just because your copy is better than the Board's. What is the date written next to your name?

A 3/10/99.

Q You, in fact; wrote that date when you signed it?

A Yes.

Q Can you tell us, the circumstances under which you came to sign that document?

A Not exactly.

Q Can you identify the Exhibit 3A; tell us what that is?

A It says; sick leave.

Q Did you ever receive that?

MR. LOVETT: You mean; prior to tonight before you handed it to him?

MR. O'NEIL: Yes.

A I'm not sure if this copy was given to me.

Q Department Exhibit 3B; do you see up in the right-hand corner where it says, rules and regulations, sick leave policy. Do you see that? (Indicating).

A Where it says procedure number?

Q Right-hand corner, where it says, rules and regulations; 3B.

A Yes.

Q When you signed that document in March 10, 1999, do you remember what you were signing for?

A For the sick leave policy.

Q Do you recognize 3A as the sick leave policy that was given to you; at that time?

A This one; no. (Indicating).

Q You're saying; it isn't it, or you don't remember?

A The date that I signed it on, the tenth, it says, revision on the eleventh.

Q Your testimony is, that is not the procedure?

MR. LOVETT: Asked and answered.

MR. O'NEIL: He didn't answer my question.

MAYOR MARVIN: Overruled. Poll the Board members.

(Whereupon, the Board was polled.)

MAYOR MARVIN: Overruled. Thank you.

A I signed for a sick policy. I don't know if I signed for this one. After I signed it, this was revised. (Indicating).

MR. LOVETT: When he said this one, he was indicating 3A for ID in his left hand.

Q Do you have, in your possession the sick leave policy and procedure that you signed for; at that time?

A My personal copy?

Q Yes.

A No.

Q Did you throw it away?

A I'm not sure where it is.

Q When was the last time you looked for it?

A I don't know.

Q Do you remember the contents of the

policy you signed for?

A No.

Q Do you remember whether item A6 was in the policy that you signed for?

MR. LOVETT: The document is not in evidence. He really shouldn't be referring to it's contents.

MR. O'NEIL: I'm trying to refresh his recollection.

MR. LOVETT: You're reading from a document that's not in evidence. I'm referring to the substance of the content. I have an objection. May I get a ruling.

MAYOR MARVIN: My proposed ruling; is overrule. Poll of the Board.

MR. BARTON: I thought this was submitted as evidence; you're saying it's not.

MAYOR MARVIN: It was identified.

MR. LOVETT: The record should reflect; that every time the Mayor articulates a ruling, it's just after Mr. O'Reilly whispers to her -- there's a causal relationship between every ruling, in which she's being told by Counsel for

the Board.

MR. O'REILLY: I'm not going to comment on that.

MR. LOVETT: I have a comment, you're telling them what to do.

MR. O'REILLY: Whatever you want to speculate on Mr. Lovett, I guess you can clutter the record. But; we're not going to comment on what we are saying to the Board.

MR. LOVETT: I'm just noting a miraculous coincidence that every time you whisper to the Mayor, she makes a ruling against me. And, the Board is polled and they side with her.

MR. O'REILLY: Then; let the record note that Officer Kempkes has been subtlety consulting with Counsel during the course of his testimony --

MR. LOVETT: That's false --

MR. O'REILLY: It is visible for all --

MR. LOVETT: Don't interrupt me.

MR. O'REILLY: No one is interrupting you --

MR. LOVETT: Cut that -- keep it quiet while I'm talking. Don't get into your routine of being noisy. He asked me a question. I said, I can't talk to you when your being questioned.

MR. O'REILLY: I don't know what you said to him. I'm just pointing out; as you were pointing out for the record, that Officer Kempkes has been speaking with you during the course of his testimony. That's all I've said. Let's take a caucus.

(Whereupon, a short recess was taken by all parties.)

MAYOR MARVIN: We're back from caucus; I have polled the Board, and the objection is overruled.

Q Do you remember whether item A6 was in the policy that you signed for?

A I'm not sure.

MR. O'NEIL: I would like to have these marked as Department 4 for identification.

(Whereupon, a department document was received and marked as Department

Exhibit 4 for identification, as of this date.)

Q Officer Kempkes; please take a look at what's been marked for identification as Department Exhibit 4. And, I refer you specifically to the first, whereas clause. Where there is mention of the department sick leave policy and procedure?

(Whereupon, the witness peruses a document.)

Q Do you see that reference?

A Yes.

Q I also ask you to look at the third page of that document?

(Whereupon, the witness peruses a document.)

Q Is that a copy of your signature?

A Yes; it is.

Q Did you sign that, and enter that date on, or about August 5, 2003?

A Yes.

Q You were represented by counsel; at that time?

A Yes; I was.

Q In fact; in the first whereas

clause, were you advised that the Village was prepared to file disciplinary charges against you based on an incident of May 9th, where you violated the police department's sick leave policy and procedure?

MR. LOVETT: Objection for the same reason I articulated earlier. This document and the question pertaining to it, are reversible error. You can't get into prior conviction for anything before you determine innocence or guilt on the pending charge.

Aside from which as Mr. O'Neil probably recognizes; what's memorialized in 4 for ID is based on a completely false factual predicate, because at the time this document was --

MR. O'NEIL: -- if you're going to lead the witness, I'm going to ask that the witness be excused.

MR. LOVETT: I'm not leading the witness.

MR. O'NEIL: I'm going to object, if you're going to make a long --

MR. LOVETT: You can't shut me up

with your hand --

MR. O'NEIL: I ask that the witness be removed.

MR. LOVETT: There's no reason. I want the Chief of Police removed out of the room too. You don't like the idea.

MR. O'NEIL: Stop. I just don't want him giving the witness information during his objection.

MR. LOVETT: Unfortunately for you; I prepared my client, long before you ever started questioning him. I don't have to tell him anything. You really want to play that game, have him stand out in the hall. Let the Mayor poll the Board, if the Board wants to have him stand in the hallway, then fine. I think that it's ridiculous. And, I object to your objection.

MAYOR MARVIN: I will propose that the Chief; as well as Officer Kempkes step out in the hall while Mr. Lovett articulates his objection.

MR. LOVETT: May I ask that you direct that they stay a distance from each

other out in the hall?

MAYOR MARVIN: Certainly; I need to poll the Board.

(Whereupon, the Board was polled.)

MAYOR MARVIN: Agreed, thank you. They have now left the room.

MR. LOVETT: At the time this document, 4 for ID was drafted and signed, any client had been and for years was denied 207C status -- disability. And these references in 4 for ID are premised upon the same mistake of fact that the instant charges are based on, and that is, that my client is subject to a sick leave policy.

And, in fact; the Chief acknowledged in writing, long prior to the date of 4 for ID; to date my client is on 207C job disability status. Not only is the document totally misleading as a matter of fact; it's impermissible in evidence as a matter of law. Because, it's prejudicial, and it goes to prior supposed misconduct being introduced at a hearing before you've ever made any

finding as to the pending charges. If that's what Mr. O'Reilly wants; over my objection.

MR. O'NEIL: You got to get the O's right. First of all, there's no question that these charges would be admissible as to penalty. Given the fact that they involve; from our position, the exact same violation that occurred under these charges. I'm not aware of any cases that require bifurcated hearings.

That you have to first have a hearing that goes to the merit of this charge. Then reconvene and have a separate hearing on the penalty. I've never encountered that kind of hearing. At least; not a police disciplinary.

Secondly; there has been an allegation that these don't apply to him. Certainly it's relevant whether or not; he understood them to apply to him.

Whether or not; the Board will make a determination -- it did cover these kinds of injuries. Because, he took a very severe penalty in lieu of being

brought up on charges back in 2003, for precisely the same incident. If his confusion is, that they didn't cover him -- and Mr. Lovett is going to argue, and he can argue anything he pleases; but he's going to argue that these didn't apply to him. Whoever his attorney was back then, that he made a mistake. And, he pled guilty -- I'm sorry, should have accepted the penalty back then.

I think it certainly is relevant to his understanding as to what policy and procedure applied to him, staying at home at that time, whatever the reason. Frankly; I don't believe the reason was any different in 2003. I think he will testify to that, that it was in 2006. He was staying home for the same reason. I believe it was an on the job injury.

If you look at the policy marked for identification; the purpose is to establish uniform procedures for reporting sick and follow up actions when members become sick or injured. Sick or injured.

We submit that he understood that

this policy applied to him then. It would appear; at least from what we believe we will be able to prove through a different witness; that these were developed by the Chief on a four to twelve tour, given to people on a midnight tour. That's why the dates -- you notice the dates. It was signed by for people on the 10th, other people on the 11th. Developed it on the four to twelve tour, signed it on his way off. He dated it the 10th also. And, the other people signed it on the 11th.

I think that the document, he should be able to use this document to refresh his recollection, and see if the document he took this penalty for in 2003, is precisely the same document that we have in front of him now. Or minimally; the provision A6 is what he was alleged to have violated back in 2003, and alleged to have violated now.

MR. LOVETT: I'm not suggesting that whoever represented my now client in 2003 was mistaken. The person mistaken was the Chief of Police, who illegally

denied my client 207C status. And, he rectified that in 2006 retroactive to 2002.

My point is, that putting evidence at this point of a prior supposed conviction which is factually misleading, at best, compromises the integrity of this entire proceeding. In any event; you should be aware, since the witnesses are not in the room, that under paragraph three in Exhibit 4 for ID; the scheduling of time by way of penalty had to be completed by February 28, 2004. Unless there was a writing extending the time frame.

The Chief of Police after February 28, 2004, with no written extension took time from my client. And, that is what we commonly refer to as a depravation of property without due process. That's a federal civil rights violation. If that's where you want to go, over my objection go there.

MR. O'NEIL: Just so it's clear on the record, this is not a conviction.

It's a settlement of potential charges that he voluntarily entered into.

MR. LOVETT: And the taking of property; that is time being money, when there was no authority to do it. And, it was precluded by the written agreement.

MR. O'REILLY: We have your observations for the record. The Board will caucus now.

(Whereupon, a short recess was taken by all parties.)

MAYOR MARVIN: By polling the Board the objection was overruled. The document will be admitted into evidence. It will be given the appropriate weight at the conclusion of the hearing.

(Whereupon, Department Exhibit 4, previously marked for identification was received in evidence.)

MR. LOVETT: At this time; I'm requesting a bifurcated hearing. Just so we're clear on that, the first phase of this proceeding with respect, to innocence or guilt. If you find guilt, I want a separate hearing as to punishment.

MR. O'NEIL: I think given the nature of the proceeding, I think it would be unduly burdensome on everyone. More importantly, this document goes to one of the main issues that's involved --

MR. O'REILLY: Mr. O'Neil, if you're going to be articulating and speaking objections, we will have to again ask the witnesses to leave. Officer Kempkes; thank you.

(Whereupon, the witness leaves the room.)

MR. O'REILLY: Mr. O'Neil, please speak to Mr. Lovett's application for bifurcation.

MR. O'NEIL: The reason I'm objecting to bifurcation, is that this document is relevant to their defense that they've already articulated in opening statements that this procedure doesn't apply to staying at home for an on the job injury.

He settled a charge exactly like that in 2003, by accepting a very severe penalty. To now argue three years later

that doesn't apply is somewhat disingenuous.

I think it's relevant to issue, as well as penalty. The Board is sophisticated enough to give this document whatever weight its due with regard to that issue. Whatever weight; if any, it should get to the issue of whether or not, he's guilty of these charges. And then, apply, if found guilty on the merit, give it the appropriate weight for the penalty, without having to bifurcate the hearing.

This is not a jury trial. It's a elected governmental body with counsel who can be spoken to with regard to the weight that's to be given.

MR. LOVETT: I'm not talking about burdening this Board. I'm talking about my client's right to due process. If due process is too burdensome; fine. I object to that. I'm not in charge of the hearing.

MR. O'NEIL: If I can add one thing; with regard to this proceeding and prior to today, there's a number of cases

involving disciplinary action where prior convictions, prior findings of misconduct were admitted during the course of the proceeding. And, it was clear that they were admitted for penalty purposes. They weren't done in the midst of bifurcation. They were done during the course of the entire proceeding.

I'm unaware of any case that requires you to bifurcate this type of hearing.

MR. LOVETT: The introduction of a prior conviction; particularly where it supposedly relates to the same issue presented in the now pending charge is reversible error. And, there are plenty of Appellate Division rulings that say that.

The course has been charted by Mr. O'Neil, and unfortunately we can't un-navigate it. I made my objections, and you're going to do what you're going to do.

MAYOR MARVIN: I propose that bifurcation be denied. I would poll the

Board.

(Whereupon, the Board is polled.)

MR. LOVETT: Let the record reflect; that just before the Mayor made that ruling, Mr. O' Reilly whispered to her. And, I trust that there's a causal connection in the timing and the ruling and what Counsel said.

MR. O'REILLY: Your speculation is so noted.

Please ask the witness to come in.

MR. O'NEIL: I'm going to move that Department 3B be received in evidence; at this time.

MR. LOVETT: I have no objection to that.

MAYOR MARVIN: So, admitted then.

(Whereupon, Department Exhibit 3B previously marked for identification was received in evidence.)

Q Officer Kempkes; the Police Department sick leave policy and procedure that you addressed in Department Exhibit 4, in the settlement of that matter; is that the same sick leave policy and procedure which you have in front

of you as Department Exhibit 3A?

A I'm not sure.

Q When you settled that case back in 2003; did you then have a sick leave policy and procedure?

A I don't recall; at this time.

Q Do you remember whether you looked at one? Settlement in a disciplinary -- did you think it was important to look at one to refresh your recollection?

MR. LOVETT: Two questions in one. It's also asked and answered.

MAYOR MARVIN: Can you rephrase.

Q Who was your counsel in 2003?

A It was Chris Harold.

Q Was he also the PBA lawyer; at that time?

A Yes.

Q Do you know whether he is currently the PBA lawyer?

A I think so.

Q Before you signed this settlement agreement, you had discussions with him about the potential charges against you?

MR. LOVETT: Answering that

question would require disclosing anything you and counsel then discussed, including the subject just referenced by Mr. O'Neil. I'm directing you not to answer.

MR. O'NEIL: I'm not asking what was said. I asking whether --

MR. LOVETT: You're asking about a particular subject, that he spoke about with his then, counsel. He's not answering it.

MR. O'NEIL: I asked, before he signed this settlement agreement, if he had discussions with him about the potential charges against him. Whether that topic was discussed.

MR. LOVETT: He's not answering that question. That is privileged, and you know better.

MR. O'NEIL: I don't agree with you.

MR. LOVETT: He's not answering. He's not waiving any attorney client privilege.

Q The allegations that were made by the Department against you back in 2003; do you

recall what they were?

A Exactly; no.

Q Not exactly; the sum and substance, do you recall what they were?

A Violating the policy.

Q Do you remember which policy? Read the agreement, see if it refreshes your recollection.

MR. LOVETT: He was about to answer your question. I'd request that he be allowed to answer the question. He started to answer when Mr. O'Neil cut him off.

(Whereupon, the witness peruses a document.)

A It was for the sick leave policy.

Q What about the sick leave policy?

A I'm not understanding your question.

Q What are you alleged to have done that prompted the department to prepare disciplinary charges against you?

MR. LOVETT: Objection, that calls for the operation of the third party's mind; even though the Police Department

can't have a mind because it's not a person. It's purely speculative. I object, because it's just compounding the damage done by even making reference to exhibit 4 in evidence. Much less; 4 for ID.

MAYOR MARVIN: I propose to sustain that objection. Board members?

(Whereupon the Board was polled.)

MAYOR MARVIN: Sustained.

Q Was there any investigation conducted with regard to your conduct prior to your entering into this agreement?

MR. LOVETT: Objection, there is no foundation. How does he know. If he knows there was fine, ask him what he knows. But you don't have a foundation that there ever was an investigation of any kind.

MAYOR MARVIN: I propose to sustain that objection. Board members?

(Whereupon the Board was polled).

MAYOR MARVIN: Agree.

Q Were you questioned about any of your conduct prior to entering into this agreement

by representatives of the department?

A Yes.

Q Who?

A Lieutenant Ambersino.

Q What conduct did he question you about; at that time?

A About not being home during the tour of duty.

Q At that time; why weren't you reporting to work?

A I'm not sure what you mean.

Q Referring you to paragraph one, the date of May 9, 2003. Do you remember whether you went to work on that date?

MR. LOVETT: Same objection with respect, to the compounding of the problem by referring to this document.

MAYOR MARVIN: I propose to overrule that objection. Board members?

(Whereupon the Board was polled).

MAYOR MARVIN: Agreed.

A Can you ask the question again.

Q Did Lieutenant Ambersino question you with regard to your whereabouts on May 9, 2003?

A He questioned me on that day; no.

Q Did he question you on May 9, 2003?
A Is that what your question is?
Q It is now. Did he question you on May 9, 2003?
A No.
Q You didn't go to work on May 9, 2003; correct?
A Right.
Q There came a time when he did question you about what you did on May 9, 2003; correct?
A Yes.
Q What did you do on May 9, 2003?
A I wasn't home.
Q Where were you?
A I went away.
Q Where did you go?
A Saratoga.
Q Did you call in that morning?
A No.
Q When you were questioned about being in Saratoga on May 9, 2003; were you shown the department's sick leave policy and procedure?
MR. LOVETT: Answering that question would require you to disclose

potentially any communications between you and your then lawyer. I'm instructing you not to answer.

MAYOR MARVIN: Could you rephrase that question; please.

Q When you were being questioned by Lieutenant Ambersino, were you shown a copy of the Police Department's sick leave policy and procedure?

A Which one?

Q You claim there is more than one?

A I signed for one on the tenth. This one is revised on the eleventh. So; I don't know if there is more than one or this is it.

Q Do you know what shift you worked on the tenth? When you signed that document on March 10, 1999?

A I have no clue.

Q My question has nothing do with what you signed. I'm asking you now about the interview you had with Lieutenant Ambersino.

Did he show you a sick leave policy and procedure?

MR. LOVETT: Objection as to form. His questions doesn't pertain; plus the

compound question that followed it.

MAYOR MARVIN: Can you rephrase the question; please.

MR. O'NEIL: I can't; with all due respect. I don't find it an objectionable question.

Q You met with Lieutenant Ambersino sometime after May 9, 2003; correct?

A Yes.

Q During the course of your conversation; Lieutenant Ambersino spoke with you about your whereabouts on May 9, 2003; correct?

A Yes.

Q During that conversation with Lieutenant Ambersino with regard to your whereabouts on May 9, 2003; did he show you a document that was entitled sick leave policy and procedure?

A He may have; but I don't recall.

Q Did you look at the sick leave policy and procedure that was in effect for May 9, 2003; any time prior to your meeting with Lieutenant Ambersino?

A I don't recall that right now. I may have, but I'm not sure.

Q When Lieutenant Ambersino questioned you, did you know what the questioning was in reference to?

A Yes.

Q Did that refresh your recollection that you knew you would be questioned about this; maybe you might have looked at the policy and procedure before you went into the meeting?

A Before I went; I don't remember.

Q Do you remember where the meeting took place?

A Yes.

Q Where?

A In Lieutenant Ambersino's office.

Q Who was there beside yourself and Lieutenant Ambersino?

A The attorney.

Q Who?

A Chris Harold.

Q You remember where the meeting took place; correct?

MR. LOVETT: He just answered that.

In the Lieutenant's office.

Q You remember who was there; correct?

MR. LOVETT: He just answered that, too.

Q But, you don't remember whether you saw, during that meeting the department sick leave policy and procedure that you are alleged to have violated?

MR. LOVETT: Asked and answered two times. This would be a third.

MAYOR MARVIN: If that was an objection I propose to overrule that objection. Board members?

(Whereupon the Board was polled.)

MAYOR MARVIN: Overruled.

MR. O'NEIL: May I have the question read back?

(Whereupon, the last question was read back by the reporter.)

MR. LOVETT: That wasn't the question.

MR: O'REILLY: Your comment is noted. Could you just ask another question, Mr. O'Neil?

Q Do you remember whether you saw during that meeting, the department sick leave policy and procedure that you were alleged to have

violated?

A No.

Q When you signed Department Exhibit 3B; do you have a recollection that you were given a sick leave policy and procedure?

A I'm sure I was.

Q Do you remember it?

A They're kept next to the desk. You sign it, you take it.

Q That is what you did on March 10, 1999; is that correct?

A Yes.

Q How long did you keep that policy and procedure?

A I'm not sure.

Q You don't have it anymore?

A I might.

Q Can I ask; if we have a second hearing; which appears very likely, you can look and see if you still have that in your possession?

MR. LOVETT: He has no obligation to do homework for Counsel.

Q Did you ever receive another sick leave policy and procedure from the department; other than the one you signed for on March 10,

1999?

A I may have. I'm not sure.

Q Do you remember getting another one?

A Not at this time; no.

Q During your meeting with Lieutenant Ambersino, do you remember admitting to him that you did have a copy of the sick leave policy and procedure; at that time?

A I'm not sure.

Q Independent of admitting it to Lieutenant Ambersino; do you remember whether you did have a sick leave policy and procedure, when you met with him about these allegations about you being in Saratoga when you were sick?

MR. LOVETT: Objection as to form. You got a declaratory statement. And, you have a question attached to it.

MAYOR MARVIN: Would you rephrase; please.

Q In, or about August, 2003; do you remember if you had in your possession; at that time, a sick leave policy and procedure from the police department?

A I may have.

Q You don't remember?

A Not directly; no.

Q Are you required to keep in your possession the department's policy and procedures?

A In my possession; no.

Q You believe you can just throw them away?

A They're maintained at the police desk.

Q You were given a policy and procedure on March 10th, 1999; correct?

A Correct.

MR. LOVETT: Asked and answered three times.

MR. O'NEIL: His memory is bad --

MR. LOVETT: -- you can't articulate a proper question, you don't get an answer. Don't accuse my client of memory failure.

MR. O'NEIL: There's a lot of I don't remember. I'm trying to refresh his recollection.

MR. LOVETT: You're doing a poor job. I object to him asking the same thing three times.

MAYOR MARVIN: I propose we overrule the objection.

(Whereupon, the Board was polled.)

MAYOR MARVIN: Overruled.

Q Was there a policy given to you on March 10, 1999?

A Yes.

Q How long did you maintain that policy?

A I still may have it; I don't know.

Q Did you ever get a different policy from the department other than the one that was given to you on March the 10th?

MR. LOVETT: Objection, asked and answered.

MAYOR MARVIN: I'll propose to sustain that objection.

(Whereupon, the Board was polled.)

MAYOR MARVIN: Sustained.

MR. O'NEIL: Is that because it's repetitive. You understand the answer to be he never got another policy, or he doesn't remember?

MAYOR MARVIN: He doesn't remember if he has another policy.

Q Did you meet with Lieutenant Satriale with regard to the charges that we're involved with right now?

MR. LOVETT: We're involved with two sets. Disciplinary charges that are in evidence, or the charges that are referenced in Department 4.

MR. O'NEIL: We're not involved in charges in Department 4. They are three years old.

Q Did you meet with the Lieutenant Satriale with regard to the charges that are in evidence as Department Exhibit 1?

A Yes.

Q Were you shown any sick leave policy and procedure during what meeting?

A Not that I recall.

Q When -- at this time, during your meeting with Lieutenant Satriale; were you directed to comply with the department sick leave policy and procedures?

MR. LOVETT: Can I have that question read back, with the false starts?

MR. O'REILLY: Off the record; please.

(Whereupon, a short recess was taken by all parties.)

MAYOR MARVIN: Mr. O'Neil.

Q Officer Kempkes; at the end of your meeting with Lieutenant Satriale, did he give you any directives with regard to your conduct; how you should conduct yourself following that meeting?

MR. LOVETT: Objection, compound.

MAYOR MARVIN: Rephrase that, for me.

Q At the completion of your meeting with Lieutenant Satriale, did he give you any directions as to how you should conduct yourself?

A In what manner?

Q With regard to staying home?

MR. LOVETT: Objection as to the form. The question is in regard to staying home. Not a question.

MAYOR MARVIN: I propose we overrule that objection.

(Whereupon, the Board was polled.)

MAYOR MARVIN: Overruled.

A I don't recall.

Q Do you remember him saying, you should comply with the department sick leave policy

and procedure?

A I don't recall.

Q On July 6, 2006, where did you reside?

MR. LOVETT: Could I ask that the address not be part of the record. I've never been at a hearing where the home address was put into the record.

MR. O'NEIL: I have no problem with you redacting it from the transcript. His address is relevant to visits to his home.

If he can say it, and then when the transcript is prepared, there can be an indication that the parties stipulated his home address would not appear in the transcript.

And then when we have the testimony of subsequent witnesses that say that they visited him at this address; we can do the same thing. So; it doesn't appear in the transcript. I don't have any problem with that.

MR. LOVETT: It would be easier if we agreed that his answer to your question instead of being an address, simply be; at

my home. Any other witness you have -- visit Officer Kempkes, home, yes.

MR. O'NEIL: He has a number of residences.

MR. O'REILLY: Can we give a town?

MR. O'NEIL: For purposes of the testimony given by the witness that's related to the residence he has in Eastchester -- can we stipulate he has only one residence in Eastchester. Can we stipulate that?

MR. LOVETT: That is true; okay. Let's refer to it as his residence in Eastchester. Any other witness may be asked if they visited his residence in Eastchester; that's fine.

MR. O'REILLY: Off the record; please.

(Whereupon, an off the record discussion took place.)

Q On July 6, 2006; did you have telephone service at your Eastchester residence?

A Yes.

Q Did you have an answering machine on your phone?

A Yes.

Q Did you also have a cell phone; at that time?

A Yes.

Q On July 6, 2006; what time did you leave your home?

A In the morning.

Q Approximately; what time?

A It was early morning.

Q Before 8:00 a.m.?

A Give or take.

Q What time did you return to your home on July 6, 2006?

A Just around lunch time.

Q Around 1:00 p.m.?

A Yeah.

Q Between the time you left your Eastchester home, and you returned to your Eastchester home, did you access your messages on your home telephone?

A No.

Q Did you receive any messages on your cell phone during that period of time from the Bronxville Police Department?

No.

Q Did you check for messages on your cell phone during that period of time?

A No.

Q Did you call the Bronxville Police Department on July 6, 2006, before you left your home?

MR. LOVETT: Asked and answered.

MAYOR MARVIN: I propose to overrule that objection.

(Whereupon, the Board was polled.)

MAYOR MARVIN: Overruled.

Q Did you call the Bronxville Police Department before you left your home on July 6, 2006?

A No.

Q Did you call them; at any time prior to 1:00 p.m. on July 6, 2006?

MR. LOVETT: Objection to them.

MR. O'NEIL: The Bronxville Police Department; if you didn't understand.

MR. LOVETT: Objection as to form. It's compound.

MAYOR MARVIN: Mr. O'Neil, just rephrase.

MR. O'NEIL: I'm confused. I don't

believe that's a compound question. It's only one question.

Q On July 6, 2006; did you call the Bronxville Police Department; at any time between 8:00 a.m. and 1:00 p.m.?

A Not that I recall.

Q Can you tell us, where you were between the hours of 8:00 a.m. and 1:00 p.m. on July 6, 2006?

A In Eastchester, in Mount Vernon.

Q What were you doing?

A I had breakfast. I stopped by my friend's place of business to talk to him. I went by another friend's place. Drove my car around. Went to another friend's. And, then I went to the car dealership to bring my car in because I was having issues with my car. And, I got a slice of pizza and went home.

Q Did you notify the police department upon your return to home that day?

A Yes.

Q How did that come about?

A On the telephone.

Q Why did you call them; at that time?

A Because Detective Gallows was in my driveway, said the department wanted me to call.

Q Who did you call?

A The desk officer.

Q Do you remember, who that was?

A I think it was Sergeant Mitchell.

Q When you came upon Detective Gallow, when you came home; do you recall having any conversation with him?

A Yes.

Q Do you recall what he asked you?

A Not exactly; no.

Q Do you remember, in sum and substance, what he asked you upon your return to the house on July 6, 2006?

A I don't recall; at this time.

Q You don't recall any of the questions he asked you?

A I remember him asking where I was.

Q That's all you remember him asking you?

A Yes.

Q Did you respond to him?

A Yes.

Q Detective Gallow; you say, told you

to call the department?

MR. LOVETT: Objection, asked and answered.

MAYOR MARVIN: I propose, objection overruled.

MR. BARTON: I disagree.

MS. POORMAN: I agree.

MR. BELLITTO: I agree.

MR. UNDERHILL: I disagree. I heard the answer.

MAYOR MARVIN: Okay.

MR. O'REILLY: Officer Kempkes, please answer the question.

(Whereupon, the last question was read back by the reporter.)

A Yes.

Q Do you remember your conversation with Sergeant Mitchell?

A I know I spoke to him.

Q Do you remember any of the conversation with Sergeant Mitchell?

A I don't recall; at this time.

Q You don't recall any of it?

A No.

Q Did you go to the police department

at all that day?

A Yes.

Q Following your conversation with Sergeant Mitchell, did you go the police department?

A Yes.

Q Does that help refresh your recollection, that Sergeant Mitchell had told you to come to the police department for any reason?

A Yes.

Q Do you remember that now?

A If I went there he told me to come so; yeah.

Q I don't want you guessing your answer.

Do you remember him telling you to come to the police department on July 6, 2006?

A Yes.

Q When you arrived at the police department; what if anything occurred?

A I don't recall.

Q Did you meet with anybody when you got to the police department on July 6, 2006?

A I think it was Lieutenant Satriale.

Q What do you remember about that

meeting?

A I don't really recall the meeting; at this time.

Q Was there anyone with you during that meeting beside Lieutenant Satriale?

A Not that I recall; at this time.

Q Was there a union representative there at that meeting?

A On the day I was supposed to be home?

Q Correct.

A I don't recall the day that meeting was on. I can't really answer that question. When I was at my meeting with him, there was a union rep there. I'm not sure what day the meeting was on.

Q Do you recall going to the police department on July 6, 2006; and having a meeting with Lieutenant Satriale which you requested union representation?

MR. LOVETT: Objection as to the form. Do you recall is improper.

Are MAYOR MARVIN: I propose that we overrule that objection.

(Whereupon, the Board was polled.)

MAYOR MARVIN: Overruled.

A I'm not sure what date we had the meeting. When I had my meeting there was a union rep present.

Q Did you have two meetings with Lieutenant Satriale?

A Yes.

Q Was the first on July 6, 2006?

A I believe so.

Q Do you remember now, whether you asked for union representation at the first meeting on July 6, 2006?

A Yes; I did.

Q Did you reschedule the meeting after you asked for union representation?

A Yes.

Q Do you remember the date on which the second meeting was scheduled?

A No.

Q Do you recall; if it was the next day?

A I don't recall; at this time.

Q The second meeting you had with Lieutenant Satriale; who else was present, if anyone?

A The PBA president.

Q Who was that?
A Joseph Panzarino.
Q During that meeting; can you tell us what you remember occurring?
A I was questioned by the lieutenant.
Q About what?
A About not being home.
Q On what date?
A July 6.
Q What did he ask you?
A I'm not sure.
Q Did he ask you, what did you do that day?
A I don't recall; at this time.
Q Do you remember telling him the places you went on July 6, 2006?
A Yes.
Q Did you tell Detective Gallow the places you went on July 6, 2006; when you met with him on that date?
A I remember telling him I went to drop my car off at Audi and get a slice of pizza.
Q That's all you told Detective Gallow; correct?
A I'm sure we had a conversation.

Q With regard to where you had been; isn't that all you told Detective Gallow, that you went for pizza and you bought your car; correct?

A Yes; he said, where are you coming from. I said, I got a slice of pizza and dropped my car off at the dealership.

Q When you spoke to Lieutenant Satriale on July 7th, you told him other places you the been on July 6th; correct?

A Yes.

Q Prior to that withdrawn -- one of the things you -- withdrawn - when you met Detective -- I'm sorry. When you met with Sergeant -- um, Lieutenant Satriale on July 7th, did you tell him that you had met some of your friends on July 6th?

MR. LOVETT: May I have that back, with all the false starts?

MR. O'NEIL: I'll withdraw the question.

Q When you met with Lieutenant Satriale on July 7th; did you indicate to him that you had met anyone to eat?

MR. LOVETT: I don't think there's any evidence the second meeting occurred

on July 7th.

Q Do you remember whether the meeting with Lieutenant Satriale took place the next day?

MR. LOVETT: Asked and answered.

MAYOR MARVIN: Overruled.

MR. LOVETT: You just said; Mr. O'Reilly, overrule. I heard you this time.

MR. O'REILLY: I don't know what you heard, Mr. Lovett.

MR. LOVETT: I heard you say overrule to the Mayor.

MR. O'REILLY: I don't know what you heard, Mr. Lovett.

MAYOR MARVIN: I don't recall him answering that, so; I have to say overrule. If the Board heard, let's poll them all. Mr. Barton?

(Whereupon, the Board was polled.)

MAYOR MARVIN: Overruled.

MR. LOVETT: May I have the Mayor's statement read back please?

MAYOR MARVIN: This is being recorded, the record will speak for itself.

MR. O'REILLY: Off the record.

(Whereupon, a short recess was taken by all parties.)

MR. O'REILLY: Officer Kempkes; please answer the question.

Q Do you remember whether the meeting with Lieutenant Satriale took place the next day?

A I don't recall.

Q When you met with Lieutenant Satriale for the second time; did you indicate to him that on July 6, one of your activities was eating with some of your friends?

A With one of my friends.

Q Who was that?

A Giovanni Pordale.

Q Prior to that date, being July 6, 2006; had you had any prior conversations with lieutenant Satriale about whether or not; you could leave home while you are out on injury leave to eat?

A No.

Q You don't recall having a conversation with him on November the 5th?

A About sick time, not injury time.

Q What was the conversation you had

with him about sick time and eating?

A I presently don't recall.

Q But, you did a couple of seconds ago?

A Verbatim, I don't recall; no.

Q Not verbatim, just sum and substance of the conversation about leaving your home to eat when you're scheduled to work and are not working?

A I don't recall that date but; yes, he made a comment about that.

Q What did he tell you?

A Not to leave the house.

Q When you met with Lieutenant Satriale for the second time; did you indicate to him that you believed you could leave the house?

A Yes.

Q Did you tell him why you thought that?

A Yes.

Q What did you tell him?

A I'm on 207C status.

Q That meant that you could leave the house when you were out injured; correct?

A I'm disabled; not injured.

Q Okay, I'm sorry. What did you say, what did you tell him?

A I'm on 207C status.

Q What do you recall telling Lieutenant Satriale with regard, to your belief that you could leave the house while you were out on some form of leave?

A I don't understand your question.

Q On July 6, 2006 were you out on 207C leave; at that time?

A Should I have been on it?

Q Had you been granted 207 leave by the Bronxville Police Department; at that time?

A No.

Q Were you on sick leave; at that time?

A They're all called indicated injuries, so; I don't know if that is the same.

Q How do you know they are all called indicated injuries?

A I have copies of it.

Q When was the last time you showed up at work and stayed a full day at the Bronxville Police Department?

A February 28, 2005.

Q When is the last time you worked the full day; did you stay the whole day that day?

MR. LOVETT: Objection as to form.

MR. O'NEIL: I'm sorry.

Q On February 28, 2005; did you work the full day?

A No.

Q When was the last time you worked the full day in the Bronxville Police Department?

A I don't recall; at this time.

Q Two years ago, three years ago? Do you have any idea?

MR. LOVETT: Objection as to form. That's three questions in one. Can I get a ruling.

MAYOR MARVIN: I propose the objection is sustained.

(Whereupon the Board was polled.)

MAYOR MARVIN: Sustained.

Q At the second meeting you had with Lieutenant Satriale, did you indicate to him it was your belief that you could leave your residence while you were out on the leave that you had taken on July 6th?

MR. LOVETT: Asked and answered.

MAYOR MARVIN: I propose, the objection is overruled.

(Whereupon the Board was polled.)

MAYOR MARVIN: Overruled.

A I believe so; yes.

Q Did you also indicate to him, at the second meeting you had with him, that it was your belief that you did not have to call in on July 6, 2006?

A I believe so; yes.

Q Was the reason you gave him the same for both of your positions?

A Yes.

Q What was his reaction to that?

A I presently don't recall.

Q Do you remember him checking the attendance records; at that point in time?

A I don't know what he was doing at his desk.

Q Do you remember him saying, that you had called in twenty-eight times before leaving home between the period of March, 2005 and January of 2006?

A Something to that effect.

Q In fact; had you called in before

you left home on some number of occasions before July 6, 2006?

A Yes.

Q On the occasions that you called in, announcing to the Department that you had a need to leave; did you call in when you returned home on those occasion?

A Probably; yes.

Q Do you recall the date of the injury that prompted your request to be granted section 207C leave?

A Yes.

Q What was the date?

A September 6th.

Q What year?

A 2002.

Q Do you recall the day on which you actually requested to be placed on Section 207C leave?

A No; I don't.

Q Did you ever submit a request in writing to be placed on Section 207C leave?

A Yes.

Q Is that approximately two years after you were first injured?

A I'm not sure.

MR. O'NEIL: I'd like to have this marked as Department Exhibit 5 for identification.

(Whereupon, a request for 207C was received and marked as Department Exhibit 5 for identification, as of this date.)

Q Officer Kempkes; please look at the document marked Department Exhibit 5. Do you recognize that document?

(Whereupon, the witness peruses a document.)

A Yes.

Q What is that?

A One of the requests for 207C that I submitted.

Q Is it your testimony, that there's a prior written request?

A Yes.

Q Do you have that?

A Not currently with me.

Q Do you recall, how much sooner than March 30, 2004, you submitted a written request?

MR. LOVETT: Objection, the date on a document that's not in evidence. No

foundation for it.

MR. O'NEIL: I move that it be received into evidence; at this time.

MR. LOVETT: It's irrelevant. I say no.

MAYOR MARVIN: Mr. O'Neil, you're requesting this be put into evidence. I propose that the objection is overruled, and it be put into evidence.

(Whereupon the Board was polled.)

MAYOR MARVIN: It's received into evidence.

(Whereupon, Department Exhibit 5 previously marked for identification was received in evidence.)

Q Do you recall, whether Chief Downey responded to Department Exhibit 5?

A Yes; he did.

Q In writing?

A Yes.

MR. O'NEIL: I ask this be marked as Department Exhibit 6.

(Whereupon, a department document was received and marked as Department Exhibit 6 for identification, as of this

date.)

Q I'm going to show a document that's been marked Department Exhibit 6.

Can you identify that document for us?

(Whereupon, the witness peruses a document.)

A It's a department communication from the Chief.

Q Did you receive that?

A Yes.

Q Absent the underlining; correct? (Indicating).

A Correct.

MR. O'NEIL: I'd like to move that, that be received into evidence; at this time.

MR. LOVETT: I have no objection.

MAYOR MARVIN: Admitted into evidence.

(Whereupon, Department Exhibit 6 previously marked for identification was received in evidence.)

Q You testified that you submitted a written request prior to Department Exhibit 5, to

the Chief requesting to be placed on 207C status?

A Yes.

Q When did you first learn it was your responsibility to file for Section 207C status?

A Earlier that year.

Q Are you sure of that?

A I could be wrong. I have the e-mail request.

Q Department Exhibit 5, could have been your first request in writing?

A No; it's not.

Q Was Department Exhibit 5, the first written request you made to be placed on 207C status, after you learned is was your responsibility to submit a request to be placed on 207C status?

A Initially; I think you're automatically on 207C status. When I went to file my taxes, I asked Lieutenant Ambersino about how to file for that.

He said, you had to request it. I'm pretty sure I requested it to Ambersino, and he forwarded me on to the Chief. That was all in writing.

Q When was that?

A I don't recall the exact day. I do have copies.

Q It was before this Exhibit 5; correct? (Indicating).

A Yes.

MR. O'NEIL: If you can just hand the witness Exhibit 5.

Q Drawing your attention to the last paragraph of Department Exhibit 5. Did you see that? (Indicating).

(Whereupon, the witness peruses a document.)

A Yes.

Q Had you just learned it was your responsibility to request 207C status, like it says in the letter?

A I'm not sure when Lieutenant Ambersino answered me. I would have to look at the e-mails I have at home saved.

Q Does this now refresh your recollection, that this is the first written request you made to the Chief, to be placed on 207C status?

A To the Chief; yes.

Q Did you challenge the Chief's determination that your submission was untimely in court?

A My attorney did.

Q Did you ultimately receive a decision from the Court?

A Yes.

MR. O'NEIL: I ask that this be marked as Department Exhibit 7; please.

(Whereupon, a was Department document received and marked as Department Exhibit 7 for identification, as of this date.)

Q Officer Kempkes; the document that is in front of you as Department Exhibit 7, is that a copy of the decision with regard to your claim for 207C status?

(Whereupon, the witness peruses a document.)

A Yes.

MR. O'NEIL: I move that, that be received into evidence.

MR. LOVETT: No objection.

MAYOR MARVIN: Department Exhibit 7, now admitted.

(Whereupon, Department Exhibit 7 previously marked for identification was received in evidence.)

Q Officer Kempkes; I'm going to directing your attention to the next to last page of Department Exhibit 7, and the last three lines. I ask that you read that to yourself; please.

(Whereupon, the witness complies.)

A Yes.

Q Following that decision, did the department make requests of you for certain medical documentation with regard to your condition?

A Yes.

Q Did they also send you to some doctors to be examined?

A Yes.

Q Ultimately, was there a determination that you would be placed on 207C status?

A Yes.

MR. O'NEIL: I ask that his be marked for identification as Department Exhibit 8.

(Whereupon, a letter was received and marked as Department Exhibit 8 for

identification, as of this date.)

Q I ask you to look at the document that's been marked for identification as Department 8, and ask you whether you recognize that document?

(Whereupon, the witness peruses a document.)

A Yes.

Q Did you receive that?

A Yes.

Q Can you tell us, what it is?

A A letter from the Chief.

Q With regard to your 207C status; correct?

A Correct.

MR. O'NEIL: I move that, that be placed in evidence.

MR. LOVETT: No objection.

MAYOR MARVIN: So admitted.

(Whereupon, Department Exhibit 8 previously marked for identification was received in evidence.)

Q Officer Kempkes; would it be fair to say; that the second meeting you had with Lieutenant Satriale occurred in 2006?

A Yes.

Q At the second meeting you had with Lieutenant Satriale in July of 2006; do you remember telling him you decided not to comply with the procedure because you guys never checked on me?

A No.

Q You said nothing like that; no words to that effect?

A Not that I recall; no.

Q Not that you recall. You may have said them, you just don't remember?

A No.

Q You didn't say it?

A I don't remember saying it; no.

Q But you may have?

A Presently; I don't recall.

Q I understand that; but does that mean you may have said it?

MR. LOVETT: Objection; that's purely speculative.

Q Did you definitely not say it?

A From what I recall; yes.

Q When the incident occurred in 2003; did an officer visit your residence; at that time which was not in Eastchester?

A I don't know.

Q What about Detective Gallow; do you remember that?

MR. LOVETT: Objection as to form. Gallow is a that.

Q In 2003; you entered into Department Exhibit 4; correct?

MR. LOVETT: Same objection.

MR. O'NEIL: I'm trying to lay a foundation for the question.

MR. LOVETT: Same objection.

MAYOR MARVIN: I propose to overrule that objection. Mr. Barton?

(Whereupon, the Board was polled.)

MAYOR MARVIN: Overruled.

A Yes.

Q That agreement followed an investigation related to you being in Saratoga; correct?

MR. LOVETT: Objection, there's no evidence that he was investigated.

MAYOR MARVIN: I propose to overrule the objection. Mr. Barton?

(Whereupon, the Board was polled.)

MAYOR MARVIN: Overruled.

A There was a purported

investigation; yes.

Q The day at issue; May 9, 2003, did you get a call from Detective Gallow on that date?

A Yes.

Q Where were you when you got that call?

A In my car.

Q Where was your car?

A Exactly?

Q What city, state?

A Saratoga.

Q Saratoga, New York?

A Yes.

Q When you received the call from Detective Gallow, what do you remember him saying to you when you first got the call?

A I really don't recall the conversation; at this time.

Q You don't recall any of it?

A No.

Q Do you recall asking him to tell the Department he was unable to get to touch with you?

A I presently don't recall that.

Q What community was your house

located in, in 2003?

A Greenburgh.

Q Do you remember on May 9, 2003; during that conversation with Detective Gallow, telling him that you were in the house in Greenburgh, upstairs, naked with a companion?

A I don't recall that; no.

Q Do you recall asking him to do you a favor during that telephone conversation on May 9, 2003?

A I don't recall that; at this time.

Q Do you remember having a conversation?

A Vaguely.

Q It was with Detective Gallow?

A I believe so.

Q Do you remember him telling you, that he was at your home in Greenburgh during that conversation?

A I don't recall that; at this time.

Q Do you remember asking, him if he would tell the Department that you were home at your house at Greenburgh; at that time?

A I don't recall that; at this time.

Q Do you recall anything about what

conversation at all?

A No.

MR. O'NEIL: I have no further questions.

MAYOR MARVIN: Mr. Lovett?

MR. LOVETT: At this time; I'll probablay call my client on our direct case.

MR. O'REILLY: You may step down. Off the record please.

(Whereupon, an off the record discussion took place.)

MR. O'REILLY: For the record; the hearing is adjourned; at this time. We will reconvene on January 4 at 6:30 p.m., at a location to be announced. We've also picked a hearing date on January 10th at 6:30 p.m., and if necessary on February 1st, at 6:30 p.m.

Is that agreeable?

MAYOR MARVIN: Board members?

(Whereupon, the Board was polled.)

MAYOR MARVIN: Agreed.

MR. LOVETT: Agreed.

MAYOR MARVIN: A good evening to

you.

(Time noted: 10:15 p.m).

B O A R D   E X H I B I T S

| EXHIBIT | DESCRIPTION | PG. |
|---|---|---|
| 1 | Notice | 6 - ID |

D E P A R T M E N T ' S   E X H I B I T S

| EXHIBIT | DESCRIPTION | PG. |
|---|---|---|
| DEP 1 | Police department document - 11 pages | 22 - ID<br>28 - EVD |
| DEP 2 | Department rules and regulations document | 28 - ID<br>32 - EVD |
| DEP 3A | Sick leave policy and procedure | 33 - ID |
| DEP 3B | Written directive distribution list | 32 - ID<br>52 - EVD |

# D E P A R T M E N T'S E X H I B I T S

| EXHIBIT | DESCRIPTION | PG. |
|---|---|---|
| DEP 4 | Department document settlement | 39 - ID<br>48 - EVD |
| DEP 5 | Request for 207C | 87 - ID<br>89 - EVD |
| DEP 6 | Department e-mail communication | 89 - ID<br>90 - EVD |
| DEP 7 | Copy of decision for 207C status | 93 - ID<br>93 - EVD |
| DEP 8 | Letter from Chief Downey | 94 - ID<br>95 - EVD |

C E R T I F I C A T I O N

Certified to be a true and accurate transcript of the aforesaid proceeding.

------------------------
Wanda J. Sepulveda

## 1

**1** - 6:22, 7:1, 22:14, 28:6, 28:8, 33:16, 67:13, 102:4, 102:9
**10** - 35:13, 59:17, 63:10, 63:25, 66:6
**10523** - 3:7
**10530** - 1:24
**10605** - 2:7
**10709** - 21:11
**10:15** - 101:2
**10th** - 46:8, 46:11, 65:11, 66:13, 100:17
**11** - 102:10
**111** - 1:24
**11530** - 2:14
**11th** - 46:9, 46:12
**13** - 1:8
**1399** - 2:13
**177** - 1:7
**1992** - 22:9, 31:11
**1999** - 35:13, 59:17, 63:11, 64:1, 65:11, 66:6
**1:00** - 71:15, 72:17, 73:5, 73:8
**1st** - 100:19

## 2

**2** - 28:12, 28:15, 28:19, 32:2, 32:4, 102:13
**200** - 21:10
**2002** - 47:3, 87:16
**2003** - 40:20, 45:1, 45:16, 46:16, 46:20, 46:24, 49:24, 53:4, 53:14, 54:25, 57:13, 57:24, 58:1, 58:4, 58:7, 58:10, 58:13, 58:22, 60:8, 60:12, 60:16, 60:22, 64:21, 96:22, 97:5, 98:2, 99:1, 99:3, 99:10
**2004** - 47:13, 47:17, 88:23
**2005** - 84:25, 85:5, 86:22
**2006** - 1:3, 1:8, 4:9, 6:23, 32:8, 45:17, 47:2, 69:3, 70:21, 71:5, 71:13, 72:5, 72:14, 72:17, 73:3, 73:9, 74:15, 76:17, 76:23, 77:17, 78:7, 78:11, 79:16, 79:19, 82:17, 84:9, 86:9, 86:23, 87:2, 95:24, 96:2
**207** - 8:20, 84:12
**207a** - 12:24
**207c** - 12:18, 12:23, 13:11, 13:20, 13:23, 14:5, 43:10, 43:19, 47:1, 83:22, 84:3, 84:10, 87:11, 87:18, 87:22, 88:5, 88:15, 91:1, 91:4, 91:14, 91:17, 91:19, 92:16, 92:23, 93:17, 94:18, 95:12, 103:8, 103:16
**21** - 1:3, 4:9
**22** - 102:10
**222** - 2:6
**26** - 6:23
**28** - 47:13, 47:17, 84:25, 85:5, 102:11, 102:14

## 3

**3.10** - 30:25
**3/10/99** - 34:13
**30** - 88:23
**32** - 102:15, 102:22
**33** - 102:18
**39** - 103:5
**3a** - 33:3, 33:4, 33:11, 33:15, 34:20, 35:16, 36:12, 53:1, 102:17
**3b** - 33:11, 33:20, 33:25, 35:4, 35:10, 52:13, 52:18, 63:4, 102:21

## 4

**4** - 39:22, 40:1, 40:5, 41:15, 43:8, 43:11, 43:18, 47:11, 48:17, 52:23, 56:5, 67:7, 67:9, 97:6, 100:15, 103:4
**40** - 21:10
**48** - 103:6
**4:00** - 32:22

## 5

**5** - 40:20, 88:3, 88:7, 88:9, 89:13, 89:17, 90:25, 91:10, 91:13, 92:4, 92:8, 92:10, 103:8
**52** - 102:23
**570** - 3:6
**5711-q** - 4:7, 10:19, 11:1
**5th** - 82:23

## 6

**6** - 69:3, 70:21, 71:5, 71:13, 72:5, 72:13, 72:17, 73:3, 73:9, 74:15, 76:17, 76:23, 77:17, 78:7, 78:11, 79:9, 79:16, 79:19, 82:11, 82:16, 84:9, 86:9, 87:2, 89:22, 89:25, 90:3, 90:21, 102:4, 103:11
**684-0201** - 1:25
**6:30** - 1:9, 100:15, 100:18, 100:19
**6th** - 32:8, 80:9, 80:16, 85:24, 87:14

## 7

**7** - 93:9, 93:12, 93:15, 93:25, 94:1, 94:6, 103:15
**7th** - 80:8, 80:14, 80:22, 81:1

## 8

**8** - 94:23, 94:25, 95:4, 95:19, 103:19
**87** - 103:8
**89** - 103:9, 103:12
**8:00** - 32:22, 32:23, 71:10, 73:5, 73:8

## 9

**9** - 57:13, 57:24, 58:1, 58:4, 58:6, 58:10, 58:13, 58:22, 60:8, 60:12, 60:16, 60:21, 98:2, 99:3, 99:10
**90** - 103:13
**914** - 1:25
**93** - 103:16, 103:17
**94** - 103:19
**95** - 103:20
**9th** - 41:3

## A

**A6** - 37:3, 39:18, 46:19
**able** - 23:20, 46:3, 46:14
**Absent** - 90:12
**absolutely** - 18:17
**accepted** - 11:6, 45:9
**accepting** - 49:24
**access** - 71:19
**accurate** - 29:22, 104:5
**accuse** - 65:18
**acknowledged** - 43:17
**act** - 11:8, 16:1, 27:2
**action** - 51:1
**actions** - 45:23
**activities** - 82:11
**Acts** - 10:23
**add** - 50:23
**address** - 21:7, 69:6, 69:8, 69:11, 69:15, 69:19, 69:25
**addressed** - 52:23
**adjourned** - 100:14
**administration** - 27:6
**administrative** - 27:8
**admissible** - 44:6
**admit** - 26:20
**admits** - 10:3
**Admitted** - 90:19
**admitted** - 28:6, 48:14, 51:3, 51:5, 52:17, 93:25, 95:18
**admitting** - 64:7, 64:11
**adversary's** - 11:14
**advised** - 41:1
**aforesaid** - 104:6
**ago** - 83:4, 85:11
**Agree** - 56:23
**agree** - 27:24, 27:25, 28:2, 28:3, 31:22, 31:23, 31:24, 31:25, 32:1, 54:19, 75:7, 75:8
**agreeable** - 100:20
**Agreed** - 43:5, 57:21, 100:23, 100:24
**agreed** - 69:24
**agreement** - 48:6, 53:23, 54:12, 55:7, 56:13, 56:25, 97:16
**ain't** - 27:11
**allegation** - 44:19
**allegations** - 10:17, 11:21, 54:24, 64:14
**alleged** - 10:11, 10:17, 46:19, 46:20, 55:20, 62:5, 62:25
**allowed** - 14:12, 16:10, 55:11
**almost** - 9:13, 14:18
**Ambersino** - 57:4, 57:23, 59:7, 59:21, 60:7, 60:11, 60:15, 60:23, 61:1, 61:16, 64:7, 64:12, 91:20, 91:23, 92:19
**Ambersino's** - 61:14
**ambiguous** - 12:12
**amounts** - 12:3
**Anne** - 2:22, 4:17
**announced** - 100:16
**announcing** - 87:5
**answer** - 26:2, 26:18, 31:3, 36:1, 54:4, 55:9, 55:11, 55:12, 59:3, 65:18, 66:21, 69:24, 75:10, 75:13, 76:15, 77:13, 82:5
**answered** - 35:25, 53:12, 61:22, 62:1, 62:7, 65:13, 66:15, 72:7, 75:3, 81:4, 85:25, 92:19
**Answering** - 53:25, 58:24
**answering** - 54:10, 54:16, 54:21, 70:24, 81:16
**appear** - 25:6, 29:25, 34:1, 46:2, 69:15, 69:20
**appearance** - 5:2
**Appellate** - 51:17
**applicability** - 18:18
**application** - 49:14
**applied** - 45:13, 46:1
**apply** - 44:19, 44:21, 45:6, 49:21, 50:1, 50:10
**appropriate** - 5:24, 48:15, 50:11
**argue** - 45:4, 45:5, 45:6, 49:25
**arise** - 6:10
**arrived** - 76:19
**article** - 29:9, 29:18, 30:16, 30:18, 30:20
**Article** - 30:1
**articulate** - 65:17
**articulated** - 41:7, 49:19
**articulates** - 37:22, 42:23
**articulating** - 49:7
**Aside** - 41:13
**assist** - 4:22, 6:18
**Associates** - 1:23
**assuming** - 12:6, 17:24, 24:17
**Assuming** - 18:2
**attached** - 64:18
**attachment** - 33:16
**attendance** - 86:17
**attention** - 17:19, 32:8, 92:9, 94:5
**attorney** - 4:21, 5:8, 19:20, 24:17, 45:7, 54:22, 61:17, 93:4
**attorneys** - 6:24
**Attorneys** - 2:5, 2:11
**Audi** - 79:22
**August** - 1:3, 4:9, 40:20, 64:21
**authority** - 48:5
**automatically** - 91:19
**automobile** - 14:22
**Avenue** - 1:24, 2:13
**aware** - 25:18, 44:10, 47:9

## B

**background** - 17:13
**backward** - 24:9
**bad** - 65:15
**bag** - 17:19
**bar** - 16:19, 18:9
**Barton** - 2:21, 4:15, 4:16, 28:3, 30:23, 32:1, 37:16, 75:6, 81:18, 97:12, 97:22
**based** - 13:22, 15:6, 41:3, 41:15, 43:13
**beating** - 18:9
**become** - 45:24
**bed** - 16:8
**belief** - 30:6, 30:10, 84:5, 85:22, 86:8
**Bellitto** - 2:20, 4:18, 28:2, 31:24, 75:8
**benefits** - 9:4, 12:21, 13:2, 13:4
**beside** - 61:15, 77:5
**best** - 12:12, 47:7
**better** - 9:2, 34:11, 54:18
**Between** - 71:17
**between** - 13:14, 37:24, 59:1, 73:4, 73:8, 86:22
**beyond** - 30:25
**bias** - 15:12, 15:15
**bifurcate** - 50:12, 51:10
**bifurcated** - 44:11, 48:21
**bifurcation** - 49:15, 49:17, 51:6, 51:25
**Black** - 16:25, 17:9
**black** - 15:17
**Blacks** - 17:3
**blacks** - 15:18
**Bloomingdale** - 2:6
**board** - 4:14
**Board** - 1:1, 2:18, 3:5, 4:2, 4:4, 4:22, 6:8, 6:11, 6:14, 6:18, 7:3, 7:7, 7:16, 12:14, 24:21, 24:22, 25:4, 27:2, 27:4, 27:17, 27:21, 27:23, 31:21, 36:4, 36:5, 37:15, 38:1, 38:10, 38:14, 39:16, 42:15, 42:16, 43:3, 43:4, 44:22, 48:8, 48:12, 50:4, 50:18, 52:1, 52:2, 56:8, 56:9, 56:21, 56:22, 57:19, 57:20, 62:11, 62:12, 66:3, 66:18, 68:21, 72:10, 77:24, 81:17, 81:19, 85:18, 86:3, 89:10, 97:13, 97:23, 100:21, 100:22
**Board's** - 24:16, 34:11
**boards** - 8:7
**body** - 50:14
**Bond** - 2:10, 5:7

**bottom** - 23:9, 33:16
**bought** - 80:3
**breakfast** - 73:12
**brewing** - 19:25
**Brian** - 5:5
**bring** - 19:13, 73:16
**broke** - 13:17
**bronchitis** - 13:16
**Bronxville** - 1:1, 1:8, 2:11, 4:3, 15:9, 17:12, 21:10, 22:4, 71:24, 72:4, 72:12, 72:19, 73:4, 84:13, 84:23, 85:9
**brought** - 45:1
**burdening** - 50:18
**burdensome** - 49:3, 50:20
**burglary** - 16:2
**business** - 73:13
**buying** - 14:23

**C**

**canyon** - 23:8
**capacity** - 22:5
**car** - 15:24, 16:6, 73:14, 73:16, 73:17, 79:22, 80:3, 80:6, 98:7, 98:8
**Carbone** - 1:23
**care** - 16:5, 27:13
**carries** - 17:7
**carrying** - 6:19
**case** - 7:9, 8:13, 9:17, 11:23, 11:24, 12:9, 12:10, 13:9, 17:23, 18:17, 21:3, 51:9, 53:3, 100:8
**cases** - 44:10, 50:25
**cat** - 17:18
**category** - 13:6, 13:18
**caucus** - 6:12, 20:5, 39:12, 39:16, 48:9
**caught** - 9:18
**causal** - 37:24, 52:6
**cell** - 5:24, 71:2, 71:23, 72:2
**Central** - 1:24
**certain** - 94:11
**certainly** - 45:11
**Certainly** - 11:13, 43:2, 44:20
**Certified** - 104:5
**Chair** - 6:6
**challenge** - 93:1
**character** - 10:24
**charge** - 41:12, 44:14, 49:23, 50:21, 51:15
**charged** - 14:25
**charges** - 4:9, 10:10, 11:17, 12:2, 12:8, 12:11, 17:25, 18:20, 21:15, 21:16, 24:5, 25:7, 41:2, 43:13, 44:1, 44:6, 44:10, 45:1, 48:1, 50:9, 53:24, 54:14, 55:22, 67:2, 67:5, 67:6, 67:9, 67:12
**Charges** - 1:2
**charted** - 51:19
**charter** - 7:20
**check** - 29:15, 72:1
**Check** - 30:23
**checked** - 96:4
**checking** - 86:16
**Chief** - 5:5, 7:7, 13:23, 15:20, 16:7, 18:23, 23:3, 26:19, 26:22, 42:5, 42:21, 43:16, 46:5, 46:25, 47:16, 89:16, 90:9, 91:1, 91:24, 92:23, 92:25, 95:11, 103:19
**Chief's** - 29:24, 93:1
**Chris** - 53:15, 61:19
**Christopher** - 2:16, 5:9
**circumstance** - 14:3
**circumstances** - 9:2, 34:17
**city** - 98:10
**City** - 2:14
**civil** - 47:21
**Claim** - 6:25
**claim** - 59:11, 93:16
**clarification** - 24:20
**Class** - 16:15
**class** - 17:3
**clause** - 40:6, 41:1
**clear** - 20:1, 47:24, 48:22, 51:4
**clearance** - 10:1
**client** - 11:21, 13:22, 14:16, 18:12, 18:18, 19:8, 19:10, 19:11, 19:20, 30:7, 42:11, 43:9, 43:14, 43:18, 46:23, 47:1, 47:18, 54:22, 65:18, 100:7
**client's** - 14:2, 50:19
**clue** - 59:18
**clutter** - 38:8
**coincidence** - 38:12
**cold** - 13:16
**coming** - 8:14, 8:16, 17:15, 80:4
**comment** - 38:3, 38:4, 38:9, 62:20, 83:11
**commission** - 18:6
**commissioners** - 8:10
**Commissioners** - 1:1, 2:18, 4:4, 4:23
**committed** - 11:8
**committing** - 16:1
**common** - 9:10
**commonly** - 16:23, 47:19
**communication** - 90:8, 103:12
**communications** - 59:1
**community** - 98:25
**comp** - 8:18
**companion** - 99:6
**competent** - 23:23, 24:8, 24:23
**completed** - 47:13
**completely** - 41:15
**completion** - 68:11
**complies** - 94:8
**comply** - 67:20, 68:25, 96:3
**compound** - 60:1, 68:8, 72:22, 73:1
**compounding** - 56:3, 57:16
**compromises** - 47:7
**concern** - 15:3, 15:10, 15:14, 15:19, 16:3, 16:6, 16:12, 16:21, 16:23, 18:13
**concerns** - 4:8
**concluded** - 30:21
**conclusion** - 48:16
**condition** - 94:12
**conduct** - 9:5, 56:12, 56:25, 57:5, 68:6, 68:7, 68:13
**conducted** - 6:15, 56:12
**conducting** - 4:5
**confused** - 25:5, 72:25
**confusion** - 45:3
**connected** - 9:1, 17:11
**connection** - 11:17, 27:5, 52:7
**consecutively** - 30:3
**constitutional** - 18:1
**consulting** - 38:18
**contact** - 32:24
**content** - 37:12
**contents** - 30:24, 36:25, 37:7
**continue** - 25:9
**continuing** - 5:14
**continuously** - 13:24
**convenes** - 4:3
**conversation** - 60:11, 60:14, 74:9, 75:17, 75:21, 76:3, 79:25, 82:23, 82:25, 83:7, 98:18, 99:4, 99:9, 99:13, 99:19, 100:1
**conversations** - 6:1, 82:17
**convicted** - 11:22
**conviction** - 17:17, 41:10, 47:6, 47:25, 51:13
**convictions** - 51:2
**cop** - 18:10
**copies** - 84:21, 92:3
**Copy** - 103:15
**copy** - 6:3, 29:14, 29:24, 34:11, 35:2, 36:17, 40:17, 59:7, 64:8, 93:16
**corner** - 35:5, 35:9
**corners** - 11:16
**correct** - 25:14, 30:11, 58:7, 58:11, 60:8, 60:12, 61:21, 61:25, 63:11, 65:11, 79:24, 80:3, 80:9, 83:24, 90:12, 92:5, 95:13, 97:6, 97:18
**Correct** - 65:12, 77:11, 90:14, 95:14
**correction** - 12:22
**corrections** - 12:20
**cot** - 16:8
**Counsel** - 3:5, 23:10, 37:25, 38:18, 52:8, 63:22
**counsel** - 19:13, 40:22, 50:14, 53:14, 54:2, 54:9
**County** - 10:21
**couple** - 83:3
**course** - 6:11, 13:3, 38:19, 39:10, 51:3, 51:7, 51:19, 60:10
**Court** - 93:6
**court** - 6:3, 12:14, 93:3
**courts** - 7:16
**cover** - 8:25, 32:21, 44:23, 45:3
**coverage** - 8:21
**covered** - 10:19, 12:18
**crimes** - 18:6
**criminal** - 17:8
**criminally** - 18:10
**current** - 12:25
**Cut** - 39:1
**cut** - 55:12

**D**

**damage** - 56:4
**date** - 7:2, 22:15, 28:16, 32:8, 33:12, 34:6, 34:7, 34:10, 34:12, 34:14, 35:21, 40:2, 40:20, 43:18, 57:13, 57:14, 78:1, 78:16, 79:8, 79:20, 82:16, 83:10, 87:9, 87:13, 88:7, 88:24, 90:1, 93:13, 95:1, 98:3, 100:17
**dated** - 4:9, 6:23, 46:11
**Dated** - 1:2
**dates** - 46:7
**dealership** - 73:16, 80:6
**dealing** - 13:19, 18:14
**December** - 1:8
**decided** - 96:3
**decision** - 24:21, 24:23, 27:5, 93:6, 93:16, 94:10, 103:15
**declaratory** - 64:17
**decorum** - 5:24
**deeply** - 17:21
**defense** - 49:18
**definitely** - 96:20
**delinquency** - 10:23
**denied** - 43:10, 47:1, 51:25
**Dep** - 102:9, 102:13, 102:17, 102:21, 103:4, 103:8, 103:11, 103:15, 103:19
**Department** - 2:12, 5:4, 7:10, 9:7, 10:2, 10:15, 15:11, 22:13, 28:6, 28:8, 28:12, 28:15, 28:19, 32:2, 32:4, 33:2, 33:10, 33:15, 33:20, 35:4, 39:22, 39:25, 40:5, 48:17, 52:13, 52:18, 52:22, 52:23, 53:1, 54:25, 55:25, 63:3, 67:7, 67:9, 67:13, 71:24, 72:5, 72:13, 72:20, 73:4, 84:13, 84:24, 85:9, 87:5, 88:3, 88:6, 88:9, 89:13, 89:17, 89:22, 89:24, 90:3, 90:21, 90:25, 91:10, 91:13, 92:10, 93:9, 93:10, 93:11, 93:15, 93:24, 94:1, 94:6, 94:22, 94:25, 95:3, 95:19, 97:6, 98:22, 99:22, 102:13, 103:4, 103:11
**department** - 14:4, 15:5, 15:13, 16:16, 17:2, 18:5, 31:5, 32:24, 39:24, 40:7, 55:21, 57:1, 62:4, 62:24, 63:24, 64:24, 66:12, 67:20, 68:25, 73:20, 74:2, 75:1, 75:25, 76:5, 76:9, 76:17, 76:20, 76:23, 77:17, 89:23, 90:8, 94:11, 102:9
**department's** - 41:4, 58:23, 65:4
**Department's** - 59:8
**departments** - 7:11, 7:22, 8:3, 10:21
**Departments** - 10:22
**depravation** - 47:19
**Deputy** - 2:20
**Description** - 102:3, 102:8, 103:3
**desk** - 16:10, 63:8, 65:9, 74:4, 86:19
**Detective** - 74:1, 74:7, 74:25, 79:18, 79:23, 80:2, 80:13, 97:1, 98:3, 98:15, 99:4, 99:15
**detective** - 9:21
**determination** - 11:22, 18:19, 20:8, 44:23, 93:2, 94:18
**determine** - 41:11
**developed** - 46:4
**Developed** - 46:9
**different** - 7:11, 45:16, 46:3, 66:11
**differently** - 15:1
**Direct** - 21:6
**direct** - 42:25, 100:7
**directed** - 67:19
**directing** - 54:4, 94:5
**directions** - 68:13
**directive** - 102:21
**Directive** - 33:7, 33:9
**directives** - 68:6
**directly** - 65:2
**disabilities** - 13:13
**disability** - 12:17, 13:6, 13:20, 43:10, 43:19
**disabled** - 14:5, 15:24, 83:25
**disagree** - 75:6, 75:9
**disagrees** - 27:17
**discharged** - 11:9
**disciplinary** - 4:5, 4:8, 7:18, 7:24, 41:2, 44:17, 51:1, 53:8, 55:22
**Disciplinary** - 1:2, 67:5
**discipline** - 8:2, 11:6
**disciplined** - 11:4
**disclose** - 58:25
**disclosing** - 54:1
**discriminating** - 15:6
**discussed** - 54:2, 54:15
**discussion** - 70:20, 100:12
**discussions** - 53:23, 54:13
**disingenuous** -

50:2
**disliked** - 15:1
**dismiss** - 18:20
**disobedience** - 10:25
**disregard** - 17:16
**distance** - 42:25
**distinction** - 13:14
**distribution** - 102:22
**Distribution** - 33:7, 33:9
**Division** - 51:17
**doctors** - 94:15
**document** - 22:12, 22:17, 22:20, 25:2, 26:7, 26:21, 28:14, 28:18, 28:22, 29:1, 29:5, 30:8, 30:16, 33:4, 33:6, 33:14, 33:17, 33:19, 33:23, 34:18, 35:12, 37:5, 37:11, 39:24, 40:10, 40:14, 40:16, 41:8, 41:17, 43:8, 43:20, 46:13, 46:14, 46:16, 46:17, 48:13, 49:4, 49:18, 50:5, 55:15, 57:17, 59:16, 60:17, 88:9, 88:10, 88:12, 88:25, 89:23, 90:2, 90:4, 90:7, 92:13, 93:11, 93:14, 93:19, 95:2, 95:4, 95:6, 102:10, 102:14, 103:4
**documentation** - 94:12
**documents** - 24:13, 26:4, 26:15, 33:2
**done** - 7:24, 11:3, 14:16, 18:5, 18:15, 51:6, 51:7, 55:20, 56:4
**double** - 29:15
**doubt** - 14:12
**down** - 100:9
**Downey** - 5:5, 5:6, 23:3, 89:16, 103:19
**drafted** - 43:8
**draw** - 13:13, 32:7
**Drawing** - 92:9
**drinking** - 16:18
**driveway** - 74:2
**Driving** - 16:24
**driving** - 16:25
**drop** - 79:22
**dropped** - 80:5
**Drove** - 73:14
**drugged** - 16:9
**due** - 24:25, 26:25, 47:20, 50:6, 50:19, 60:4
**duly** - 21:3
**during** - 6:10, 9:8, 9:9, 9:15, 10:7, 13:3, 14:6, 38:18, 39:10, 42:9, 51:3, 51:7, 57:7, 62:4, 62:24, 67:16, 67:18, 71:23, 72:2, 77:4, 99:4, 99:9, 99:18
**During** - 60:10, 60:14, 64:6, 79:3
**duties** - 4:24
**duty** - 14:7, 16:11, 57:8
**Dwb** - 16:24
**Dwh** - 16:24

**E**

**e-mail** - 91:9, 103:11
**e-mails** - 92:20
**early** - 24:3, 71:9
**easier** - 69:23
**Eastchester** - 70:9, 70:10, 70:14, 70:16, 70:22, 71:18, 71:19, 73:10, 96:24
**eat** - 80:23, 82:20, 83:8
**eating** - 82:12, 83:1
**effect** - 10:24, 60:21, 86:24, 96:7
**efficient** - 6:16
**eight** - 86:21
**either** - 8:9, 14:22, 18:22, 29:3
**elected** - 5:16, 50:14
**elephant** - 17:20
**eleven** - 22:12, 24:14, 25:13, 25:22, 26:6
**Eleven** - 26:21
**eleventh** - 35:22, 59:13
**Elmsford** - 3:7
**employed** - 21:13, 22:2
**employment** - 7:12, 12:6
**Employment** - 7:16
**encountered** - 44:16
**end** - 68:4
**endangered** - 16:16
**enter** - 40:19
**entered** - 48:2, 97:5
**entering** - 56:13, 56:25
**entire** - 47:8, 51:8
**entirely** - 17:16
**entitled** - 19:1, 19:8, 33:6, 60:17
**entitlement** - 13:2
**error** - 11:19, 19:24, 41:9, 51:16
**errors** - 24:3
**Esq** - 2:8, 2:15, 2:16, 3:8
**Esqs** - 2:4
**establish** - 45:22
**Evd** - 102:11, 102:15, 102:23, 103:6, 103:9, 103:13, 103:17, 103:20
**evening** - 4:1, 4:3, 7:6, 100:25
**event** - 47:8
**evidence** - 8:12, 10:11, 11:20, 14:13, 21:15, 23:5, 23:6, 23:11, 24:5, 26:21, 28:7, 28:10, 31:13, 31:17, 32:3, 32:6, 37:6, 37:11, 37:17, 43:22, 47:4, 48:14, 48:19, 52:13, 52:20, 56:5, 67:6, 67:13, 80:25, 88:25, 89:3, 89:7, 89:9, 89:12, 89:15, 90:16, 90:20, 90:23, 93:22, 94:3, 95:16, 95:21, 97:20
**exact** - 44:8, 92:2
**exactly** - 34:19, 49:23, 55:3, 74:12
**Exactly** - 55:2, 98:9
**Examination** - 21:6
**examined** - 21:5, 94:15
**exception** - 26:24, 27:14, 31:18
**exclude** - 19:23
**excluded** - 7:17
**Excluding** - 22:21
**Excuse** - 25:23
**excused** - 41:20
**exercise** - 5:23
**exhibit** - 21:20, 21:22, 56:5
**Exhibit** - 6:22, 7:1, 22:14, 28:6, 28:8, 28:12, 28:15, 28:19, 32:2, 32:4, 33:3, 33:11, 34:20, 35:4, 40:1, 40:5, 47:11, 48:17, 52:18, 52:23, 53:1, 63:3, 67:13, 88:3, 88:6, 88:9, 89:13, 89:17, 89:22, 89:25, 90:3, 90:21, 90:25, 91:10, 91:13, 92:4, 92:8, 92:10, 93:9, 93:12, 93:15, 93:24, 94:1, 94:6, 94:23, 94:25, 95:19, 97:6, 102:3, 102:8, 103:3
**Exhibitf** - 33:25
**expected** - 5:23
**expects** - 6:14
**expenses** - 9:1
**experience** - 14:14, 19:12, 19:16, 19:19
**express** - 31:21
**expressed** - 15:3, 15:10, 15:14, 15:19, 16:2, 16:6, 16:12, 16:22, 18:13, 30:6
**expressions** - 16:20
**extending** - 47:14
**extension** - 47:17

**F**

**face** - 12:13
**fact** - 7:15, 11:5, 11:7, 34:14, 40:25, 43:12, 43:16, 43:21, 44:7, 86:25
**factor** - 8:22
**factors** - 11:1
**facts** - 14:19
**factual** - 41:16
**factually** - 47:6
**failed** - 9:6
**failure** - 65:19
**fair** - 17:14, 95:22
**false** - 9:20, 16:14, 38:20, 41:15, 67:23, 80:18
**familiar** - 13:11
**far** - 27:8
**favor** - 99:9
**fax** - 29:21, 30:15
**faxed** - 29:6
**February** - 47:13, 47:16, 84:25, 85:5, 100:18
**federal** - 47:21
**fell** - 13:16
**fellow** - 16:13
**female** - 15:8
**fighters** - 12:20
**file** - 41:2, 91:4, 91:19, 91:21
**Finally** - 9:23
**findings** - 51:2
**fine** - 42:17, 50:20, 56:16, 70:16
**fire** - 12:19
**firefighters** - 12:23
**first** - 7:9, 21:3, 31:9, 40:6, 40:25, 44:12, 48:22, 78:7, 78:10, 87:25, 91:3, 91:11, 91:13, 92:22, 98:16
**First** - 44:5
**fleeting** - 12:15
**fold** - 9:6
**Follow** - 30:16
**follow** - 24:11, 45:23
**followed** - 29:17, 60:1, 97:16
**following** - 68:7
**Following** - 30:18, 76:3, 94:10
**follows** - 21:5
**food** - 10:4
**forbade** - 14:5
**force** - 18:5
**foremost** - 7:9
**forgot** - 23:10
**form** - 59:24, 64:16, 68:17, 72:21, 77:21, 84:7, 85:3, 85:13, 97:3
**forth** - 12:7
**forward** - 27:19
**forwarded** - 91:24
**foundation** - 23:9, 24:2, 24:8, 24:24, 25:1, 25:20, 56:15, 56:17, 89:1, 97:9
**four** - 11:16, 29:9, 46:5, 46:10
**frame** - 47:15
**Franklin** - 2:13
**Frankly** - 19:12, 45:15
**free** - 18:11
**friend's** - 73:13, 73:14, 73:15
**friends** - 80:15, 82:12, 82:13
**fringe** - 9:3
**front** - 17:20, 22:21, 22:22, 46:18, 52:25, 93:15
**full** - 8:22, 8:24, 9:3, 13:4, 16:11, 84:23, 85:2, 85:6, 85:9
**functions** - 6:19

**G**

**Gallow** - 74:8, 74:25, 79:18, 79:24, 80:2, 97:1, 97:4, 98:3, 98:15, 99:4, 99:15
**Gallows** - 74:1
**game** - 42:14
**Garden** - 2:14
**gender** - 15:6
**General** - 8:20, 10:19, 12:19, 12:21, 13:21
**general** - 10:12, 10:18, 10:24
**gentleman** - 18:22
**gigantic** - 18:2, 18:3
**Giovanni** - 82:15
**Given** - 11:5, 44:7
**given** - 9:18, 11:7, 35:2, 35:17, 46:5, 48:15, 49:1, 50:16, 63:4, 65:10, 66:5, 66:13, 70:7
**Glenn** - 2:20, 4:18
**Gould** - 2:4, 5:11
**govern** - 7:21
**governmental** - 50:14
**governs** - 10:13, 10:20
**grand** - 12:1
**granted** - 84:12, 87:10
**Greenburgh** - 99:2, 99:6, 99:18, 99:23
**guarded** - 8:4
**guess** - 38:7
**guessing** - 76:14
**guilt** - 11:23, 41:11, 48:24
**guilty** - 18:19, 45:9, 50:9, 50:10
**guys** - 96:4

**H**

**hall** - 20:14, 42:15, 42:22, 43:1
**hallway** - 42:17
**hand** - 23:11, 35:5, 35:9, 36:13, 42:1, 92:7
**handed** - 28:18, 34:25
**Harold** - 53:15, 61:19
**Hartsdale** - 1:24
**health** - 15:22
**hear** - 7:4
**heard** - 75:10, 81:7, 81:10, 81:11, 81:14, 81:17
**hearing** - 4:6, 4:8, 5:17, 5:21, 6:2, 6:7, 6:11, 6:15, 6:19, 24:6, 28:7, 43:25, 44:13, 44:15, 44:16, 48:16, 48:21, 48:25, 50:12, 50:22, 51:11, 63:19, 69:7, 100:14, 100:17
**Hearing** - 6:22
**hearings** - 44:11
**held** - 22:7
**help** - 76:7
**herself** - 4:14
**himself** - 23:12
**Hispanic** - 15:13, 16:25
**Hispanics** - 17:3
**history** - 15:9
**hit** - 23:8
**Hitsman** - 3:4
**Hoffman** - 3:4
**home** - 9:8, 9:14, 45:13, 45:18, 49:21, 57:7, 58:14, 68:15, 68:18, 69:7, 69:11, 69:15, 70:1, 70:2, 71:6, 71:13, 71:18, 71:19, 71:20, 72:6, 72:13, 73:18, 73:20, 74:8, 77:10, 79:7, 82:19, 83:8, 86:22, 87:1, 87:7, 92:20, 99:18, 99:22
**homework** - 63:22
**honored** - 14:24
**hook** - 19:15

**hours** - 32:21, 73:8
**house** - 14:6, 74:15, 83:13, 83:16, 83:24, 84:6, 98:25, 99:5, 99:23
**hypothetically** - 12:6

**I**

**Id** - 36:12, 41:15, 43:8, 43:11, 43:18, 47:11, 56:6, 102:4, 102:10, 102:14, 102:18, 102:22, 103:5, 103:8, 103:12, 103:16, 103:19
**idea** - 42:6, 85:12
**identification** - 7:2, 22:11, 22:14, 28:9, 28:15, 28:18, 32:5, 33:11, 33:20, 39:23, 40:1, 40:4, 45:21, 48:18, 52:19, 88:4, 88:7, 89:14, 89:25, 90:22, 93:12, 94:2, 94:22, 95:1, 95:3, 95:20
**identified** - 37:19
**identify** - 21:18, 21:23, 22:17, 23:14, 23:22, 23:23, 28:20, 30:8, 34:20, 90:4
**ignore** - 33:15
**ignored** - 30:15
**illegally** - 46:25
**imbeds** - 17:21
**immediate** - 15:20
**impermissible** - 43:21
**important** - 8:22, 53:9
**importantly** - 49:4
**improper** - 77:21
**impunity** - 18:7
**incident** - 41:3, 45:2, 96:22
**include** - 14:2
**including** - 18:6, 18:7, 54:2
**incompetent** - 23:14
**incorrectly** - 30:9
**Independent** - 64:11
**independent** - 10:16
**indicate** - 80:22, 82:10, 83:15, 85:21, 86:6
**indicated** - 6:17, 25:3, 30:14, 34:7, 84:17, 84:20
**Indicating** - 34:8, 35:7, 35:18, 36:10, 90:13, 92:5, 92:11
**indicating** - 36:12
**indication** - 69:14
**individual** - 18:9
**information** - 9:21, 42:8
**informed** - 24:21, 24:23
**initials** - 34:1
**injured** - 8:17, 9:8, 9:14, 12:16, 13:1, 13:17, 45:24, 83:24, 83:25, 87:25
**injuries** - 9:1, 44:24, 84:18, 84:20
**injury** - 13:10, 32:17, 45:19, 49:22, 82:19, 82:24, 87:10
**innocence** - 11:23, 41:11, 48:23
**instances** - 7:19, 8:19, 8:21
**instant** - 43:13
**instead** - 69:25
**instructing** - 59:2
**insubordination** - 9:24
**insurance** - 8:25
**integrity** - 47:7
**intend** - 18:22
**intention** - 20:20
**intercede** - 15:25
**interceding** - 25:16, 26:9
**interest** - 8:1
**interrupt** - 11:14, 38:23
**interrupting** - 38:25
**interview** - 59:21
**intradepartmentally** - 15:15
**introduce** - 4:14, 4:21, 14:12
**introduced** - 43:24
**introduction** - 51:12
**investigate** - 9:22
**investigated** - 97:20
**investigation** - 56:11, 56:18, 97:17, 98:1
**involve** - 14:8, 44:8
**involved** - 16:13, 49:5, 67:3, 67:4, 67:8
**involves** - 7:10
**involving** - 51:1
**irrelevant** - 89:4
**issue** - 14:11, 14:15, 14:22, 18:16, 19:16, 50:3, 50:7, 50:8, 51:14, 98:2
**issues** - 6:9, 6:12, 10:9, 49:5, 73:17
**item** - 37:3, 39:18
**itself** - 25:3, 81:25

**J**

**January**- 86:22, 100:15, 100:17
**jealously** - 8:3
**job** - 12:17, 13:1, 13:12, 14:5, 43:19, 45:19, 49:21, 65:24
**John**- 3:8, 4:21
**joint** - 21:20, 21:22
**Jonathan**- 2:8, 5:10
**Joseph**- 79:2
**Jr**- 2:21
**July**- 32:8, 69:3, 70:21, 71:5, 71:13, 72:5, 72:13, 72:17, 73:3, 73:9, 74:15, 76:17, 76:23, 77:17, 78:7, 78:11, 79:9, 79:16, 79:19, 80:8, 80:9, 80:14, 80:16, 80:22, 81:1, 82:11, 82:16, 84:9, 85:24, 86:9, 87:2, 96:2
**Jump**- 23:7
**jury** - 50:13

**K**

**keep** - 39:1, 63:13, 65:3
**Kempkes**- 1:6, 2:5, 4:11, 5:12, 5:13, 5:16, 5:21, 7:8, 15:23, 18:24, 21:1, 21:9, 21:12, 22:16, 24:12, 25:12, 25:21, 26:2, 26:15, 26:22, 28:17, 31:1, 32:7, 33:13, 34:4, 38:17, 39:9, 40:3, 42:21, 49:10, 52:21, 68:4, 70:2, 75:12, 82:4, 88:8, 93:14, 94:4, 95:22
**kept** - 63:8
**kind** - 44:16, 56:19
**kinds** - 44:24
**King**- 2:10, 5:8
**knee** - 13:17
**knows** - 56:16, 56:17
**Kurtz**- 2:16, 5:7, 5:9

**L**

**laid** - 24:24
**large** - 12:11
**larger** - 33:17
**last** - 36:22, 62:16, 75:14, 84:22, 85:1, 85:8, 92:9, 94:5, 94:6
**Law**- 4:7, 8:20, 10:20, 12:19, 12:22, 13:21
**law** - 12:10, 12:25, 27:11, 43:22
**laws** - 7:21
**lawyer** - 53:16, 53:20, 59:2
**lay** - 97:8
**lays** - 24:8
**lead** - 41:19
**leading** - 41:21
**learn** - 91:3
**learned** - 91:15, 92:15
**least** - 44:17, 46:2
**leave** - 9:7, 9:25, 10:7, 10:13, 12:12, 12:16, 13:25, 34:22, 35:6, 35:15, 35:17, 36:15, 40:7, 41:4, 43:14, 49:9, 52:22, 52:25, 53:4, 55:16, 55:17, 58:23, 59:8, 59:22, 60:17, 60:20, 62:4, 62:24, 63:5, 63:24, 64:8, 64:13, 64:23, 67:15, 67:20, 68:25, 71:6, 82:19, 83:13, 83:16, 83:23, 84:6, 84:7, 84:10, 84:12, 84:15, 85:22, 85:23, 87:6, 87:11, 87:19, 87:22, 102:17
**leaves** - 49:11
**leaving** - 14:6, 83:7, 86:21
**left** - 9:19, 10:3, 16:5, 36:12, 43:6, 71:17, 72:5, 72:13, 87:1
**legal** - 17:24, 18:2
**legitimate** - 10:7
**less** - 17:9, 56:5
**Letter**- 103:19
**letter** - 92:17, 94:24, 95:11
**lieu** - 44:25
**lieutenant** - 10:6, 79:5, 82:18
**Lieutenant**- 16:13, 18:7, 57:4, 57:23, 59:7, 59:21, 60:7, 60:11, 60:15, 60:23, 61:1, 61:14, 61:16, 64:6, 64:12, 67:1, 67:11, 67:19, 68:5, 68:12, 76:24, 77:5, 77:18, 78:5, 78:23, 80:7, 80:14, 80:21, 81:3, 82:7, 82:9, 83:14, 84:5, 85:21, 91:20, 92:18, 95:24, 96:2
**Lieutenant's**- 61:23
**likely** - 63:19
**lines** - 94:6
**List**- 33:7, 33:9
**list** - 102:22
**Llc**- 3:4
**loathe** - 11:15
**local** - 16:19
**located** - 99:1
**location** - 100:16
**look** - 12:2, 13:7, 24:13, 28:19, 29:7, 29:23, 33:14, 33:18, 33:21, 40:3, 40:13, 45:20, 53:9, 60:20, 63:19, 88:8, 92:19, 95:2
**looked** - 36:22, 53:7, 61:7
**love** - 24:2
**Lovett**- 2:4, 2:8, 5:10, 5:11, 5:15, 5:19, 7:7, 11:11, 11:13, 18:25, 19:3, 19:7, 19:10, 19:14, 19:18, 20:3, 20:10, 20:16, 21:14, 21:21, 23:6, 24:1, 24:15, 24:22, 25:15, 25:19, 25:23, 26:8, 26:12, 26:16, 26:24, 27:10, 27:20, 28:23, 29:13, 29:16, 30:5, 30:18, 31:15, 31:18, 34:24, 35:25, 36:11, 37:5, 37:10, 37:20, 38:4, 38:7, 38:11, 38:20, 38:23, 39:1, 41:6, 41:21, 41:25, 42:4, 42:10, 42:22, 42:24, 43:7, 45:4, 46:22, 48:3, 48:20, 50:17, 51:12, 52:3, 52:15, 53:11, 53:25, 54:7, 54:16, 54:21, 55:9, 55:23, 56:14, 57:15, 58:24, 59:24, 61:22, 62:1, 62:7, 62:18, 63:21, 64:16, 65:13, 65:16, 65:23, 66:14, 67:4, 67:22, 68:8, 68:16, 69:5, 69:23, 70:12, 72:7, 72:18, 72:21, 75:2, 77:20, 80:17, 80:24, 81:4, 81:6, 81:10, 81:11, 81:14, 81:21, 85:3, 85:13, 85:25, 88:24, 89:4, 90:18, 93:23, 95:17, 96:18, 97:3, 97:7, 97:10, 97:19, 100:5, 100:6, 100:24
**Lovett's**- 49:14
**lower** - 17:3
**Ltd**- 1:23
**lunch** - 71:14

**M**

**machine** - 70:24
**Madam** - 6:21
**mail** - 91:9, 103:11
**mails** - 92:20
**main** - 49:5
**maintain** - 66:8
**maintained** - 65:8
**majority** - 27:1, 27:4
**manner** - 6:16, 68:14
**March** - 35:13, 59:17, 63:10, 63:25, 65:11, 66:6, 66:13, 86:22, 88:23
**mark** - 6:22, 22:10, 33:2
**marked** - 7:1, 22:13, 28:9, 28:12, 28:14, 28:18, 32:5, 33:5, 33:10, 33:14, 33:19, 39:22, 39:25, 40:4, 45:20, 48:18, 52:19, 88:3, 88:6, 88:9, 89:14, 89:21, 89:24, 90:3, 90:22, 93:9, 93:11, 94:2, 94:22, 94:25, 95:3, 95:20
**Marvin** - 2:19, 4:1, 4:12, 4:20, 5:14, 5:20, 7:3, 11:11, 20:5, 20:8, 20:19, 20:23, 22:3, 25:8, 25:21, 26:20, 27:7, 27:19, 27:22, 28:4, 29:2, 29:11, 31:16, 36:3, 36:6, 37:14, 37:19, 39:15, 42:20, 43:2, 43:5, 48:12, 51:24, 52:17, 53:13, 56:7, 56:10, 56:20, 56:23, 57:18, 57:21, 59:4, 60:2, 62:9, 62:13, 64:19, 66:1, 66:4, 66:16, 66:19, 66:24, 68:3, 68:9, 68:19, 68:22, 72:8, 72:11, 72:23, 75:4, 75:11, 77:22, 77:25, 81:5, 81:15, 81:20, 81:23, 85:16, 85:19, 86:1, 86:4, 89:6, 89:11, 90:19, 93:24, 95:18, 97:11, 97:14, 97:21, 97:24, 100:5, 100:21, 100:23, 100:25
**Mary** - 2:19, 4:12
**matter** - 8:15, 18:12, 43:21, 43:22, 52:24
**Matter** - 1:2
**matters** - 6:9
**Mayor** - 2:19, 2:20, 4:1, 4:12, 4:20, 5:14, 5:20, 6:6, 7:3, 7:6, 11:11, 20:5, 20:8, 20:19, 20:23, 22:3, 25:8, 25:21, 26:20, 27:1, 27:7, 27:9, 27:19, 27:22, 28:1, 28:4, 29:2, 29:11, 31:16, 31:22, 36:3, 36:6, 37:14, 37:19, 37:21, 38:13, 39:15, 42:15, 42:20, 43:2, 43:5, 48:12, 51:24, 52:4, 52:17, 53:13,

56:7, 56:10, 56:20, 56:23, 57:18, 57:21, 59:4, 60:2, 62:9, 62:13, 64:19, 66:1, 66:4, 66:16, 66:19, 66:24, 68:3, 68:9, 68:19, 68:22, 72:8, 72:11, 72:23, 75:4, 75:11, 77:22, 77:25, 81:5, 81:12, 81:15, 81:20, 81:23, 85:16, 85:19, 86:1, 86:4, 89:6, 89:11, 90:19, 93:24, 95:18, 97:11, 97:14, 97:21, 97:24, 100:5, 100:21, 100:23, 100:25
**Mayor's** - 27:18, 31:19, 81:21
**mean** - 34:24, 57:11, 96:17
**meant** - 12:17, 83:23
**medical** - 8:25, 94:11
**medication** - 16:9
**meet** - 67:1, 67:11, 76:22
**meeting** - 60:22, 61:8, 61:10, 61:20, 62:4, 62:24, 64:6, 67:16, 67:19, 68:5, 68:7, 68:11, 77:1, 77:2, 77:5, 77:8, 77:12, 77:14, 77:15, 77:17, 78:2, 78:10, 78:13, 78:17, 78:22, 79:3, 80:25, 81:2, 82:6, 85:20, 86:7, 95:23, 96:1
**meetings** - 78:4
**member** - 4:13, 6:13, 15:13, 19:22, 20:21, 27:16, 27:20
**members** - 36:4, 45:23, 56:8, 56:21, 57:19, 62:11, 100:21
**Members** - 5:22, 18:4, 31:20
**memorialized** - 41:14
**memory** - 65:15, 65:19
**mention** - 40:7
**mentioned** - 11:1
**merit** - 44:13, 50:10
**messages** - 71:19, 71:22, 72:1
**met** - 60:7, 64:14, 79:19, 80:12, 80:13, 80:15, 80:21, 80:23, 82:9, 83:14
**midnight** - 46:6
**midst** - 51:6
**might** - 20:17, 61:7, 63:17
**mind** - 55:25, 56:1
**minds** - 17:22
**minimal** - 23:9
**minimally** - 46:18
**Minimally** - 8:24
**ministerial** - 6:9
**minor** - 16:17
**miraculous** - 38:12
**misassembled** - 30:9, 30:13
**misconduct** - 10:24, 43:24, 51:2
**misdemeanor** - 16:15
**misleading** - 9:20, 43:20, 47:6
**missed** - 29:11
**missing** - 29:10, 29:12, 30:22
**mistake** - 43:12, 45:8
**mistaken** - 46:24
**Mitchell** - 74:6, 75:18, 75:21, 76:4, 76:8
**money** - 14:11, 18:4, 48:4
**morning** - 58:19, 71:7, 71:9
**most** - 7:19, 19:12
**Mount** - 73:10
**move** - 23:4, 23:11, 31:12, 52:12, 89:2, 90:15, 93:21, 95:15
**Municipal** - 8:20, 10:20, 12:19, 12:22, 13:21
**must** - 8:11, 20:12

**N**

**naked** - 99:6
**name** - 21:7, 34:12
**named** - 34:3
**nature** - 49:2
**navigate** - 51:21
**necessary** - 100:18
**need** - 9:7, 20:11, 23:9, 25:1, 25:10, 43:2, 87:6
**needed** - 6:20
**needless** - 14:9
**negotiating** - 7:23
**negotiations** - 7:18
**never** - 15:7, 22:22, 44:16, 66:22, 69:7, 96:4
**New** - 1:8, 1:24, 2:7, 2:14, 3:7, 4:6, 7:13, 21:4, 21:11, 98:12
**next** - 34:3, 34:12, 63:8, 78:19, 81:3, 82:7, 94:5
**noisy** - 39:3
**none** - 8:7
**North** - 1:24
**Notary** - 21:4
**note** - 5:2, 28:23, 38:17
**noted** - 26:1, 26:17, 52:10, 62:21, 101:2
**nothing** - 59:19, 96:6
**notice** - 9:6, 9:19, 46:7
**Notice** - 6:22, 6:25, 102:4
**notify** - 73:19
**noting** - 38:11
**November** - 82:23
**nucleus** - 14:19
**number** - 15:2, 18:1, 21:10, 35:8, 50:25, 70:3, 87:1
**numbered** - 30:9
**numbers** - 29:11, 30:14, 30:16, 30:19

**O**

**O'** - 4:21, 25:24, 52:5
**O'neil** - 2:15, 5:8, 7:5, 7:6, 12:5, 14:1, 17:16, 19:9, 20:24, 20:25, 21:6, 21:17, 21:24, 22:10, 23:4, 23:16, 24:10, 24:25, 25:8, 28:11, 29:4, 29:15, 29:23, 30:12, 31:12, 33:1, 35:1, 36:1, 37:8, 39:21, 41:13, 41:18, 41:23, 42:2, 42:7, 44:4, 47:24, 49:1, 49:6, 49:13, 49:16, 50:23, 51:20, 52:12, 54:3, 54:5, 54:11, 54:19, 55:12, 60:4, 62:14, 62:22, 65:15, 65:20, 66:20, 67:8, 68:3, 69:9, 70:3, 70:6, 72:19, 72:23, 72:25, 80:19, 85:4, 88:2, 89:2, 89:6, 89:21, 90:15, 92:7, 93:8, 93:21, 94:21, 95:15, 97:8, 100:3
**O'reilly** - 3:4, 3:8, 6:18, 18:21, 19:2, 19:5, 20:1, 20:4, 24:12, 24:19, 25:10, 25:18, 26:1, 26:6, 26:10, 26:14, 26:17, 27:16, 28:5, 31:1, 31:20, 32:2, 37:23, 38:2, 38:6, 38:16, 38:21, 38:24, 39:6, 44:2, 48:7, 49:6, 49:13, 52:9, 62:20, 67:24, 70:5, 70:17, 75:12, 81:7, 81:9, 81:13, 82:1, 82:4, 100:9, 100:13
**O's** - 44:4
**Object** - 24:15
**object** - 41:23, 42:18, 50:20, 56:3, 65:24
**objecting** - 49:17
**Objection** - 21:14, 25:15, 26:8, 41:6, 55:23, 56:14, 59:24, 64:16, 66:14, 68:8, 68:16, 72:18, 72:21, 75:2, 77:20, 85:3, 85:13, 88:24, 96:18, 97:3, 97:19
**objection** - 22:1, 26:11, 26:13, 26:16, 31:15, 37:13, 39:17, 42:9, 42:19, 42:23, 44:3, 47:22, 48:13, 52:15, 56:8, 56:21, 57:15, 57:19, 62:10, 62:11, 66:2, 66:17, 68:20, 72:9, 75:4, 77:23, 85:17, 86:2, 89:8, 90:18, 93:23, 95:17, 97:7, 97:10, 97:12, 97:22
**objectionable** - 60:5
**objections** - 6:10, 25:25, 49:8, 51:21
**obligation** - 63:21
**observations** - 48:8
**occasion** - 87:7
**occasions** - 87:1, 87:4
**occurred** - 44:9, 76:20, 80:25, 95:24, 96:22
**occurring** - 79:4
**October** - 6:23
**offenses** - 11:10
**office** - 61:14, 61:23
**officer** - 8:13, 15:4, 15:8, 15:17, 22:6, 31:10, 74:4, 96:23
**Officer** - 1:6, 2:5, 4:10, 5:12, 5:16, 5:21, 7:8, 15:23, 18:24, 20:25, 21:9, 21:12, 22:16, 24:12, 25:12, 25:21, 26:1, 26:15, 26:22, 28:17, 31:1, 32:7, 33:13, 38:17, 39:9, 40:3, 42:21, 49:9, 52:21, 68:4, 70:2, 75:12, 82:4, 88:8, 93:14, 94:4, 95:22
**officers** - 12:20, 12:23, 16:4
**old** - 67:10
**omitted** - 30:20
**one** - 8:9, 10:2, 13:5, 15:16, 30:21, 35:18, 36:9, 36:11, 38:24, 49:4, 50:23, 53:8, 53:9, 53:11, 57:12, 59:10, 59:11, 59:12, 59:13, 59:14, 63:25, 64:4, 66:12, 70:10, 73:2, 80:11, 82:11, 82:13, 85:14
**One** - 15:2, 27:20, 88:15
**ones** - 23:21
**Open** - 5:19
**open** - 5:17, 5:21
**opening** - 7:4, 11:12, 11:18, 49:19
**operating** - 13:9
**operation** - 55:24
**opportunity** - 31:2
**opposed** - 13:18
**order** - 10:13, 28:25, 30:2
**organization** - 7:14
**original** - 29:4
**ought** - 8:1, 13:19, 17:14, 18:15
**ourselves** - 14:9
**outside** - 19:13
**overrule** - 37:15, 57:19, 62:10, 66:2, 68:20, 72:9, 77:23, 81:7, 81:12, 81:17, 97:12, 97:22
**overruled** - 39:17, 48:13, 75:5, 86:2, 89:8
**Overruled** - 22:3, 36:3, 36:6, 62:13, 66:4, 68:22, 72:11, 77:25, 81:5, 81:20, 86:4, 97:14, 97:24
**overwhelmingly** - 17:2
**own** - 27:13

**P**

**page** - 22:12, 22:21, 22:22, 26:7, 26:21, 28:24, 28:25, 29:8, 29:12, 29:16, 29:17, 29:18, 29:19, 29:20, 30:2, 30:14, 30:21, 33:16, 40:14, 94:5
**pages** - 24:14, 25:13, 25:22, 29:5, 29:6, 29:10, 30:1, 30:10, 102:10
**paginated** - 29:5, 30:17
**paid** - 16:11
**Panzarino** - 79:2
**paragraph** - 47:10, 57:12, 92:10
**paramilitary** - 7:14
**Park** - 1:24
**part** - 12:11, 29:19, 33:17, 69:6
**participant** - 18:8
**particular** - 14:21, 54:8
**particularly** - 51:13
**parties** - 6:24, 20:7, 39:14, 48:11, 68:2, 69:14, 82:3
**party** - 6:5, 19:6, 20:9
**party's** - 55:24
**past** - 14:13, 15:21
**patrol** - 15:23
**pay** - 17:19
**payer's** - 14:10
**Pba** - 18:25, 19:3, 19:5, 19:7, 19:11, 19:17, 19:20, 19:22, 19:23, 20:2, 20:9, 20:11, 20:12, 53:16, 53:20, 78:25
**penalty** - 44:7, 44:15, 44:25, 45:10, 46:16, 47:12, 49:25, 50:4, 50:11, 51:5
**pending** - 41:12, 44:1, 51:15
**people** - 16:3, 46:6, 46:8, 46:9, 46:12
**performance** - 4:23
**perhaps** - 29:21
**period** - 11:8, 71:23, 72:2, 86:22
**person** - 12:18, 46:24, 56:2
**personal** - 36:17
**pertain** - 59:25
**pertaining** - 41:8
**peruses** - 22:19, 26:3, 28:21, 33:22, 40:9, 40:15, 55:14, 88:11, 90:6, 92:12, 93:18, 95:5
**pettiness** - 17:24
**Pg** - 102:3, 102:8, 103:3
**phase** - 48:22
**phone** - 70:25, 71:2, 71:23, 72:2
**phones** - 5:25
**picked** - 100:17
**pink** - 17:20
**pinky** - 13:17
**pizza** - 14:23, 73:18, 79:22, 80:3, 80:5
**place** - 7:20, 61:11, 61:21, 70:20, 73:13, 73:14, 81:3, 82:7, 100:12
**placed** - 87:18, 87:22, 91:1, 91:14, 91:16, 92:23, 94:18, 95:16
**places** - 79:16, 79:19, 80:8
**Plains** - 2:7
**play** - 42:14
**pleases** - 45:5
**pled** - 45:8

**plenty** - 51:16
**Pllc** - 2:10
**plus** - 59:25
**Pm** - 1:9, 32:22, 71:15, 72:17, 73:5, 73:8, 100:15, 100:18, 100:19, 101:2
**point** - 5:1, 47:4, 47:5, 86:17
**pointing** - 39:7, 39:8
**police** - 7:11, 7:22, 8:10, 9:10, 10:20, 13:12, 14:4, 15:4, 15:5, 15:8, 15:13, 16:6, 16:8, 16:14, 17:1, 18:5, 31:10, 32:24, 41:4, 44:17, 64:24, 65:8, 73:19, 75:25, 76:4, 76:9, 76:17, 76:19, 76:23, 77:16
**Police** - 1:1, 1:6, 2:11, 4:4, 4:10, 4:22, 5:3, 5:5, 5:12, 7:10, 10:22, 12:19, 12:22, 13:23, 15:11, 15:20, 16:7, 18:23, 21:9, 22:6, 26:23, 42:5, 46:25, 47:16, 52:21, 55:25, 59:8, 71:24, 72:4, 72:12, 72:19, 73:4, 84:13, 84:24, 85:9, 102:9
**policies** - 10:13
**Policy** - 33:8
**policy** - 7:25, 12:12, 12:16, 13:15, 14:1, 33:5, 35:6, 35:15, 35:17, 36:8, 36:15, 37:1, 37:4, 39:19, 40:8, 41:4, 43:15, 45:12, 45:20, 46:1, 52:22, 52:25, 53:4, 55:5, 55:6, 55:16, 55:17, 58:23, 59:8, 59:22, 60:17, 60:21, 61:7, 62:5, 62:25, 63:5, 63:13, 63:24, 64:8, 64:13, 64:23, 65:4, 65:10, 66:5, 66:9, 66:11, 66:22, 66:25, 67:16, 67:20, 68:25, 102:17
**Poll** - 36:3, 37:15
**poll** - 27:22, 42:15, 43:3, 51:25, 81:17
**polled** - 36:5, 38:14, 39:16, 43:4, 52:2, 56:9, 56:22, 57:20, 62:12, 66:3, 66:18, 68:21, 72:10, 77:24, 81:19, 85:18, 86:3, 89:10, 97:13, 97:23, 100:22
**polling** - 48:12
**Pondfield** - 1:7, 21:10
**poor** - 65:23
**Poorman** - 2:22, 4:17, 27:25, 31:25, 75:7
**Pordale** - 82:15
**position** - 20:18, 22:8, 44:8
**positions** - 86:12
**possession** - 31:10, 36:14, 63:20, 64:22, 65:4, 65:5
**possibly** - 15:25
**Possibly** - 18:25
**pot** - 18:3, 19:25
**potential** - 20:13, 48:1, 53:24, 54:14
**potentially** - 59:1
**precious** - 12:4
**precisely** - 11:4, 45:2, 46:17
**precluded** - 48:6
**predicate** - 30:7, 41:16
**prejudicial** - 43:23
**premised** - 43:11
**premiss** - 12:10
**prepare** - 55:21
**prepared** - 7:4, 41:2, 42:11, 69:13
**prescription** - 16:9
**present** - 5:23, 19:8, 78:3, 78:23
**presented** - 51:15
**presently** - 83:2, 86:15, 98:24
**Presently** - 96:15
**president** - 19:1, 19:4, 19:21, 19:22, 20:12, 20:14, 78:25
**pretty** - 91:23
**previously** - 6:17, 9:24, 11:6, 11:21, 28:9, 32:5, 48:18, 52:19, 89:14, 90:22, 94:2, 95:20
**primarily** - 13:9, 18:17
**principals** - 10:18
**private** - 6:1
**privilege** - 54:23
**privileged** - 54:17
**probablay** - 100:7
**problem** - 24:5, 57:16, 69:9, 69:21
**Procedure** - 33:8
**procedure** - 8:6, 13:8, 33:5, 35:8, 35:24, 36:15, 40:8, 41:5, 45:13, 49:20, 52:22, 52:25, 53:5, 58:23, 59:9, 59:23, 60:18, 60:21, 61:8, 62:5, 62:25, 63:5, 63:14, 63:24, 64:9, 64:13, 64:23, 65:11, 67:16, 69:1, 96:4, 102:18
**procedures** - 7:18, 7:24, 10:14, 45:22, 65:4, 67:21
**proceed** - 21:16, 24:10
**proceeding** - 4:25, 27:3, 27:6, 47:8, 48:23, 49:2, 50:24, 51:4, 51:8, 104:6
**proceedings** - 24:4, 27:8
**process** - 47:20, 50:19, 50:20
**product** - 30:15
**professional** - 6:16
**proffer** - 17:25
**Proffered** - 1:5
**proffered** - 4:9
**prohibited** - 7:22
**prompted** - 55:21, 87:10
**proper** - 65:17
**property** - 47:20, 48:4
**propose** - 42:20, 51:24, 56:7, 56:20, 57:18, 62:10, 66:1, 66:16, 68:19, 72:8, 75:4, 77:22, 85:16, 86:1, 89:8, 97:11, 97:21
**proposed** - 37:14
**prosecuted** - 17:9, 17:12, 18:11
**prosecutions** - 17:8
**prosecutor** - 24:18, 25:16
**protected** - 8:2
**prove** - 12:7, 46:3
**provided** - 6:4, 16:7
**provision** - 7:21, 14:3, 46:19
**provisions** - 10:14
**public** - 5:17, 5:22, 7:25, 15:22, 20:22
**Public** - 7:15, 21:4
**punishment** - 48:25
**purely** - 56:2, 96:19
**purported** - 97:25
**purpose** - 45:21
**purposes** - 4:5, 6:7, 28:7, 51:5, 70:6
**pursuant** - 4:6
**put** - 15:21, 20:18, 21:19, 21:21, 31:16, 69:8, 89:7, 89:9
**putting** - 16:3, 47:4
**Putting** - 11:20

**Q**

**questioned** - 39:5, 56:24, 57:25, 58:21, 59:6, 61:2, 61:6, 79:5
**questioning** - 24:16, 42:12, 61:2
**questions** - 53:11, 59:25, 74:18, 85:14, 100:4
**quiet** - 39:2

**R**

**racial** - 15:11, 15:15
**ran** - 17:20
**rape** - 16:2
**rather** - 14:11
**reaction** - 86:14
**read** - 34:10, 62:15, 62:17, 67:23, 75:15, 81:22, 94:7
**Read**- 55:6
**readily** - 13:13
**reading** - 37:10
**real** - 14:11, 14:15
**really** - 8:15, 37:6, 42:13, 77:2, 77:13, 98:17
**reason** - 10:7, 14:24, 41:7, 42:4, 45:14, 45:15, 45:18, 49:16, 76:9, 86:11
**reasons** - 10:3, 15:2, 18:1
**receive** - 26:22, 34:23, 63:23, 71:22, 90:10, 93:5, 95:8
**received** - 7:1, 22:13, 23:5, 26:7, 26:15, 28:10, 28:14, 31:13, 32:6, 33:10, 39:25, 48:19, 52:13, 52:20, 88:6, 89:3, 89:11, 89:15, 89:24, 90:16, 90:23, 93:11, 93:22, 94:3, 94:24, 95:21, 98:14
**receiving** - 13:4
**recess** - 20:6, 39:13, 48:10, 68:1, 82:2
**recognize** - 35:16, 88:10, 95:4
**recognizes** - 41:14
**recollection** - 37:9, 46:15, 53:10, 55:8, 61:5, 63:4, 65:22, 76:8, 92:22
**reconvene** - 44:14, 100:15
**record** - 4:13, 5:2, 5:15, 9:12, 20:10, 20:19, 21:8, 24:20, 25:24, 27:15, 28:5, 28:24, 37:20, 38:8, 38:16, 39:8, 47:25, 48:8, 52:3, 67:24, 69:6, 69:8, 70:17, 70:19, 81:24, 82:1, 100:10, 100:11, 100:13
**recorded** - 81:24
**records** - 86:17
**recover** - 23:12
**rectified** - 47:2
**redacting** - 69:10
**refer** - 40:5, 47:19, 70:13
**reference** - 12:15, 29:6, 40:11, 56:4, 61:3
**referenced** - 13:14, 54:3, 67:7
**references** - 43:11
**referred** - 16:24
**Referring**- 57:12
**referring** - 37:7, 37:12, 57:17
**reflect** - 37:21, 52:4
**refresh** - 37:8, 46:15, 53:9, 61:5, 65:21, 76:7, 92:21
**refreshes** - 55:7
**regard** - 7:23, 19:15, 50:6, 50:15, 50:24, 56:12, 57:24, 60:15, 67:2, 67:12, 68:6, 68:15, 68:17, 80:1, 84:5, 93:16, 94:12, 95:12
**regular** - 9:9
**regularly** - 9:15, 10:8
**regulational** - 13:8
**regulations** - 10:15, 31:5, 35:6, 35:10, 102:14
**Regulations**- 28:13
**Reilly**- 4:21, 25:24, 52:5
**related** - 13:12, 14:22, 32:16, 70:8, 97:17
**relates** - 12:11, 51:14
**Relations**- 7:16
**relationship** - 37:24
**relatively** - 9:10, 11:7
**relatives** - 9:11
**relevant** - 44:20, 45:11, 49:18, 50:3, 69:11
**relish** - 8:8
**remember** - 35:13, 35:20, 36:25, 37:3, 39:18, 53:7, 55:6, 57:13, 61:9, 61:10, 61:20, 61:24, 62:3, 62:23, 63:7, 64:3, 64:7, 64:12, 64:22, 65:1, 65:21, 66:23, 66:24, 68:24, 74:5, 74:13, 74:19, 74:20, 75:17, 75:20, 76:11, 76:16, 76:25, 78:9, 78:16, 79:4, 79:15, 79:21, 81:2, 82:6, 86:16, 86:20, 96:3, 96:10, 96:13, 97:2, 98:15, 99:3, 99:12, 99:17, 99:21
**removed** - 42:3, 42:5
**rep** - 77:14, 78:3
**repeatedly** - 15:3, 15:10, 15:14
**repetitive** - 66:21
**rephrase** - 53:13, 59:4, 60:2, 64:19, 72:24
**Rephrase**- 68:9
**report** - 16:15
**reporter** - 6:3, 33:1, 62:17, 75:15
**Reporter**- 6:21
**reporting** - 45:22, 57:10
**represent** - 19:19, 30:12
**representation** - 77:19, 78:10, 78:14
**representative** - 77:7
**representatives** - 57:1
**represented** - 8:8, 40:22, 46:23
**representing** - 20:2, 20:11
**represents** - 19:7, 19:10, 19:11
**Request**- 103:8
**request** - 5:20, 55:10, 87:10, 87:21, 88:5, 88:18, 88:23, 90:25, 91:9, 91:11, 91:14, 91:16, 91:22, 92:16, 92:23
**requested** - 6:13, 77:18, 87:18, 91:23
**requesting** - 48:21, 89:7, 91:1
**requests** - 88:15, 94:11
**require** - 44:11, 54:1, 58:25
**required** - 65:3
**requires** - 51:10
**reschedule** - 78:13
**reserve** - 6:12
**reside** - 69:4
**residence** - 9:19, 10:1, 10:4, 14:20, 70:8, 70:10, 70:13, 70:15, 70:22, 85:22, 96:23
**residences** - 70:4
**residents** - 17:5
**respect** - 6:8, 13:10, 17:8, 24:25, 26:25, 48:23, 57:16, 60:5
**respective** - 6:24
**respond** - 74:23
**responded** - 89:17

**Respondent**- 21:2
**responsibilities** - 4:24
**responsibility** - 8:10, 91:4, 91:16, 92:16
**retroactive** - 47:2
**return** - 71:12, 73:20, 74:14
**returned** - 71:18, 87:6
**reversible** - 11:19, 11:24, 24:18, 41:9, 51:16
**review** - 31:2
**revised** - 36:10, 59:13
**revision** - 35:22
**ridiculous** - 42:18
**right-hand** - 35:5
**Right-hand**- 35:9
**rights** - 47:21
**risk** - 15:22, 16:4, 27:13
**Road**- 1:7, 2:6, 3:6, 21:10
**robbery** - 16:1
**Robert**- 2:23, 4:19
**role** - 24:17, 25:17
**room** - 42:6, 43:6, 47:10, 49:12
**routine** - 39:3
**routinely** - 17:4
**rule** - 13:7, 18:16, 31:19
**rules** - 7:15, 10:15, 31:4, 35:5, 35:10, 102:13
**Rules**- 28:13
**ruling** - 25:11, 27:13, 27:18, 37:13, 37:14, 37:22, 37:24, 38:13, 52:5, 52:7, 85:15
**rulings** - 51:17

S

**safety** - 15:22
**salary** - 8:23, 8:24, 9:3, 13:5, 16:11
**Saratoga** - 58:18, 58:22, 64:15, 97:17, 98:11, 98:12
**Satriale** - 16:14, 18:8, 18:11, 67:2, 67:12, 67:19, 68:5, 68:12, 76:24, 77:5, 77:18, 78:5, 78:23, 80:8, 80:14, 80:22, 81:3, 82:7, 82:10, 82:18, 83:15, 84:5, 85:21, 95:24, 96:2
**saved** - 92:20
**saw** - 22:22, 62:4, 62:23
**scheduled** - 9:16, 10:8, 32:9, 32:19, 78:17, 83:8
**scheduling** - 47:11
**scheme** - 12:1
**Schoeneck** - 2:10, 5:7
**scrambled** - 29:1
**second** - 63:18, 78:17, 78:22, 80:25, 82:10, 83:15, 85:20, 86:7, 95:23, 96:1
**Secondly** - 44:18
**seconds** - 83:3
**Section** - 4:7, 8:20, 10:19, 30:25, 87:18, 87:22, 91:4
**section** - 87:11
**see** - 10:10, 35:4, 35:6, 40:11, 46:15, 55:7, 63:20, 92:10
**send** - 94:14
**sending** - 15:23
**separate** - 44:15, 48:25
**September** - 87:14
**Sepulveda** - 1:23, 21:4, 104:10
**sequence** - 29:21
**Sergeant** - 16:8, 74:6, 75:18, 75:21, 76:4, 76:8, 80:13
**serious** - 18:5
**seriously** - 10:23
**serve** - 6:6, 8:11
**served** - 6:23, 21:18, 22:25, 23:2, 23:17, 23:24, 25:3
**service** - 70:22
**set** - 12:7
**sets** - 67:5
**settled** - 49:23, 53:3
**Settlement** - 53:8
**settlement** - 48:1, 52:24, 53:22, 54:12, 103:5
**seven** - 29:17, 29:18
**severe** - 44:25, 49:24
**Shield** - 21:10
**shift** - 59:15
**short** - 11:7, 16:20, 20:6, 39:13, 48:10, 68:1, 82:2
**show** - 8:12, 11:2, 17:2, 32:12, 59:22, 60:16, 90:2
**showed** - 84:22
**shown** - 58:22, 59:7, 67:15
**shut** - 41:25
**Sick** - 45:24, 102:17
**sick** - 8:16, 9:8, 9:14, 10:13, 12:11, 12:16, 13:15, 13:25, 18:16, 34:22, 35:6, 35:15, 35:16, 36:8, 36:15, 40:7, 41:4, 43:14, 45:23, 45:24, 52:22, 52:24, 53:4, 55:16, 55:17, 58:23, 59:8, 59:22, 60:17, 60:20, 62:4, 62:24, 63:5, 63:23, 64:8, 64:13, 64:15, 64:23, 67:15, 67:20, 68:25, 82:24, 83:1, 84:15
**sickness** - 13:10
**side** - 38:15
**sign** - 34:6, 34:18, 40:19, 63:9
**signature** - 34:1, 40:17
**signed** - 21:23, 23:7, 23:14, 23:17, 23:21, 34:15, 35:12, 35:21, 36:8, 36:9, 36:10, 36:15, 37:1, 37:4, 39:19, 43:8, 46:8, 46:10, 46:12, 53:22, 54:12, 59:12, 59:16, 59:20, 63:3, 63:25
**significant** - 17:10
**signing** - 35:14
**simply** - 13:1, 30:5, 69:25
**single** - 15:8
**sleep** - 16:10
**slice** - 14:23, 73:17, 79:22, 80:5
**someone** - 8:13, 23:8
**sometime** - 31:11, 60:8
**somewhat** - 50:1
**sooner** - 88:22
**sophisticated** - 50:5
**sorry** - 45:9, 80:13, 84:1, 85:4
**speaking** - 39:9, 49:8
**speaks** - 25:2
**special** - 7:15, 7:21, 12:21
**specifically** - 10:5, 40:6
**specifications** - 12:3, 14:18
**speculate** - 38:7
**speculation** - 52:9
**speculative** - 56:2, 96:19
**spoken** - 9:11, 50:15
**stand** - 23:13, 42:14, 42:16
**standing** - 26:11, 26:13
**stapled** - 30:4
**start** - 20:23
**started** - 42:12, 55:12
**starting** - 5:3
**starts** - 30:20, 67:23, 80:18
**State** - 7:13, 21:4
**state** - 7:17, 12:25, 21:7, 98:10
**statement** - 11:12, 11:15, 11:18, 64:17, 81:22
**statements** - 7:4, 49:20
**statistics** - 17:1
**status** - 13:24, 43:10, 43:19, 47:1, 83:22, 84:3, 91:1, 91:5, 91:15, 91:17, 91:19, 92:16, 92:24, 93:17, 94:19, 95:12, 103:16
**stay** - 20:18, 20:21, 42:25, 85:2
**stayed** - 84:23
**staying** - 45:13, 45:18, 49:21, 68:15, 68:18
**step** - 42:21, 100:9
**still** - 12:3, 21:25, 63:20, 66:10
**stipulate** - 70:9, 70:11
**stipulated** - 69:14
**Stop** - 42:7
**stopped** - 17:4, 17:6, 73:12
**straining** - 13:25
**subject** - 43:14, 54:3, 54:8
**submission** - 93:2
**submit** - 11:9, 45:25, 87:21, 91:16
**submitted** - 16:14, 37:17, 88:16, 88:23, 90:24
**subordinates** - 15:21
**subsequent** - 69:18
**subsequently** - 12:14
**substance** - 37:12, 55:3, 74:14, 83:7
**subtlety** - 38:18
**suggesting** - 46:22
**sum** - 55:3, 74:13, 83:6
**summoned** - 17:4
**summons** - 17:6
**support** - 19:21
**supposed** - 14:7, 24:6, 30:7, 43:24, 47:5, 77:9
**supposedly** - 51:14
**suspect** - 23:10
**sustain** - 56:7, 56:20, 66:17
**sustained** - 32:16, 85:17
**Sustained** - 56:10, 66:19, 85:19
**switched** - 5:25
**sworn** - 21:3
**systemically** - 15:5

T

**T's**- 102:6, 103:1
**table** - 30:23
**talks** - 13:9
**targeted** - 14:17
**tax** - 14:10
**taxes** - 91:20
**Taxter**- 3:6
**tea** - 18:3, 19:25
**teeny** - 14:19
**telephone** - 70:22, 71:20, 73:23, 99:9
**tempest** - 18:3, 19:25
**ten** - 29:18, 29:19, 30:1
**tenth** - 35:22, 59:12, 59:16
**tenure** - 15:4
**Terence**- 2:15, 5:8
**termination** - 12:5, 12:9
**testified** - 21:5, 23:24, 24:1, 90:24
**testify** - 19:24, 45:17
**testimony** - 35:23, 38:19, 39:11, 69:17, 70:7, 88:17
**therefore** - 20:21
**they've** - 49:19
**third** - 13:18, 40:13, 55:24, 62:8
**thirteen** - 28:24, 28:25, 29:3, 29:8, 29:17, 29:19
**thirteenth** - 30:2
**Thomas**- 1:6, 4:10, 5:12, 21:9
**three** - 9:6, 10:25, 29:9, 47:11, 49:25, 65:14, 65:25, 67:9, 85:11, 85:14, 94:6
**three-fold** - 9:6
**throw** - 36:20, 65:6
**timing** - 52:7
**today** - 50:25
**together** - 30:4
**token** - 15:16, 15:17
**Tonight**- 25:17
**tonight** - 31:7, 34:25
**took** - 44:24, 46:16, 47:17, 61:11, 61:20, 70:20, 81:3, 82:7, 100:12
**top** - 29:7
**topic** - 54:15
**totally** - 43:20
**touch** - 98:22
**tour** - 9:9, 9:15, 10:8, 14:7, 32:18, 46:5, 46:6, 46:10, 57:8
**Tour**- 32:20, 32:21
**town** - 70:5
**transcribed** - 6:2
**transcript** - 69:10, 69:13, 69:16, 69:21, 104:6
**transcripts** - 6:4
**treat** - 20:12
**treated** - 15:1
**trial** - 50:13
**trouble** - 16:21
**true** - 29:25, 70:12, 104:5
**trust** - 52:6
**Trustee**- 2:21, 2:22, 2:23
**Trustees**- 4:2, 7:7
**try** - 25:23
**trying** - 23:12, 37:8, 65:21, 97:8
**twelve** - 46:5, 46:10
**twenty** - 29:17, 29:18, 86:21
**twenty-eight** - 86:21
**twenty-seven** - 29:17, 29:18
**two** - 15:17, 32:20, 32:21, 33:2, 62:7, 67:5, 78:4, 87:24
**Two**- 53:11, 85:11
**type** - 7:12, 8:6, 51:10
**typed** - 34:3

U

**ultimately** - 17:23, 93:5
**Ultimately** - 94:17
**un-navigate** - 51:21
**unable** - 98:22
**unaware** - 51:9
**Unconsolidated** - 4:7
**under** - 9:2, 12:10, 12:18, 12:21, 12:23, 12:24, 13:20, 34:18, 44:9, 47:10
**underaged** - 16:18
**Underhill** - 2:23, 4:19, 27:24, 31:23, 75:9
**underlining** - 90:12
**understood** - 44:21, 45:25
**unduly** - 49:3
**unfortunately** - 51:20
**Unfortunately** - 42:10
**uniform** - 45:22

**unilateral** - 31:19
**unilaterally** - 27:2
**union** - 19:14, 77:7, 77:14, 77:18, 78:2, 78:10, 78:14
**unions** - 7:22, 19:12
**Unless** - 47:13
**untimely** - 93:2
**unusual** - 8:6
**up** - 16:9, 29:1, 32:12, 35:5, 41:25, 45:1, 45:23, 84:23
**upstairs** - 99:6

## V

**vacuum** - 18:14
**Vaguely** - 99:14
**Various** - 10:14
**Verbatim** - 83:5
**verbatim** - 83:6
**Vernon** - 73:10
**view** - 31:21
**Village** - 1:1, 2:11, 4:2, 4:10, 5:3, 10:22, 13:8, 15:9, 15:11, 17:5, 22:4, 41:1
**violated** - 10:12, 10:18, 41:3, 46:20, 46:21, 62:6, 63:1
**Violating** - 55:5
**violation** - 44:9, 47:21
**visible** - 38:21
**visit** - 70:2, 96:23
**visited** - 69:19, 70:15
**visits** - 69:11
**voluntarily** - 48:2

## W

**waiving** - 54:22
**walked** - 18:11
**Wanda** - 1:23, 21:3, 104:10
**wants** - 24:10, 42:16, 44:2
**warping** - 13:25
**waste** - 14:10, 18:4
**wealthy** - 17:11
**weight** - 48:15, 50:6, 50:7, 50:11, 50:15
**welfare** - 16:17
**well-connected** - 17:11
**Westchester** - 10:21
**whereabouts** - 9:22, 57:24, 60:12, 60:16
**whereas** - 40:6, 40:25
**whisper** - 38:13
**whispered** - 52:5
**whispers** - 37:23
**White** - 2:7, 17:5
**Whites** - 17:10
**whole** - 6:14, 85:2
**William** - 2:21, 4:16
**withdraw** - 80:19
**withdrawn** - 80:11, 80:12
**withholding** - 13:5
**witness** - 20:13, 20:15, 20:17, 20:21, 22:19, 23:13, 23:19, 24:7, 26:3, 28:21, 33:22, 40:9, 40:15, 41:19, 41:20, 41:22, 42:2, 42:8, 46:4, 49:11, 52:11, 55:14, 70:1, 70:7, 70:14, 88:11, 90:6, 92:8, 92:12, 93:18, 94:8, 95:5
**witnesses** - 18:23, 47:9, 49:9, 69:18
**words** - 96:7
**worker's** - 8:18
**world** - 13:12
**writing** - 13:23, 43:17, 47:14, 87:22, 89:19, 91:11, 91:25
**Written** - 33:6, 33:9, 102:21
**written** - 34:12, 47:17, 48:6, 88:18, 88:23, 90:25, 91:14, 92:22
**wrote** - 34:14

## Y

**year** - 87:15, 91:6
**years** - 13:22, 14:16, 15:16, 43:9, 49:25, 67:10, 85:11, 87:24
**York** - 1:8, 1:24, 2:7, 2:14, 3:7, 4:6, 7:13, 21:5, 21:11, 98:12
**yourself** - 61:15, 68:7, 68:13, 94:7
**youth** - 16:18

VILLAGE OF BRONXVILLE
BOARD OF POLICE COMMISSIONERS

---------------------------------------------x

IN THE MATTER OF DISCIPLINARY CHARGES
DATED AUGUST 21, 2006,

-preferred against-

POLICE OFFICER THOMAS KEMPKES,

---------------------------------------------x

Bronxville Library
Yeager Community Room
January 4, 2007
6:30 p.m.

# D I S C I P L I N A R Y  H E A R I N G

CARBONE & ASSOCIATES, LTD.

Melissa Sasso

111 North Central Park Avenue

Hartsdale, New York 10530

(914) 684-0201



A P P E A R A N C E S:

LOVETT & GOULD, ESQS.
Attorneys for OFFICER KEMPKES
222 Bloomingdale Road
White Plains, New York 10605
BY: JONATHAN LOVETT, ESQ.

BOND, SCHOENECK & KING, PLLC
Attorneys for the DEPARTMENT
1399 Franklin Avenue - Suite 200
Garden City, New York 11530-1679
BY: TERENCE M. O'NEIL, ESQ. and
CHRISTOPHER T. KURTZ, ESQ.

ALSO PRESENT:
THE BOARD OF POLICE COMMISSIONERS -
MARY C. MARVIN - MAYOR
GLENN D. BELLITTO - DEPUTY MAYOR
WILLIAM BARTON, JR. - TRUSTEE
ANNE POORMAN - TRUSTEE
ROBERT UNDERHILL - TRUSTEE

HITSMAN HOFFMAN & O'REILLY, LLC.
COUNSEL TO THE BOARD
570 Taxter Road
Elmsford, New York 10523
BY: JOHN F. O'REILLY, ESQ.

MAYOR MARVIN: We are going to start tonight's hearing. It's the continuation of the Board of Police Commissioners meeting first convened on December 13, 2006, and I believe we are at, Mr. O'Neil, I assume you were going to be prepared to call another witness.

MR. O'NEIL: That's correct.

MAYOR MARVIN: Before I do, for the record I just want to state that I received, as well as board members, a letter signed by Officer Kempkes dated December 21, 2006, and I would just like this letter marked for identification only as Board Exhibit 2. Do the attorneys have it?

MR. O'REILLY: Yes, I'm going to give them a copy right now.

MR. LOVETT: Why don't we correct the record, unless you just didn't read the letter accurately, Ms. Mayor. It is not sent to you by Officer Kempkes. It is sent to you by him in a civilian capacity.

MAYOR MARVIN: Yes, it is sent from Thomas A. Kempkes of Eastchester.

MR. LOVETT: Right.

MAYOR MARVIN: Yes.

MR. O'NEIL: I think this will be Board's Exhibit 3.

MR. O'REILLY: What was 2 last time?

MR. KURTZ: We had a February 26th Board's 1, and 11/20 Notice of Rehearing as Board's 2.

MR. O'REILLY: So this will be Board Exhibit 3.

MAYOR MARVIN: Okay, so it's Board Exhibit 3. Do both attorneys have a copy of this?

MR. O'NEIL: No.

MR. O'REILLY: I'm going to give them a copy.

MAYOR MARVIN: Okay.

MR. LOVETT: Is there any particular reason why this is being marked as an exhibit?

MAYOR MARVIN: Because this was sent to my home, and I thought I should mark it for identification.

MR. O'REILLY: It's not being marked as an exhibit, just marked for

identification.

MR. LOVETT: Okay.

(Whereupon, a letter was received and marked as Board's Exhibit 3, for identification, as of this date.)

MAYOR MARVIN: Mr. O'Neil, whenever you are ready.

MR. O'REILLY: Can I just first ask Counsel to take a look around the room and see if there is anybody here that you intend to call as a witness, other than Officer Kempkes and Chief Downey?

MR. O'NEIL: Lieutenant Satriale, but he's going to be our next witness.

MR. O'REILLY: Okay, anybody else?

MR. O'NEIL: I don't see anybody else.

MR. O'REILLY: Mr. Lovett?

MR. LOVETT: No.

MR. O'NEIL: We call Lieutenant Satriale.

L I E U T E N A N T S A T R I A L E, the Witness herein, after having been first duly sworn by Melissa Sasso, a Notary Public of the State of New York, was examined and testified as follows:

DIRECT EXAMINATION BY MR. O'NEIL:

Q Lieutenant Satriale, by whom are you employed?

A Village of Bronxville.

Q In what capacity?

A Police Lieutenant.

Q How long have you been a Lieutenant?

A I'll complete 19 years in August.

Q 19 years as a Lieutenant, or --

A No, as a Lieutenant three years.

Q How many years have you been on the job?

A 19 years.

Q What other ranks have you held, and for what period of time in the department?

A I joined the department in 1988 as a police officer. I was assigned to the Detective Division in 1992. I was promoted to Patrol Sergeant in 1996. I was promoted to Detective Sergeant in 2000, and then a Lieutenant in 2003.

Q And can you tell me the duties you perform as a Lieutenant?

A I'm the Patrol Commander. I oversee the Patrol Division, and at this point in

time I oversee the Detectives.

Q And was that also your function on July 6th of 2006?

A Yes.

MR. O'NEIL: I'm going to ask that the witness be shown Department's Exhibit 2.

(Whereupon, a document was handed to the witness.)

Q Lieutenant Satriale, you have been shown a document that has been marked in evidence as Department's Exhibit 2. I ask you whether you are familiar with that document?

A Yes, I am.

Q Can you tell me what it is?

A These are the Village of Bronxville Police Department Rules and Regulations, and the Duties of Conduct.

Q When did you first receive a copy of those, if at all?

A 1988.

MR. O'NEIL: Can I also ask that the witness be shown a document that has been marked for identification as Department's Exhibit 3, and I believe I have the one

that was marked, and, I'm sorry, it's 3A, and I believe that you kept the copies from the last time. There was an issue at the end of the last hearing about what we were going to do with this exhibit. I think everyone should have copies of them. I asked if everybody had their written notes on them, and I believe they ended up in our custody.

MR. LOVETT: Which are you showing him, 3?

MR. O'NEIL: 3A.

MR. LOVETT: Okay.

MR. O'NEIL: Off the record.

(Whereupon, an off the record discussion took place.)

MR. O'NEIL: Can I also ask that the witness be shown Department Exhibit 3B entitled Written Direct Distribution List?

MR. O'REILLY: Dated March 10, 1999?

MR. O'NEIL: Correct.

(Whereupon, a document was handed to the witness.)

Q Lieutenant Satriale, I'm going to ask you to look at Department's Exhibit 3B and ask

you whether you can identify that document for us?

A Yes.

Q And does your signature appear anywhere on that document?

A Yes, it does.

Q Is there a date next to your signature on that document?

A Yes.

Q What's the date next to your name?

A March 14, 1999.

Q I'm going to refer you now to Department's Exhibit 3A and ask you whether you can identify that document for us?

A Yes.

Q Can you tell us what it is?

A This is the sick leave policy and procedures for the Bronxville Police Department.

Q And was that ever given to you?

A Yes.

Q Do you know when it was given to you?

A I would have been issued a copy in 1995 when it was originally issued, and then the revision date of March 11, '99 is what is reflected by my signature, three days later when I came to

work.

Q When you say by your signature on the document, you are holding up Department's 3B?

A Correct.

Q So you would have signed for the receipt of that on March the 14th?

A Yes.

Q Since your receipt of that document on March the 14th in 1999, are there any other sick leave policy and procedures distributed in the department?

A No.

Q On the bottom of Exhibit 3A there is a marking. It looks like it may even be stamped as an attachment number one?

A Yes.

Q Do you know what that is from?

A Whoever made this copy made a copy of the policy from my internal report that I submitted to the Chief, and I would have stuck a sticker on my copy of the policy.

MR. O'NEIL: I'd like to move that that be received in evidence, at this time, ignoring the reference to the attachment on the bottom.

MR. LOVETT: I have no objection, but I cannot ignore the word attachment with the word number one riveted on it.

MAYOR MARVIN: Okay.

MR. O'REILLY: So received.

MAYOR MARVIN: So it is received.

MR. O'NEIL: Thank you.

(Whereupon, Department's Exhibit 3A, previously marked for identification was received in evidence.)

MR. O'NEIL: Can we have this marked for identification as Department's Exhibit 9?

(Whereupon, a memorandum was received and marked as Department's Exhibit 9, for identification, as of this date.)

Q Lieutenant Satriale, I'm asking you to look at a document that has been marked for identification as Department's Exhibit 9 and ask you whether you can identify that document for us?

A Yes.

Q Can you tell us what that is?

A This is a memorandum from the Chief of Police dated August 5, 2003, and it details the

--

MR. LOVETT: Objection as to what it says. It is not in evidence.

MR. O'NEIL: I thought he was identifying the document?

MR. LOVETT: Yes, he did, and he was about to say what it talks about. That is impermissible.

MR. O'NEIL: I didn't know you could read his mind as to what he was about to talk about.

MAYOR MARVIN: All right, Lieutenant, just identify the document.

A It's a memorandum from the Chief of Police dated August 5, 2003.

MAYOR MARVIN: Okay, thank you.

Q Do you recall ever having seen that document before?

A Yes.

Q When did you see it?

A August of 2003, and July of 2006.

Q And where did you first see it in August of 2003?

A Posted on the department bulletin board.

Q And in 2006 under what circumstances did you see this document?

A Part of my investigative file for this case.

MR. O'NEIL: I would like to move that this be received in evidence, at this time.

MR. LOVETT: Over my objection. You're compounding the reversible error that has already been committed, not only in the drafting of the charges, but as to what was said last time. You can't prove prior convictions before you determine guilt in this set of charges, but if Mr. O'Reilly insists, I'm sorry, if Mr. O'Neil insists you are going to receive it over my objection.

MAYOR MARVIN: Okay.

MR. LOVETT: There is a way this could have been prevented about prior notice without tainting the record, and it's self evident as to how it could have been done, but the record has been polluted, so I suppose you will add more to it.

MAYOR MARVIN: Well, I'm prepared to overrule that objection.

(Whereupon the Board was polled.)

MAYOR MARVIN: Okay, objection overruled.

MR. O'REILLY: Received in evidence.

MAYOR MARVIN: And that will be received in evidence.

(Whereupon, Department's Exhibit 9, previously marked for identification was received in evidence.)

Q Lieutenant Satriale, were you working on July the 6th of 2006?

A Yes, sir.

Q And what hours did you work?

A 8:00 a.m. to 4:00 p.m.

MR. O'NEIL: And I'm going to ask that this document be marked for identification as Department's Exhibit 10.

(Whereupon, a roll call sheet was received and marked as Department's Exhibit 10, for identification, as of this date.)

Q Lieutenant Satriale, I'm going to ask you to look at a document that has been marked

for identification as Department's Exhibit 10 and ask you whether you can identify that for us?

(Whereupon, the witness peruses a document.)

A Yes.

Q What is that?

A This is what we refer to as our roll call for that date. That is basically just a schedule of the officers that are to work on a specific date in the police department.

Q And who prepares that document?

A It is prepared in our computer system.

Q Is that a copy of the roll call sheet that was in effect on July the 6th of 2006?

A Yes, with the exception of the attachment number four, for the same reason as number one.

MR. O'NEIL: I would like to ask that that be received in evidence, at this time.

MR. LOVETT: No objection.

MAYOR MARVIN: Okay, so received in evidence.

(Whereupon, Department's Exhibit

10, previously marked for identification was received in evidence.)

MR. O'NEIL: I'm going to ask that the next document be marked for identification as Department's Exhibit 11.

(Whereupon, a log was received and marked as Department's Exhibit 11, for identification, as of this date.)

Q Lieutenant Satriale, I'm going to ask you to look at a document that has been marked for identification as Department's Exhibit 11 and ask you whether you can identify that for us?

(Whereupon, a document was handed to the witness to peruse.)

A Yes.

Q Can you tell us what that is?

A This is a copy of the desk officer's log that's generated by our computer record system.

Q And for what date?

A It was generated on April 26th of 2006 at 8:15 in the morning.

MR. O'NEIL: I'm going to ask that that be received in evidence, at this time.

MR. LOVETT: No objection.

MAYOR MARVIN: Okay, it is received in evidence.

(Whereupon, Department's Exhibit 11, previously marked for identification was received in evidence.)

MR. O'NEIL: I'm going to ask that this be marked as Department's Exhibit 12.

(Whereupon, a doctor's note was received and marked as Department's Exhibit 12, for identification, as of this date.)

Q Okay, Lieutenant Satriale, I'm going to ask you to look at a document that has been marked for identification as Department's Exhibit 11 --

MR. O'REILLY: 12.

Q -- and ask you whether you can identify that for us?

MR. KURTZ: It's Department's 12.

Q I'm sorry, Department's Exhibit 12.

A Yes.

Q Can you tell us what that is?

A This is a handwritten note from Dr. James H. Carr.

Q And I'm going to ask you to look at Department's Exhibit 11, the narrative portion, and ask you whether in fact that's the note that is referred to in the narrative portion of Department's Exhibit 11?

(Whereupon, the witness peruses a document.)

A Yes.

MR. O'NEIL: I would like to move that that be received in evidence, at this time.

MR. LOVETT: Voir dire?

MR. O'REILLY: Go ahead.

VOIR DIRE BY MR. LOVETT:

Q Do you know the person who wrote Exhibit 12 for ID?

A No, sir.

Q Were you present when the individual who wrote it in fact wrote it?

A No, sir.

Q Are you familiar with the person's handwriting, as it appears in Exhibit 12 for ID?

A No.

Q Based on your personal knowledge, and bearing in mind you are testifying under

penalty of perjury, who wrote what is now Exhibit 12 for ID?

A Dr. Carr.

Q How can you swear to that if you don't know his handwriting, you didn't see who write it, and you don't know in fact who wrote it?

A This is the note that your client presented from his doctor to keep him out injured, so I assume it was a legitimate note from his doctor.

Q Aside from the assumption, do you know whether in fact that is a note from his doctor?

A No, I don't.

MR. LOVETT: I object to the receipt of this document. There is no foundation.

MR. O'NEIL: Well, the foundation is that this is the letter that is identified in the narrative of Department's Exhibit 11, and the witness has said that this is the note that was submitted by Officer Kempkes. Whether or not his doctor prepared it or not is kind of irrelevant. It's the note he submitted to the department. Whether it is legitimate or

fraudulent has no relevance, at this time.

MR. LOVETT: Speaking of irrelevance, the fact that Exhibit 12 for ID exists and somebody cleverly made reference to what is apparently 12 for ID, and 11 doesn't matter. You can't bootstrap yourself with thin air, and that is what they are doing here, but I'm sure you will let it into evidence.

MAYOR MARVIN: Okay, Officer Satriale I'm going to ask you when you got this copy under what circumstances you received it?

LIEUTENANT SATRIALE: Officer Kempkes has been out on a long-term injury, and he's --

MR. LOVETT: Move to strike as non responsive. He was asked where he got it, not for a history.

MR. O'NEIL: He hasn't finished his answer.

MR. LOVETT: His answer is unresponsive.

MR. O'REILLY: All right, let the witness finish his answer, and then we

will hear whatever you have to say with regard to his answer. You can move to strike after he has answered the question, if you'd like.

MR. LOVETT: No, I'll do as I please, thank you.

A And he would periodically give us updates for this in either this type of note, or fax us something at the office, or drop off the documents. On this date he was due for an update, or due to come back for work. I received this in my mailbox. When you receive this in the mailbox it gives you a date he's going to be reevaluated. I generated 11 in our computer to document in our in-house system that we received another note that claims he is still disabled and he won't be back to work for his next evaluation.

MAYOR MARVIN: Was this the only letter, or you said you received these previously?

LIEUTENANT SATRIALE: Multiple. This is in the middle of his absence.

MAYOR MARVIN: So this is a series?

LIEUTENANT SATRIALE: Correct.

MAYOR MARVIN: Okay, I'm prepared to

allow it into evidence.

MR. LOVETT: Before you do, based on your questions I have some additional voir dire.

MR. O'REILLY: Sure.

CONTINUED VOIR DIRE BY MR. LOVETT:

Q You say 12 for ID appeared in your mailbox?

A Yes.

Q Were you there when it appeared?

A No.

Q Do you know who put it there?

A No.

Q Do you know the source of the letter, based on personal knowledge?

A No, sir.

MR. LOVETT: You've got no foundation, but I know you are going to let it in anyhow, over my objection.

MR. O'REILLY: Mr. O'Neil, do you have any questions?

CONTINUED DIRECT EXAMINATION BY MR. O'NEIL:

Q Did you ever have any discussions with Officer Kempkes about this letter.

A No.

Q Were there other letters submitted by this same doctor by Officer Kempkes?

A Yes.

MR. LOVETT: Objection. There is no evidence that Officer Kempkes submitted 12 for ID. The form of the question is impermissible.

MAYOR MARVIN: Could you rephrase your question?

MR. O'NEIL: If you believe it is necessary I will.

Q Were there letters submitted to you by Officer Kempkes from Dr. Carr?

A Yes.

Q The letters that you just testified about that had been submitted to you from Dr. Carr, how were they transmitted to you?

A Either by fax or delivered to my mailbox.

MR. O'NEIL: I would like to move that it be received in evidence.

MAYOR MARVIN: Okay, I'm prepared to accept it as evidence.

(Whereupon the Board was polled.)

MR. UNDERHILL: Yes.

MAYOR MARVIN: It will be received in evidence.

(Whereupon, Department's Exhibit 12, previously marked for identification was received in evidence.)

Q Lieutenant Satriale, it says on Exhibit 10 that Officer Kempkes was scheduled for tour. Can you tell us what tour he was scheduled for, on that date?

A It says 2L. That's the late man tour. That's 8:00 a.m. to 4:00 p.m.

Q Did he show up on that tour at 8:00 a.m.?

A No.

Q Can you tell us prior to July the 6th in 2006 when the last time Officer Kempkes had worked a full tour?

MR. LOVETT: Objection. How can he possibly tell you anything before that date? It's after that date.

MR. O'NEIL: Excuse me?

MR. LOVETT: How can he tell the Board anything before a date that already has come and gone? The question is improper as to form.

MAYOR MARVIN I'm afraid you lost me on that one, Mr. Lovett. I'll overrule that objection.

A He had been out in excess of over a year, so I don't know the date prior to July of '06.

Q As Lieutenant in charge of the tour on July the 6th, can you tell us what, if anything, you did with regard to his absence on that day?

A I directed Sergeant Mitchell to call him at home and have him come clean out his physical mailbox, and check his electronic e-mails.

Q So what was Sergeant Mitchell's duties as of that day?

A He was the Desk Sergeant working 7:00 a.m. to 3:00 p.m.

Q Prior to July the 6th of 2006 had you ever directed the Desk Sergeant to call Officer Kempkes to come in and perform similar tasks?

A Yes.

Q Do you recall on, approximately, how many occasions?

A No more than five.

Q Following the directive you gave to Sergeant Mitchell to call Officer Kempkes, did you

have any conversations with Sergeant Mitchell about that directive?

A Yes.

Q Can you tell us what he told you with regard to his call?

MR. LOVETT: Objection. It is rank hearsay, and I presume Mitchell is going to be testifying as a witness.

MR. O'NEIL: He is, and it is subject to connection, and it's not hearsay about what Sergeant Mitchell told Lieutenant Satriale, which then precipitated a certain action on his part, whether or not he was actually a participant of the conversation with Sergeant Mitchell.

MR. LOVETT: I'll stipulate he was a participant in the conversation, but what he was told by Mitchell is rank hearsay, and dressing it up with a pretty skirt doesn't change the subject matter. It's impermissible, but I'm sure you'll overrule it.

MAYOR MARVIN: I am prepared to overrule that objection.

(Whereupon the Board was polled.)

MR. UNDERHILL: Overruled.

MAYOR MARVIN: It's overruled.

MR. O'REILLY: Can you answer the question?

Q Do you remember the question?

A You may have to repeat that one.

MR. O'NEIL: Sure. Could you read it back, please?

(Whereupon, the last question was read back by the reporter.)

A He told me no one answered the phone and he left a message on the answering machine.

Q Upon receipt of that information from Sergeant Mitchell, can you tell me what, if anything, you did with regard to Police Officer Kempkes' whereabouts on July the 6th?

A Yes, I went to his home.

Q Had you been to his home before?

A Yes.

Q And can you tell us, for purposes of this proceeding I think we have limited the identification of Police Officer Kempkes' home to a particular town. Do you know where that is?

MR. LOVETT: We did, but then the Mayor violated that agreement by shuffling for ID Board's Exhibit 3.

MAYOR MARVIN: We can block out the address on Board's Exhibit 3 and just leave Eastchester.

MR. LOVETT: It's not blocked out on the copy that was given to me.

MR. O'REILLY: It's not part of the record, in any event.

MR. O'NEIL: It's marked for identification.

MR. LOVETT: So what?

MR. O'REILLY: So it's not part of the record.

MR. LOVETT: It's really not properly part of anything, much less for ID, but since the Mayor went out of her way to put that in, to make reference to it, seems to me that the agreement has been breached. Sorry, I didn't mean to interrupt you.

MAYOR MARVIN: Mr. O'Neil?

MR. O'NEIL: I think there is a question pending.

A Yes, Eastchester.

Q Eastchester, thank you. Had you been to his house previously?

A Yes.

Q Under what circumstances?

A To check on whether or not he had been home during his scheduled tour of duty.

Q And, approximately, how long a drive is it from the police department to his home?

A Five minutes.

Q Upon arrival at Police Officer Kempkes' home on July the 6th, can you tell me what, if anything, you first did with regard to his whereabouts?

A I rang the doorbell.

Q What happened when you rang the doorbell, if anything?

A The dogs inside the home began to bark, and I received no response at the door.

Q After having rang the doorbell and getting no response, what, if anything, did you do after that with regard to his whereabouts?

MR. LOVETT: Objection as to having rang, R-A-N-G, the doorbell, the form.

MR. O'NEIL: It's not ring, rang,

rung?

MR. LOVETT: Have rung, yes.

MAYOR MARVIN: Have rung.

MR. O'NEIL: Those nuns. You have to blame the nuns.

Q Do you understand the question?

A I got it. I walked to the back of the home to ensure that nobody was on the rear deck, and then walked back to the front of the house.

Q Did you see Officer Kempkes, at any time, at that point?

A No.

Q After ringing the bell and walking around the house, what, if anything, did you next do to ascertain the whereabouts of Police Officer Kempkes?

A I remained in the driveway for a period of time, called Sergeant Mitchell at the police desk, and directed him to make another telephone call to Officer Kempkes' home, and if he received a response to have him come to the front door, because I was in the driveway.

Q Following that conversation with Sergeant Mitchell did he get back to you?

A Yes.

Q Can you tell us what he told you, at that time?

MR. LOVETT: Objection, rank hearsay.

MAYOR MARVIN: I'm prepared to overrule the objection.

(Whereupon the Board was polled.)

MAYOR MARVIN: Yes, objection overruled.

A He told me he received the same answering machine and that he left a message.

Q After receiving that information from Sergeant Mitchell did you give him any directives?

A Yes, I directed him to e-mail me in our department record system detailing his two telephone calls to the home.

MR. O'NEIL: I'm going to ask that this document be marked for identification as Department's Exhibit 13.

(Whereupon, an e-mail was received and marked as Department's Exhibit 13, for identification, as of this date.)

Q Can you look at a document that has

been marked for identification, Lieutenant Satriale, as Department's Exhibit 13?

(Whereupon, the witness peruses a document.)

Q I'm going to ask you whether or not you can identify that document for us?

A Yes.

Q What is that?

A It's a copy of the e-mail that Sergeant Mitchell sent to me.

Q And the date and the time appear to be accurate to you?

A Yes, July 6, 2006 at 11:55 and 38 seconds in the morning.

MR. O'NEIL: I'd like to move that that be received in evidence, again, without the reference to the attachment file.

MR. LOVETT: Voir dire?

MAYOR MARVIN: Yes.

VOIR DIRE BY MR. LOVETT:

Q Do you know whose phone number that is on the second line of that e-mail?

A I don't have that number committed to memory, no.

Q Incidentally, how do you know that Mitchell sent you this e-mail, 13 for ID?

A Because unless his password has been compromised, he's the only one that can access his e-mail to send to another person.

Q Separate and apart from 13 for ID, did Mitchell tell you that that is the phone number that he dialed?

A No.

Q Did he give you any other phone number that he dialed?

A No.

MR. LOVETT: I have no objection.

MAYOR MARVIN: Okay, we'll accept that as evidence.

MR. LOVETT: But I also ask that the telephone number be redacted, at least to the extent of the last four digits.

MR. O'NEIL: Is that still his number?

MR. LOVETT: Is it what?

MR. O'NEIL: Is that still his telephone number?

MR. LOVETT: Well, when you want to take my testimony subpoena me.

MR. O'NEIL: Because if it's not then there is no reason to redact it.

MR. O'REILLY: Fine. Can you give us the reason why you are asking for the four digits to be redacted?

MR. LOVETT: Privacy of whoever's telephone number that is.

MR. O'REILLY: Well, whose number is it?

MR. LOVETT: It ain't my clients, that's for sure. I can give you comfort knowing that, and I'm sure that the Sergeant can explain how he cleverly managed to call the wrong number, but that will be later in the hearing.

MR. O'REILLY: So it's for the privacy of an unknown person is what you are saying?

MR. LOVETT: Right. What difference does it make?

MR. O'NEIL: Under those conditions we have no objection.

MAYOR MARVIN: Okay. We will redact the last four digits.

MR. LOVETT: Thank you.

(Whereupon, Department's Exhibit 13, previously marked for identification was received in evidence.)

CONTINUED DIRECT EXAMINATION BY MR. O'NEIL:

Q After having the conversation with Sergeant Mitchell on that date, Lieutenant Satriale, can you tell me how much longer you remained at the residence of Officer Kempkes?

A I was there for about an hour-and-a-half.

Q Total?

A Yes.

Q How did you get to the residence of Officer Kempkes?

A Drove there.

Q In what kind of vehicle?

A A police truck.

Q Where did you park it?

A In his driveway.

MR. LOVETT: Asked and answered. He already testified about that.

MR. O'NEIL: Where he parked the truck?

MAYOR MARVIN: No.

MR. O'NEILL: Are you at another

hearing?

MR. LOVETT: I don't think so.

MAYOR MARVIN: Continue.

A In his driveway.

Q Prior to your leaving, where did you stay around Officer Kempkes' residence?

A In the driveway.

Q In the truck?

A Yes.

Q Okay. After having spoken to Sergeant Mitchell, and before leaving, did you have any additional telephone calls while at Officer Kempkes' home with regard to his whereabouts?

A Yes.

Q Who did you call, if anyone?

A Detective Steven Gallo.

Q What, if anything, did you tell Detective Gallo with respect to this issue?

A I directed him to contact Officer Kempkes on his cell phone and ascertain his whereabouts.

Q Did you then hang up with Officer Gallo?

A Yes.

Q Following that conversation with

Detective Gallo, I'm sorry, did he call you back?

A Yes.

Q And what did he tell you?

MR. LOVETT: Objection, hearsay, although I'm sure Gallo is coming in.

MAYOR MARVIN: I'm prepared to overrule that objection.

(Whereupon the Board was polled.)

MAYOR MARVIN: Objection overruled.

A He told me he left a voicemail message on his cell phone.

Q On whose cell phone?

A Officer Kempkes'.

Q Did you have any further conversation with regard to Officer Kempkes' whereabouts while you were at his house?

A On his phone call from Detective Gallo to me I directed him after he told me he left the voicemail to come up and relieve me at the home.

Q Did in fact Detective Gallo arrive to relieve you?

A Yes.

Q Do you recall, approximately, what time that was?

A 12:30.

Q When Detective Gallo arrived, what, if any, conversations did you have with him with regard to Officer Kempkes' whereabouts?

MR. LOVETT: Objection, hearsay.

MAYOR MARVIN: I'm prepared to overrule.

(Whereupon the Board was polled.)

MAYOR MARVIN: Objection overruled.

A I directed him to remain in the driveway, remain in the home, and when Officer Kempkes returned home, if he did, to have him contact the police department.

Q Following that conversation, and prior to leaving Officer Kempkes' residence, what, if anything, else did you do to determine Officer Kempkes' whereabouts?

A At 12:30, before leaving I rang the bell for what would have been the third time during my hour and 23 or 30 minutes of being there.

Q What occurred after you rang the bell?

A No response. Dogs barking, and that is when I left.

Q When you left where did you go?

A Back to work.

Q Work being?

A My office.

Q Okay. Upon returning to your office did you have any conversation with Detective Gallo with respect to Officer Kempkes' whereabouts?

A Yes.

Q When did that occur?

A About 1:00.

Q What, if anything, did Detective Gallo tell you about Officer Kempkes' whereabouts?

MR. LOVETT: Objection, hearsay.

MAYOR MARVIN: I'm prepared to overrule.

(Whereupon the Board was polled.)

MAYOR MARVIN: Objection overruled.

A He called me and he told me that Officer Kempkes had returned home and that at my direction he told him to contact the police department. He also asked him where he had been, and he said he had been out on Workers' Comp., out sick, and did not have to be home, and that he had brought his car in to Classic Automobiles in Mount Vernon for service.

Q Following that conversation when

did you next see Detective Gallo, if at all?

A About 15 minutes later.

Q Where did you see him?

A At my office.

Q What, if anything, did you do with Detective Gallo with regard to this incident?

A We went to Classic Automobiles on MacQuesten Parkway in Mount Vernon.

Q When you went to Classic Automobiles did you speak to anyone with regard to Officer Kempkes' whereabouts?

A Yes.

Q Who was it that you spoke to?

A The service manager.

Q Do you remember his name?

A John DeGraw, I think.

MR. O'NEIL: I'm going to ask that this be marked for identification as Department's Exhibit 14.

(Whereupon, a service order from Classic Auto was received and marked as Department's Exhibit 14, for identification, as of this date.)

Q Lieutenant Satriale, I'm going to ask you to look at a document that has been marked

for identification as Department's Exhibit 14 and ask you whether you can identify that for us?

(Whereupon, the witness peruses a document.)

A Yes.

Q Can you tell us what that is?

A This is a copy of the advisory service order from Classic Automobiles in Mount Vernon.

Q And I'm going to direct you to the upper left portion of the document where something appears to have been circled, the 12:44.

A Yes.

Q Do you recall whether that was circled on the copy that was provided to you?

A I don't.

MR. O'NEIL: I'm going to ask that this be received in evidence, at this time.

MR. LOVETT: No objection.

MAYOR MARVIN: Okay, received in evidence.

(Whereupon, Department's Exhibit 14, previously marked for identification was received in evidence.)

MR. O'REILLY: And pursuant to the prior stipulation we are going to cross out the address that is indicated near the top left.

MR. O'NEIL: And the phone number, as well.

MR. O'REILLY: The last four digits.

Q Can you tell us what, if any, conversation you had with the service manager, at that time?

MR. LOVETT: Objection. It's rank hearsay again.

MAYOR MARVIN: I'm prepared to overrule the objection.

(Whereupon the Board was polled.)

MR. UNDERHILL: Yes.

MAYOR MARVIN: Okay, the objection is overruled.

MR. LOVETT: Is the service manager coming in as a witness, or is this going to be uncorroborated hearsay?

MR. O'REILLY: We don't have to respond to that. Will you answer the question, Lieutenant?

MR. LOVETT: He doesn't have to

respond to it. It just goes to how bad the rulings are that the Mayor has been making.

A I asked him if Officer Kempkes, Thomas Kempkes, brought a car in for service. He provided me with a copy of the service order to confirm that he did in fact come in at 12:44 to service his car.

Q Approximately how long were you at the auto dealership?

A Five minutes.

Q Following your visit to the auto dealership where did you go next?

A Back to my office.

Q After having left the auto dealership, did anyone advise you with regard to Officer Kempkes' whereabouts, at that time?

MR. LOVETT: Objection, leading, eliciting hearsay of his affirmative answer.

MAYOR MARVIN: I'm prepared to overrule that.

(Whereupon the Board was polled.)

MR. LOVETT: Yes, because that is just what Mr. O'Reilly mouthed to you,

which he has been doing all evening.

MAYOR MARVIN: I'm prepared to overrule that.

MR. BARTON: Agree.

MR. UNDERHILL: Agree.

MAYOR MARVIN: Objection overruled.

MR. LOVETT: It doesn't make any difference. Mr. O'Reilly is calling the shots, not the Mayor of the Board. It is obvious, and it is either audible or we can read lips, overruled. It sounds like Judge Cowhey.

MR. O'REILLY: Anything else, Mr. Lovett?

MR. LOVETT: Yes, lots later.

MAYOR MARVIN: You may answer the question, Lieutenant.

A When Detective Gallo called me to tell me that Officer --

MR. LOVETT: Objection to what Gallo said.

A -- Kempkes had arrived home, I told him --

MR. LOVETT: Excuse me, I have an objection. Do you mind?

MR. O'NEIL: Lieutenant, you don't have to listen to him. You just listen to what the Mayor and Mr. O'Reilly have to say.

MR. O'REILLY: You can continue.

MR. LOVETT: Excuse me, I'm objecting as to hearsay. If you want to shuffle it in and then tell the Board to disregard the pink elephant that just ran across the room, if that is the way you want to run this hearing.

A When he called me and told me that Officer Kempkes returned home he directed him to call the police desk. My direction to Sergeant Mitchell was when Officer Kempkes contacts you have him respond to the police department to see me.

Q When you left the auto dealership what did you know about his whereabouts, at that time, if anything?

A He was at headquarters.

Q Who told you that?

A Sergeant Mitchell.

Q Did there come a time upon your return to headquarters that you met with Officer Kempkes?

A Yes.

Q Who, if anyone, was present at that meeting?

A Just me and Officer Kempkes.

Q At the beginning of the meeting, what, if anything, did you tell him about the nature of the meeting?

A I explained he was there to discuss why he was not home, and why he was in violation of the sick leave policy and procedures.

Q What, if anything, did Officer Kempkes say in response that?

A He told me that he wanted to be represented at the hearing, excuse me, at the interview, I'm sorry.

Q What, if anything, did you respond to that?

A I told him we would meet the following morning at 10:00 a.m.

Q Did you have any further contact with Officer Kempkes that day?

A I don't know if I had it that day or the next day. I'm not sure.

Q On the next day, July 7, 2006, did that meeting take place that you just had referred

to?

A Yes.

Q Where did that take place?

A In my office.

Q Who was there?

A Myself, Officer Kempkes and Officer Joseph Panzarino.

Q In what capacity was Officer Panzarino there?

A He's the PBA President.

Q Do you know, approximately, what time that meeting took place?

A 10:15.

Q During the course of that interview with Officer Kempkes. Did you refer to any documents?

A Yes.

Q Can you tell us which ones, if any?

A The sick leave policy and procedures.

Q The policies that has been received in evidence as Department's Exhibit 3A?

A Correct.

Q Can you tell us the substance of the conversation you had with Officer Kempkes on

July the 7th with regard to his whereabouts on July the 6th?

A If I might just finish the answer?

Q Sorry.

A There were other documents that I referred to during the interview.

Q Can you tell us what they were?

A They are not here. They are the logs that we keep to record officers calling into the desk sick, and officers calling into the desk to say that they are leaving their home for a reason.

MR. O'NEIL: I'm going to ask that these documents be marked for identification as Department's Exhibit 15?

(Whereupon, sick leave report logs, was received and marked as Department's Exhibit 15, for identification, as of this date.)

Q Lieutenant Satriale, I'm going to ask you to look at a document that has been marked for identification as Department's Exhibit 15 and ask you whether you can identify that document for us?

(Whereupon, the witness peruses a

document.)

A Yes.

Q What is that?

A These are copies of the sick leave report logs that are created by the desk officer when an officer either calls in sick or is out sick and needs to leave his home and has to call the desk and say he's leaving.

Q Were those documents referred to during your meeting with Officer Kempkes on July the 7th of 2006?

MR. LOVETT: Objection, leading.

MAYOR MARVIN: Could you rephrase your question?

Q You testified previously that in addition to Department's Exhibit 3A, which is in evidence, that there were other documents that were referred to during your meeting with Officer Kempkes, is that correct?

A Yes.

Q Can you tell us what documents those were?

A These sick leave logs (Indicating.)

Q When you say these, are you referring to Department's Exhibit 15?

A Yes.

MR. O'NEIL: I would like to move that those be received in evidence.

MR. LOVETT: No objection.

MAYOR MARVIN: All right, they are received as evidence.

(Whereupon, Department's Exhibit 15, previously marked for identification was received in evidence.)

Q The document that has been received in evidence as Department's Exhibit 15, you've testified that these are used to report sick leave use. Are they used to report any other kind of leave usage?

A Yes.

Q What?

A Injury.

Q During the interview with Officer Kempkes on July the 7th of 2006, can you tell us what, if anything, he said with regard to his whereabouts on July the 6th of 2006?

A Yes, he did not recall exactly what time he left his home in the morning, but did recall at around 9:30 he went to Zuccarelli's Deli in Eastchester for coffee, and after leaving

Zuccarelli's he went down to Giovanni's Auto Body Shop in Tuckahoe to have breakfast with his friend Giovanni. After breakfast he recalled going to Melissa's cousins frame shop to meet with a friend of his, Robert Esposito, and after that meeting going to George Niko's Service Station (ph) in Yonkers for awhile, and then when deciding to leave Niko's Service Station he wanted to attempt to have the car that he was driving recreate a smoke condition that he experienced previously, so he drove around for awhile until the car did in fact smoke, and that's what brought him to Classic Automobiles.

Q Did he tell you what he did after he was at Classic Automobiles?

A He received a loaner car, dropped off the car that he was driving, went to Chester Heights which is a section of Eastchester and got a slice of pizza and then went home and found Detective Gallo in his driveway.

Q You made reference in your testimony to someone named Melissa.

A Yes.

Q Can you tell us who that person is?

A Tom's girlfriend.

Q Tom being Officer Kempkes?

A Yes.

Q You also indicated that he told you he had left his home to get coffee, and then to eat breakfast with somebody else. Have you ever had any discussions with Officer Kempkes prior to July 6, 2006 concerning his leaving the home while out on injured to eat?

A Yes.

Q Can you tell us the substance of those conversations?

A In November of 2005 I called Officer Kempkes at home and told him that I was reviewing the sick leave reports and that I noticed that he had left his home several times to get breakfast or lunch, and I directed him not to leave anymore for breakfast or lunch, to make sure he had food at home, to prepare or to eat during his regular tour of duty. That was not an authorized reason to leave his home when he was being paid to work.

Q And you had mentioned previous in your testimony that Department's Exhibit 3A was made reference to during the conversation with Officer Kempkes on July the 7th. Can you tell us

what you recall about that part of the conversation?

A Yes, 3A, sick leave policy and procedures.

Q Correct.

A He had originally told me that he didn't call the desk when he left his house because he was injured and not sick, and I referred to the policy where it says must notify the desk upon leaving, whether sick or injured.

Q Where is that in the policy?

A Section A number 6, first notify the Department, except in an emergency of a need to leave home or place of confinement during the scheduled tour, and if you go to the purpose on the top of the page, the purpose of the policy is to establish uniformed procedures for reporting sick, and follow actions when members become sick or injured.

Q Prior to July 6, 2006 had Officer Kempkes notified the police department that he was leaving his home while out injured?

A Yes.

Q Did that come up in the conversation you had with him?

A Yes.

Q And in what context?

A Well, after saying he didn't need to comply with this policy because he was injured I directed him to the word injured. He then said he didn't need to comply with the policy because he was out on Workers' Comp., and not injured, so it was a different reason than sick or injured, so I then stopped counting at, I think 28, 28 times. I showed him where while he was out on Workers' Comp. he comply with the policy and call the department saying he was leaving the house. So what was a difference on July 6th versus the 28 times his status did not change.

Q What was his response to that, if anything?

A Well, he kept referring to a department policy or regulation that had nothing to do with my investigation, and said that he was waiting to get a copy of that policy, and if he didn't have that policy he could not comply with something he did not have, and I reiterated to him that we were there to discuss the sick leave policy and procedures, the identical one that he agreed to forfeit time from for violating in August of 2003

that had nothing to do with any other policy.

MR. LOVETT: Move to strike as to the policy of 2003, and the violation. It's just compounding the damage that's done already.

MAYOR MARVIN: Okay, I'm prepared to overrule that objection.

(Whereupon the Board was polled.)

MAYOR MARVIN: Objection overruled.

A And then he said, well, you guys weren't checking up on me, so I thought I was okay.

Q At any time during the conversation with him on July 7, 2006 did he indicate to you that he did not have a copy of Department's Exhibit 3A?

MR. LOVETT: Objection, leading.

MAYOR MARVIN: All right, I'm prepared to overrule that.

(Whereupon the Board was polled.)

MAYOR MARVIN: Okay, objection overruled.

A No.

MR. O'NEIL: I have no further questions of this witness.

MAYOR MARVIN: All right.

CROSS EXAMINATION BY MR. LOVETT:

Q Is there a department rule, regulation, policy, or procedure that governs when an officer was out either sick or injured is supposed to come in and empty their mailbox?

A No.

Q Is there any rule, regulation, policy, or procedure in the department that requires an officer out injured or sick to come in and check their e-mails?

A Yes.

Q Where is that?

A It's not a written policy. It's at my direction if they are out for an extended period of time.

Q When was this verbal directive given?

A Its been given since I've been a Lieutenant.

Q Pardon me?

A Its been given since I'm a Lieutenant.

Q So every day you issue the same directive?

A If I have a member out for an

extended period of time, sick or injured, I will ensure that on a regular basis they come in and check their mail.

Q What is the regularity that you insist upon?

A When I see their mailbox full I make sure they come in and check their mail.

Q And when their mailbox is full you know they have a lot of e-mails?

A No, I'm referring to their physical mailbox.

Q I'm referring to e-mails.

A The e-mails, it doesn't matter.

Q It doesn't matter how many e-mails accumulate?

A No.

Q How do you determine that a mailbox is full?

A Just by looking at it. It's not closed. It's an open compartment that you slide mail into.

Q So prior to July 6, '06, how many times did you direct my client to come in to clean out his mailbox?

A No more than five times.

Q When was the first occasion?

A I don't know.

Q You didn't make any note about that?

A No.

Q When was the second occasion?

A I don't know.

Q How long after the first occasion was the second occasion?

A I don't know.

Q Was the mailbox full on the first occasion, even though you don't recall when it was?

A Yes.

Q You remember that?

A I wouldn't have called him in if his mailbox was not full. There were three or four paychecks in the mailbox.

Q And that fills the entire mailbox, three or four paychecks?

A No, but that's a pretty good indication that he has not been in for three or four weeks.

Q That's not my question. I said three or four paychecks fills the mailbox?

A That's not what I said.

Q I'm asking you, does three or four paychecks fill the mailbox?

A No, it doesn't.

Q In addition to the three or four paychecks being in the mailbox, what prompted you to first call him in to come and clean out his mailbox?

A I don't know. His mailbox was full.

Q What was in it, other than the three or four paychecks?

A I don't know. I didn't look at his mail.

Q You didn't look at the mailbox, either, did you?

A Yes, I did.

Q Did anybody else witness what you observed, at the time you observed it?

A No.

Q When was the third time you directed him to come in?

A I don't know.

Q The second time you directed him to do it, what was in the mailbox, three or for paychecks?

A I don't know.

Q And how long after the second time you asked him to come in and clean the mailbox out did the third occasion arise?

A I don't know.

Q What year was the first occasion?

A I don't know.

Q What year was the second occasion?

A I don't know.

Q What year was the third occasion?

A I don't know.

Q Was there a fourth occasion?

A There may have been.

Q I'm asking whether there was a fourth occasion?

A I don't know.

Q Well, if there was, how long after the third occasion did the fourth occasion arise?

A I don't know.

Q What was in the mailbox on the fourth occasion, if it occurred, that prompted you to direct my client in?

A I don't know.

Q Was there a fifth occasion?

A I don't know.

Q Well, why did you testify earlier that you directed him to come in and clean out his mailbox no more than five times if you don't even know if you gave that directive more than three times?

MR. O'NEIL: Objection.

MR. O'REILLY: Grounds?

MR. O'NEIL: As to form. He said no more than five is what his testimony was.

MR. LOVETT: I'll rephrase the question.

Q Do you remember testifying, as Mr. O'Neil said, that you called him in no more than five times to empty his mailbox?

A Yes.

Q When you gave that sworn testimony did you then know that you only called him in three times?

A No.

Q What was the source of your information when you swore that you called him no more than five times?

A To the best of my recollection, it had been no more than five times that I requested him to come in.

Q Well, the time you requested him to come in on July 6, '06, was that the fourth time or the fifth time?

A I don't know.

Q And what did you observe in his mailbox that prompted you to direct him in on July 6th to clean out his mailbox?

MR. O'NEILL: Objection. Asked and answered.

MR. LOVETT: No, it wasn't.

MAYOR MARVIN: Overruled.

MR. LOVETT: Which hearing are you at, Counselor? I haven't gotten to that one yet.

MAYOR MARVIN: I'm prepared to overrule that objection.

(Whereupon the Board was polled.)

MAYOR MARVIN: Objection overruled.

A Mail.

Q The mailbox was full?

A There was mail in his mailbox.

Q I thought you said when the box was full you would direct him in?

A If you are going to ask me that day whether the box was full or whether there was

enough mail that it was an indication that he hadn't been in to check his mail in a period of time that was acceptable to me, I don't know if it was full or if it's just that he hadn't been in in awhile, and it was time for him to come in and clean it out and see what was going on within the department and within the village.

Q I thought that you testified that you called him to come in and clean out his mailbox when it was full, is that true?

A Yes.

Q And you are telling me now that on July 6th you don't know if the mailbox was full, but you directed him in, anyhow?

A Yes.

Q Why?

A Because there was a clear indication that he had not been in in awhile to find out what had been going on in the village and within the department, and it was at my direction that he come in and check his e-mail and empty his mailbox as a paid member of the department.

Q Were you present when he emptied his mailbox as a result of the July 6th directive from you?

A No.

Q Do you know what he removed from the mailbox, if anything?

MR. O'NEIL: Objection. There is no foundation or any testimony that he ever cleaned out his mailbox.

MAYOR MARVIN: I'm prepared to sustain it.

(Whereupon the Board was polled.)

MAYOR MARVIN: Objection is sustained.

Q Based on your directive, Lieutenant, did my client clean out what was in his mailbox on July 6th or 7th?

A I don't know.

Q Didn't you verify whether he complied with your directive?

A His mailbox was clean. I have no way of confirming whether he emptied it or somebody else emptied it.

Q Well, how long prior to July 6th had somebody cleaned out my client's mailbox?

A How long prior?

Q Yes.

A I don't understand the question.

Q You say on July 6, '06 you wanted him to clean out his mailbox.

A Correct.

Q How long had it been prior to that that the mailbox had last been cleaned out?

A I don't know.

Q If you don't know then how could you testify a few minutes ago by reason of what was in the mailbox it was obvious to you that he hadn't been in there for quite awhile?

A Because there was an accumulation of mail. That can happen in two hours. It can happen in three weeks. I don't know when the mailbox was clean versus now there is an accumulation of mail in there that needs to be addressed. I cannot tell you that it was done three weeks ago, three days ago, ten days ago. I can tell you that the volume of mail in the mailbox indicated to me that he needed to come in and check his mail.

Q How long was Officer Kempkes out on injured status, prior to July 6, '06?

A I don't know. More than a year.

Q More than three years?

A I don't know.

Q Do you know that he sustained a job injury and as a result no longer reported to work?

A He claims a job injury, yes.

Q Well, don't you know your own Chief of Police gave him retroactive status on 207C in August of last year?

A Yes, I do.

Q So do you think he was on job injured status as of the date the Chief gave it to him?

A Yes.

Q How did you find out on July 6th that my client had left his house? In fact, how did you find out?

A He told Detective Gallo when he returned to the home.

Q Didn't you learn from somebody before you sent anybody down there to knock on the door, or ring the bell, that my client was seen outside his home?

A Absolutely not.

Q So it was just by coincidence that on July 6, '06 you ordered or tried to order my client in to clean out his mailbox?

A It's not a coincidence. That's my

job.

Q Why did you do it on July 6th instead of July 5th?

A July 6th is the day I looked at the mailbox and said he needs to come in and check his mail.

Q Were you speaking out loud when you said that?

A Yes, I was.

Q To whom?

A To Sergeant Mitchell.

Q You said to Mitchell he, meaning my client, needs to come in and empty his mailbox?

A Yes, I did. I turned around from the mailbox and said to Mitchell, call Kempkes and have him come clean out his mailbox.

Q What did Mitchell tell you?

A I'll call him.

Q Did he tell you anything about whether he agreed or disagreed that the mailbox had to then be cleaned?

A No.

Q Do you have any objective standard as to when a mailbox is supposed to be cleaned by an officer who is out on sick or job injured

status?

A I don't understand your question.

Q Is there any objective standard you use in determining when to direct an officer to clean out their mailbox?

A No, you can't. I can't put a number on it of pieces of mail or weight, or no, I don't have an objective standard.

Q Did you have any awareness on July 6 '06 that Officer Kempkes had e-mails that hadn't been opened?

A No.

Q Well, you directed him to check up on his e-mails, too, didn't you?

A Yes.

Q Why, if you didn't know he had any?

A The only way to find out if you have any is to check them, and if you don't come in and check them you are not going to know what's going on within the department. So it was a good assumption on my part that he had e-mails, because I sent e-mails.

Q Are you aware that on July 6, '06 my client had been out continually job injured for several years?

A Am I aware of that?

Q Yes.

A I knew it was a long time, longer than a year.

Q And you think he was regularly receiving mail as an active member of the department, at that time?

A He still continues to.

Q His paycheck --

A He's in an e-mail group that whenever an e-mail goes out to the entire department he gets it. Right now there is e-mail in his e-mail box.

Q Well, why didn't you direct him in today to get his e-mails?

A He's suspended. He's not to come into the police department.

Q Give me the names of each other officer you ordered in to empty their mailboxes when they were on sick leave or job injured status?

A No.

Q Why not?

A Why not?

Q Why not?

A I have been a Lieutenant for

three years, and in that three years I have had several officers go out from on the job injury or long-term illness, or injury or surgery off the job, that they were dedicated, honest, hard working officers that had surgeries and injuries that were legitimate to me, and I gave them the benefit of the doubt and allowed them to recuperate under doctor's care, listen to their doctor's note, and they returned on time, or early from their injury, illness or surgery. So there is no reason for me to inconvenience them.

Q What are the names of the officers?

A Officer Dorre had an extended absence, Officer Murray.

Q Who else?

A Officer Panzarino. That is all I recall, at this time.

Q How long was --

A Sergeant Mitchell.

Q How long was Dorre out?

A I don't know.

Q Was that a job injury or a sick status?

A I think he had one of each.

Q Over how long a period of time was

he out?

A I don't know.

Q What about Murray, how long was he out?

A I don't know.

Q And the PBA President, how long was he out?

A I don't know.

Q What about Mitchell?

A Don't know.

Q Well, when you say you gave each of those four people the benefit of the doubt, you mean you let their mailbox fill up and you didn't make them come in to clean them out?

A Yes.

Q Did you know that they were accumulating e-mails in their absence?

A Yes.

Q Did you direct any of them to come in and check their e-mails so they can be current on departmental information?

A No.

Q Did any of those four individuals' mailboxes, to your personal observations, become full while they were out?

A I don't remember.

Q You did not check them?

A I have checked them. I don't remember. It wasn't something that I was concentrating on, at the time.

Q Why did you check them?

A Because I distribute everybody's mail and paychecks every week, so I know when I am slipping a paycheck into a guy's mailbox what mail is in there.

Q When you slipped that paycheck in to say Dorre's mailbox, you could tell if it was full, couldn't you?

A Absolutely.

Q And the same was true with the other three?

A Yes.

Q When you reached a point that you knew they or any of them had a full mailbox you didn't call them and direct them in, right?

A No.

Q Did you arrange to have their mail delivered to their home?

A No.

Q Why not?

A Because I knew that they were under a doctor's care returning to work either early or on time, and would have an opportunity to read what mail there was when they returned.

Q Well, what arrangement did you make for each of those individuals, or any of them, when their mailbox couldn't take anymore material and it was too full?

A That never happened.

Q How come? Did you do something with the mail when it was sitting in a mailbox?

A No.

Q So during all the time that each of these four individuals are out, none of them received enough mail to fill their mailbox, on any occasion?

A Well, I'm confident none of them were out more than a year, so, yes, the mail did not fill up.

Q In a year's time the mailbox did not fill up?

A No, what I said is I'm confident none of them were out more than a year, like your client, so their mailboxes did not fill up for the time period that they were out.

Q Okay, going back one year from July 6 '06, during that one year period did my client's mailbox fill up quicker than those of the other four when they were out for that one year?

MR. O'NEIL: Objection. There has been no testimony that any of them were out for one year. The testimony is that none of them were out for a year.

MR. LOVETT: I'll rephrase the question.

Q How long were those four individuals out?

A I don't know.

Q Were they out a year or more each?

A No.

Q Was any of them out a year?

A No.

Q Was any of them out nine months?

A No.

Q What was the shortest period of time one of them was out?

A I don't know.

Q Do you have any best estimate as to how long Dorre was out?

A No.

Q Was it more than a month?

A I don't know. I'm not going to estimate.

Q Now, when you decided to tell my client to come in and to clean out his mailbox, did you discuss that with the Chief of Police?

A No.

Q Did you discuss it with the Chief of Police after the events of July 6 '06?

A Yes.

Q Have you attended any meeting with the members of the Village Board about the events of July 6 '06?

A No.

Q Has the Chief told you that he has spoken with the members of the board about that?

A No.

Q You decided at what time to direct my client in to check his mailbox and e-mails?

A 10:55 in the morning.

Q What did you say, at that time, and to whom?

A I told Sergeant Mitchell to call Officer Kempkes at home, have him come to headquarters and clean out his mailbox, and check

his e-mail.

Q What was the necessity that Officer Kempkes clean out his mailbox that day?

A Because he was working that day, and being paid to work that day. That was his shift.

Q Didn't he work the day before?

A Yes.

Q Didn't he work the week before?

A Yes.

Q And I mean by working he was getting paid?

A Yes.

Q In the sense of being paid he worked every day for the preceding three years, even though he wasn't at work, right?

A I don't understand your question. He was being paid as a member of the department while he was out, yes.

Q What was it about July 6th that prompted you to decide that he had to come in that very day to clean out his mailbox?

A I was checking his mail. I was checking the mailboxes.

Q Didn't you check his mailbox on the

5th?

A I may not have.

Q And you may have. I'm asking whether you did.

A I don't know.

Q Did you check his mailbox any day in the week preceding July 6 '06?

A I'm sure I did, yes.

Q When you did that, did you not notice the mailbox needed to be emptied?

A I don't remember.

Q Did you make a conscious decision to wait until July 6th, for some reason or other, before you directed him to empty the mailbox?

A No, sir.

Q Is there any reason you can give me as to why you didn't direct him in on July 3rd to empty the mailbox?

A Well, without looking now, if he was not working on July 3rd I would have no authority to direct him in, or I would have to pay him overtime.

MR. O'NEIL: Can I have an objection?

MAYOR MARVIN: Yes.

MR. O'NEIL: Just so it can be clear for the record, when they say he's working, that means scheduled to work, because he hasn't shown up to work for quite an extended period of time. I just want to make sure it's clear for the record when the witness is testifying about working he's talking about scheduled to work.

Q Was there any day prior to July 6 '06 in the month of July when my client was scheduled to work but didn't because of a job injury?

A I don't know, specifically. I'm sure he was. He doesn't get five days, so there was --

Q How about during the month of July 6 '06, was he scheduled to work but didn't because of a job injury?

A Yes.

Q Do you know if anything went into his mailbox following June 30th, and up until July 6th?

A No, I don't.

Q When was the last time you put a

paycheck in his mailbox, on or prior to July 6 '06?

A I'd have to look at a calendar. It would be the Thursday before, or --

Q So it would be the Thursday before or two Thursdays before?

A Once every Thursday.

Q So pay is every Thursday?

A Yes.

Q And every Thursday you looked at my client's mailbox to put the paycheck in it?

A Yes, sir.

Q What day of the week was July 6th?

A I don't know.

Q Was it July 6th that you first noticed the mailbox had sufficient contents to direct my client in?

A I don't know.

Q Well, you directed that somebody contact my client. Did you give a number at which my client was supposed to be contacted?

A No.

Q What did you expect the person who you were talking to to do in order to place the phone call?

A Call him at home.

Q Who did you ask to call, initially?
A Sergeant Mitchell.
Q And you say Mitchell later told you that he called?
A Yes.
Q Did you ask him what number he dialed?
A No.
Q Did he tell you what number he called?
A No.
Q What happened next?
A I went to his home.
Q Why as a Lieutenant in charge of patrol would you go to my client's house and spend, approximately, an hour-and-a-half?
A To find out why he was not home when we were paying him to be home.
Q Don't you think it would have been a better use of your time to wait until somebody contacted him and have him in and ask him?
A Absolutely not.
Q So you took an hour-and-a-half, approximately, out of your time to sit in my client's driveway?

A Yes, sir.

Q When you first got to his house what time was it?

A Around ten after eleven.

Q Incidentally, you made reference to some investigative file you put together.

A Yes.

Q Did you review that prior to testifying today?

A Yes.

MR. LOVETT: I ask that it be produced in its entirety.

MR. O'REILLY: Mr. O'Neil?

MR. O'NEIL: We have no objection to him reviewing the file. We have, I believe we may even have a clean copy. He has the original there. If Mr. Lovett wants to examine it now he certainly can do it within Lieutenant Satriale's presence with no objection.

MR. LOVETT: I'll take a copy. I don't need the original.

MR. O'NEIL: And you'll review it some time now? Is that your request?

MR. LOVETT: I'll review it when I

have a chance. I'm not going to interrupt the questioning now.

MR. O'NEIL: Okay, then when you are ready we will find it.

MR. O'REILLY: So it will be produced. Will you please continue with your questioning?

MR. LOVETT: Fine.

Q Mitchell told you he called and got what response?

A The answering machine.

Q Did he say what he heard on the answering machine's message?

A No.

Q Did you ask him?

A No.

Q Did he tell you he left a message?

A Yes.

Q What did he tell you he said in the message he left?

A I directed him to leave a message and have him call headquarters.

Q I don't care what you directed him to do. My question is, what did he say he left by way of a message?

A He said he left a message.

Q Did you ask him what the message was?

A No.

Q Did you ask him if he identified himself?

A No.

Q Did you get anything from Mitchell in words or substance that indicated what the message was that he claimed he left on the answering machine?

A I got the e-mail from him.

Q Other than that, is there any other documentation?

A No.

Q Did you know when you got the e-mail that the phone number referenced in it was not my client's?

MR. O'NEIL: Objection. You know, the representation that Mr. Lovett is making, whether they are true or not we don't know. He's not a witness here, but the telephone number on the e-mail from Sergeant Mitchell happens to be the same as the telephone number on the auto

report, so we don't know whether they are correct or not, but the name he gave, excuse me, the number that the people at the auto company recorded as being his home number is the same number as in Sergeant Mitchell's e-mail to Lieutenant Satriale, so I don't think it is fair to him to be representing on the record that that is not his home number.

MR. LOVETT: Well, I'll tell you what, I could care less if you don't think it is fair, and since I'm not worthy of credibility neither is Mr. O'Reilly, I'm sorry, Mr. O'Neil.

MR. O'REILLY: I'll wear a sign.

MR. LOVETT: You don't have to. I see you as the same ilk.

MR. O'NEIL: By the way, the panel, the Board can take a look at the two documents, themselves, if you want to take a break and see if they are different.

MR. LOVETT: I'm sure that guidance will be very helpful to the Board.

Q Lieutenant, after Mitchell told you he left some sort of a message on the answering

machine, what happened next?

A I went to his house, Officer Kempkes' house.

Q When you got there what did you do?

A Rang the doorbell.

Q Did anybody respond?

A No.

Q What did you do next?

A Walked to the rear of the house.

Q For what?

A To see if anybody was in the back.

Q Was anybody in the back?

A No.

Q Then what did you do?

A Called Sergeant Mitchell again, told him --

Q Called him on the cell phone?

A Yes.

Q Your own cell phone?

A Department cell phone.

Q Was that something that would generate a record, an incoming call to headquarters?

A It would generate a record, me calling from a cell phone, yes.

Q Did you call on a recorded line?

A Yes.

Q What did you say to him, and what did he say to you?

A I told him to call Kempkes, tell him to come to the front door, I'm in the driveway.

Q Then what happened?

A He called me back and said he got the same machine.

Q Did you ask him what machine he was talking about?

A No.

Q Did you ask him what the machine said by way of message?

A No.

Q Did you ask him what he said to the machine when it requested a message be left?

A No.

Q Did he tell you?

A No.

Q Then what happened?

A I waited in the driveway.

Q For what?

A Officer Kempkes to return home.

Q Why didn't you direct a subordinate

to do that instead of wasting your time?

A I didn't have a sub available to do it, at that time.

Q How many members of your department are there?

A 23.

Q And you were the only person available to sit in my client's driveway for an hour-and-a-half?

A Yes, sir.

Q Did you ever do that --

A 23 don't work at the same time. We had a Sergeant working and two officers on the road who could not leave the village.

Q And you were supervising patrol while you were sitting in my client's driveway?

A Part of my job.

Q How did you do that when you were sitting in my client's driveway?

A Part of supervising patrol is to check up on the officers that are being paid to work, or scheduled to work.

Q How did you supervise those officers on duty, other than my client who was scheduled to work while you were sitting in his

driveway?

A For that hour-and-a-half I wasn't supervising the officers on the road.

Q Who was?

A Nobody. There was a Sergeant on the desk, as with any shift when I'm off.

Q Now, after you rang the bell for the second time what did you do?

A Called Detective Gallo.

Q Then what?

A Directed Detective Gallo to call Officer Kempkes on his cell phone.

Q Then what happened?

A Detective Gallo called me back, said he received a voicemail, and at that time I directed him to come up and relieve me.

Q Gallo said he received a voicemail? Did he tell you what it consisted of?

A No.

Q Did you ask Gallo how he received a voicemail from somebody who supposedly was not calling the department?

A I don't understand your question.

Q You said Gallo told you that he got a voicemail.

A Received a voicemail when he called Officer Kempkes' box. He didn't personally receive a voicemail from somebody. He was met with the voicemail feature of Officer Kempkes' cell phone.

Q Did he tell you what voice he heard?

A No.

Q Did you ask him?

A No.

Q Did he tell you what message he left?

A No.

Q What happened next?

A Detective Gallo came and relieved me.

Q That was at what time?

A About 12:25.

Q What had he been doing to your then knowledge for the preceding hour-and-a-half?

A I don't know.

Q Well, was he available to come relieve you immediately after you first rang the doorbell and got dogs barking in response?

A I don't know.

Q What made you think that he could

come relieve you when he did if you didn't know that he couldn't have relieved you an hour-and-a-half earlier?

A An hour-and-a-half earlier was neither his position, nor his job to do that. It was my job as patrol commander.

Q And after an hour-and-a-half of you sitting in the driveway it became his job?

A Yes, because I needed to continue the investigation elsewhere.

Q Do what?

A Continue this investigation at a different location.

Q What was the necessity of that?

A I was going to drive to your client's home in Connecticut.

Q Oh, and did you do that?

A No.

Q So when you decided not to go to his home in Connecticut were you continuing the investigation, anyhow?

A By the time I printed out the directions for the home in Connecticut Detective Gallo had called me and told me he returned home, so the investigation changed at that point. I no

longer had to locate him.

Q What happened next?

A I went to Audi.

Q Why?

MR. LOVETT: Withdrawn.

Q Who went to Audi?

A I did.

Q The Patrol Lieutenant went to Audi for what?

A To confirm Officer Kempkes' story.

Q Why didn't you send a subordinate out of your jurisdiction to confirm the story?

A Because it's my job.

Q Says who?

A Says the department rules and regulations for Internal Affairs Investigation.

Q Oh, you are an Internal Affairs Investigator?

A Yes, I am.

Q And you were conducting an Internal Affairs Investigation?

A Yes.

Q You gave my client a Garrity Warning when you spoke to him on the 6th and the 7th?

A Yes, I did.

Q What is a Garrity Warning?

A A Garrity Warning is a warning that tells an employee that you're questioning that you're conducting a departmental investigation and that he does not have a right to refuse to cooperate in a departmental investigation if there is a parallel criminal investigation. None of what happens in the departmental investigation will be turned over for the criminal. So if you are called in for a criminal investigation you have a right to remain silent. You don't have that right in a departmental investigation. You must answer questions in a departmental, but you're guaranteed under Garrity that the department will not turn over your statements or your answers to the criminal investigators.

Q Now, did you read the Garrity Warning on July 7th?

A Yes.

Q Who was present when you read it?

A Officer Kempkes and Officer Panzarino.

Q Did you get a copy of that signed by anybody in your presence?

A No.

Q Isn't that standard protocol in your department?

A If I felt confident that there was a parallel criminal investigation I would have done it.

Q I'm not asking that. Isn't there a requirement procedurally that you get the officer who has been given a Garrity Warning to sign a copy of it?

A No.

Q Did you read a Garrity Warning on July 6th?

A No.

Q How long was the meeting on July 6th?

A The 6th?

Q The 6th.

A Five minutes.

Q From when to when?

A About 2:25 to 2:30.

Q Now, after the meeting ended did you check my client's mailbox to see if it was cleaned out?

A No.

Q After that meeting did you check my client's e-mail, or ask anyone to do that to see if he recovered all of his e-mails?

A He's the only one that can do that.

Q Did you direct him to do that in your presence?

A No.

Q This is now January '07. Do you know whether the e-mails were ever collected or received by my client from July 6th to today?

A No.

Q Now, what was said on July 6th when you met with my client?

A I told him why he was there.

Q What did you tell him?

A I told him that I was investigating why he was not home, in violation of the sick leave policy and procedures. He told me that he wanted to be represented by PBA and an attorney, and I told him I would set up a meeting for tomorrow morning at 10:00.

Q Did you set it up?

A Yes.

Q How did you do that with the PBA?

A That's not my responsibility. I

afforded him an opportunity to have an interview at a different date.

Q Was the meeting of July 7th stenographically recorded?

A No.

Q Was it audio recorded?

A No.

Q Was it video recorded?

A No.

Q Do you have a department procedure or policy, or requirement, that an Internal Affairs Investigation be recorded by some means, either audio, video, or stenographically?

A No.

Q Did you make notes at that meeting?

A Yes.

Q Are they contained in your investigative file?

A Yes.

Q What did you do with the investigative file, after you completed filing it?

MR. O'NEIL: Objection to form.

MR. LOVETT: I'll tell you what, I'll break it into tiny pieces for you.

Q What did you do with the

investigative file, after you completed making it?

A Submitted a copy to the Chief of Police.

Q For what?

A For his review.

Q Did he ever say anything to you after he supposedly reviewed it?

A Yes.

Q What did he say?

A He informed me that he was -- well, prior to reviewing it he informed me that Officer Kempkes was being suspended on the 7th, and that he expected my reports as soon as possible.

Q Did he say by whom Kempkes was being suspended?

A He was suspending him.

Q Who?

A Chief of Police.

Q The Chief told you that he, the Chief, was suspending my client?

A Yes.

Q Did he say whether that was with or without pay?

A He did not say.

Q Did you come to learn that it was

without pay?

A Yes.

Q How did you learn that?

A I do the payroll, so I had to submit a memo to the payroll department, so some time after the 7th the Chief would have told me to submit that payroll memo.

Q How long has the pay list suspension lasted?

A I don't know.

Q Is it still ongoing?

A No.

Q At some point in time you started getting payroll checks and you put them in my client's mailbox?

A Yes.

Q And after a period of time the mailbox became full, right?

A No.

Q Since July 6th until now, notwithstanding what has been put into the mailbox, it never got full?

A Somebody has been emptying it.

Q Who?

A I don't know.

Q Did the Chief tell you that it was his decision alone to suspend my client without pay?

A It never got that far.

Q I didn't ask you if it got that far. Did he say that in words or substance?

A No.

Q Did you ask him in words or substance?

A No.

Q Did you have any conversation with the Chief?

MR. O'NEIL: I have an objection as to the relevancy of the suspension with regard to these charges. These charges relate to the incident which occurred on July the 6th of 2006. They have nothing to do with the suspension that occurred thereafter.

MR. LOVETT: Well, the whole series of questions that I asked were without objection and had nothing to do with the hearing, either, but there was no objection so I kept going. I appreciate the free discovery since Counsel has now

awaken from hibernation.

MR. O'NEIL: No, I just find it more economic to let you go on your rants for awhile, and sometimes you stop, sometimes you don't, so I figured I would let you go for awhile. If it gets a little too redundant I object.

MR. LOVETT: I appreciate everything I get since it is going to be used in a different forum.

MR. O'NEIL: I know. I know.

MR. LOVETT: Yeah, you know it, right?

Q What happened after you gave the Chief the investigative file for his review, to your knowledge?

MR. O'NEIL: Same objection.

MR. LOVETT: No, that has nothing to do with the investigation.

MR. O'NEIL: If he wants to ask about the investigation he can ask about the investigation, but not the file or the reports that were reviewed as a result of that. That has no relevancy to these charges.

MR. LOVETT: It has every relevance, because it has been brought out on the Lieutenant's direct-examination, and I asked that the file be produced and I still haven't gotten it.

MR. O'NEIL: Seriously? Can we have an adjournment and we will give him a copy of the file now? It's right here. Do you want to take a break?

MR. O'REILLY: Okay, let's take one at a time.

MAYOR MARVIN: I'm prepared to overrule that objection.

(Whereupon the Board was polled.)

MAYOR MARVIN: The objection is overruled.

MR. O'REILLY: Let's have the witness answer the question, and then if you want to take a break to look at the file now we will take a break.

MR. O'NEIL: Do you need the question read back?

A Yes.

MR. O'NEIL: All right, can you read back the question?

(Whereupon, the last question was read back by the reporter.)

A Officer Kempkes was suspended.

MR. LOVETT: Am I supposed to take a break now?

MAYOR MARVIN: If you want one. Do you want a break to review the file?

MR. LOVETT: No. I can't review that file in five minutes.

MR. O'REILLY: We didn't say five minutes. We will take whatever time you want to review the file, if you want to do it now or some other time.

MR. LOVETT: I'll take a copy tonight, and I will review it, and if there is anything that I have to follow-up on I will.

MR. O'REILLY: So you don't wish to review the file now?

MR. LOVETT: No, I want a copy of it tonight.

MAYOR MARVIN: Right.

MR. O'REILLY: We will furnish you with the production of the file when we get to that later, but for now, at this

point, you don't want to review the file?

MR. LOVETT: I'd like to look at it. I can't in good conscience in this 15-watt lighting I'm in review what looks like a 2-inch file and analyze it and come up with some questions that will be pertinent, and I don't think I have to do that.

MR. O' REILLY: So we will take that as a no.

MR. LOVETT: You can take that as anything you want, but I want the file tonight to review.

MR. O'REILLY: We heard that. Will you please continue with your questioning?

MR. LOVETT: I'll review the file right now. Let me have it.

MAYOR MARVIN: Okay, we will take --

MR. O'REILLY: Hold on. Mr. O'Neil, do you wish to be heard?

MR. O'NEIL: Yes. Just so it's clear for the record, we do have copies of the Lieutenant's report. There has been no requests prior to this hearing for any information for any documents, all of

which had he requested beforehand would have been made available to him, and he could have read them before this witness would have testified. So we would hope there would be no undue length to the questioning because he failed to request any of these things beforehand, but we do have copies with us in case anyone needed them.

MR. LOVETT: I must be missing something. The law must have changed since 2007. I'm not entitled to pre hearing discovery. Everyone in this room knows that I'm not entitled to pre hearing discovery. To ask beforehand whether the witness reviewed the document is absurd, but having made that ridiculous announcement, as Counsel has, let me have the record.

MR. O' REILLY: So we will take a break, at this time. Mr. Lovett, we will ask for you to review the record, and if you can give us an indication at some point about how much time you think you need to do that we will decide what we are

going to do from there.

MR. LOVETT: Fine.

(Whereupon, a short recess was taken by all parties.)

MAYOR MARVIN: Mr. Lovett?

MR. O'REILLY: All right, we are back on the record.

CONTINUED CROSS EXAMINATION BY MR. LOVETT:

Q When have you made known the directive, from time to time, that officers out on sick or injured status have to come in periodically and empty their mailbox?

A There is no specific schedule for that. Whenever I deem it necessary for them to come in and check.

Q Well, have you given that directive to anybody other than my client?

A No.

Q You said that the record is not in writing anywhere.

A No.

Q There is no policy embodying it?

A No.

Q Now, with respect to e-mails, isn't there somebody who administers the e-mail system

and has a pass code word to get in, like the Chief?

A I don't know if the Chief has everybody's pass code. He administers the department, so he administers officers and the management records system.

Q So you know the Chief can access my client's e-mails, if he wants?

A I don't know that, specifically.

Q Did you ever ask the Chief?

A No.

Q Did you ever ask the Chief if he could check my client's e-mails and see if there is 1 or 100?

A No.

Q Did Sergeant Mitchell tell you that following your directive he left a message that is on the answering machine attached to my client's home telephone number?

A That may be in his e-mail. I'm not sure of the specific words in his e-mail.

Q Would it jog your memory if I told you it was in your incident synopsis?

A If I reviewed it, yes.

Q Why don't you review it and see if it jogs your memory? It's the third page of your

report under incident synopsis, about six or seven lines down?

MR. O'REILLY: Can we have what the Lieutenant is looking at marked for identification?

MR. LOVETT: Sure.

MR. O'NEIL: We have copies that are marked. You don't have of a document that was marked up, do you? We have copies of them now that we can give you. We can show those -- well, let me just see how badly they were marked up. I was unaware until tonight that the first couple of pages were copied from a document we marked up.

MR. LOVETT: Do they have your notes on them? I would like a copy.

MR. O'NEIL: Then we found a plain one for you.

MR. LOVETT: I mean, there is a lot of handwriting on the one you gave me already.

MR. KURTZ: It's not ours.

MR. O'NEIL: I'm going to show Mr. Lovett one of the copies and see if he has any objection to those being provided to

the Board. Since he is using this document, if he wants to make copies he can give it to you.

MR. LOVETT: I have no objection if these marked up copies are marked for ID, because it's just a series of underlines and asterisks, and so on.

MR. O'REILLY: Okay.

MR. LOVETT: What do you want this marked as, Board's 4 for ID?

MR. O'REILLY: Well, I think since you are the one asking him the questions it should be marked Kempkes' 8.

MR. LOVETT: I'm not asking that it be marked for ID, you are.

MR. O'REILLY: Fair enough. We will mark in as Board's Exhibit 4 for identification.

(Whereupon, a document was received and marked as Board's Exhibit 4, for identification, as of this date.)

Q Lieutenant, take a look at Board's 4 for ID, third page under incident synopsis, sixth line down.

A Okay.

Q You see where it says with respect to Mitchell that he reported he left a message on an answering machine attached to Officer Kempkes' home telephone number?

A Yes.

Q Did he tell you that?

A Yes.

Q Did he tell you what the phone number was?

A No. I think in his e-mail.

Q Did he tell you that the answering machine was one connected to Kempkes' home telephone number?

A It's the only telephone number we have in the department that we could call.

Q Did he tell you that? I don't care what you have on the record.

A Directly?

Q Yes or no.

A No.

Q Then why did you put it in the report?

A Because it's the only telephone number that we have for Officer Kempkes, and when he was directed to call Officer Kempkes at home

that is the phone number he used.

Q Let's go back to the incident synopsis. The fifth line, "at or about 10:55 hours Sergeant Mitchell reported to my office that he left a message on an answering machine attached to Officer Kempkes' home telephone number."

A Right.

Q Did he tell you that, yes or no?

A I can't answer yes or no to that.

Q Then why did you put that in the report that he told you that?

A Because indirectly, yes, he did tell me that.

Q How did he do it, indirectly?

A Because when I said Sergeant Mitchell, call Officer Kempkes at home and have him come in and clean out his mailbox, and check his e-mails, and five minutes later he reported to me, I called him and got an answering machine, there was an assumption on my part, at that time, that he called him at home, which is the only number we have. In the 15 years that Officer Kempkes is here we only have a home phone number. It has changed, from time to time, but his home number is the only number we have for contact for him.

Q All right. Is there anything you purposely left out of the incident synopsis?

A Absolutely not.

Q Would you read to me, or just tell me where in it there is a reference to you giving a Garrity Warning?

A It's not in here.

Q Did you purposely leave that out?

A No.

Q Did you think it was important that you gave, or claim you gave the Garrity Warning?

A Actually, no.

Q Then why did you give it?

A At the time --

MR. LOVETT: Withdrawn. Withdrawn.

Q You said on direct-examination that you wanted Kempkes to come in and empty his mailbox, and to read his e-mails?

A Yes.

Q Except in the second and third line under incident synopsis you say that, "I wanted Kempkes to come to police headquarters to read his departmental e-mails and to check his mail slot at the police desk."

A Right.

Q If you wanted him to empty his mailbox why didn't you say that?

A It's the same thing.

Q That's the same thing as to what you ordered him to do?

A If I say empty your mailbox or clean out your mail slot, it's the same thing to me.

Q You said to check his mailbox. Is there a reason you didn't say either?

A Again, same answer.

Q Well, what did you actually direct that he do, come in to clean out his mailbox, to look at his mailbox, or to check his mailbox, or something else?

A I'm not sure which exact words I used. Every member of the department would understand what I meant if I said check it, clean it, empty it. It all means come in and look at the mail, review the mail in your mailbox. I cannot recall the exact words that I used.

Q How is it that you did on direct when you told us --

A I didn't.

MR. O'NEIL: Objection. Objection.

He didn't testify those were the precise words that he said.

MR. LOVETT: Yes, he did, but the record will show what he said.

MR. O'NEIL: Yes, it will.

MR. LOVETT: We'll deal with that later.

Q Okay, let's go back to your incident synopsis. Eighth line down there is a reference to Officer Kempkes reported sick or injured. Did he report sick on July 6 '06, yes or no?

A No.

Q Did he report injured on July 6 '06?

A Yes, he did.

Q Who did he call?

A His doctor's note put him out injured.

Q The doctor's note was a report of injury on July 6 '06?

A Absolutely.

Q And the date of the doctor's note was what?

A The doctor's note was dated April

25 '06, and kept him out injured until August 15 '06, when he was reevaluated.

Q So it was July 6th that he called in injured, or was it April 25 '06?

A He didn't call in on either date.

Q Okay. So on July 6 '06 he did not call in sick, right?

A No.

Q No, he did not, right?

A Correct.

Q Okay, and he did not on that day call in injured, either, did he?

A Correct.

Q Do you have, I'd like you to turn to the sick leave policy that is contained in your investigative report, and we will look at Exhibit 3A in evidence. Do you see capital A about three-fifths of the way down the first page?

A Yes.

Q And just above it it says in bold face caps, **PROCEDURE FOR REPORTING SICK**, doesn't it?

A Yes.

Q So is what follows on that page the procedure for reporting sick?

MR. O'NEIL: Objection. The document speaks for itself. It's got the purpose listed up above. If he's going to ask for an interpretation of this document, or his opinion of what it means, we will let him testify as to that, but it should not be augmented.

MR. LOVETT: Not at all. In fact, with the cute testimony elicited on direct you are made to believe that this policy and the procedures for reporting sick applies to an injured, and my client didn't report sick or injured on that date, July 6th, and the procedure for reporting sick is quite clear. It has nothing to do with the events of July 6th, so we can chalk it up to a nice try by the prosecuting attorney, but I'm entitled to ask this witness questions as to what he understands the plain meaning of 3A in evidence is.

MR. O'NEIL: If I could be heard on this, the policy that's in evidence as Department's Exhibit 3A clearly talks about the purpose for people whether or

not they are out sick or injured, and it also, despite what Mr. Lovett or Mr. Kempkes may have argued, at this time, there was no misunderstanding on his part that this policy applied to him, and he had already taken a command discipline, forfeited 12 days of pay for having violated the same policy while he was out "injured" in 2003. So to make this argument as something he may do after the fact, but he was told that this policy applied, he lived up to it, he called in, he took a whack when he got caught once before, and now this is the second time he got caught.

Now he may argue it doesn't apply, but he was directed to follow it. So even if he can argue that it may have been vague or unclear, or whatever, he was directed to follow this policy, and he has previously been disciplined for not following it. So to say now the policy doesn't apply, even though he was directed to follow it, this would be the wrong way to go about it. It would be after the

fact, Article 78 to say you cannot apply these rules to this officer.

MR. LOVETT: That's a great assumption, but it's irrelevant, and I still have questions to ask of the Lieutenant now that the interference seems to have slacked. May I proceed?

MAYOR MARVIN: Yes.

MR. O'REILLY: We need a ruling on the objection. Do you wish to have the question answered, or are you withdrawing the question?

MR. LOVETT: I'm not withdrawing anything.

MR. O'REILLY: Fine.

MAYOR MARVIN: We are going to take a caucus.

MR. O'REILLY: All right, we are going to ask the audience to leave while we caucus.

(Whereupon the Board conducts a caucus.)

MAYOR MARVIN: Okay, the Board is going to overrule that objection and allow Lieutenant Satriale to answer your

question, Mr. Lovett.

MR. LOVETT: Okay.

MR. O'REILLY: So we will need to have it read back.

A Yes, I forgot the question.

(Whereupon, the last question was read back by the reporter.)

A Yes.

Q Next to A you see where it says a member of the department reporting sick is to, and then follows?

A Yes.

Q Are the things that are listed under A1 through 7 the things that somebody reporting sick is required to do?

A Yes.

Q How many times have you had my client checked on at his home during the period of time he was out job injured?

A I don't know, specifically.

Q More than once?

A How many times?

Q More than once?

A Yes.

Q More than 10 times?

A I don't believe so.

Q But you're not sure?

A No.

Q Would you identify for me each other member of the department that has been out sick or job injured, and you've had somebody check on their presence at their home?

A None.

Q Is there a department policy, practice, or system by reason of which when an officer is out sick somebody in the department is supposed to verify that they are at home?

A That's not a question I can answer yes or no to.

Q You can't answer that?

A It depends on the circumstances.

Q Is there a written policy, procedure, rule, regulation, or order that requires the department to check on an officer out sick to see if they are at home?

A This policy applies in that there is no specific written directive that says every third day you'll call and check on somebody, or every Tuesday in October, no.

Q Okay. In Exhibit 3A in evidence

would you read me the line or lines that say that whenever someone is out sick the department has to check and make sure they are home?

A It's not specific.

Q You will acknowledge that it's not there?

A No, it's not.

Q When someone is job injured is there a written policy, practice, rule, or order that requires that somebody in the department on duty check on that person to make sure that they are at home?

A No, nothing written, other than this policy and the logs that are kept in accordance with that policy.

Q And will you agree with me that in 3A in evidence there is nothing, whatsoever, in words or substance that requires that any officer that is out on job injured status has to be checked on to make sure that they are at home, right?

A Correct.

Q Going back to your incident synopsis, the ninth line down under that subheading makes a reference to numerous attempts to reach someone at the house by ringing the doorbell. Who

made those numerous attempts?

A Me.

Q How many was numerous?

A Three.

Q Didn't you testify on direct-examination that after the first occasion you went around the back to see if anybody was on the back porch or deck?

A Yes.

Q Take a look at your report and see if that jogs your memory where it says a walk around of the exterior of the residence revealed no members of the household were in the rear yard.

(Whereupon, the witness peruses a document.)

A Correct.

Q If you were checking the porch or the deck why did you make reference to the rear yard?

A Because the deck is in the rear yard.

Q Oh, so you misspoke?

A I didn't misspeak.

MR. O'NEIL: Objection.

Q Today when you were testifying you

were checking the deck you meant that to be the same thing as checking the rear yard?

A I checked both. I walked to the rear yard which is where the deck is located, saw nobody in the yard, and nobody on the deck.

Q Then if you skip down you see the bold faced reference to **attachment five**?

A Yes.

Q Following that it makes reference to you, "I remained parked at the residence and made additional attempts to reach someone by ringing the doorbell."

A Yes.

Q Were those additional attempts part of the three attempts you just explained you made?

A Well, you stopped at doorbell. If you continued it said "made additional attempts to reach someone by ringing the doorbell at 1150 hours and was met with negative results." That 1150 hours is one of the three attempts I made.

Q So at 1150 you made additional attempts, plural?

A Well, if I rang the bell more than once --

Q Did you?

A Yes.

Q And if you look down on the next to last paragraph on that first page of incident synopsis it makes reference to July 7 '06 being a Friday. Do you see that?

A Yes, on Friday, July 7, 2006.

Q Okay, so the day you had someone try and get my client in to check or look at, or empty his mailbox was a Thursday, right?

A Correct.

Q And on that Thursday you put a paycheck in my client's mailbox?

A Correct.

Q Was the mailbox full or empty when you did that?

A Clearly there was enough mail in there to indicate that he had not been in to check his mail. I don't know if it was full or not.

Q Was there one more piece of mail on the 6th of July, after you put the paycheck in there, than there had been the preceding Thursday when you put a paycheck in there?

A Sure. The paycheck would have been one more pieces of mail. I'm not sure of the exact number besides that.

Q But there was one additional piece of mail on July 6th, that being a check you put in there that day, preceding what had been there the Thursday before?

A I don't know.

Q Who puts things in the mailbox, anybody?

A Yes.

Q And anybody can take things out?

A Yes.

Q Now, at the interview on July 7th did my client ask to tape-record the matter?

A Yes.

Q What did you tell him?

A No.

Q Why did you tell him no, so you could have had a complete, accurate record of what was said?

A Because we have no policy or procedure governing tape-recording on our site, and we do not tape-record, and we do not allow people that are being interviewed to tape-record.

Q Who says it's not allowed?

A We say. We set the rules of interview.

Q What's the rule that says no tape-recording of Internal Affairs Investigations?

A That's it.

Q Written?

A Not written.

Q Just you under the verbal rule?

A Yes.

Q Now, do you recall any mention being made on July 7th during a meeting with my client and a PBA Rep. about any memo or memos issued by the Chief regarding Chapter 19 Section 2.0?

A Yes.

Q Were those documents in your presence during that discussion?

A No.

Q Who made reference to them?

A Your client.

Q And what did he say about them?

A He said he had been trying to obtain Chapter or Article 19 of the rules and regulations from the Chief for some time.

Q Did he say anything about any memos where the Chief had indicated that he, Kempkes, had violated that chapter and section?

A No.

Q Are you sure?

A Yes.

Q Did my client, to your recollection, say anything about the Chief having written at least two memos to him making reference to a non existent rule?

A No.

Q You don't recall that?

A No, I know he did not. He continued to say he was attempting to get this section, and he was met with negative results every time he tried to get it, and he said, I can't follow something I don't have, and that's when I continued to remind him that I was not proceeding under Article 19. I had never seen it. We were proceeding under the sick leave policy and procedures.

Q Did you ask my client why he was trying to get a copy of Article 19?

A No.

Q Did he tell you?

A No.

Q He didn't make reference to two memos from the Chief of Police that referenced that

article or chapter and section?

A No.

Q Have you ever seen those memos?

A No.

Q You're sure?

A Yes.

Q You say that Officer Kempkes has a home in Connecticut?

A Yes.

Q If he wanted to, could he have remained indoors at his home in Connecticut on July 6th?

A He would have had to notify us that he was leaving his home in Eastchester.

Q Well, if he had been in Connecticut at his home he was at his home, wasn't he?

A No, his residence is in Eastchester. He lives in Eastchester. The address on file with the department is the Eastchester address. That's where he is expected to be.

Q Where is that written?

A Where is that written?

Q Where is it written that he has to stay in the Eastchester residence if he's out job injured or sick?

A It's not written anywhere. It's written that he lives in Eastchester. That is what he notified the department, that he lives in Eastchester, at the time, not Connecticut.

Q How do you know he has a house in Connecticut?

A Because he called from his house in Connecticut to say that he was too ill to come home.

Q So you understood he was at home in his residence in Connecticut?

A He was at his residence in Connecticut. If he called at home I don't know why he was calling to say I can't come home, I'm in my Connecticut house in the past.

Q Well, when he called in from the Connecticut residence sick or injured, was he violating the sick leave policy, 3A in evidence?

A No.

Q Do you know he has a Florida home?

A No.

Q On July 6th why did you choose the Eastchester residence as opposed to the Connecticut residence to ascertain my client's whereabouts?

A That is the address that he has on

file with the department. That's the first place I went. I was en route to Connecticut after that, because he came to his home in Eastchester prior to me being able to go to Connecticut.

Q Did you have a phone number for the Connecticut residence?

A Yes.

Q Did you call it?

A No, I did not.

Q So you were prepared to drive to that residence rather than calling?

A Yes.

MR. LOVETT: I have nothing further on cross-examination, but I'm reserving my right to recall this Lieutenant on my case.

MAYOR MARVIN: All right.

MR. O'REILLY: So noted.

MR. O'NEIL: I don't know why he would have a right to recall him without subpoenaing him. He's a witness. He's here. We put him on and we produced him. He is subject to cross-examination. We are not representing that we are making him available, just so that is clear, also.

MR. LOVETT: Well, I'll tell you what, I don't see what the point of that statement is, but the Lieutenant was subpoenaed by me.

MR. O'NEIL: He was not subpoenaed.

MR. LOVETT: Please, excuse me. I'm talking. Let him disregard my subpoena and we will fight it out in Supreme Court where I can have him held in contempt. If you want to play that smart ass game that is fine. It's his reputation at stake.

MR. O'REILLY: We have your comment on the record. We will deal with that when we get to that point.

MR. LOVETT: Fine.

MR. O'REILLY: Do you have any questions, Mr. O'Neil?

MR. O'NEIL: Just a few.

REDIRECT EXAMINATION BY MR. O'NEIL:

Q Lieutenant Satriale, the officers you mentioned who have been out for extended periods of time, Officer Dorre, did he ever accept command discipline for violating the department sick leave policies and procedures?

A No.

MR. LOVETT: Objection. It is totally irrelevant. Here we go again poisoning the record. Why don't you see if you can put it in bold face and underline it next time, Counsel.

MR. O'NEIL: There is an argument by Counsel that he had no idea that this policy and procedure was applicable, so even if this evidence is offered to show the ridiculousness of that argument, to show that not only did he have knowledge that this policy applied, but he had accepted command discipline, which I believe was the most serious command discipline in the history of the department up to that time, so for him to make that argument that that has no relevancy when his argument here is that he didn't believe this applied, whether it poisons the record or not, certainly the relevancy of that outweighs the facts of keeping it out. And why people would be treated differently, if someone has violated the policy, you are certainly entitled to treat them differently than

someone who never violated the policy, so I think this is extremely relevant to examine why he was treated differently. There is no question he was treated differently. You know, people say you discriminate. Well, you are allowed to discriminate if there is a reason to do it, if you're a sick leave abuser or offender rather than someone who never violated the trust of getting these days, getting paid for staying home, and taking care of themselves as opposed to people wandering around and the events surrounding the initial discipline are obviously very serious, and what he did in that regard will come out through another witness, but certainly the Board is entitled to know that the reason Officer Dorre may have been treated differently than Officer Kempkes is because Officer Dorre was never taking command discipline for violating the same policy before.

MR. LOVETT: I appreciate that, even though it is irrelevant. We reserved our rights to litigate in Federal Court, but

as Counsel so eloquently stated, it is a sort of sloppy attempt to articulate a selective prosecution claim. That is one of our claims we advanced in Federal Court. It is not for you folks to decide. It is for a jury to decide what the damages are going to be. So having poisoned the well once again and telling everybody that the poison is more than the prejudice I congratulate Counsel. He probably could not do more to damage the record in this case than he already has done, but I'm sure he will give it another shot.

MR. O'NEIL: I didn't bring up Officer Dorre, Officer Murray, or Officer Panzarino, or Officer Mitchell. It was all brought up on cross. I'm certainly entitled to go into why they were treated differently on redirect.

MAYOR MARVIN: I'm prepared to overrule the objection.

MR. LOVETT: Incidentally, before you do that, since Counsel announced what my client got is the most serious

punishment ever meted out in the department, you have to look behind that. You have one officer who committed an assault on a civilian, and guess what he got, nothing. Guess who was a witness, the good Lieutenant Satriale. What he got was nothing. False reports were filed. Nobody got more serious punishment because they were the good old fair-haired boys.

MR. O'REILLY: We have a ruling. Can we have the Lieutenant, would you answer the question, please? Do you need to have it read back?

MR. O'NEIL: Do you need the question read back?

A No. Did Dorre ever receive command discipline, no.

Q How about Officer Murray?

A No.

Q By the way, with regard to Officer Murray, was his home ever visited with regard to the utilization of sick leave?

MR. LOVETT: Objection, leading.

MR. O'NEIL: Yes, it's redirect.

MR. LOVETT: It's leading. It

doesn't matter if it's re re redirect.

MR. O'NEIL: It's your cross-examination that went into this area.

MR. LOVETT: It doesn't make your question proper, Counselor. You know better than that. Maybe you don't.

MR. O'NEIL: You use the same lines in every place, Mr. Lovett. They are not successful then or this time.

MR. LOVETT: Because you make the same mistake every time. It's boring.

MAYOR MARVIN: All right, can you read back the question, please?

(Whereupon, the last question was read back by the reporter.)

A Not at my direction, no.

Q Okay. So the answer you gave on cross-examination about others not having their home visited, the answer was limited to your direction?

A I believe that is what the question was, have I ever.

Q Officer Panzarino, has he ever, to your knowledge, violated the sick leave policy and

procedures?

A No.

Q Officer Mitchell, same question.

A Sergeant Mitchell.

Q Sergeant Mitchell, I'm sorry, same question.

A No.

MR. O'NEIL: I'm going to ask that the witness be shown Department's Exhibit 4.

(Whereupon, a document was handed to the witness.)

Q Lieutenant Satriale, have you seen that document prior to July 6, 2006?

MR. LOVETT: 4 was not the subject of cross. This is improper redirect.

MR. O'REILLY: Mr. O'Neil?

MR. O'NEIL: The cross-examination focused on different treatment between Officers Dorre, Murray, Panzarino, Mitchell, excuse me, Sergeant Mitchell, and Officer Kempkes. On redirect I'm entitled to go into why he was treated differently. Part of the reasons as an offer of proof that he may have been

treated differently is that he had agreed in the past that he violated this policy, had been punished by forfeiting compensatory time, 12 vacation days, and now I'm trying to inquire as to whether or not because of that there was a reason to treat him differently, and why he was treated differently. Whether someone had directed Lieutenant Satriale to keep an eye on this guy while he was going to stay out is part of it, and whether or not he was aware of this resolution through command discipline.

MR. LOVETT: Exhibit 4 still wasn't discussed or referenced in cross-examination. It's improper redirect, but I was right before, Counsel has enhanced the legal meadow muffin he deposited when we first began this hearing, and once again put into play the prior convictions, which was a product, I can even guess, of lousy legal advice.

MAYOR MARVIN: I'm prepared to overrule that objection.

(Whereupon the Board was polled.)

MAYOR MARVIN: Objection overruled. Continue.

A No.

MR. O'NEIL: Can I ask that the witness be shown Department's Exhibit 9?

(Whereupon, a document was handed to the witness.)

MR. LOVETT: 9 wasn't the subject of cross-examination. It's improper redirect.

Q Lieutenant Satriale --

MR. O'REILLY: Hold on. Hold on. We have an objection. Same response?

MR. O'NEIL: It's the same response. This is just a summary of the other document.

MAYOR MARVIN: I'm prepared to overrule the objection.

(Whereupon the Board was polled.)

MR. LOVETT: Also aggravating the old meadow muffin again. We are back to the 2003 supposed conviction for being naughty for violating a rule when my client was on sick leave having illegally been denied 207C Status by the Chief who later reversed himself after these

charges. The 2003 events, as I said earlier, or the first night, have nothing to do with the issue at band, because tonight and last time we are dealing with someone who was on 207C Status, not sick leave, and presto chango the Chief of Police put that in writing himself. It's in evidence. So repeated referencing to a command discipline or most serious offense meted out by someone who was not one of the fair-haired boys here just makes it worse, but over my objection I'm sure you will let Mr. O'Neil go forward.

MAYOR MARVIN: Yes, we already overruled the objection, so continue, please.

A Yes.

Q And the subsection mentioned in Department's Exhibit 9, Section A6, is that the same Section A6 provision that you were investigating with regard to Officer Kempkes?

MR. LOVETT: Objection, leading.

MR. O'NEIL: Maybe I'm wrong on this. We have legal Counsel, but when his cross-examination goes into areas that

were not covered directly on direct-examination I think I have the same leeway on redirect to ask leading questions.

MR. LOVETT: You're wrong, as a matter of law. I'm glad you realized your possible frailty.

MAYOR MARVIN: I'm prepared to overrule that objection.

(Whereupon the Board was polled.)

MAYOR MARVIN: Objection overruled. Continue.

A Yes, it is the exact same section.

Q After Officer Kempkes had agreed to forfeit the compensatory time and the vacation time for having violated Department's Exhibit 3A, Subsection 6, did the Chief give you any direction as to how to handle Officer Kempkes' absences in the future?

A There was no vacation time. It was compensatory time as a suspension.

Q Oh, I'm sorry. I'm sorry, it was a 12 day suspension, 12 days of compensatory time. Following that, did the Chief give you any direction as to how to handle Officer Kempkes'

absences?

A Yes.

Q What did he tell you?

A Make sure he's home. Continue to check on him.

Q Can officers in the department check their e-mails from outside of the department computers?

A No.

MR. LOVETT: Objection. There is no foundation that this witness has any competency to answer that. How does he know?

MAYOR MARVIN: I'm prepared to overrule that objection.

MR. LOVETT: Of course you are.

(Whereupon the Board was polled.)

MAYOR MARVIN: Objection overruled. Continue.

A No, same answer.

Q During any of the prior checks of Officer Kempkes' home, prior to July 6th of 2006, did you ever have any conversations with him with regard to him being out on the deck or in his backyard?

A Yes.

Q Can you tell us the circumstances under which that arose?

MR. LOVETT: Totally improper redirect. It doesn't come up remotely on cross.

MR. O'NEIL: We spent 15 minutes on the deck, the back of the house.

MAYOR MARVIN: I'm prepared to overrule the objection.

MR. O'NEIL: Thank you.

(Whereupon the Board was polled.)

MAYOR MARVIN: Objection overruled.

MR. LOVETT: Before you get so excited and overrule all the objections, Ms. Mayor, there was no question about any conversations about the deck or the porch which my client referenced on direct or cross examination. Why don't you just disband what minimal rules of evidence there are here so that Mr. O'Neil can ask whatever he has to to try and catch up.

MR. O'NEIL: With all do respect, it is not minimal rulings of evidence applicable here. There are no rules of

evidence applicable in this hearing. Certainly they apply when they help get out the truth, but it is clear that the rules of evidence do not apply.

MR. LOVETT: They won't be answered in this kangaroo forum. They will be answered in Federal Court.

MR. O'NEIL: You can answer the question. Do you remember it?

A Yes. There was a time when Officer Kempkes did not answer the door at his home, and a subsequent conversation I had with him where he said he had been on the deck in the rear yard of his home and he didn't hear the doorbell.

MR. O'NEIL: Can I ask that the witness be shown Department's Exhibit 2?

(Whereupon, a document was handed to the witness.)

Q Could you turn to Article 4, Subsection 4.1?

MR. LOVETT: Objection. This has no bearing on cross-examination. It was not the subject of direct. It's improper redirect, but I'm sure that the Mayor will be inclined to overrule my objection, just

as she has on almost every other major point.

MR. O'NEIL: There is no question yet, so I don't know what you are objecting to.

MR. LOVETT: I'm objecting to the subject matter. It is sort of obvious.

MR. O'NEIL: You spent almost --

MR. LOVETT: Do you think the reporter can take us both down? Guess again. It wasn't the subject of direct. It's not the subject of cross. It's improper redirect.

MR. O'NEIL: There was, again, 20 minutes, at least, as to why he was performing his supervisory duties by spending time at Officer Kempkes' residence as opposed to doing other things that Mr. Lovett may have thought were more important, so I think I'm entitled on redirect to inquire as to that.

MAYOR MARVIN: I'm prepared to overrule the objection.

(Whereupon the Board was polled.)

MAYOR MARVIN: Objection overruled.

Continue.

Q Are you familiar with the provision of Article 4 of the rules and regulations, Lieutenant Satriale?

A Yes.

MR. O'NEIL: I have no further questions of this witness.

MR. LOVETT: You led us right up to an exciting subject and walked away.

RECROSS EXAMINATION BY MR. LOVETT:

Q Lieutenant, would you put the rules and regulations on the table, please? I have a question for you. Just put them down.

A I am. I'm putting them in the order I like them, in case I have to refer to them again.

Q Fine. You are familiar with the rules and regulations?

A Yes, I am.

Q Okay, what does Article 8 pertain to?

A I do not have them committed to memory.

Q You don't know the substance of Article 8?

A No, I do not.

Q How many articles are there in the rules and regulations?

MR. O'NEIL: I'm going to object to this line of questioning.

A I don't know.

MR. LOVETT: I do, too.

Q You had a conversation with my client and he said he had been on the deck when you were ringing the front doorbell?

A Yes.

Q When was that?

A I don't remember.

Q Did you not make any written record of it?

A No.

Q What year was that?

A I don't know.

Q But the event is indelibly etched in your memory?

A Yes, because I knew the next time I would ensure that I checked the backyard and the deck. I gave him the benefit of the doubt that time.

Q So it was the very next time after

you had that conversation with my client that the events of 7/6/06 occurred?

A Yes.

Q When did the Chief tell you to make sure Kempkes was at home, and check on him, as you testified?

A I don't remember specific dates.

Q What year?

A I don't know.

Q What season?

A I don't know.

Q Did he tell you that in writing?

A No.

Q Did he tell you with respect to any other member of the force to make sure that they are at home, and check on them?

A No.

Q You are certain?

A Positive.

Q Now, you said that somebody checked on Murray when he was at home?

A Yes.

Q That's firsthand knowledge to you?

A No.

Q How did you learn about that?

A Through procedures of the department, memos that came out, and procedures that followed.

Q What memos and what procedures?

A I believe there was a, there is an ongoing court proceeding about that visit to his home.

Q What was the nature of the proceeding?

A I don't know the specifics.

Q What year was the proceeding?

A 2005, 6, I'm sorry.

Q Do you know who directed that someone check on Murray?

A The Chief.

Q Who was the Chief, at that time?

A Brian Downey?

Q Did he tell you the reason he wanted someone to check on Murray?

A I was not personally involved in any of that.

Q Did he tell you, at any point in time, why he had someone check on Murray's presence, or lack of presence at his home?

A I was not personally involved in

that, so no, he did not.

Q I'm not asking if you were personally involved.

MR. O'NEIL: Objection. He answered the question.

Q Did he ever tell you in words or substance why he directed that Murray be checked out?

A No.

Q Did anybody ever tell you what the reason was?

A No.

Q And the ongoing procedure or litigation pertained to what?

A I believe Murray losing a day's pay. A memo came out similar to the command discipline that he was forfeiting a day, or losing a day's pay.

Q For what?

A As a result of not being home when sick.

Q Was that the product of command discipline?

A I don't know. You've got to keep in mind, I wasn't personally involved in this, so I

don't know the facts.

Q But you saw the memo that said he lost a day's pay for not being home when he should have been?

A Yes.

Q He was supposed to be home by reason of becoming sick, or job injured?

A I don't know.

MR. LOVETT: Thank you, I have nothing further.

MR. O'REILLY: Mr. O'Neil?

RE REDIRECT BY MR. O'NEIL:

Q You said, Lieutenant Satriale, you didn't know whether the Chief told you to keep an eye on or check on Officer Kempkes, but do you know whether or not it was after Department's Exhibit 9 was posted?

A Yes.

MR. O'NEIL: I have no further questions.

RE RECROSS EXAMINATION BY MR. LOVETT:

Q You were just asked whether you know if it was after Exhibit 9 was posted and you said you knew. What's the answer? Was it before or after?

A It was after.

MR. LOVETT: Thank you. I'm sure Counsel would appreciate that clarification. Thank you very much.

MAYOR MARVIN: All right, thank you.

MR. O'REILLY: Any further questions?

MR. O'NEIL: I have no further questions.

MR. O'REILLY: Does the Board want to caucus?

MAYOR MARVIN: Board, do you have any questions for the Lieutenant, at this time?

MR. UNDERHILL: I have none.

MR. BARTON: I think I do. Let's refer for a second to Exhibit 3A again. You see where it says under Purpose to Establishing Form of Procedures for Reporting Sick, and follow-up on actions when members become sick or injured, but there are only references here to sick. I believe I read the whole thing, but every bold topic says sick. Nothing says injured, per se, but I guess what you are

saying is that these are substitutable words?

MR. O'NEIL: I'm going to object to the question. I know that this is unusual, but you are saying that the document doesn't make reference to injured, and that is not accurate.

MR. LOVETT: He didn't say that. Don't distort what a Board Member is saying. You can distort what I'm saying, but not the Board.

MR. BARTON: No, I'm listening to you.

MR. O'NEIL: I do know that she can't take down both of us. Maybe I misunderstood your question. I thought you said it didn't make reference to injured, and there is a number of places in that document that says and injured, or injuries. If you want I can point them out to you.

MR. BARTON: No, I see the word injury used in the subsections of these things, but in bold type when it says, for instance procedure for reporting sick, and

then A, a member of the department reporting sick, and then B, desk officer receiving a sick report, etc., etc. None of the bolds refer to injured, so I'm just trying to ascertain whether or not sick and injured for the purposes of following the procedure are the same exact treatment. They are substitutable words I guess is what I'm asking? Are they? Are sick and injured used one in the same when it comes to call in procedures?

MR. O'NEIL: If you are asking me the question --

MR. BARTON: No, I'm sorry, I'm looking at you, but I'm asking the Lieutenant.

LIEUTENANT SATRIALE: I wouldn't say they are interchangeable. The purpose of the policy is to govern how to call in sick for single days, how to call in injured, whether it be extended period of time, or one day. I'm not calling in today because I'm injured, and that is spelled out in the purpose, and in the background where it governs vacancies created by

illness or injured, and members early returns to duty. So when you go to Section A, the member of the department reporting sick for a single day is to do this. Now an extended injury, we don't require when you are under a doctor's care and have a doctor's note with a starting date and an ending date, we don't require every day that you are scheduled to work to call and say I'm injured, but when you are out on injury leave, clearly you have to comply with this policy, because that's the purpose of the policy.

MR. BARTON: Being that you don't have to call in?

LIEUTENANT SATRIALE: You don't have to call and say you are injured every day, but you have to comply with everything else in the policy.

MR. BARTON: Okay.

MAYOR MARVIN: Anymore questions, Mr. Barton?

MR. BARTON: No.

MR. LOVETT: I have a couple of follow-up questions if no other Board

Members have any.

MR. O'REILLY: Well, let's find out if the Board has any.

MR. LOVETT: I said if no other Board Members have any.

MR. O'REILLY: No other questions? All right, Mr. Lovett?

RE RE RECROSS EXAMINATION BY MR. LOVETT:

Q Do you know who drafted 3A in evidence?

A No.

Q Do you think it was a mistake that the policy is described in bold face at the top of the first page as **Sick Leave Policies And Procedures**?

A No.

Q Did anybody ever tell you that embodies a typo, and somebody forgot to put in disability, as well?

A No.

Q Where it says under policy, the last sentence, "members on sick leave will comply with all follow-up procedures outlined herein," do you think that was a typo there, and it was supposed to say disability leave?

A No.

Q Where it says, "abuse of sick leave may result in disciplinary action," do you think that is a typo there where it was intended to say disability leave?

A No.

Q Then it says procedure for reporting sick. Do you think there was an inadvertent omission and it was supposed to say disability, as well?

A No.

Q Where it says, "a member of the department reporting sick is to," do you think somebody inadvertently left out disability there?

A No.

Q Then on the next page where it says at the top, "sick leave policies and employee procedures continued," do you think that was a typo or an inadvertent omission?

A No.

Q Under B where it says --

MR. O'NEIL: I'm going to object.

MR. LOVETT: Good.

Q -- the desk officer receiving a sick report --

MR. O'NEIL: Excuse me, but I have an objection.

MR. LOVETT: Don't you remember what Mr. Riley said? Wait until the question is asked, and then make your objection.

MR. O'NEIL: I stopped.

MR. LOVETT: Otherwise you will throw me off track and completely confuse me.

Q Do you see under B, "desk sergeant receiving a sick report shall," do you think there was an inadvertent omission to include disability report?

MR. O'NEIL: I object. I think he already answered a question whether he thought there was any typographical errors or mistakes as to the document.

MR. LOVETT: No, we haven't gotten to these, B, C and D.

MR. O'NEIL: He answered as to the whole document. He said he didn't think there were any errors or mistakes as to the document, so that includes every subsection of the document.

MR. LOVETT: No, I would like the

record to be complete.

MR. O'NEIL: I'm entitled to finish speaking now, Mr. Lovett.

MR. LOVETT: Well, I was talking when you interrupted me, so good, we can both talk at the same time and then we'll see what the record looks like.

MAYOR MARVIN: I'm prepared to overrule the objection.

(Whereupon the Board was polled.)

MAYOR MARVIN: Objection overruled.

Q So with respect to the desk officer receiving a sick report, do you think there was an inadvertent omission as to include disability, or disability status?

A No.

Q Take a look at B1 where it says you've got to fill out a "sick leave report," do you think that is an inadvertent omission regarding disability or disability status?

A No.

Q And the second numbered item where it says, "questions have to be asked by the member reporting sick," do you think that is an inadvertent omission with respect to the term

injured?

A No.

Q How about 6 where it says, "when receiving notification from a member on sick leave that he/she is leaving, etc.," do you think that was an inadvertent omission and a failure through perhaps negligence to include the word disabled or disability?

A No.

Q Take a look at C where it says, "supervisor on duty when sick report is received," do you think whoever drafted that inadvertently failed to include the word injured?

A No.

Q And under C3 where it says that the supervisor on duty shall "file the sick leave report," do you think that's a typo and it should have said job injury report?

A No.

Q Okay, take a look at the next item, "supervisor for tour of duty in which officer has reported sick shall note," do you think it was inadvertent in nature and that there should have been the word job injured?

A No.

Q Then under D1, "complete section of the BVPD planning sick leave report," do you think that should have said job injured report?

A No.

Q And then the next item it says, "procedure when returning from sick leave," do you think that's a typo, too, and somebody inadvertently forgot to put in job injured status?

A No.

Q And under A, "a member's return to duty from sick leave shall," do you think that's another inadvertent omission and somebody should have scribbled or put in disability status?

A No.

Q Under A1 where it makes reference to filling out a sick leave report, do you think that should have been properly referenced to disability report?

A No.

Q And under A2 it says return to complete sick leave report. Is there a sick leave report?

A Yes.

Q Is there a job injured report?

A No.

Q So it's your sworn testimony that each of the procedures I just referenced apply with equal force to someone who is out sick, and/or job injured, right?

A Sick or injured, regardless of job or not.

Q All of the procedures I reviewed with you make no reference to injured status?

A Yes.

Q And even though my client never called in sick or injured on July 6 '06?

A Yes.

MR. LOVETT: Thank you.

MR. O'REILLY: Mr. O'Neil, do you have any questions?

MR. O'NEIL: Yes.

RE RE REDIRECT EXAMINATION BY MR. O'NEIL:

MR. O'NEIL: Can I ask that the witness be shown Department's Exhibit 15?

A I've got it.

Q What's the title of that document?

A Bronxville Police Department Sick Leave Report.

Q Who is that sick leave report used for, Lieutenant Satriale?

A This is to document an officer calling the desk and reporting sick or injured, and not coming to work.

Q And, in fact, this report was used by Officer Kempkes to report all his injuries?

A Yes.

Q And absences related to those injuries?

MR. LOVETT: Objection, leading.

(Whereupon the Board was polled.)

MAYOR MARVIN: Objection overruled.

A Yes.

Q During the period you have been on the job in Bronxville, was there ever a separate report utilized for on the job injuries?

A No.

Q For the same period of time was there ever a separate report used for Workers' Comp. absences?

A No.

MR. O'NEIL: I have no further questions.

RE RE RE RECROSS EXAMINATION BY MR. LOVETT:

Q Lieutenant, taking a look at those sick leave reports on the dates that those reports

bare my client's job status was sick, he was out on sick leave, wasn't he?

A No.

Q Well, don't you remember in August of '06 the Chief wrote a memo cancelling his sick status and retroactively giving him 207C job injury status?

MR. O'NEIL: Objection. Are you referring to a document that is in evidence?

MR. LOVETT: No, I'm not. So what?

MR. O'NEIL: So what is --

MR. LOVETT: The question is if he remembers.

Q Don't you remember that after the charges at issue were filed the Chief wrote my client a memo, which you saw, saying that he changed retroactive 202, his status, and gave him 207C job injured status?

A Yes.

Q And didn't you know that up until the point in time the Chief authored that memo my client was on sick status, not job injured status?

A No. He was on injured status. There is a difference.

Q Injured status meaning 207C?

A Meaning if I fall down --

Q Injured status meaning 207C?

A No. There is a difference. If I fall down while walking out of here and get injured I'm calling in that I'm injured. If I get injured on the job and I'm out for a week, I'm injured. It doesn't mean I'm on 207C.

Q You are not sick?

A I'm not sick. I'm injured on the job. There is a difference between that and 207C.

Q So you think then that whoever drafted A3 in evidence didn't know the difference between sick leave as it is repeatedly used in at that document, as opposed to job injury?

A No.

MR. LOVETT: Thank you.

MR. O'NEIL: Can I have the last question and answer read back?

(Whereupon, the testimony was read back by the reporter.)

MR. O'NEIL: I have no further questions.

MR. LOVETT: I have a couple of follow-up.

MR. O'NEIL: Follow-up questions to what, rereading the question?

MR. KURTZ: He's joking.

MR. O'REILLY: Thank you, Lieutenant Satriale.

MR. SATRIALE: Thank you.

MR. O'REILLY: Can we go off the record a minute?

(Whereupon, an off the record discussion took place.)

(Whereupon, a short recess was taken by all parties.)

S E R G E A N T E U G E N E M I T C H E L L, the Witness herein, after having been first duly sworn by Melissa Sasso, a Notary Public of the State of New York, was examined and testified as follows:

DIRECT EXAMINATION BY MR. KURTZ:

MR. O'REILLY: State your name for the record.

SERGEANT MITCHELL: Sergeant Eugene Mitchell.

MR. O'REILLY: Thank you.

Q Good evening, Sergeant.

A Good evening.

Q Would you please state how long you have been employed by the Bronxville Police Department?

A About 25-and-a-half years.

Q What were your ranks?

A I was a patrolman until 1991, and I have been a Sergeant since August of 1991.

Q As a Sergeant what are your duties?

A Tour supervision of my men.

Q Were you scheduled to work on July 6, 2006?

A Yes, I was.

Q What shift were you scheduled?

A A day tour.

Q A day tour which encompasses what time?

A Basically 6:30 to 2:30.

Q Did you work that shift?

A Yes, I did.

Q During the course of that shift on July 6th, do you recall Lieutenant Satriale giving you any orders with respect to Officer Kempkes?

MR. LOVETT: Objection, leading.

MAYOR MARVIN: Could you rephrase that?

MR. KURTZ: Sure.

Q On July 6, 2006 did you receive any orders from Lieutenant Satriale?

A Yes, I did. About 10:50 in the morning Lieutenant Satriale told me to call Officer Kempkes at his residence to tell him to respond to headquarters to check his e-mail and to pickup some pay stubs in his mail slot.

Q Did you follow that order?

A Yes, I did.

Q Did you call Officer Kempkes?

A I called him and I received his answering machine, and I left a message on the machine.

Q Where did you call Officer Kempkes?

A At his residence.

Q Where did you get the phone number for that?

A From department records.

Q And what, generally, if you recall, did you say on the message?

A I don't remember the exact conversation, but something about come to headquarters to check your e-mail and clean out your mail slot. Call me when you get in, I

believe. I'm not quite sure of that.

Q Did you contact Lieutenant Satriale after?

A Lieutenant Satriale had asked me to let him know what the outcome of my phone call was, and at such time I told him I received the answering machine.

Q Did Lieutenant Satriale give you any further orders?

A At that time Lieutenant Satriale left the temporary police headquarters and contacted me again and told me to call Officer Kempkes again at his residence and tell him to respond to his front door. At that time I received the answering machine a second time and I left a message a second time.

Q About how long a period of time was there between the first order from Lieutenant Satriale and the second order to call?

A Approximately, half an hour.

Q After you left the second message for Officer Kempkes did you contact Lieutenant Satriale?

A I advised Lieutenant Satriale, at that time, that there was no answer, again.

Q Did you see Officer Kempkes at any point during the course of your shift on July 6th?

A Yes, at one point Officer Kempkes did show up at headquarters.

Q Did you advise him to do anything upon that appointment at headquarters?

A I advised him to wait for Lieutenant Satriale. Lieutenant Satriale told me if Officer Kempkes showed up for him to wait so they could have a meeting, a conversation, or whatever you want to call it.

Q Did Officer Kempkes wait?

A Yes, he did.

Q Did Lieutenant Satriale return?

A Yes, he did.

Q And did they have a meeting?

A Yes, they did.

Q Did Lieutenant Satriale give you any further orders with respect to your phone calls to Officer Kempkes?

A Aside from composing an e-mail or what we call a mailbox, no, that was it as far as Lieutenant Satriale's concerned.

Q So he ordered you to compose a mailbox, or e-mail?

A That's correct.

Q When did he order you to do this?

A I believe it was after the second phone call. Some time after that.

Q Was it the same day?

A Yes, it was the same day.

Q So it was July 6, 2006?

A Yeah, it was approximately, I believe I composed the mailbox within 45 minutes of the second phone call.

Q Okay, and would the e-mail or the mailbox reflect the time it was composed?

A Yes, it would.

MR. KURTZ: I'm going to ask that the witness be shown Department's Exhibit 13.

(Whereupon, a document was handed to the witness.)

Q Sergeant Mitchell, would you take a moment to review Exhibit 13, please, and can you identify Department's Exhibit 13?

(Whereupon, the witness peruses a document.)

A Yes, this was the mailbox I composed and sent to Lieutenant Satriale, which I

actually signed at 1:55 a.m., on that date.

Q On July 6, 2006?

A That's correct.

MR. KURTZ: Thank you. That's it, at this time.

MR. O'REILLY: Mr. Lovett?

MR. LOVETT: Yes.

CROSS EXAMINATION BY MR. LOVETT:

Q Before you made any phone call to Officer Kempkes on July 6 '06 did you have any occasion to be in the presence of Lieutenant Satriale in headquarters?

A Yes.

Q What was he doing when you were in his presence?

A I have no idea.

Q Did you have occasion on that date, before you were directed to make a call to my client to look at my client's mailbox?

A Not particularly, no.

Q Pardon me?

A Not particularly, no.

Q Not particularly meaning what, you did or you didn't?

A Not that I recall, no.

Q Prior to July 6th did you look at my client's mailbox?

A No.

Q What was it Satriale told you to tell my client with respect to his mailbox?

A To come to headquarters to clean out his mailbox, and to check his e-mails.

Q Do you have any factual basis for telling this Board that there was anything in my client's mailbox at the time that order was issued to you?

A No.

Q Do you know if my client cleaned out his mailbox, as directed?

A I believe he did.

Q I'm not asking for your belief. I want to know the factual basis for it.

A I don't know.

Q Do you know if my client had any e-mails as of the time he got the directive to have him come in and listen to his e-mails?

A I don't know.

Q Do you know if he listened to his e-mails, or downloaded them?

A I don't know.

MR. LOVETT: Withdrawn. I don't think you can hear your e-mails.

MR. O'REILLY: Yes, you can. You can listen to them.

Q Do you know if he accessed his e-mails at headquarters?

A Yes, he did have access to his e-mails at headquarters.

Q You saw him do that?

A No, I didn't see him do that.

Q So what is your factual basis for swearing that he did it?

A I didn't swear that he did.

MR. BARTON: He didn't say that.

MAYOR MARVIN: Yes, he didn't testify to that.

Q Well, you are under oath, aren't you?

MR. O'NEIL: He never said that.

MR. LOVETT: Excuse me, you don't have a standing objection.

MR. O'NEIL: Well, there is an objection, because he didn't understand the question that was asked.

MR. LOVETT: He didn't understand

the question, hint, hint.

Q Is it truly that you didn't understand the question, Sergeant, now that you've been told that by your lawyer?

A Re ask your question and I'll tell you whether I understood it or not.

MR. LOVETT: Okay, can you read the question back, please?

(Whereupon, the last question was read back by the reporter.)

A I don't know. That is my answer.

Q Have you ever been out injured or sick and someone has checked on your whereabouts?

A Yes, I have.

Q When did that occur?

A I couldn't tell you.

Q Is there anything that would jog your memory?

A No.

Q It wasn't 2005?

A That somebody checked on me, no.

Q Who checked on you?

A Detective Sergeant Brian Downey under previous administration.

Q Do you know why he checked on you?

A I was out sick.

Q Do you know why he checked on you?

A No, I do not.

Q As a result of him checking on you did you have any disciplinary action, command or otherwise?

A No.

Q Were you at home when he checked on you?

A No.

Q Were you supposed to be at home when he checked on you?

A At that time, no.

Q Well, what was that time?

A I have no idea. It was previous administration.

Q Well --

A It was prior to our sick leave policy.

MR. LOVETT: Could the witness be given Exhibit 3A in evidence, please?

(Whereupon, a document was handed to the witness.)

Q Have you ever seen 3A before?

A Yes, I have.

Q Do you know if that was in effect on the occasion when you were checked at home by --

A No, it was not.

Q So what year was it then that you were checked on?

A It was prior to 1/1/95.

Q Did Detective Sergeant Downey tell you why he was checking on you?

A No, he did not.

Q In the last 10 years have you ever been out sick?

A Yes, I have.

Q Has anybody checked on your whereabouts during that time?

A No, they have not.

Q Have you ever been out job injured?

A Yes, I have.

Q And on those occasions has anybody in the department, to your knowledge, checked on your whereabouts?

A No, they have not.

Q Was there any policy in the police department governing whether a sick or injured officer had to remain in their home on the occasion when you were checked on?

A When I was checked on?

Q Yes.

A Not that I remember.

Q Approximately how many years after you were the subject of a check at home did 3A come into effect?

A Probably within six months.

Q Did anybody in words or substance ever tell you that by reason of your not being at home when you were checked on by Downey that you were in violation of any department rule or procedure?

A No, I wasn't.

Q Pardon me?

A No, I wasn't.

MR. LOVETT: Thank you very much. I have nothing further.

MR. O'REILLY: Mr. Kurtz?

MR. KURTZ: Nothing further.

MR. O'REILLY: Members of the Board?

MR. BARTON: I have one. I meant to ask Lieutenant Satriale, but I think I can ask you, also. When you made reference that every Thursday they put a pay stub or a paycheck in people's mailboxes, do you

all use direct deposit in the police department?

SERGEANT MITCHELL: Not everybody. A majority do.

MR. BARTON: So it's a stub rather than a physical check that gets put in the mailbox?

SERGEANT MITCHELL: Well, some people, I believe two or three people by virtue of talking to people still receive actual checks. Other people receive the stubs.

MR. BARTON: Okay, thank you.

MAYOR MARVIN: Okay, any other questions?

MR. UNDERHILL: No.

MAYOR MARVIN: Thank you very much.

MR. LOVETT: I have one more based on that last question.

MAYOR MARVIN: I'm sorry.

RECROSS EXAMINATION BY MR. LOVETT:

Q Do you know whether Officer Kempkes receives his pay by direct deposit?

A I don't know.

MR. LOVETT: Thank you.

MR. O'REILLY: Thank you, Sergeant.

SERGEANT MITCHELL: Thank you.

MR. O'REILLY: Off the record, please.

(Whereupon, an off the record discussion took place.)

C H I E F B R I A N M I C H A E L D O W N E Y, the Witness herein, after having been first duly sworn by Melissa Sasso, a Notary Public of the State of New York, was examined and testified as follows:

DIRECT EXAMINATION BY MR. O'NEIL:

MR. O'REILLY: Please state your name for record.

CHIEF DOWNEY: Brian Michael Downey.

Q Okay, Chief, by whom are you employed?

A Village of Bronxville Police Department.

Q In what capacity?

A Chief of Police.

Q How long have you held that position?

A Since September of 2000.

Q And prior to that can you tell us

what positions you held, if any, in the Bronxville Police Department, and for what period of time?

A From May 9, 1986 to June 19, 1988 I was a patrolman; from June 1988 to October 1992 I was a Detective; from October 1992 to August 1998 I was a Detective Sergeant; and in August 1998 to September 2000 I was a Lieutenant.

MR. O'NEIL: Could I ask that the witness be shown Department's Exhibit 3A and 3B, which are in evidence?

(Whereupon, documents were handed to the witness.)

Q Chief, I'm going to ask you to look at Exhibit 3B and ask you whether you see your name on that document?

A Yes, I do.

Q Is your signature also on there?

A Yes, it is.

Q And is there a date next to your signature?

A Yes, there is.

Q Who entered the date?

A I did.

Q Can you tell us what date you entered that?

A March 10, 1999.

Q And I'm going to ask you to look at Exhibit 3A, which is in evidence.

A Yes.

Q Do you see the revision date on that document?

A Yes, I do.

Q What is the date on that?

A 3/11 1999.

Q Can you tell us how you came to know to sign for that document on March the 10th of 1999?

A Yes. I was a Lieutenant at that time and I worked the 3:00 p.m. to 11:00 p.m. shift, and Chief Divernieri asked me to distribute the sick leave policies and procedures prior to me leaving that evening, which I did, and I signed for them, at that time.

MR. O'NEIL: I'm going to ask that this document be marked for identification as Department's Exhibit 16.

(Whereupon, a document was received and marked as Department's Exhibit 16, for identification, as of this date.)

Q Chief, I'm going to ask you to look

at a document that has been marked for identification as Department's Exhibit 16 and ask you whether you recognize that document?

A Yes, I do.

Q Tell us what it is.

A Yes, it's the police department roll call for Wednesday, March 10, 1999, Tour 3.

Q Can you tell us the hours of Tour 3 on March the 10th of 1999?

A The tour is designated 4:00 to 12:00. Certain officers work different hours during that tour, though.

Q Does that document indicate that Officer Kempkes worked that tour, as well?

A Yes.

MR. LOVETT: Objection. It is not in evidence.

MR. O'NEIL: I would like to move that that be received in evidence.

MR. O'REILLY: Mr. Lovett?

MR. LOVETT: I have no objection,

MAYOR MARVIN: All right, received in evidence.

(Whereupon, Department's Exhibit 16, previously marked for identification

was received in evidence.)

Q The document that is in evidence as Department's 3A, have there been any other sick leave policy and procedures issued in the department since that date of March 11, 1999?

A No, there haven't.

MR. O'NEIL: I have no further questions of this witness.

MR. O'REILLY: Mr. Lovett?

MR. LOVETT: I have no cross, but I'm going to recall the Chief on our direct case.

MAYOR MARVIN: Okay.

MR. O'REILLY: Any Board questions?

MAYOR MARVIN: Any Board questions for the Chief? No? Thank you, Chief.

CHIEF DOWNEY: Thank you.

MR. O'REILLY: Off the record, please.

(Whereupon, an off the record discussion took place.)

D E T E C T I V E S T E P H E N G A L L O, the Witness herein, after having been first duly sworn by Melissa Sasso, a Notary Public of the State of New York, was examined and testified as follows:

DIRECT EXAMINATION BY MR. KURTZ:

MR. O'REILLY: State your name for the record, please.

DETECTIVE GALLO: Detective Steven Gallo, Shield number 21.

Q Detective Gallo, by whom are you currently employed?

A Village of Bronxville Police Department.

Q How long have you been employed by the Village of Bronxville P.D?

A 11 years.

Q What have been your ranks throughout?

A I've been a police officer for 11 years, and for the last four-and-a-half years I've been assigned to the Detective Division.

Q As a Detective assigned to the Detective Division, what are your duties?

A Mostly follow-up investigations, community outreach, things like that.

Q Were you scheduled to work on July 6, 2006?

A Yes, I was.

Q What shift were you scheduled to

work that day?

A The day tour shift, which is 8:00 a.m. to 4:00 p.m.

Q Did you work that day?

A Yes, I did.

Q During the course of your shift on that day, July 6 '06, do you recall receiving any orders from Lieutenant Satriale?

A Yes, I do.

Q What were those orders?

A At approximately 11:50 a.m. I received a telephone call from Lieutenant Satriale on the departmental cell phones and he directed me to attempt cellular telephone contact with Officer Kempkes.

Q So he contacted you and told you to contact Officer Kempkes on the cell phone?

A Yes.

Q Did you follow that order?

A I did.

Q What happened when you contacted Officer Kempkes?

A Approximately two or three minutes later I attempted that phone call and met with a voicemail message prompting the caller to leave a

message, and the voice on that phone was Tom saying please leave a message.

Q Did you recognize the voice?

A I did.

Q Whose voice did you recognize?

A I believe it was Officer Kempkes.

Q Did you leave a message for him?

A Yes, I did.

Q What was the content of the message, per the direction of Lieutenant Satriale?

A I stated to Kempkes on the telephone that he should call the department when he received my message.

Q After you finished leaving this message what did you do next, if anything?

A I called the Lieutenant and told him what I had done, and waited for further instructions.

Q Did you ever receive any further instructions from the Lieutenant?

A Yes, I did.

Q What were the instructions?

A At approximately 12:25 p.m. the Lieutenant directed me to relieve him on a stationary post at the address of Officer Kempkes.

Q And where was that address?

MR. LOVETT: Objection to that.

Q Is that address located in Eastchester?

MR. LOVETT: Can we make sure that the stenographer is not recording the specific address?

MR. O'REILLY: I'll instruct the stenographer after the questioning about the use of the number.

MR. LOVETT: Okay.

Q Is that address located in Eastchester?

A Yes, it is.

Q And did you go and relive Lieutenant Satriale at that address?

A Yes, I did.

Q How long in time elapsed between when you received the order from Lieutenant Satriale to when you arrived to relieve him?

A I would say no more than five minutes.

Q How did you get to the address?

A I drove to the address in an unmarked police car.

Q What, if anything, did you do when you got there?

A I pulled into the driveway and I briefly met with Lieutenant Satriale.

Q When you met with Lieutenant Satriale did he tell you anything? Did he give you any orders?

A He told me to remain at the address until which time Officer Kempkes arrived.

Q What, if anything, did Lieutenant Satriale do next?

A He made one more attempt, I believe while I was there. He walked to the front door, knocked and rang the bell, and instructed me that he had found no one home, and I was to remain there until further instructions.

Q This was Officer Kempkes' particular door at his address?

A Yes.

Q And did there come a point in time then when Lieutenant Satriale left the location?

A Yes, after making another attempt to see if anyone was home he did leave, and then I was at the address myself.

Q What, if anything, did you

understand that you were to do while waiting at that address?

A I was to remain there until which time Officer Kempkes returned home.

Q Did you ever see Officer Kempkes return home?

A Yes, I did.

Q Approximately how much later?

A It was, approximately, a half hour later. I was positioned in his driveway facing out towards California Road and Officer Kempkes pulled into his driveway.

Q Did you see, personally see Officer Kempkes driving in his car?

A Yes, I did.

Q Did you recognize or write down any details about the car?

A I know I noted the license plate of the car, and what type of car it was.

Q What type of car was it?

A It was a late model Audi, dark color Audi.

Q After you saw Officer Kempkes return home, what, if anything, did you do?

A Again, per the instructions of

Lieutenant Satriale, I exited my vehicle and I engaged very briefly in conversation with Officer Kempkes and asked him of his whereabouts that day.

Q What did Officer Kempkes tell you?

A He told me that he had been to drop off his car for service and to get a slice of pizza in Chester Heights.

Q Did you ever ask Officer Kempkes about the cell phone call that you placed to him?

MR. LOVETT: Objection, leading.

MAYOR MARVIN: Can you just rephrase your question, please?

Q What, if anything, did Officer Kempkes say to you about the telephone call?

MR. LOVETT: Objection, leading.

MAYOR MARVIN: I'm going to overrule that objection. You can answer, please.

A I had asked him if he had received my message, and he told me that he had not.

Q Did he volunteer any other information to you during this conversation?

MR. LOVETT: Objection. There is no testimony that he volunteered anything. The form is improper.

MAYOR MARVIN: Yes, I think you need

to rephrase your question.

Q Did you ask Officer Kempkes anything else during your conversation with him?

A I asked him why he hadn't been home again, and, again, that was per the instructions of the Lieutenant, and he told me he didn't need to be home, he was out on compensation, and not out sick.

Q Did he elaborate at all on compensation?

A No.

Q Was there anything else that was obtained during the course of this conversation between yourself and Officer Kempkes?

A He was just, again, prompting his question as to why are you here, and I told him that I needed to be here per the Lieutenant's orders.

Q That was the end of the conversation?

A Yes.

Q What did you do after the end of the conversation?

A I entered my vehicle and drove back to the police department and reported to Lieutenant Satriale.

Q When you reported back to Lieutenant Satriale, what did you do next?

A The Lieutenant instructed me that he and I would be traveling to the car dealership where Officer Kempkes said he had dropped his car.

Q Did you go with Lieutenant Satriale to that car dealership?

A Yes, I did.

Q Where was that dealership?

A It's in the City of Mount Vernon on MacQuesten Parkway, I believe.

Q What dealership is it?

A It's an Audi dealership, and I don't recall the name.

Q How long after you reported back to the department did you leave with Lieutenant Satriale to go to the Audi Dealership?

A Very shortly. A few minutes.

Q What happened when you arrived at the Audi Dealership?

A The Lieutenant asked to see a manager, and he briefly spoke with the manager.

Q Did you or Lieutenant Satriale receive any documents from the manager?

A The Lieutenant did. I did not.

Q How long would you say, in total, that you were at that dealership?

A I would say about five minutes.

Q When you left where did you go next?

A Back to the department.

Q And you came straight back to the department?

A Yes.

Q When you returned back to the department were you ordered to do anything else with respect to Officer Kempkes that day?

A Yes, I was.

Q What was that?

A The Lieutenant had opened a case in our computer and he ordered me to fill out what we call a supplemental report in that case.

Q Did you fill out a supplemental report?

A Yes, I did.

MR. O'NEIL: I would like to mark this as Department's Exhibit 17.

(Whereupon, a document was received and marked as Department's Exhibit 17, for identification, as of this date.)

Q Detective, would you take moment to review Department's Exhibit 17?

(Whereupon, the witness peruses a document.)

Q Do you recognize the exhibit?

A Yes, I do.

Q What is it?

A This is my supplemental report that I entered after the Lieutenant directed me to do so.

Q And if you look on the top line it notes 125: at the beginning. Can you identify what 125 is?

A That is my departmental identification number, and when you sign onto the computer it automatically adds that for you.

Q And following that a 07/06/2006. Would that be the date?

MR. LOVETT: The document is not in evidence. Counsel's reading it into the record is impermissible.

MR. KURTZ: I would like to move that the document be placed in evidence.

MR. LOVETT: I have no objection.

MAYOR MARVIN: The document is in

evidence.

(Whereupon, Department's Exhibit 17, previously marked for identification was received in evidence.)

Q Detective, at the top line there it says 07/06/2006. Does that reflect the date you entered this supplemental report?

A Yes, it is.

Q And the numbers following it, 13:39, what would that be reflective of?

A That is the military time, 1:39 p.m.

Q At any point prior to July 6, 2006 were you ever ordered to visit Officer Kempkes' home?

A Yes, I was.

Q Can you please describe the circumstances in which you were ordered to do so?

A That occasion was in May of 2003, and I was ordered by the Chief of Police to visit the then address of Officer Kempkes, which was in White Plains at the time.

Q And did you visit the address, the White Plains address, at that time?

A Yes, I did.

Q What, if anything, did you observe when you arrived there?

A It was approximately a quarter to ten at night, 9:45 p.m., and I drove to the address. The house was completely dark, and there was a for sale sign on the lawn.

Q And when you were ordered to visit the address, were you given any further orders with respect to what you were to do when you arrived there?

A Yes.

Q What were those?

A I was ordered to attempt telephone contact with Officer Kempkes, and to personally see if he was home.

Q And when you arrived at the White Plains address did you attempt telephone contact?

A Yes, I did.

Q Were you able to reach Officer Kempkes?

A I was.

Q Did a conversation take place after that?

A Yes, it did.

Q Can you please describe the

contents of that conversation?

A I had told Officer Kempkes that I was instructed to respond to his address and verify that he was home, and he originally told me that he was home, but was not able to come to the door.

Q So you were out in front of the house at the point when he told you that he was home?

A Yes, I was.

Q And did you ask him to verify that, in any form?

A Yes, and he told me that he was naked and had company, and could not come to the door.

Q After he told you that did you follow-up?

A I did. I told him that I needed to physically see him, per the instructions of the Chief.

Q How did Officer Kempkes respond to that?

A He asked me if I was alone in the car.

Q And what did you say?

A I said that I was.

Q What did Officer Kempkes say next?

A He then asked me to either tell them that I could not reach him, or that he was home.

Q And who did you understand Officer Kempkes to mean by them?

A I'm sorry, could you repeat that?

Q Sure. Who did you understand them to be?

MR. LOVETT: Objection. More meadow muffin related issues here. This has nothing to do, whatsoever, with the charges at issue, and in fact has been established already this evening. The charges have nothing to do with any rule violation.

MR. O'REILLY: Mr. Kurtz?

MR. O'NEIL: Yes, it's the same thing we sort have been going through before, and they opened the door to prior disciplinary matters going back to 2003, and this is a continuation of it.

MAYOR MARVIN: I'm prepared to overrule that objection.

(Whereupon the Board was polled.)

MAYOR MARVIN: Objection overruled. You can answer, Detective.

A Can you repeat the last question, please.

MR. O'REILLY: The reporter will read it back to you.

DETECTIVE GALLO: Okay.

(Whereupon, the last question was read back by the reporter.)

A I understood them to mean the department, police department, specifically meaning the Chief and Lieutenant Satriale.

Q Could you please detail what, if anything, was the rest of your conversation?

A Actually, if I could correct something? I may have misspoke before. At the time Lieutenant Satriale was Detective Sergeant Satriale, just to clarify.

Q What was the rest of your conversation with Officer Kempkes, at that point?

A I reiterated that I actually needed to see him, and he told me again that he actually was not home, and I said that was not a good enough answer, and where was he. He just said that he wasn't home, and if I had to burn him then go ahead

and burn him.

Q Did he say anything else to you in that conversation?

A This was more specifically regarding him not being home?

Q Yes, during the course of this conversation.

A I told him, again, that he should have been home and I was there to check, specifically, if he was home, and he said, I don't want to hear you moralize on the issue, just do what you have to do.

Q And that was the end of the conversation?

A Yes, it was.

Q After you completed the conversation did you receive any further orders from the Chief, or anybody else, with regard to that conversation with Officer Kempkes?

A Yes, I was to report directly to the Chief on my findings, and when I returned to the department I was asked to leave an electronic mailbox to the Detective Sergeant, at the time, regarding my findings, also.

MR. KURTZ: I would like to mark for

identification Department's Exhibit 18.

(Whereupon, a document was received and marked as Department's Exhibit 18, for identification, as of this date.)

Q Detective, would you please take a moment to review Department's Exhibit 18?

(Whereupon, the witness peruses a document.)

A Yes.

Q Can you identify what has been marked as Department's Exhibit 17?

A Yes, this is the electronic mailbox.

MR. KURTZ: I'm sorry, excuse me, for the record it is Department's Exhibit 18.

A This is the electronic mailbox that I generated that same evening when I returned to the department.

Q May 9, 2003 that was?

A Yes.

Q Subject to completing this mailbox, did you ever receive any other orders then with respect to your initial phone conversation with Officer Kempkes, going to his home?

A Yes, I did.

Q What were those orders?

A This was rather kind of a brief synopsis of the phone call on the following Monday. This was Friday evening. On the following Monday the Detective Sergeant asked me if I had any more details regarding the phone call and my visit to the house to give him a longer mailbox with those details and to send that to his office.

Q Did you in fact give a longer mailbox?

A Yes, I did.

MR. KURTZ: First I would just like to make sure I move Department's Exhibit 18 into evidence.

MR. LOVETT: He didn't, and I object to it. It is prejudicial. It goes to an irrelevant series of events, but it is consistent with the prosecution's theory that they can convict now based on totally inapposite prior command discipline. The events referenced in 18 have nothing to do with either the price of bananas or this case, but I'm sure you are going to let it in, anyhow.

MR. O'REILLY: Mr. Kurtz?

MR. O'NEIL: It's the same response with regard to the prior incident of 2003, and also it goes to what the Detective just testified to.

MAYOR MARVIN: I'm prepared to overrule that objection.

(Whereupon the Board was polled.)

MAYOR MARVIN: Objection overruled. It will be in evidence.

(Whereupon, Department's Exhibit 18, previously marked for identification was received in evidence.)

MR. O'NEIL: I would like to mark this Department's Exhibit 19.

(Whereupon, an electronic mailbox was received and marked as Department's Exhibit 19, for identification, as of this date.)

Q Detective, just take a moment to review Department's Exhibit 19, please.

A Sure.

(Whereupon, the witness peruses a document.)

Q Detective, after reviewing -- first

of all, Detective, can you please identify that document?

A This is the second electronic mailbox that I submitted to the Detective Sergeant regarding the 2003 occasion. It was done the following Monday.

Q That was prepared by you?

A Yes.

MR. KURTZ: I would like to move that Department's Exhibit 19 be placed into evidence.

MR. LOVETT: Another fruitless objection which I'm sure you will overrule.

MR. O'REILLY: That's an objection?

MR. LOVETT: Yes, it's an objection, but I know it is a waste of time, because the end result is preordained as the overruling.

MR. O'REILLY: Mr. Kurtz?

MR. O'NEIL: There is not much there to respond to. It's an objection without any basis, but for the same reasons as before.

MAYOR MARVIN: I'm prepared to

overrule the objection.

(Whereupon the Board was polled.)

MAYOR MARVIN: Objection overruled. It will be placed in evidence.

(Whereupon, Department's Exhibit 19, previously marked for identification was received in evidence.)

Q Detective, after taking a look at Department's Exhibit 19, is there anything that refreshes your recollection as to anything else that occurred during that conversation between yourself and Officer Kempkes?

MR. LOVETT: You didn't indicate that his recollection needed refreshing, so this is totally improper, and it's leading.

MAYOR MARVIN: Yes, I'm prepared to sustain that objection.

(Whereupon the Board was polled.)

MAYOR MARVIN: Objection sustained.

Q During the course of your testimony here just tonight, did that contain everything that occurred during the course of your conversation with Officer Kempkes on May 9, 2003?

A I believe in sum and substance it

did.

Q Officer Kempkes, I'm just going to point you through the course of the document in the middle of this Department's Exhibit 19. About halfway down there is a phrase that starts with, okay, listen, I'm not really home. Can you just review that section, that sentence, essentially, and tell the Board if that is consistent with your testimony here tonight?

(Whereupon, the witness peruses a document.)

A Yes, it is.

MR. LOVETT: Excuse me, it's leading to improper. It's in evidence. It speaks for itself. Why are we wasting this time? Oh, because I guess money doesn't matter here.

MAYOR MARVIN: Objection sustained.

MR. KURTZ: Well, the document, itself, is in evidence, and I think there is something in here that is quoted, and I want to make sure what is quoted in the document is consistent with what Detective Gallo mentioned later on tonight.

MR. LOVETT: In other words, he wants his witness to tailor his testimony to square with a written document. The document is in evidence. The witness has already testified as to his recollection. If there is a divergence that goes to credibility, and because Counsel wants to clean it up doesn't make it right to do.

MR. KURTZ: It would not be a divergence, but I just want to clarify.

MAYOR MARVIN: Objection sustained.

MR. LOVETT: I withdraw my objection. Why don't you tell him what you want him to swear to Counsel, and I'm sure he will accommodate, even though he is under penalty of perjury.

MR. O'REILLY: There is no pending question. I'm not sure what the comment of that is.

MR. LOVETT: He wants him to say something different, and he has not said it yet. That is the objection.

MR. O'REILLY: Can we have a question?

Q The material that is in quotes,

"okay, listen, I'm not really home," the end of that quote, did that occur during the course of your conversation with Officer Kempkes on May 9, 2003?

A Yes, it did.

MR. KURTZ: Nothing further, at this time.

MR. O'REILLY: Can we go off the record a second?

(Whereupon, an off the record discussion took place.)

MR. O'REILLY: Mr. Lovett?

CROSS EXAMINATION BY MR. LOVETT:

Q On July 6 '06 the first order that Satriale gave you was what?

A He telephoned me and directed me to attempt telephone contact with Officer Kempkes.

Q Did he tell you for what purpose?

A To verify whether or not he was home. To see if he would answer the phone, basically.

Q And whether he answered the phone or not, that would tell you if he was or was not home?

A Well, from the telephone number I

got, I understood it was a cellular number, I believe.

Q You believe, but you don't know for a fact?

A I believe it was a cellular number.

Q What is the factual basis for your belief?

A I believe that a home number was tried by a Sergeant.

Q I'm not interested in what you believe. What is the factual basis for your belief?

A I was given a number by the Lieutenant saying this is the cellular number we have for Officer Kempkes, attempt it.

Q So Satriale gave you the cellular number?

A I believe he did, yes.

Q I'm not asking for your belief. Did he give you the number, yes or no?

A That is my recollection, sir.

Q Pardon me?

A That is my recollection.

Q Is your recollection accurate?

A I wouldn't be giving it to you if I

didn't think it was accurate.

Q So, in fact, he gave you that cellular number, right?

A I believe he may have.

Q He may have or he did?

A He may have.

Q But you're not sure?

A It may be listed in our computer. He may have given me the number or said look in the computer for Officer Kempkes.

Q I'm asking you what he said to you. Don't you know?

A I don't remember how I got the number.

Q Well, you said earlier that he gave it to you.

A That is what I believe.

Q And now you're saying you don't recall how you got the number?

A No, no, what I'm saying is I believe he gave me the number.

Q And if he didn't, what was the source?

A He may have said try the number in the computer. Either way, that is how I got the

number, through the computer, or through the Lieutenant.

Q You testified earlier that you got the number from Satriale.

A Right.

Q Was that true?

A To the best of my recollection it is.

Q Was that true, yes or no?

A To the best of my recollection it is.

Q Then why do you tell us maybe you got it from some other source?

A Because that is what my normal course of business would be. If the Lieutenant didn't recall the number he would say look in the computer, make sure it's accurate.

Q He told you to contact Kempkes and tell him what?

A To telephone the department upon receiving my message.

Q For what?

A He didn't give me a reason. That is what he told me.

Q Telephone who at the department?

A Leave a message, telephone the main number, 337-0500.

Q That is what Satriale told you to tell him?

A Yes, call the desk.

Q Call the main number?

A Call the desk, yes.

Q Did you leave that on the answering machine, call the desk?

A I believe I left call the department when you receive the message. I don't think I specified further.

Q I'm not asking you for your belief. What did you say, not your belief? What did you say?

A Call the department when you receive the message.

Q And you gave no reason?

A I don't believe I gave a reason.

Q I'm not asking for your belief. Did you leave a message where you gave a reason?

A I don't believe so.

Q You don't think so because you didn't do it?

A I don't remember being told to do

it. I remember being told to tell Officer Kempkes through the telephone to have him call the department, and that was it.

Q All right, and then what happened?

A And then I called the Lieutenant, returned the call, and said that I had left that message and received a voicemail from Officer Kempkes.

Q What happened next?

A He then, approximately 20 minutes later, told me to relieve him at Eastchester.

Q Who is he, Satriale?

A Lieutenant Satriale, yes.

Q Incidentally, this was what shift you were working?

A Well, we call it Tour 2. It's a day shift, 8:00 to 4:00.

Q On that 8:00 to 4:00 shift on July 6, 2006, how many officers were on duty, outside headquarters?

A I don't know.

Q Were there more than two marked units on the street?

A I don't know.

Q Had you not been involved in this

investigation of Officer Kempkes, what were you supposed to be doing that day?

A I would have been involved in other investigations.

Q In the Detective Division?

A Yes.

Q For how long were you and Satriale out of the Jurisdiction of Bronxville, that is when you went to visit the Audi dealership?

A I would say, approximately, 20 to 25 minutes.

Q And when you were out of the jurisdiction with Satriale, how many police officers were on duty during that shift protecting people in the Village of Bronxville?

A I don't know, sir. I would have to review a roll call in our computer. I don't know.

Q After you spoke with Satriale and told him what you did in the first place, what did he say to you?

A He instructed me to relieve him on the stationary post in Eastchester.

Q Did he say why he wanted you to relieve him?

A Yes, he did. He had to come back

to the office to do other work. I'm not sure what.

Q He didn't tell you he was going to go to Connecticut?

A He may have. I don't recall that.

Q Is there anything you can use to refresh your memory?

A At this time, unless I had the Lieutenant's notes or something, he may very well have said that. I don't recall that.

Q Now, he told you to come relieve him, and you did what?

A I went to relieve him at Officer Kempkes' address.

Q You said when you got there you had some kind of interaction with the Lieutenant?

A Very brief. We both exited our vehicles, and he tried the door one more time, and then left.

Q He tried the door meaning what?

A I believe he rang the bell or knocked. I'm not sure. He walked up to the front entrance of the house.

Q I'm not interested in your belief. Did he knock on the door? Did he ring the bell? Did he do something else? What did you see?

A I saw him walk to the front door.

Q And do what?

A And check as one would if someone were home.

Q How would one do that?

A I don't recall if he knocked or rang the bell.

Q Did you hear anything after he knocked?

A I don't recall hearing anything.

Q Did you hear anything after he rang the bell?

A I don't recall hearing anything.

Q How far were you from the door when Satriale knocked, and/or rang the bell?

A Approximately, 30 to 40 feet.

Q Did he say anything to you at the time you came to relieve him, other than what you have already told us?

A He told me that he had checked and apparently no one was home, and that I was to stay there until which time he would give me further instructions, or until which time Officer Kempkes arrived home.

Q And you remained there after how

long?

A Approximately one half hour.

Q Doing what?

A Staring at California Road from my vehicle.

Q Then what happened?

A Officer Kempkes pulled in.

Q And you said what to him, if anything?

A I said, per the Lieutenant's instructions I'm to ask you where you have been this morning.

Q Excuse me. When did the Lieutenant tell you he wanted to know where Kempkes had been?

A When we were at the house together.

Q And you forgot to mention that on direct-examination?

A No, I believe I did.

Q So you testified as to that today?

A I had a brief conversation with the Lieutenant.

Q You testified today, is it true, that when you went to relieve the Lieutenant that he told you to find out where Kempkes was to be that day? Did you give that testimony?

A I believe I said something to that effect.

Q I'm not asking you about your belief. Did you testify tonight, under penalty of perjury, that when you went to relieve the Lieutenant that he told you to find out where Officer Kempkes had been that day, yes or no?

A I believe I said that, something to that effect.

Q I'm not asking for your belief. Did you say it?

A If I had to be quoted I would have to have it read back to me. I don't recall my exact words.

Q Well, did the Lieutenant tell you that when you came to relieve him?

A Yes, he did.

Q Tell me what he said, in words or substance.

A He told me to remain at that address until which time he further instructed me, or until the time Officer Kempkes arrived home.

Q So he didn't tell you anything about asking Officer Kempkes where he had been?

A Yes, he did.

Q Why didn't you say that?

A Yes, I just did.

Q Tell me everything.

A If and when he arrives home and you are still here, unless I further direct you to leave, ask him about his whereabouts during the day.

Q Did the Lieutenant tell you why he wanted to know of his whereabouts?

A I don't believe he specified why, at that point.

Q I'm not asking for your belief. Did he tell you?

A No, I don't believe so.

Q No, or you don't believe so?

A I don't believe he did.

Q Is your belief based on the fact that he did not?

A I don't recall, so how would I know that?

Q Well, when you take my testimony ask whatever you want.

MR. O'REILLY: Is that a question?

Q So you asked what questions, if any, of my client when he returned home?

A I said to him, per the Lieutenant I need to ask you where you were this morning.

Q Okay, and then did you ask my client where he had been?

A Yes.

Q You posed that question after you said per the Lieutenant I need to ask you that?

A Yes.

Q So you repeated yourself?

A Yes.

Q And when you said it the second time, what was the question?

A Where were you this morning?

Q Okay, and what did he say?

A He said he had dropped his car off at a dealership, and that he had gone to get a slice of pizza.

Q Did you ask him anything else?

A I don't believe so.

Q I'm not asking your belief. Did you ask him anything else?

A No, not that I recall.

Q No, or you don't recall?

A I don't believe I asked him anything else.

Q I'm not asking for your belief. Did you ask him any other questions, yes or no?

A To my recollection, no, I did not.

Q Is there anything you can use to refresh your recollection?

A Such as notes? I have notes in front of me.

Q Okay, take a look at them. See if they refresh your recollection as to whether or not you asked him any other questions.

(Whereupon, the witness peruses a document.)

A No, I don't believe I asked him anymore questions. I did not ask him anymore questions.

Q Fine. Was there anything that prevented you from asking him additional questions?

A No. That was all I needed to ask him, per my instructions from the Lieutenant.

Q So you didn't ask Officer Kempkes whether he had done anything else, whatsoever, that day when he was out of his house, right?

A Correct.

Q You had no follow-up questions?

A Correct.

Q And your question to him was where had he been that morning, right?

A Where had he been, why wasn't he home, something to that effect.

Q Well, you testified twice now that you asked him where he had been that morning. Don't you remember that?

A Yes, I remember saying that.

Q Okay. And that's in fact what you asked my client, right?

A Yes.

Q Where were you this morning?

A Yes.

Q And the time of day you asked him, that was when, in the afternoon?

A Oh, it was, approximately, 12:55, I believe.

Q Why didn't you ask him what he had done in the afternoon up until the point in time when you were talking to him?

A I don't know.

Q Did the Lieutenant ask you to find out where my client had been on the morning of July 6th?

A On that day.

Q Then you disregarded his order, didn't you?

A I don't recall if I said morning, or where were you today.

Q Well, he asked you to find out where my client had been that day, July 6th, right?

A Yes.

Q You understood that directive?

A Yes.

Q And you disregarded it by asking only about the morning?

A No, I believe my question was understood as to where were you that day, and I believe that is what I said.

Q Well, why did you testify twice already --

A I may have misspoke when I said morning. I may have said where were you that day.

Q Excuse me. Why did you say twice under oath that you asked my client where he had been that morning?

A I believe I misspoke.

Q How many times under penalty of perjury did you misspeak tonight, three times?

A Maybe once, sir.

Q And when you misspoke you knew that you were saying something that was inaccurate?
A No. I refreshed my memory.
Q So what did the Lieutenant tell you, to find out where Kempkes had been that morning?
A That day, where he had been.
Q So, in fact, you asked Kempkes where were you until now, right?
A Yes.
Q You didn't say where were you this morning?
A Correct.
Q And when he said he had took his car in, did you ask him what time?
A No, I did not.
Q And when he said he got a slice of pizza, did you ask him what time?
A No, I did not.
Q Did you ask him when he left the house?
A When he left the house?
Q Did you ask him when he left the house?
A No, I did not.

Q Did you ask him where he took his car?

A Yes.

Q What did he tell you?

A He told me MacQuesten Parkway, which I know to be in the City of Mount Vernon.

Q Did Satriale tell you why he wanted you to accompany him to go down to talk to an individual at that dealership?

A Did he tell me why he wanted me to accompany him, no.

Q Did he express any fear of interacting with the person he spoke with down there?

A No, he did not.

Q Did you tell Satriale after speaking with my client that you asked my client where he had been that morning, meaning July 6, '06?

A No. I believe I just told Satriale I asked him where he had been that day. In other words, until he arrived home.

Q You believe you did. I'm asking for the basis and fact for your belief. What did you tell him that you had asked my client?

A Where he had been that day.

Q So you used the word that day?

A To my recollection, yes.

Q And you memorialized that somewhere in writing?

A I don't recall if it's in my notes. If I can refer to my notes?

Q Sure. Take a look at your notes and tell me if there is any reference in there that jogs your memory as to what you asked my client by way of a time reference, that is where he was that morning or that day.

(Whereupon, the witness peruses a document.)

A Yes, I was to ask Officer Kempkes about his whereabouts that day. So the morning is, I believe is incorrect. I misspoke when I said morning. This does refresh my memory.

Q And you asked him where he had been earlier that day, using those three words?

A Previously that day.

Q Well, which is it? Your memory is refreshed from looking at your note, right?

A Previously that day, yes.

Q Your notes are exhibit which?

A 19, I believe.

Q Okay, and you just read them?

A Actually, I have 17, 18 and 19 in my hands.

Q Read them all, if you'd like, but tell me with your memory refreshed, what did you ask my client, where were you earlier, where were you this morning, where were you this afternoon, or what?

A Where were you previously today.

Q You said previously today?

A Yes.

Q Did you tell my client, I want to know every place you have been since you left your house until you came back?

A No, I did not.

Q Did anything prevent you from doing that?

A No.

Q Did the Lieutenant tell you to get some general idea as to where Kempkes had been, rather than specifics as to every location he had been when he was out of his house that day?

A The Lieutenant instructed me to ask a generic instruction, where he had been when he

arrived home. Ask him where he had been.

Q And if he said outside that would have answered your question, right?

A If he had answered outside?

Q Yes, answering a generic question, where he had been, and if my client said outside, that would have answered the question?

A I think I would have specified, at that point. When he offered a car dealership and pizza place I didn't need to specify any longer.

Q I see. Did he tell you where the pizza place was?

A I believe he said Chester Heights, but I can refer to my notes.

Q So he gave you a location?

A He did.

Q All right, and did you ask him when he was there, by way of time?

A No, I did not.

Q Did he volunteer it?

A I don't think he did, no.

Q And did you ask him what time of day it was when he went to the dealership?

A I don't recall asking him that.

Q Did he tell you, whether you had

asked him or not?

A No.

Q Did you ask him how long he had been out of his house, prior to his returning to the house when you spoke with him?

A No, I did not.

Q Did anything prevent you from inquiring as to how many hours, if that long, he had been out of the house?

A No.

Q Did you ask him how long it took to go get the piece of pizza?

A No.

Q Did you ask him how long the drive was from the pizza place to his home?

A No.

Q Did you ask him how long he had been at the dealership?

A No.

Q Did you ask him if there was anything else, if there was any other time period that he was out of the house, other than going to the dealership and getting a piece of pizza?

A No, I did not.

MR. LOVETT: Thank you. I have

nothing further.

MR. O' REILLY: Mr. Kurtz?

MR. KURTZ: No further questions.

MR. O'REILLY: Members of the Board.

MR. UNDERHILL: Nothing for me.

MAYOR MARVIN: Any questions? No? No questions?

MR. O'REILLY: All right, thank you, Detective.

DETECTIVE GALLO: Thank you.

MR. LOVETT: Does the Village rest?

MR. O'NEIL: Yes, we rest.

MR. LOVETT: Just to save a little telephone time --

MR. O'REILLY: Let's do this off the record, Mr. Lovett.

MR. LOVETT: No, on. It will just be a minute. If I have to re subpoena the Chief I'll do it, but I would like the Chief as my first witness, and Satriale as my second witness. If you will produce them, fine. If you won't, you won't.

MR. O'NEIL: They were here tonight. They were subject to cross-examination. If you want to subpoena them, subpoena

them.

MR. LOVETT: I already did.

MR. O'NEIL: I'm not responding to that. We don't believe you have responded.

MR. LOVETT: Guess what? You folks are going to come back here on the 10th, and because learned Counsel doesn't want to honor a subpoena we will have no witnesses to call. Won't that be a productive use of your time.

MR. O'REILLY: The Board is going to caucus. Will you please excuse yourselves?

(Whereupon the Board conducts a caucus.)

MAYOR MARVIN: The Board is not going to make any ruling on the validity of subpoenas. We don't know anything about that. We will instruct Mr. O'Neil to have Chief Downey and Lieutenant Satriale here for our January 10th meeting at 6:30. So January 10th at 6:30, back in the Bronxville School Building.

MR. O'REILLY: We will let you know the room location.

MR. LOVETT: Can we ascertain

whether Mr. O'Neil is going to comply with your directive?

MR. O'NEIL: Just so it's clear, because this is similar to the discussion we had earlier about the documents, we understand under the statute there is no requirement that you must supply pre-trial discovery. We have had disciplinary proceedings with you here before. I have had many disciplinary proceedings with you. I know the rights. I almost always, and I believe even in cases prior with Mr. Lovett we get request demands for Bills of Particular, and we generally comply with them so we don't go through what we went through tonight, sitting in the hallway for an hour-and-a-half waiting for you to read it.

Similarly, with regard to the subpoenas and witnesses, the day before this hearing commenced Mr. Lovett attempted to subpoena the entire police department to appear at the same time at the beginning of the hearing, and we believe that is an abuse of process, and

we think it would be unenforceable. We communicated with Mr. Lovett and said that to him, and we said give us a call and tell us who you want, and when. We got no call. We got no response. That is why we took the position we did. We have no problem. If you tell us you want the Chief and Lieutenant Satriale here, they will be here.

MR. LOVETT: So speeches aside I take it he agreed to produce the Chief and Satriale. Is that the Board's understanding?

MAYOR MARVIN: Yes, that is correct.

MR. O'REILLY: You will make your best efforts to have Chief Downey and Lieutenant Satriale?

MR. O'NEIL: Absolutely.

MR. LOVETT: Thank you.

MAYOR MARVIN: All right, so good evening, everybody.

MR. O'REILLY: We are adjourned.

MAYOR MARVIN: Until the 10th.

(Time Noted: 11:20 p.m.)

E X H I B I T S.

| BOARD'S EXHIBITS | DESCRIPTION | ID |
|---|---|---|
| 3 | Letter from Officer Kempkes dated 12/21/06 | 5 |
| 4 | Incident Synopsis | 107 |

| DEPARTMENT'S EXHIBITS | DESCRIPTION | ID/EVD |
|---|---|---|
| 9 | Memorandum from the Chief of Police dated August 5, 2003 | 11/14 |
| 10 | July 6, 2006 roll call sheet | 14/15 |
| 11 | Desk Officer's log dated 4/26/06 | 16/17 |
| 12 | Handwritten note by Dr. James H. Carr | 17/24 |
| 13 | July 6, 2006 e-mail from Sergeant Mitchell | 31/35 |
| 14 | Service order from Classic Automobiles | 40/41 |
| 15 | Sick leave report logs | 48/50 |
| 16 | 3/10/99 roll call | 180/181 |
| 17 | Detective Gallo's 7/6/06 supplemental report | 192/194 |
| 18 | Detective Gallo's electronic mailbox dated 5/9/03 | 200/202 |
| 19 | Detective Gallo's 2nd electronic mailbox | 202/204 |

I N D E X

| EXAMINATION BY: | PAGE |
|---|---|
| DIRECT EXAMINATION OF LIEUTENANT SATRIALE BY MR. O'NEIL | 6-18 |
| VOIR DIRE EXAMINATION OF LIEUTENANT SATRIALE BY MR. LOVETT | 18-22 |
| CONTINUED DIRECT EXAMINATION OF LIEUTENANT SATRIALE BY MR. O'NEIL | 22-32 |
| VOIR DIRE EXAMINATION OF LIEUTENANT SATRIALE BY MR. LOVETT | 32-34 |
| CONTINUED DIRECT EXAMINATION OF LIEUTENANT SATRIALE BY MR. O'NEIL | 34-55 |
| CROSS EXAMINATION OF LIEUTENANT SATRIALE BY MR. LOVETT | 55-129 |
| REDIRECT EXAMINATION OF LIEUTENANT SATRIALE BY MR. O'NEIL | 129-144 |
| RECROSS EXAMINATION OF LIEUTENANT SATRIALE BY MR. LOVETT | 144-149 |
| RE REDIRECT EXAMINATION OF LIEUTENANT SATRIALE BY MR. O'NEIL | 149 |
| RE RECROSS EXAMINATION OF LIEUTENANT SATRIALE BY MR. LOVETT | 149-150 |
| RE RE RECROSS EXAMINATION OF LIEUTENANT SATRIALE BY MR. LOVETT | 154-160 |

I N D E X (CNT'D)

| EXAMINATION BY: | PAGE |
|---|---|
| RE RE REDIRECT EXAMINATION OF LIEUTENANT SATRIALE BY MR. O'NEIL | 160-161 |
| RE RE RE RECROSS EXAMINATION OF LIEUTENANT SATRIALE BY MR. LOVETT | 161-163 |
| DIRECT EXAMINATION OF SERGEANT MITCHELL BY MR. KURTZ | 164-170 |
| CROSS EXAMINATION OF SERGEANT MITCHELL BY MR. LOVETT | 170-176 |
| RECROSS EXAMINATION OF SERGEANT MITCHELL BY MR. LOVETT | 177 |
| DIRECT EXAMINATION OF CHIEF DOWNEY BY MR. O'NEIL | 178-182 |
| DIRECT EXAMINATION OF DETECTIVE GALLO BY MR. KURTZ | 182-207 |
| CROSS EXAMINATION OF DETECTIVE GALLO BY MR. LOVETT | 207-229 |

C E R T I F I C A T I O N

Certified to be a true and accurate transcript of the aforesaid proceeding.

Melissa Sasso

---------------------

Melissa Sasso

### '

**'06** - 25:6, 57:22, 62:2, 65:1, 65:22, 66:23, 68:10, 68:23, 74:2, 75:9, 75:13, 77:7, 78:11, 78:18, 79:1, 112:11, 112:15, 112:21, 113:1, 113:2, 113:4, 113:6, 122:4, 160:11, 162:5, 170:10, 184:7, 207:14, 224:19
**'07** - 94:8
**'99** - 9:24

### 0

**07/06/2006** - 193:17, 194:6

### 1

**1** - 4:7, 105:13
**1/1/95** - 175:6
**10** - 8:20, 14:19, 14:22, 15:1, 16:1, 24:7, 117:25, 175:10, 180:1, 181:7, 233:11
**100** - 105:13
**10523** - 2:18
**10530** - 1:24
**10605** - 2:3
**107** - 233:5
**10:00** - 46:19, 94:21
**10:15** - 47:13
**10:50** - 166:4
**10:55** - 75:20, 109:3
**10th** - 180:11, 181:9, 230:6, 230:20, 230:21, 232:23
**11** - 9:24, 16:5, 16:7, 16:11, 17:5, 17:16, 18:2, 18:5, 19:20, 20:6, 21:14, 182:5, 183:12, 183:15, 233:12
**11/14** - 233:9
**11/20** - 4:7
**111** - 1:23
**1150** - 121:18, 121:19, 121:21
**11530-1679** - 2:8
**11:00** - 180:14
**11:20** - 232:24
**11:50** - 184:11
**11:55** - 32:13
**12** - 17:8, 17:11, 17:17, 17:20, 17:21, 18:16, 18:22, 19:2, 20:3, 20:5, 22:7, 23:5, 24:4, 115:7, 136:4, 139:23, 233:14
**12/21/06** - 233:4
**125** - 193:12, 193:13
**129-144** - 234:15
**12:00** - 181:11
**12:25** - 89:17, 185:23
**12:30** - 38:1, 38:18
**12:44** - 41:12, 43:7
**12:55** - 221:16
**13** - 3:4, 31:21, 31:23, 32:2, 33:2, 33:6, 35:2, 169:16, 169:20, 169:21, 233:15
**1399** - 2:7
**13:39** - 194:10
**14** - 9:10, 40:19, 40:22, 41:1, 41:24, 233:17
**14/15** - 233:11
**144-149** - 234:17
**149** - 234:19
**149-150** - 234:21
**14th** - 10:6, 10:9
**15** - 40:2, 48:15, 48:18, 48:22, 49:25, 50:8, 50:11, 109:22, 113:1, 141:7, 160:19, 233:18
**15-watt** - 102:3
**154-160** - 234:23
**16** - 180:21, 180:23, 181:2, 181:25, 233:20
**16/17** - 233:12
**160-161** - 235:3
**161-163** - 235:5
**164-170** - 235:7
**17** - 192:22, 192:24, 193:2, 194:3, 200:11, 226:3, 233:21
**17/24** - 233:14
**170-176** - 235:9
**177** - 235:11
**178-182** - 235:13
**18** - 200:1, 200:3, 200:6, 200:16, 201:15, 201:22, 202:12, 226:3, 233:23
**18-22** - 234:5
**180/181** - 233:20
**182-207** - 235:15
**19** - 6:9, 6:10, 6:14, 124:11, 124:21, 125:16, 125:20, 179:3, 202:15, 202:18, 202:21, 203:10, 204:6, 204:9, 205:4, 226:1, 226:3, 233:25
**192/194** - 233:21
**1986** - 179:3
**1988** - 6:17, 7:21, 179:3, 179:4
**1991** - 165:6, 165:7
**1992** - 6:19, 179:4, 179:5
**1995** - 9:23
**1996** - 6:20
**1998** - 179:5, 179:6
**1999** - 8:20, 9:10, 10:9, 180:1, 180:9, 180:12, 181:7, 181:9, 182:5
**1:00** - 39:9
**1:39** - 194:11
**1:55** - 170:1

### 2

**2** - 3:15, 4:5, 4:8, 7:7, 7:12, 142:16, 212:16
**2-inch** - 102:5
**2.0** - 124:12
**20** - 143:14, 212:10, 213:10
**200** - 2:7
**200/202** - 233:23
**2000** - 6:21, 178:24, 179:7
**2003** - 6:21, 11:25, 12:15, 12:21, 12:23, 54:25, 55:3, 115:9, 137:21, 138:1, 194:19, 197:21, 200:20, 202:3, 203:5, 204:24, 207:4, 233:10
**2005** - 52:12, 147:12, 173:20
**2006** - 1:3, 3:5, 3:13, 7:3, 12:21, 13:1, 14:13, 15:15, 16:22, 24:16, 25:17, 32:13, 46:24, 49:11, 50:19, 50:21, 52:7, 53:20, 55:13, 98:17, 122:6, 135:14, 140:22, 165:11, 166:2, 169:7, 170:2, 183:23, 194:13, 212:19, 233:11, 233:15
**2007** - 1:9, 103:12
**202** - 162:18
**202/204** - 233:25
**207-229** - 235:17
**207c** - 66:5, 137:24, 138:5, 162:6, 162:19, 163:1, 163:3, 163:8, 163:11
**21** - 1:3, 3:13, 183:5
**22-32** - 234:7
**222** - 2:3
**23** - 38:20, 87:6, 87:12
**25** - 113:1, 113:4, 213:11
**25-and-a-half** - 165:4
**26th** - 4:6, 16:21
**28** - 54:9, 54:13
**2:25** - 93:21
**2:30** - 93:21, 165:17
**2l** - 24:10
**2nd** - 233:25

### 3

**3** - 4:4, 4:10, 4:12, 5:4, 7:25, 8:11, 28:3, 28:5, 181:7, 181:8, 233:3
**3/10/99** - 233:20
**3/11** - 180:9
**30** - 38:20, 215:16
**30th** - 78:22
**31/35** - 233:15
**32-34** - 234:9
**337-0500** - 211:2
**34-55** - 234:11
**38** - 32:13
**3:00** - 25:16, 180:14
**3a** - 8:1, 8:12, 9:12, 10:13, 11:9, 47:22, 49:16, 52:23, 53:3, 55:15, 113:17, 114:20, 114:24, 118:25, 119:17, 127:18, 139:16, 150:17, 154:9, 174:21, 174:24, 176:5, 179:9, 180:3, 182:3
**3b** - 8:18, 8:25, 10:3, 179:10, 179:14
**3rd** - 77:17, 77:20

### 4

**4** - 1:9, 107:10, 107:17, 107:20, 107:23, 135:10, 135:15, 136:14, 142:19, 144:3, 233:5
**4.1** - 142:20
**4/26/06** - 233:13
**40** - 215:16
**40/41** - 233:17
**45** - 169:9
**48/50** - 233:18
**4:00** - 14:16, 24:11, 181:10, 184:3, 212:17, 212:18

### 5

**5** - 11:25, 12:15, 233:3, 233:10
**5/9/03** - 233:24
**55-129** - 234:13
**570** - 2:18
**5th** - 67:3, 77:1

### 6

**6** - 32:13, 52:7, 53:12, 53:20, 57:22, 62:2, 65:1, 65:22, 66:23, 68:10, 68:23, 74:2, 75:9, 75:13, 77:7, 78:10, 78:18, 79:1, 112:11, 112:14, 112:21, 113:6, 135:14, 139:17, 147:12, 158:3, 160:11, 165:11, 166:2, 169:7, 170:2, 170:10, 183:23, 184:7, 194:13, 207:14, 212:19, 224:18, 233:11, 233:15
**6-18** - 234:3
**684-0201** - 1:25
**6:30** - 1:10, 165:17, 230:20, 230:21
**6th** - 7:3, 14:13, 15:15, 24:16, 25:8, 25:17, 27:18, 29:12, 48:2, 50:21, 54:13, 62:7, 63:13, 63:24, 64:14, 64:21, 66:12, 67:2, 67:4, 76:20, 77:13, 78:23, 79:12, 79:14, 91:24, 93:13, 93:16, 93:17, 93:18, 94:10, 94:12, 97:20, 98:17, 113:3, 114:14, 114:16, 122:20, 123:2, 126:12, 127:22, 140:22, 165:21, 168:2, 171:1, 221:24, 222:6

### 7

**7** - 46:24, 55:13, 117:14, 122:4, 122:6
**7/6/06** - 146:2, 233:21
**78** - 116:1
**7:00** - 25:16
**7th** - 48:1, 49:11, 50:19, 52:25, 64:14, 91:25, 92:19, 95:3, 96:12, 97:6, 123:11, 124:9

### 8

**8** - 107:13, 144:20, 144:25
**8:00** - 14:16, 24:11, 24:12, 184:2, 212:17, 212:18
**8:15** - 16:22

### 9

**9** - 11:13, 11:16, 11:20, 14:9, 137:5, 137:8, 138:19, 149:16, 149:23, 179:3, 200:20, 204:24, 207:3, 233:9
**914** - 1:25
**9:30** - 50:24
**9:45** - 195:4

### A

**A1** - 117:14, 159:15
**A2** - 159:20
**A3** - 163:13
**A6** - 138:19, 138:20
**able** - 128:4, 195:19, 196:5
**absence** - 21:22, 25:9, 70:14, 71:17
**absences** - 139:18, 140:1, 161:7, 161:19
**Absolutely** - 66:21, 72:14, 80:22, 110:3, 112:22, 232:18
**absurd** - 103:16
**abuse** - 155:2, 231:25
**abuser** - 131:8
**accept** - 23:23, 33:14, 129:22
**acceptable** - 63:3
**accepted** - 130:13
**access** - 33:4, 105:6, 172:7
**accessed** - 172:5
**accommodate** - 206:15
**accompany** - 224:8, 224:11
**accordance** - 119:15
**accumulate** - 57:15
**accumulating** - 71:17
**accumulation** - 65:11, 65:15
**accurate** - 32:12, 123:17, 151:7, 208:24, 209:1, 210:17, 236:7
**accurately** - 3:21
**acknowledge** - 119:5
**action** - 26:13, 155:3, 174:5
**actions** - 53:18, 150:20
**active** - 69:6
**actual** - 177:11
**add** - 13:24
**addition** - 49:16, 59:4
**additional** - 22:3, 36:12, 121:11, 121:14, 121:17, 121:21, 123:1, 220:17
**address** - 28:5, 42:3, 126:18, 126:20, 127:25, 185:25, 186:1, 186:3, 186:7, 186:12, 186:16, 186:23, 186:24, 187:8, 187:18, 187:24, 188:2, 194:21, 194:23, 194:24, 195:5, 195:8,

195:17, 196:3, 214:13, 217:21
**addressed** - 65:16
**adds** - 193:16
**adjourned** - 232:22
**adjournment** - 100:7
**administers** - 104:25, 105:3, 105:4
**administration** - 173:24, 174:16
**advanced** - 132:4
**advice** - 136:22
**advise** - 43:16, 168:5
**advised** - 167:24, 168:7
**advisory** - 41:7
**Affairs** - 91:16, 91:17, 91:21, 95:11, 124:2
**afforded** - 95:1
**aforesaid** - 236:8
**afraid** - 25:1
**afternoon** - 221:15, 221:19, 226:8
**aggravating** - 137:19
**ago** - 65:8, 65:17
**Agree** - 44:4, 44:5
**agree** - 119:16
**agreed** - 54:24, 67:20, 136:1, 139:14, 232:11
**agreement** - 28:2, 28:20
**ahead** - 18:13, 198:25
**ain't** - 34:10
**air** - 20:7
**allow** - 22:1, 116:24, 123:21
**allowed** - 70:7, 123:23, 131:6
**almost** - 143:1, 143:8, 231:11
**alone** - 98:2, 196:22
**analyze** - 102:5
**Anne** - 2:15
**announced** - 132:24
**announcement** - 103:18
**answer** - 20:21, 20:22, 20:25, 21:2, 27:4, 42:23, 43:20, 44:16, 48:3, 92:13, 100:18, 109:9, 111:11, 116:25, 118:13, 118:15, 133:12, 134:18, 134:20, 140:12, 140:20, 142:8, 142:11, 149:24, 163:19, 167:25, 173:11, 189:17, 198:2, 198:24, 207:20
**answered** - 21:3, 27:12, 35:20, 62:9, 116:11, 142:5, 142:7, 148:4, 156:15, 156:20, 207:22, 227:3, 227:4, 227:7
**answering** - 27:13, 31:12, 82:11, 82:13, 83:11, 84:25, 105:17, 108:3, 108:11, 109:5, 109:19, 166:13, 167:7, 167:15, 211:8, 227:5
**answers** - 92:16
**anyhow** - 22:19, 63:14, 90:21, 201:25
**apart** - 33:6
**appear** - 9:3, 32:11, 231:23
**appeared** - 22:7, 22:10
**applicable** - 130:8, 141:25, 142:1
**applied** - 115:5, 115:12, 130:12, 130:19
**applies** - 114:12, 118:21
**apply** - 115:16, 115:23, 116:1, 142:2, 142:4, 160:2
**appointment** - 168:6
**appreciate** - 98:24, 99:8, 131:23, 150:3
**April** - 16:21, 112:25, 113:4
**area** - 134:4
**areas** - 138:25
**argue** - 115:16, 115:18
**argued** - 115:3
**argument** - 115:10, 130:6, 130:10, 130:17, 130:18
**arise** - 60:4, 60:18
**arose** - 141:3
**arrange** - 72:22
**arrangement** - 73:5
**arrival** - 29:11
**arrive** - 37:21
**arrived** - 38:2, 44:22, 186:20, 187:9, 191:19, 195:2, 195:9, 195:16, 215:24, 217:22, 224:22, 227:1
**arrives** - 218:4
**Article** - 116:1, 124:21, 125:16, 125:20, 142:19, 144:3, 144:20, 144:25
**article** - 126:1
**articles** - 145:2
**articulate** - 132:2
**ascertain** - 30:16, 36:20, 127:24, 152:5, 230:25
**aside** - 232:10
**Aside** - 19:11, 168:21
**ass** - 129:10
**assault** - 133:4
**assigned** - 6:18, 183:17, 183:18
**Associates** - 1:21
**assume** - 3:6, 19:9
**assumption** - 19:11, 68:21, 109:20, 116:4
**asterisks** - 107:7
**attached** - 105:17, 108:3, 109:5
**attachment** - 10:15, 10:25, 11:2, 15:17, 32:17, 121:7
**attempt** - 51:8, 132:2, 184:14, 187:12, 187:22, 195:13, 195:17, 207:17, 208:15
**attempted** - 184:24, 231:22
**attempting** - 125:11
**attempts** - 119:24, 120:1, 121:11, 121:14, 121:15, 121:17, 121:20, 121:22
**attended** - 75:11
**attorney** - 94:19, 114:18
**attorneys** - 3:15, 4:12
**Attorneys** - 2:2, 2:7
**Audi** - 91:3, 91:6, 91:8, 188:21, 188:22, 191:13, 191:17, 191:20, 213:9
**audible** - 44:10
**audience** - 116:19
**audio** - 95:6, 95:13
**augmented** - 114:7
**August** - 1:3, 6:9, 11:25, 12:15, 12:21, 12:23, 54:25, 66:6, 113:1, 162:4, 165:7, 179:5, 179:6, 233:10
**authored** - 162:22
**authority** - 77:21
**authorized** - 52:19
**Auto** - 40:21, 51:1
**auto** - 43:10, 43:12, 43:15, 45:17, 83:25, 84:4
**automatically** - 193:16
**Automobiles** - 39:23, 40:7, 40:10, 41:8, 51:13, 51:15, 233:17
**available** - 87:2, 87:8, 89:21, 103:2, 128:25
**Avenue** - 1:23, 2:7
**awaken** - 99:1
**aware** - 68:23, 69:1, 136:12
**awareness** - 68:9
**awhile** - 51:7, 51:11, 63:5, 63:18, 65:10, 99:4, 99:6

## B

**B1** - 157:17
**background** - 152:24
**backyard** - 140:25, 145:22
**bad** - 43:1
**badly** - 106:11
**bananas** - 201:23
**band** - 138:3
**bare** - 162:1
**bark** - 29:19
**barking** - 38:23, 89:23
**Barton** - 2:15, 44:4, 150:16, 151:12, 151:22, 152:14, 153:14, 153:20, 153:22, 153:23, 172:14, 176:21, 177:5, 177:13
**Based** - 18:24, 64:12
**based** - 22:2, 22:15, 177:18, 201:20, 218:17
**basis** - 57:2, 171:8, 171:17, 172:11, 203:23, 208:6, 208:11, 224:24
**bearing** - 18:25, 142:22
**became** - 90:8, 97:18
**become** - 53:18, 71:24, 150:21
**becoming** - 149:7
**beforehand** - 103:1, 103:7, 103:15
**began** - 29:18, 136:19
**beginning** - 46:5, 193:12, 231:24
**behind** - 133:2
**belief** - 171:16, 208:7, 208:12, 208:19, 211:13, 211:14, 211:20, 214:23, 217:4, 217:10, 218:12, 218:17, 219:20, 220:1, 224:24
**bell** - 30:14, 38:19, 38:22, 66:19, 88:7, 121:23, 187:14, 214:20, 214:24, 215:7, 215:12, 215:15
**Bellitto** - 2:14
**benefit** - 70:6, 71:12, 145:23
**best** - 61:23, 74:23, 210:7, 210:10, 232:16
**better** - 80:20, 134:7
**between** - 135:19, 163:11, 163:14, 167:18, 186:18, 190:13, 204:11
**Bills** - 231:13
**blame** - 30:5
**block** - 28:4
**blocked** - 28:7
**Bloomingdale** - 2:3
**board** - 3:11, 12:25, 75:16
**Board** - 1:1, 2:13, 2:17, 3:3, 3:15, 4:9, 4:11, 14:3, 23:24, 24:23, 27:1, 31:8, 37:8, 38:8, 39:15, 42:15, 43:23, 44:9, 45:8, 55:8, 55:19, 62:17, 64:9, 75:12, 84:19, 84:23, 100:14, 107:1, 116:21, 116:23, 131:17, 136:25, 137:18, 139:10, 140:17, 141:12, 143:24, 150:10, 150:12, 151:9, 151:11, 153:25, 154:3, 154:5, 157:10, 161:10, 171:9, 176:20, 182:14, 182:15, 197:25, 202:8, 204:2, 204:19, 205:8, 229:4, 230:11, 230:13, 230:15
**Board's** - 4:4, 4:7, 4:8, 5:4, 28:3, 28:5, 107:10, 107:17, 107:20, 107:22, 232:12, 233:2
**Body** - 51:1
**bold** - 113:20, 121:7, 130:4, 150:24, 151:24, 154:13
**bolds** - 152:4
**Bond** - 2:6
**bootstrap** - 20:7
**boring** - 134:12
**bottom** - 10:13, 10:25
**box** - 62:22, 62:25, 69:13, 89:2
**boys** - 133:9, 138:11
**breached** - 28:21
**break** - 84:21, 95:24, 100:9, 100:19, 100:20, 101:5, 101:7, 103:21
**breakfast** - 51:2, 51:3, 52:5, 52:16, 52:17
**Brian** - 147:17, 173:23, 178:15
**brief** - 201:3, 214:16, 216:20
**briefly** - 187:4, 189:2, 191:22
**bring** - 132:15
**Bronxville** - 1:1, 1:8, 6:4, 7:16, 9:17, 160:22, 161:14, 165:2, 178:18, 179:1, 183:8, 183:11, 213:8, 213:15, 230:22
**brought** - 39:23, 43:5, 51:12, 100:2, 132:18
**Building** - 230:22
**bulletin** - 12:24
**burn** - 198:25, 199:1
**business** - 210:15
**Bvpd** - 159:2

## C

**C3** - 158:15
**calendar** - 79:2
**California** - 188:11, 216:4
**caller** - 184:25
**cancelling** - 162:5
**cannot** - 11:2, 65:16, 111:20, 116:1
**capacity** - 3:23, 6:5, 47:8, 178:20
**capital** - 113:17
**caps** - 113:21
**car** - 39:23, 43:5, 43:8, 51:9, 51:11, 51:16, 51:17, 186:25, 188:14, 188:17, 188:19, 188:20, 189:6, 191:4, 191:5, 191:7, 196:23, 219:15, 223:15, 224:2, 227:9
**Carbone** - 1:21
**care** - 70:8, 73:2, 82:23, 84:11, 108:16, 131:12, 153:6
**Carr** - 17:25, 19:3, 23:13, 23:16, 233:14
**case** - 13:4, 103:8, 128:16, 132:12, 144:15, 182:12, 192:15, 192:17, 201:24
**cases** - 231:12
**catch** - 141:22
**caucus** - 116:17, 116:20, 116:22, 150:11, 230:12, 230:14
**caught** - 115:13, 115:15
**cell** - 36:20, 37:11,

37:12, 85:17, 85:19, 85:20, 85:25, 88:12, 89:4, 184:13, 184:17, 189:9
**cellular** - 184:14, 208:1, 208:5, 208:14, 208:16, 209:3
**Central** - 1:23
**certain** - 26:13, 146:18
**Certain** - 181:11
**Certainly** - 142:2
**certainly** - 81:18, 130:20, 130:24, 131:17, 132:18
**Certified** - 236:7
**chalk** - 114:17
**chance** - 82:1
**change** - 26:21, 54:14
**changed** - 90:25, 103:11, 109:23, 162:18
**chango** - 138:6
**Chapter** - 124:11, 124:21
**chapter** - 124:25, 126:1
**charge** - 25:7, 80:14
**Charges** - 1:2
**charges** - 13:11, 13:14, 98:15, 99:25, 138:1, 162:16, 197:13, 197:15
**check** - 25:12, 29:6, 56:10, 57:3, 57:7, 63:2, 63:21, 65:19, 67:5, 68:13, 68:18, 68:19, 71:20, 72:2, 72:6, 75:19, 75:25, 76:25, 77:6, 87:21, 93:23, 94:1, 104:15, 105:12, 109:17, 110:23, 111:9, 111:14, 111:18, 118:6, 118:19, 118:23, 119:3, 119:11, 122:8, 122:17, 123:2, 140:5, 140:7, 146:5, 146:16, 147:14, 147:19, 147:23, 149:15, 166:7, 166:24, 171:7, 176:5, 177:6, 199:9, 215:3
**checked** - 72:3, 117:18, 119:19, 121:3, 145:22, 146:20, 148:7, 173:13, 173:21, 173:22, 173:25, 174:2, 174:8, 174:12, 175:2, 175:5, 175:13, 175:19, 175:25, 176:1, 176:10, 215:20
**checking** - 55:11, 76:23, 76:24, 120:17, 121:1, 121:2, 174:4, 175:8
**checks** - 97:14, 140:21, 177:11
**Chester** - 51:17, 189:7, 227:13
**Chief** - 5:12, 10:20, 11:24, 12:14, 66:4, 66:9, 75:6, 75:8, 75:15, 96:2, 96:18, 96:19, 96:20, 97:6, 98:1, 98:12, 99:15, 105:1, 105:2, 105:6, 105:9, 105:11, 124:11, 124:22, 124:24, 125:5, 125:25, 137:24, 138:6, 139:17, 139:24, 146:4, 147:15, 147:16, 149:14, 162:5, 162:16, 162:22, 178:15, 178:16, 178:21, 179:13, 180:15, 180:25, 182:11, 182:16, 182:17, 194:20, 196:19, 198:12, 199:18, 199:21, 229:19, 229:20, 230:19, 232:7, 232:11, 232:16, 233:9, 235:13
**choose** - 127:22
**Christopher** - 2:9
**circled** - 41:12, 41:15
**circumstances** - 13:2, 20:12, 29:5, 118:16, 141:2, 194:18
**City** - 2:8, 191:10, 224:6
**civilian** - 3:23, 133:4
**claim** - 110:11, 132:3
**claimed** - 83:10
**claims** - 21:16, 66:3, 132:4
**clarification** - 150:4
**clarify** - 198:18, 206:10
**Classic** - 39:23, 40:7, 40:9, 40:21, 41:8, 51:12, 51:15, 233:17
**clean** - 25:11, 57:23, 59:6, 60:3, 61:2, 62:7, 63:6, 63:9, 64:13, 64:18, 65:2, 65:14, 66:24, 67:16, 68:5, 71:14, 75:5, 75:25, 76:3, 76:22, 81:16, 109:17, 111:7, 111:13, 111:18, 166:24, 171:6, 206:8
**cleaned** - 64:6, 64:22, 65:5, 67:21, 67:24, 93:24, 171:13
**clear** - 63:17, 78:1, 78:6, 102:21, 114:15, 128:25, 142:3, 231:3
**Clearly** - 122:16
**clearly** - 114:24, 153:11
**cleverly** - 20:4, 34:13
**client** - 19:7, 57:23, 60:22, 64:13, 66:13, 66:19, 66:24, 67:13, 68:24, 73:24, 75:5, 75:19, 78:11, 79:16, 79:19, 79:20, 87:24, 91:23, 94:10, 94:13, 96:20, 98:2, 104:17, 114:12, 117:18, 122:8, 123:12, 124:10, 124:18, 125:4, 125:19, 132:25, 137:23, 141:18, 145:9, 146:1, 160:10, 162:17, 162:23, 170:19, 171:5, 171:13, 171:19, 218:25, 219:4, 221:10, 221:23, 222:6, 222:20, 224:17, 224:25, 225:10, 226:7, 226:13, 227:6
**client's** - 64:22, 74:2, 79:10, 80:15, 80:25, 83:18, 87:8, 87:16, 87:19, 90:16, 93:23, 94:2, 97:15, 105:7, 105:12, 105:17, 122:12, 127:24, 162:1, 170:19, 171:2, 171:10
**clients** - 34:10
**closed** - 57:20
**Cnt'd** - 235:1
**code** - 105:1, 105:3
**coffee** - 50:25, 52:4
**coincidence** - 66:22, 66:25
**collected** - 94:9
**color** - 188:22
**comfort** - 34:11
**coming** - 37:5, 42:20, 161:3
**command** - 115:6, 129:23, 130:13, 130:14, 131:21, 133:16, 136:13, 138:9, 148:16, 148:22, 174:5, 201:21
**Commander** - 6:24
**commander** - 90:6
**commenced** - 231:21
**comment** - 129:12, 206:18
**Commissioners** - 1:1, 2:13, 3:3
**committed** - 13:10, 32:24, 133:3, 144:22
**communicated** - 232:2
**community** - 183:21
**Community** - 1:9
**Comp** - 39:21, 54:7, 54:10, 161:19
**company** - 84:4, 196:13
**compartment** - 57:20
**compensation** - 190:7, 190:9
**compensatory** - 136:4, 139:15, 139:21, 139:23
**competency** - 140:12
**complete** - 6:9, 123:17, 157:1, 159:1, 159:21
**completed** - 95:21, 96:1, 199:16
**completely** - 156:8, 195:5
**completing** - 200:22
**complied** - 64:17
**comply** - 54:4, 54:6, 54:11, 54:21, 153:11, 153:18, 154:22, 231:1, 231:14
**compose** - 168:24
**composed** - 169:9, 169:12, 169:25
**composing** - 168:21
**compounding** - 13:9, 55:4
**compromised** - 33:4
**computer** - 15:12, 16:18, 21:14, 192:16, 193:16, 209:8, 209:10, 209:25, 210:1, 210:17, 213:17
**computers** - 140:8
**concentrating** - 72:5
**concerned** - 168:23
**concerning** - 52:7
**condition** - 51:10
**conditions** - 34:21
**Conduct** - 7:18
**conducting** - 91:20, 92:5
**conducts** - 116:21, 230:13
**confident** - 73:17, 73:22, 93:4
**confinement** - 53:14
**confirm** - 43:7, 91:10, 91:12
**confirming** - 64:19
**confuse** - 156:8
**congratulate** - 132:10
**connected** - 108:12
**Connecticut** - 90:16, 90:20, 90:23, 126:8, 126:11, 126:15, 127:4, 127:6, 127:8, 127:11, 127:13, 127:15, 127:17, 127:23, 128:2, 128:4, 128:6, 214:3
**connection** - 26:10
**conscience** - 102:3
**conscious** - 77:12
**consisted** - 88:18
**consistent** - 201:19, 205:8, 205:23
**contact** - 36:19, 38:13, 39:19, 46:20, 79:19, 109:25, 167:2, 167:22, 184:14, 184:17, 195:14, 195:17, 207:17, 210:18
**contacted** - 79:20, 80:21, 167:12, 184:16, 184:21
**contacts** - 45:15
**contain** - 204:22
**contained** - 95:17, 113:15
**contempt** - 129:9
**content** - 185:9
**contents** - 79:15, 196:1
**context** - 54:2
**continually** - 68:24
**continuation** - 3:2, 197:22
**Continue** - 36:3, 90:12, 137:2, 139:12, 140:4, 140:19, 144:1
**continue** - 45:5, 82:6, 90:9, 102:15, 138:15
**continued** - 121:17, 125:11, 125:15, 155:18
**Continued** - 22:6, 22:22, 35:4, 104:8, 234:7, 234:11
**continues** - 69:8
**continuing** - 90:20
**convened** - 3:4
**conversation** - 26:15, 26:18, 30:24, 35:5, 36:25, 37:15, 38:14, 39:5, 39:25, 42:9, 47:25, 52:24, 53:2, 53:25, 55:12, 98:11, 142:12, 145:8, 146:1, 166:23, 168:10, 189:2, 189:21, 190:3, 190:12, 190:19, 190:22, 195:22, 196:1, 198:14, 198:20, 199:3, 199:7, 199:14, 199:17, 199:19, 200:24, 204:11, 204:23, 207:3, 216:20
**conversations** - 26:1, 38:3, 52:11, 140:23, 141:17
**convict** - 201:20
**conviction** - 137:21
**convictions** - 13:13, 136:21
**cooperate** - 92:7
**copied** - 106:14
**copies** - 8:2, 8:6, 49:4, 102:22, 103:8, 106:7, 106:9, 106:24, 107:2, 107:5
**copy** - 3:18, 4:12, 4:16, 7:19, 9:22, 10:18, 10:21, 15:14, 16:17, 20:12, 28:8, 32:9, 41:7, 41:15, 43:6, 54:20, 55:14, 81:16, 81:21, 92:24, 93:9, 96:2, 100:7, 101:14, 101:20, 106:16, 125:20
**Correct** - 8:21, 10:4, 21:24, 47:23, 53:5, 65:3, 113:10, 113:13, 119:21, 120:16, 122:10, 122:13, 220:23, 220:25, 223:13
**correct** - 3:8, 3:19, 49:19, 84:2, 169:1, 170:3, 198:15, 232:14
**Counsel** - 2:17, 5:9, 98:25, 103:18, 130:5, 130:7, 132:1, 132:10, 132:24, 136:17, 138:24, 150:3, 206:7, 206:14, 230:7
**Counsel's** - 193:20
**Counselor** - 62:13, 134:6
**counting** - 54:9
**couple** - 106:13, 153:24, 163:24
**course** - 47:14, 140:16, 165:20, 168:2, 184:6, 190:12, 199:6, 204:21, 204:23, 205:3, 207:2, 210:15
**court** - 147:6
**Court** - 129:8, 131:25, 132:5, 142:7
**cousins** - 51:4
**covered** - 139:1
**Cowhey** - 44:12

**created** - 49:5, 152:25
**credibility** - 84:13, 206:7
**criminal** - 92:8, 92:10, 92:11, 92:17, 93:5
**Cross** - 56:1, 104:8, 170:8, 207:13, 234:13, 235:9, 235:17
**cross** - 42:2, 128:14, 128:23, 132:18, 134:3, 134:19, 135:16, 135:18, 136:16, 137:9, 138:25, 141:6, 141:19, 142:22, 143:12, 182:10, 229:24
**cross-examination** - 128:14, 128:23, 134:3, 134:19, 135:18, 136:16, 137:9, 138:25, 142:22, 229:24
**current** - 71:20
**custody** - 8:9
**cute** - 114:9

## D

**D1** - 159:1
**damage** - 55:4, 132:11
**damages** - 132:7
**dark** - 188:21, 195:5
**date** - 5:5, 9:6, 9:9, 9:24, 11:17, 14:23, 15:8, 15:10, 16:8, 16:20, 17:12, 21:10, 21:13, 24:9, 24:20, 24:23, 25:5, 31:24, 32:11, 35:6, 40:23, 48:19, 66:9, 95:2, 107:21, 112:23, 113:5, 114:14, 153:7, 153:8, 170:1, 170:17, 179:19, 179:22, 179:24, 180:5, 180:8, 180:24, 182:5, 192:25, 193:18, 194:6, 200:4, 202:19
**dated** - 3:12, 11:25, 12:15, 112:25, 233:4, 233:10, 233:13, 233:24
**Dated** - 1:3, 8:20
**dates** - 146:7, 161:25
**day's** - 148:15, 148:18, 149:3
**days** - 9:25, 65:17, 78:15, 115:7, 131:10, 136:4, 139:23, 152:20
**deal** - 112:6, 129:13
**dealership** - 43:10, 43:13, 43:16, 45:17, 191:4, 191:7, 191:9, 191:12, 191:13, 192:2, 213:9, 219:16, 224:9, 227:9, 227:23, 228:18, 228:23
**Dealership** - 191:17, 191:20
**dealing** - 138:4
**December** - 3:4, 3:13
**decide** - 76:21, 103:25, 132:5, 132:6
**decided** - 75:4, 75:18, 90:19
**deciding** - 51:7
**decision** - 77:12, 98:2
**deck** - 30:9, 120:8, 120:18, 120:20, 121:1, 121:4, 121:5, 140:24, 141:8, 141:17, 142:13, 145:9, 145:23
**dedicated** - 70:4
**deem** - 104:14
**Degraw** - 40:16
**Deli** - 50:24
**delivered** - 23:18, 72:23
**demands** - 231:13
**denied** - 137:24
**department** - 6:16, 6:17, 10:11, 12:24, 15:10, 19:25, 29:9, 31:17, 38:13, 39:20, 45:16, 53:21, 54:11, 54:18, 56:2, 56:8, 63:7, 63:20, 63:22, 68:20, 69:7, 69:12, 69:17, 76:18, 87:4, 88:22, 91:15, 92:15, 93:3, 95:10, 97:5, 105:4, 108:15, 111:17, 117:10, 118:5, 118:9, 118:11, 118:19, 119:2, 119:10, 126:19, 127:3, 128:1, 129:23, 130:16, 133:2, 140:6, 140:7, 147:2, 152:1, 153:3, 155:13, 166:19, 175:19, 175:23, 176:11, 177:2, 181:6, 182:5, 185:12, 190:24, 191:16, 192:6, 192:8, 192:11, 198:11, 199:22, 200:19, 210:20, 210:25, 211:11, 211:16, 212:3, 231:23
**Department** - 2:7, 7:17, 8:18, 9:17, 53:13, 85:20, 160:22, 165:3, 178:19, 179:2, 183:9
**Department's** - 7:6, 7:12, 7:24, 8:25, 9:12, 10:3, 11:8, 11:12, 11:15, 11:20, 14:9, 14:19, 14:21, 15:1, 15:25, 16:5, 16:7, 16:11, 17:4, 17:8, 17:10, 17:15, 17:20, 17:21, 18:2, 18:5, 19:19, 24:3, 31:21, 31:23, 32:2, 35:1, 40:19, 40:22, 41:1, 41:23, 47:22, 48:15, 48:17, 48:22, 49:16, 49:25, 50:7, 50:11, 52:23, 55:14, 114:24, 135:9, 137:5, 138:19, 139:16, 142:16, 149:16, 160:19, 169:15, 169:21, 179:9, 180:21, 180:23, 181:2, 181:24, 182:3, 192:22, 192:24, 193:2, 194:2, 200:1, 200:3, 200:6, 200:11, 200:15, 201:14, 202:11, 202:15, 202:17, 202:21, 203:10, 204:5, 204:9, 205:4, 233:7
**departmental** - 71:21, 92:5, 92:7, 92:9, 92:13, 92:14, 110:23, 184:13, 193:14
**deposit** - 177:1, 177:23
**deposited** - 136:19
**Deputy** - 2:14
**describe** - 194:17, 195:25
**described** - 154:13
**Description** - 233:2, 233:8
**designated** - 181:10
**desk** - 16:17, 30:20, 45:14, 48:10, 49:5, 49:8, 53:7, 53:9, 88:6, 110:24, 152:2, 155:24, 156:10, 157:12, 161:2, 211:5, 211:7, 211:9
**Desk** - 25:15, 25:18, 233:12
**despite** - 115:2
**detail** - 198:13
**detailing** - 31:17
**details** - 11:25, 188:17, 201:7, 201:9
**Detective** - 6:18, 6:20, 36:16, 36:18, 37:1, 37:17, 37:21, 38:2, 39:5, 39:10, 40:1, 40:6, 44:18, 51:20, 66:15, 88:9, 88:11, 88:14, 89:14, 90:23, 173:23, 175:7, 179:5, 179:6, 183:4, 183:6, 183:17, 183:18, 183:19, 193:1, 194:5, 198:2, 198:7, 198:17, 199:23, 200:5, 201:6, 202:4, 202:20, 202:25, 203:1, 203:4, 204:8, 205:24, 213:5, 229:9, 229:10, 233:21, 233:23, 233:25, 235:15, 235:17
**Detectives** - 7:1
**determine** - 13:13, 38:16, 57:17
**determining** - 68:4
**dialed** - 33:8, 33:11, 80:7
**difference** - 34:19, 44:8, 54:13, 162:25, 163:4, 163:11, 163:13
**different** - 54:8, 84:21, 90:13, 95:2, 99:10, 135:19, 181:11, 206:21
**differently** - 130:23, 130:25, 131:3, 131:5, 131:19, 132:20, 135:24, 136:1, 136:7, 136:8
**digits** - 33:18, 34:5, 34:24, 42:7
**dire** - 18:12, 22:4, 32:19
**Dire** - 18:14, 22:6, 32:21, 234:5, 234:9
**Direct** - 6:1, 8:19, 22:22, 35:4, 164:18, 178:12, 183:1, 234:3, 234:7, 234:11, 235:7, 235:13, 235:15
**direct** - 41:10, 57:23, 60:22, 62:6, 62:23, 68:4, 69:14, 71:19, 72:20, 75:18, 77:17, 77:21, 79:16, 86:25, 94:5, 100:3, 110:16, 111:12, 111:22, 114:9, 120:6, 139:2, 141:18, 142:23, 143:11, 177:1, 177:23, 182:12, 216:17, 218:5
**direct-examination** - 100:3, 110:16, 120:6, 139:2, 216:17
**directed** - 25:10, 25:18, 30:20, 31:16, 36:19, 37:18, 38:10, 45:13, 52:16, 54:5, 59:21, 59:23, 61:2, 63:14, 68:13, 77:14, 79:18, 82:21, 82:23, 88:16, 108:25, 115:17, 115:20, 115:23, 136:9, 147:13, 148:7, 170:18, 171:14, 184:13, 185:24, 193:9, 207:16
**Directed** - 88:11
**direction** - 39:19, 45:14, 56:14, 63:20, 134:17, 134:21, 139:17, 139:25, 185:10
**directions** - 90:23
**directive** - 25:24, 26:2, 56:16, 56:24, 61:4, 63:24, 64:12, 64:17, 104:10, 104:16, 105:16, 118:22, 171:20, 222:8, 231:2
**directives** - 31:15
**directly** - 139:1, 199:20
**Directly** - 108:18
**disability** - 154:19, 154:25, 155:5, 155:10, 155:14, 156:12, 157:14, 157:15, 157:20, 158:8, 159:13, 159:18
**disabled** - 21:16, 158:7
**disagreed** - 67:20
**disband** - 141:20
**Disciplinary** - 1:2
**disciplinary** - 155:3, 174:5, 197:21, 231:8, 231:10
**discipline** - 115:6, 129:23, 130:13, 130:15, 131:14, 131:21, 133:17, 136:13, 138:9, 148:17, 148:23, 201:21
**disciplined** - 115:21
**discovery** - 98:25, 103:13, 103:15, 231:8
**discriminate** - 131:6, 131:7
**discuss** - 46:8, 54:23, 75:6, 75:8
**discussed** - 136:15
**discussion** - 8:16, 124:15, 164:10, 178:6, 182:21, 207:11, 231:4
**discussions** - 22:23, 52:6
**disregard** - 45:9, 129:7
**disregarded** - 222:1, 222:10
**distort** - 151:9, 151:10
**distribute** - 72:7, 180:15
**distributed** - 10:10
**Distribution** - 8:19
**divergence** - 206:6, 206:10
**Divernieri** - 180:15
**Division** - 6:19, 6:25, 183:17, 183:19, 213:5
**doctor** - 19:8, 19:10, 19:13, 19:22, 23:2
**doctor's** - 17:9, 70:8, 73:2, 112:18, 112:20, 112:23, 112:25, 153:6, 153:7
**document** - 7:8, 7:11, 7:13, 7:23, 8:22, 9:1, 9:4, 9:7, 9:13, 10:3, 10:8, 11:19, 11:21, 12:5, 12:13, 12:18, 13:2, 14:18, 14:25, 15:4, 15:11, 16:4, 16:10, 16:13, 17:14, 18:7, 19:16, 21:14, 31:20, 31:25, 32:4, 32:6, 40:25, 41:4, 41:11, 48:21, 48:23, 49:1, 50:10, 103:16, 106:8, 106:14, 107:2, 107:19, 114:1, 114:4, 120:15, 135:11, 135:14, 137:6, 137:15, 142:17, 151:5, 151:19, 156:17, 156:21, 156:23, 156:24, 160:21, 161:1, 162:9, 163:15, 169:17, 169:23, 174:22, 179:15, 180:6, 180:11, 180:20, 180:22, 181:1, 181:3, 181:13, 182:2, 192:23, 193:4, 193:19, 193:23, 193:25, 200:2, 200:8, 202:24, 203:2, 205:3, 205:11, 205:19, 205:23, 206:3, 206:4, 220:12, 225:14
**documentation** - 83:14
**documents** - 21:10, 47:16, 48:5, 48:14, 49:9, 49:17, 49:21, 84:20, 102:25, 124:14, 179:11, 191:24, 231:5
**dogs** - 29:18, 89:23
**Dogs** - 38:23
**done** - 13:23, 55:5, 65:16, 93:5, 132:13, 185:17, 203:5, 220:21, 221:19
**door** - 29:19, 30:23, 66:19, 86:6, 142:11,

167:14, 187:13, 187:18, 196:5, 196:14, 197:20, 214:17, 214:19, 214:24, 215:1, 215:14
**doorbell** - 29:15, 29:17, 29:20, 29:24, 85:5, 89:23, 119:25, 121:12, 121:16, 121:18, 142:14, 145:10
**Dorre** - 70:13, 70:20, 74:24, 129:22, 131:19, 131:21, 132:16, 133:16, 135:20
**Dorre's** - 72:12
**doubt** - 70:7, 71:12, 145:23
**down** - 51:1, 66:18, 106:2, 107:24, 112:9, 113:18, 119:23, 121:6, 122:2, 143:10, 144:13, 151:15, 163:2, 163:5, 188:16, 205:5, 224:8, 224:13
**Downey** - 5:12, 147:17, 173:23, 175:7, 176:10, 178:15, 182:17, 230:19, 232:16, 235:13
**downloaded** - 171:24
**Dr** - 17:24, 19:3, 23:13, 23:16, 233:14
**drafted** - 154:9, 158:12, 163:13
**drafting** - 13:11
**dressing** - 26:20
**drive** - 29:9, 90:15, 128:10, 228:14
**driveway** - 30:18, 30:23, 35:19, 36:4, 36:7, 38:11, 51:20, 80:25, 86:6, 86:22, 87:8, 87:16, 87:19, 88:1, 90:8, 187:3, 188:10, 188:12
**driving** - 51:9, 51:17, 188:14
**drop** - 21:9, 189:5
**dropped** - 51:16, 191:5, 219:15
**Drove** - 35:15
**drove** - 51:11, 186:24, 190:23, 195:4
**due** - 21:10, 21:11
**duly** - 5:23, 164:14, 178:8, 182:23
**During** - 47:14, 50:18, 140:21, 161:13, 165:20, 184:6, 204:21
**during** - 29:7, 38:19, 48:6, 49:10, 49:18, 52:18, 52:24, 53:14, 55:12, 73:13, 74:2, 78:17, 117:18, 124:9, 124:15, 168:2, 175:14, 181:12, 189:21, 190:3, 190:12, 199:6, 204:11, 204:23, 207:2, 213:14, 218:6
**duties** - 6:22, 25:14, 143:16, 165:8, 183:19
**Duties** - 7:18
**duty** - 29:7, 52:19, 87:24, 119:11, 153:2, 158:11, 158:16, 158:21, 159:11, 212:19, 213:14

## E

**e-mail** - 31:16, 31:22, 32:9, 32:23, 33:2, 33:5, 63:21, 69:10, 69:11, 69:12, 69:13, 76:1, 83:12, 83:17, 83:23, 84:6, 94:2, 104:25, 105:19, 105:20, 108:10, 166:7, 166:24, 168:21, 168:25, 169:11, 233:15
**e-mails** - 25:12, 56:10, 57:9, 57:12, 57:13, 57:14, 68:10, 68:14, 68:21, 68:22, 69:15, 71:17, 71:20, 75:19, 94:3, 94:9, 104:24, 105:7, 105:12, 109:18, 110:18, 110:23, 140:7, 171:7, 171:20, 171:21, 171:24, 172:2, 172:6, 172:8
**early** - 70:9, 73:2, 153:1
**Eastchester** - 3:25, 28:6, 29:1, 29:2, 50:25, 51:18, 126:14, 126:18, 126:19, 126:24, 127:2, 127:4, 127:23, 128:3, 186:4, 186:13, 212:11, 213:22
**eat** - 52:4, 52:8, 52:18
**economic** - 99:3
**effect** - 15:15, 175:1, 176:6, 217:2, 217:9, 221:4
**efforts** - 232:16
**Eighth** - 112:9
**either** - 21:8, 44:10, 49:6, 56:4, 59:15, 73:2, 95:12, 98:23, 111:10, 113:5, 113:12, 197:2, 201:23
**Either** - 23:18, 209:25
**elaborate** - 190:8
**elapsed** - 186:18
**electronic** - 25:12, 199:22, 200:12, 200:17, 202:16, 203:3, 233:23, 233:25
**elephant** - 45:9
**eleven** - 81:4
**elicited** - 114:9
**eliciting** - 43:19
**Elmsford** - 2:18
**eloquently** - 132:1
**elsewhere** - 90:10
**embodies** - 154:18
**embodying** - 104:22
**emergency** - 53:13
**employed** - 6:3, 165:2, 178:17, 183:7, 183:10
**employee** - 92:4, 155:17
**emptied** - 63:23, 64:19, 64:20, 77:10
**empty** - 56:5, 61:14, 63:21, 67:13, 69:19, 77:14, 77:18, 104:12, 110:17, 111:1, 111:6, 111:19, 122:9, 122:14
**emptying** - 97:23
**en** - 128:2
**encompasses** - 165:15
**end** - 8:4, 190:18, 190:21, 199:13, 203:18, 207:1
**ended** - 8:8, 93:22
**ending** - 153:8
**engaged** - 189:2
**enhanced** - 136:18
**ensure** - 30:8, 57:2, 145:22
**entered** - 179:22, 179:25, 190:23, 193:9, 194:7
**entire** - 58:18, 69:11, 231:22
**entirety** - 81:12
**entitled** - 8:19, 103:12, 103:14, 114:18, 130:25, 131:18, 132:19, 135:23, 143:20, 157:2
**entrance** - 214:22
**equal** - 160:3
**error** - 13:9
**errors** - 156:16, 156:22
**Esposito** - 51:5
**Esq** - 2:4, 2:8, 2:9, 2:19
**Esqs** - 2:2
**essentially** - 205:7
**establish** - 53:17
**established** - 197:14
**Establishing** - 150:19
**estimate** - 74:23, 75:3
**etc** - 152:3, 158:5
**etched** - 145:19
**Eugene** - 164:21
**evaluation** - 21:17
**evening** - 44:1, 164:24, 164:25, 180:17, 197:14, 200:18, 201:5, 232:21
**event** - 28:10, 145:19
**events** - 75:9, 75:12, 114:16, 131:13, 138:1, 146:2, 201:18, 201:22
**evidence** - 7:11, 10:23, 11:10, 12:3, 13:6, 14:6, 14:8, 14:11, 15:20, 15:24, 16:2, 16:24, 17:3, 17:6, 18:10, 20:9, 22:1, 23:5, 23:21, 23:23, 24:2, 24:5, 32:16, 33:15, 35:3, 41:18, 41:22, 41:25, 47:22, 49:17, 50:3, 50:6, 50:9, 50:11, 113:17, 114:21, 114:23, 118:25, 119:17, 127:18, 130:9, 138:8, 141:20, 141:24, 142:1, 142:4, 154:10, 162:10, 163:13, 174:21, 179:10, 180:3, 181:17, 181:19, 181:23, 182:1, 182:2, 193:20, 193:23, 194:1, 194:4, 201:15, 202:10, 202:13, 203:11, 204:4, 204:7, 205:14, 205:20, 206:4
**evident** - 13:22
**exact** - 111:16, 111:21, 122:24, 139:13, 152:7, 166:22, 217:14
**exactly** - 50:22
**Examination** - 6:1, 22:22, 35:4, 56:1, 104:8, 129:19, 144:10, 149:21, 154:8, 160:17, 161:23, 164:18, 170:8, 177:21, 178:12, 183:1, 207:13, 234:2, 234:3, 234:5, 234:7, 234:9, 234:11, 234:13, 234:15, 234:17, 234:19, 234:21, 234:23, 235:2, 235:3, 235:5, 235:7, 235:9, 235:11, 235:13, 235:15, 235:17
**examination** - 100:3, 110:16, 120:6, 128:14, 128:23, 134:3, 134:19, 135:18, 136:16, 137:9, 138:25, 139:2, 141:19, 142:22, 216:17, 229:24
**examine** - 81:18, 131:3
**examined** - 5:25, 164:16, 178:10, 182:25
**except** - 53:13
**Except** - 110:20
**exception** - 15:16
**excess** - 25:4
**excited** - 141:15
**exciting** - 144:9
**excuse** - 46:14, 84:3, 129:6, 135:21, 200:14, 230:12
**Excuse** - 24:21, 44:24, 45:6, 156:1, 172:20, 205:13, 216:13, 222:19
**Exhibit** - 3:15, 4:4, 4:10, 4:12, 5:4, 7:7, 7:12, 7:25, 8:18, 8:25, 9:12, 10:13, 11:8, 11:13, 11:16, 11:20, 14:9, 14:19, 14:22, 15:1, 15:25, 16:5, 16:7, 16:11, 17:4, 17:8, 17:11, 17:16, 17:21, 18:2, 18:5, 18:16, 18:22, 19:1, 19:19, 20:3, 24:3, 24:7, 28:3, 28:5, 31:21, 31:23, 32:2, 35:1, 40:19, 40:22, 41:1, 41:23, 47:22, 48:15, 48:18, 48:22, 49:16, 49:25, 50:7, 50:11, 52:23, 55:15, 107:17, 107:20, 113:16, 114:24, 118:25, 135:10, 136:14, 137:5, 138:19, 139:16, 142:16, 149:16, 149:23, 150:17, 160:19, 169:15, 169:20, 169:21, 174:21, 179:9, 179:14, 180:3, 180:21, 180:23, 181:2, 181:24, 192:22, 192:24, 193:2, 194:2, 200:1, 200:3, 200:6, 200:11, 200:15, 201:14, 202:11, 202:15, 202:18, 202:21, 203:10, 204:5, 204:9, 205:4
**exhibit** - 4:20, 4:25, 8:5, 193:5, 225:25
**Exhibits** - 233:2, 233:8
**existent** - 125:7
**exists** - 20:4
**exited** - 189:1, 214:16
**expect** - 79:22
**expected** - 96:13, 126:20
**experienced** - 51:10
**explain** - 34:13
**explained** - 46:8, 121:15
**express** - 224:12
**extended** - 56:14, 57:1, 70:13, 78:5, 129:21, 152:21, 153:5
**extent** - 33:18
**exterior** - 120:12
**extremely** - 131:2
**eye** - 136:10, 149:15

## F

**face** - 113:21, 130:4, 154:13
**faced** - 121:7
**facing** - 188:10
**fact** - 18:3, 18:19, 19:6, 19:12, 20:3, 37:21, 43:7, 51:11, 66:13, 114:8, 115:11, 116:1, 161:4, 197:13, 201:10, 208:4, 209:2, 218:17, 221:9, 223:8, 224:24
**facts** - 130:21, 149:1
**factual** - 171:8, 171:17, 172:11, 208:6, 208:11
**failed** - 103:6, 158:13
**failure** - 158:6
**Fair** - 107:16
**fair** - 84:7, 84:12, 133:9, 138:11
**fair-haired** - 133:9, 138:11
**fall** - 163:2, 163:5
**False** - 133:7
**familiar** - 7:13, 18:21, 144:2, 144:17
**far** - 98:4, 98:6, 168:22, 215:14
**fax** - 21:9, 23:18
**fear** - 224:12
**feature** - 89:4
**February** - 4:6
**Federal** - 131:25, 132:4, 142:7
**feet** - 215:16
**felt** - 93:4
**few** - 65:8, 129:18,

191:18
**fifth** - 60:24, 62:3, 109:3
**fifths** - 113:18
**fight** - 129:8
**figured** - 99:5
**file** - 13:3, 32:18, 81:6, 81:15, 95:18, 95:21, 96:1, 99:15, 99:22, 100:4, 100:8, 100:20, 101:7, 101:9, 101:12, 101:19, 101:24, 102:1, 102:5, 102:12, 102:16, 126:19, 128:1, 158:16
**filed** - 133:7, 162:16
**filing** - 95:21
**fill** - 59:2, 71:13, 73:15, 73:19, 73:21, 73:24, 74:3, 157:18, 192:16, 192:18
**filling** - 159:16
**fills** - 58:18, 58:24
**findings** - 199:21, 199:24
**Fine**- 34:3, 82:8, 104:2, 116:15, 129:15, 144:17, 220:16
**fine** - 129:11, 229:22
**finish** - 20:25, 48:3, 157:2
**finished** - 20:20, 185:14
**First**- 201:13
**first** - 3:4, 5:8, 5:23, 7:19, 12:22, 29:13, 53:12, 58:1, 58:8, 58:11, 59:6, 60:6, 79:14, 81:2, 89:22, 106:13, 113:18, 120:6, 122:3, 128:1, 136:19, 138:2, 154:14, 164:14, 167:18, 178:8, 182:23, 202:25, 207:14, 213:19, 229:20
**firsthand** - 146:23
**five** - 25:23, 57:25, 61:3, 61:9, 61:14, 61:22, 61:24, 78:15, 101:9, 101:11, 109:18, 121:7, 186:21, 192:3
**Five**- 29:10, 43:11, 93:19
**Florida**- 127:20
**focused** - 135:19
**folks** - 132:5, 230:5
**follow** - 53:18, 101:16, 115:17, 115:20, 115:24, 125:14, 150:20, 153:25, 154:23, 163:25, 166:9, 183:20, 184:19, 196:16, 220:24
**Follow**- 164:1
**follow-up** - 101:16, 150:20, 153:25, 154:23, 163:25, 183:20, 196:16, 220:24
**Follow-up**- 164:1
**followed** - 147:3
**Following**- 25:24, 30:24, 36:25, 38:14, 39:25, 43:12, 121:9, 139:24
**following** - 46:19, 78:22, 105:16, 115:22, 152:6, 193:17, 194:9, 201:4, 201:5, 203:6
**follows** - 5:25, 113:24, 117:11, 164:17, 178:11, 182:25
**food** - 52:18
**force** - 146:15, 160:3
**forfeit** - 54:25, 139:15
**forfeited** - 115:7
**forfeiting** - 136:3, 148:17
**forgot** - 117:5, 154:18, 159:8, 216:16
**form** - 23:6, 24:25, 29:24, 61:8, 95:22, 189:24, 196:11
**Form**- 150:19
**forum** - 99:10, 142:6
**forward** - 138:13
**foundation** - 19:16, 19:17, 22:18, 64:5, 140:11
**four** - 15:17, 33:18, 34:4, 34:24, 42:7, 58:16, 58:19, 58:22, 58:24, 59:1, 59:4, 59:11, 71:12, 71:23, 73:14, 74:4, 74:11, 183:16
**four-and-a-half** - 183:16
**fourth** - 60:12, 60:15, 60:18, 60:21, 62:2
**frailty** - 139:7
**frame** - 51:4
**Franklin**- 2:7
**fraudulent** - 20:1
**free** - 98:25
**Friday**- 122:5, 122:6, 201:5
**friend** - 51:2, 51:4
**front** - 30:9, 30:22, 86:6, 145:10, 167:14, 187:13, 196:6, 214:21, 215:1, 220:7
**fruitless** - 203:12
**full** - 24:17, 57:6, 57:8, 57:18, 58:11, 58:16, 59:9, 62:20, 62:23, 62:25, 63:4, 63:10, 63:13, 71:25, 72:13, 72:19, 73:8, 97:18, 97:22, 122:14, 122:18
**function** - 7:2
**furnish** - 101:23
**future** - 139:19

## G

**Gallo**- 36:16, 36:18, 36:23, 37:1, 37:5, 37:18, 37:21, 38:2, 39:6, 39:11, 40:1, 40:6, 44:18, 44:20, 51:20, 66:15, 88:9, 88:11, 88:14, 88:17, 88:20, 88:24, 89:14, 90:24, 183:4, 183:5, 183:6, 198:7, 205:24, 229:10, 235:15, 235:17
**Gallo's**- 233:21, 233:23, 233:25
**game** - 129:10
**Garden**- 2:8
**Garrity**- 91:23, 92:2, 92:3, 92:15, 92:18, 93:9, 93:12, 110:6, 110:11
**general** - 226:21
**generally** - 166:20, 231:14
**generate** - 85:22, 85:24
**generated** - 16:18, 16:21, 21:14, 200:18
**generic** - 226:25, 227:5
**George**- 51:6
**Giovanni**- 51:3
**Giovanni's**- 51:1
**girlfriend** - 51:25
**given** - 9:18, 9:20, 28:8, 56:17, 56:18, 56:21, 93:9, 104:16, 174:21, 195:8, 208:13, 209:9
**glad** - 139:6
**Glenn**- 2:14
**Gould**- 2:2
**govern** - 152:19
**governing** - 123:20, 175:23
**governs** - 56:3, 152:25
**great** - 116:3
**Grounds**- 61:7
**group** - 69:10
**guaranteed** - 92:14
**guess** - 133:4, 136:22, 150:25, 152:9, 205:16
**Guess**- 133:5, 143:10, 230:5
**guidance** - 84:22
**guilt** - 13:14
**guy** - 136:10
**guys** - 55:10

## H

**haired** - 133:9, 138:11
**half** - 35:10, 80:16, 80:23, 87:9, 88:2, 89:19, 90:3, 90:4, 90:7, 167:20, 183:16, 188:9, 216:2, 231:17
**halfway** - 205:5
**hallway** - 231:16
**handed** - 7:8, 8:22, 16:13, 135:11, 137:6, 142:17, 169:17, 174:22, 179:11
**handle** - 139:18, 139:25
**hands** - 226:4
**handwriting** - 18:22, 19:5, 106:20
**Handwritten** - 233:14
**handwritten** - 17:24
**hang** - 36:22
**hard** - 70:4
**Hartsdale**- 1:24
**he/she** - 158:5
**headquarters** - 45:20, 45:24, 75:25, 82:22, 85:23, 110:22, 166:7, 166:24, 167:11, 168:4, 168:6, 170:12, 171:6, 172:6, 172:8, 212:20
**hear** - 21:1, 142:14, 172:2, 199:11, 215:8, 215:11
**heard** - 82:12, 89:6, 102:14, 102:20, 114:22
**hearing** - 3:2, 8:4, 34:15, 36:1, 45:11, 46:14, 62:12, 98:23, 102:24, 103:13, 103:14, 136:20, 142:1, 215:10, 215:13, 231:21, 231:24
**hearsay** - 26:7, 26:11, 26:19, 31:5, 37:4, 38:5, 39:12, 42:12, 42:21, 43:19, 45:7
**Heights**- 51:18, 189:7, 227:13
**held** - 6:15, 129:9, 178:22, 179:1
**help** - 142:2
**helpful** - 84:23
**herein** - 5:23, 154:23, 164:14, 178:8, 182:23
**hibernation** - 99:1
**himself** - 83:6, 137:25, 138:7
**hint** - 173:1
**history** - 20:19, 130:15
**Hitsman**- 2:17
**Hoffman**- 2:17
**Hold**- 102:19, 137:11
**holding** - 10:3
**home** - 4:22, 25:11, 27:19, 27:20, 27:24, 29:7, 29:9, 29:12, 29:18, 30:8, 30:21, 31:18, 36:13, 37:20, 38:11, 38:12, 39:18, 39:22, 44:22, 45:13, 46:9, 48:11, 49:7, 50:23, 51:19, 52:4, 52:7, 52:13, 52:15, 52:18, 52:20, 53:14, 53:22, 66:16, 66:20, 72:23, 75:24, 79:25, 80:13, 80:17, 80:18, 84:5, 84:9, 86:24, 90:16, 90:20, 90:23, 90:24, 94:17, 105:18, 108:4, 108:12, 108:25, 109:6, 109:16, 109:21, 109:23, 109:24, 117:18, 118:7, 118:12, 118:20, 119:3, 119:12, 119:20, 126:8, 126:11, 126:14, 126:16, 127:9, 127:10, 127:13, 127:14, 127:20, 128:3, 131:11, 133:21, 134:20, 140:4, 140:22, 142:11, 142:14, 146:5, 146:16, 146:21, 147:7, 147:24, 148:20, 149:3, 149:6, 174:8, 174:11, 175:2, 175:24, 176:5, 176:10, 187:15, 187:23, 188:4, 188:6, 188:24, 190:4, 190:7, 194:15, 195:15, 196:4, 196:5, 196:8, 197:4, 198:23, 198:25, 199:5, 199:9, 199:10, 200:25, 205:6, 207:1, 207:20, 207:24, 208:8, 215:4, 215:21, 215:24, 217:22, 218:4, 218:25, 221:4, 224:22, 227:1, 228:15
**honest** - 70:4
**honor** - 230:8
**hope** - 103:4
**hour** - 35:10, 38:20, 80:16, 80:23, 87:9, 88:2, 89:19, 90:3, 90:4, 90:7, 167:20, 188:9, 216:2, 231:17
**hour-and-a-half** - 35:10, 80:16, 80:23, 87:9, 88:2, 89:19, 90:3, 90:4, 90:7, 231:17
**hours** - 14:15, 65:12, 109:3, 121:18, 121:20, 181:8, 181:11, 228:8
**house** - 21:15, 29:3, 30:10, 30:15, 37:16, 53:7, 54:12, 66:13, 80:15, 81:2, 85:2, 85:3, 85:9, 119:25, 127:5, 127:7, 127:15, 141:8, 195:5, 196:7, 201:8, 214:22, 216:15, 220:22, 223:21, 223:22, 223:24, 226:15, 226:23, 228:4, 228:5, 228:9, 228:22
**household** - 120:13

## I

**Id** - 18:16, 18:22, 19:2, 20:4, 20:5, 22:7, 23:6, 28:3, 28:18, 33:2, 33:6, 107:5, 107:10, 107:15, 107:23, 233:2
**Id/evd** - 233:8
**idea** - 130:7, 170:16, 174:15, 226:21
**identical** - 54:24
**identification** - 3:14, 4:23, 5:1, 5:5, 7:24, 11:9, 11:12, 11:16, 11:20, 14:10, 14:19, 14:22, 15:1, 16:1, 16:5, 16:8, 16:11, 17:5, 17:11, 17:15, 24:4, 27:24, 28:12, 31:20, 31:24, 32:1, 35:2, 40:18, 40:23, 41:1, 41:24, 48:15, 48:18, 48:22, 50:8, 106:5, 107:18, 107:21, 180:20, 180:24, 181:2, 181:25, 192:25, 193:15, 194:3, 200:1, 200:4, 202:12, 202:18, 204:6
**identified** - 19:18,

83:5
**identify** - 9:1, 9:13, 11:21, 12:13, 15:2, 16:12, 17:19, 32:6, 41:2, 48:23, 118:4, 169:21, 193:12, 200:10, 203:1
**identifying** - 12:5
**ignore** - 11:2
**ignoring** - 10:24
**ilk** - 84:17
**ill** - 127:8
**illegally** - 137:23
**illness** - 70:3, 70:10, 153:1
**immediately** - 89:22
**impermissible** - 12:8, 23:7, 26:22, 193:21
**important** - 110:10, 143:20
**improper** - 24:25, 135:16, 136:16, 137:9, 141:4, 142:23, 143:13, 189:24, 204:15, 205:14
**in-house** - 21:15
**inaccurate** - 223:2
**inadvertent** - 155:9, 155:19, 156:12, 157:14, 157:19, 157:25, 158:6, 158:23, 159:12
**inadvertently** - 155:14, 158:12, 159:8
**inapposite** - 201:21
**Incident** - 233:5
**incident** - 40:6, 98:16, 105:22, 106:1, 107:23, 109:2, 110:2, 110:21, 112:9, 119:22, 122:3, 202:3
**Incidentally** - 33:1, 81:5, 132:23, 212:14
**inclined** - 142:25
**include** - 156:12, 157:14, 158:7, 158:13
**includes** - 156:23
**incoming** - 85:22
**inconvenience** - 70:11
**incorrect** - 225:17
**indelibly** - 145:19
**indicate** - 55:13, 122:17, 181:13, 204:13
**indicated** - 42:3, 52:3, 65:19, 83:9, 124:24
**Indicating** - 49:23
**indication** - 58:21, 63:1, 63:18, 103:23
**indirectly** - 109:12, 109:14
**individual** - 18:19, 224:9
**individuals** - 73:6, 73:14, 74:12
**individuals'** - 71:23
**indoors** - 126:11
**information** - 27:15, 31:13, 61:21, 71:21, 102:25, 189:21
**informed** - 96:10, 96:11
**initial** - 131:14, 200:24
**Injured** - 163:1, 163:3
**injured** - 19:8, 52:8, 53:8, 53:10, 53:19, 53:22, 54:4, 54:5, 54:7, 54:8, 56:4, 56:9, 57:1, 65:22, 66:9, 67:25, 68:24, 69:20, 104:11, 112:11, 112:14, 112:19, 113:1, 113:4, 113:12, 114:12, 114:13, 115:1, 115:9, 117:19, 118:6, 119:8, 119:19, 126:25, 127:17, 149:7, 150:21, 150:25, 151:6, 151:17, 151:19, 152:4, 152:6, 152:10, 152:21, 152:23, 153:1, 153:10, 153:17, 158:1, 158:13, 158:24, 159:3, 159:8, 159:24, 160:4, 160:5, 160:8, 160:11, 161:2, 162:19, 162:23, 162:24, 163:5, 163:6, 163:7, 163:10, 173:12, 175:16, 175:23
**injuries** - 70:5, 151:20, 161:5, 161:8, 161:15
**Injury** - 50:17
**injury** - 20:16, 66:2, 66:3, 70:2, 70:3, 70:9, 70:22, 78:13, 78:19, 112:21, 151:23, 153:5, 153:11, 158:18, 162:6, 163:15
**inquire** - 136:5, 143:21
**inquiring** - 228:8
**inside** - 29:18
**insist** - 57:5
**insists** - 13:15, 13:16
**instance** - 151:25
**instead** - 67:3, 87:1
**instruct** - 186:8, 230:18
**instructed** - 187:14, 191:3, 196:3, 213:21, 217:21, 226:24
**instruction** - 226:25
**instructions** - 185:18, 185:20, 185:22, 187:16, 188:25, 190:5, 196:18, 215:23, 216:11, 220:19
**intend** - 5:11
**intended** - 155:4
**interacting** - 224:13
**interaction** - 214:15
**interchangeable** - 152:18
**interested** - 208:10, 214:23
**interference** - 116:6
**Internal** - 91:16, 91:17, 91:20, 95:11, 124:2
**internal** - 10:19
**interpretation** - 114:4
**interrupt** - 28:22, 82:1
**interrupted** - 157:5
**interview** - 46:15, 47:14, 48:6, 50:18, 95:1, 123:11, 123:25
**interviewed** - 123:22
**investigating** - 94:16, 138:21
**investigation** - 54:19, 90:10, 90:12, 90:21, 90:25, 92:5, 92:7, 92:8, 92:9, 92:11, 92:13, 93:5, 99:19, 99:21, 99:22, 213:1
**Investigation** - 91:16, 91:21, 95:12
**investigations** - 183:20, 213:4
**Investigations** - 124:2
**investigative** - 13:3, 81:6, 95:18, 95:21, 96:1, 99:15, 113:16
**Investigator** - 91:18
**investigators** - 92:17
**involved** - 147:20, 147:25, 148:3, 148:25, 212:25, 213:3
**irrelevance** - 20:3
**irrelevant** - 19:23, 116:4, 130:2, 131:24, 201:18
**issue** - 8:3, 36:18, 56:23, 138:3, 162:16, 197:13, 199:11
**issued** - 9:22, 9:23, 124:11, 171:10, 182:4
**issues** - 197:11
**item** - 157:22, 158:20, 159:5
**itself** - 114:2, 205:15, 205:20

J

**James**- 17:25, 233:14
**January**- 1:9, 94:8, 230:20, 230:21
**job** - 6:13, 66:1, 66:3, 66:8, 67:1, 67:25, 68:24, 69:20, 70:2, 70:4, 70:22, 78:12, 78:19, 87:17, 90:5, 90:6, 90:8, 91:13, 117:19, 118:6, 119:8, 119:19, 126:24, 149:7, 158:18, 158:24, 159:3, 159:8, 159:24, 160:3, 160:5, 161:14, 161:15, 162:1, 162:6, 162:19, 162:23, 163:7, 163:11, 163:15, 175:16
**jog** - 105:21, 173:17
**jogs** - 105:25, 120:11, 225:10
**John**- 2:19, 40:16
**joined** - 6:17
**joking** - 164:3
**Jonathan**- 2:4
**Joseph**- 47:7
**Jr**- 2:15
**Judge**- 44:12
**July**- 7:3, 12:21, 14:13, 15:15, 24:15, 25:5, 25:8, 25:17, 27:18, 29:12, 32:13, 46:24, 48:1, 49:10, 50:19, 50:21, 52:6, 52:25, 53:20, 54:13, 55:13, 57:22, 62:2, 62:7, 63:13, 63:24, 64:14, 64:21, 65:1, 65:22, 66:12, 66:23, 67:2, 67:3, 67:4, 68:10, 68:23, 74:1, 75:9, 75:13, 76:20, 77:7, 77:13, 77:17, 77:20, 78:10, 78:11, 78:18, 78:23, 79:1, 79:12, 79:14, 92:19, 93:13, 93:16, 94:10, 94:12, 95:3, 97:20, 98:17, 112:11, 112:14, 112:21, 113:3, 113:6, 114:14, 114:16, 122:4, 122:6, 122:20, 123:2, 123:11, 124:9, 126:12, 127:22, 135:14, 140:22, 160:11, 165:11, 165:21, 166:2, 168:2, 169:7, 170:2, 170:10, 171:1, 183:23, 184:7, 194:13, 207:14, 212:18, 221:24, 222:6, 224:18, 233:11, 233:15
**June**- 78:22, 179:3, 179:4
**jurisdiction** - 91:12, 213:13
**Jurisdiction**- 213:8
**jury** - 132:6

K

**kangaroo** - 142:6
**keep** - 19:8, 48:9, 136:9, 148:24, 149:14
**keeping** - 130:22
**Kempkes**- 1:7, 2:2, 3:12, 3:22, 3:25, 5:12, 19:22, 20:15, 22:24, 23:2, 23:5, 23:13, 24:7, 24:16, 25:19, 25:25, 30:11, 30:17, 35:8, 35:14, 36:20, 38:12, 39:18, 43:4, 43:5, 44:22, 45:13, 45:15, 45:25, 46:4, 46:12, 46:21, 47:6, 47:15, 47:25, 49:10, 49:19, 50:19, 52:1, 52:6, 52:13, 52:25, 53:21, 65:21, 67:15, 68:10, 75:24, 76:3, 86:5, 86:24, 88:12, 92:22, 96:12, 96:14, 101:3, 108:24, 108:25, 109:16, 109:22, 110:17, 110:22, 112:10, 115:3, 124:24, 126:7, 131:20, 135:22, 138:21, 139:14, 142:11, 146:5, 149:15, 161:5, 165:22, 166:6, 166:11, 166:15, 167:13, 167:22, 168:1, 168:3, 168:9, 168:12, 168:20, 170:10, 177:22, 181:14, 184:15, 184:17, 184:22, 185:6, 185:11, 185:25, 187:9, 188:4, 188:5, 188:11, 188:14, 188:23, 189:3, 189:4, 189:8, 189:14, 190:2, 190:13, 191:5, 192:12, 194:21, 195:14, 195:20, 196:2, 196:20, 197:1, 197:6, 198:20, 199:19, 200:25, 204:12, 204:24, 205:2, 207:3, 207:17, 208:15, 209:10, 210:18, 212:1, 212:8, 213:1, 215:23, 216:7, 216:14, 216:24, 217:7, 217:22, 217:24, 220:20, 223:5, 223:8, 225:15, 226:21, 233:4
**Kempkes'**- 27:18, 27:24, 29:12, 30:21, 36:6, 36:13, 37:13, 37:15, 38:4, 38:15, 38:17, 39:6, 39:11, 40:11, 43:17, 85:3, 89:2, 89:4, 91:10, 107:13, 108:3, 108:12, 109:6, 139:18, 139:25, 140:22, 143:17, 187:17, 194:14, 214:13
**kept** - 8:2, 54:17, 98:24, 113:1, 119:14
**kind** - 19:23, 35:16, 50:13, 201:3, 214:15
**King**- 2:6
**knock** - 66:18, 214:24
**knocked** - 187:14, 214:21, 215:6, 215:9, 215:15
**knowing** - 34:12
**knowledge** - 18:24, 22:15, 89:19, 99:16, 130:11, 134:25, 146:23, 175:19
**known** - 104:9
**knows** - 103:14
**Kurtz**- 2:9, 4:6, 17:20, 106:22, 164:3, 164:18, 166:1, 169:14, 170:4, 176:18, 176:19, 183:1, 193:22, 197:17, 199:25, 200:14, 201:13, 202:1, 203:9, 203:20, 205:19, 206:9, 207:6, 229:2, 229:3, 235:8, 235:16

L

**lack** - 147:24
**last** - 4:5, 8:3, 8:4, 13:12, 24:16, 27:10, 33:18, 34:24, 42:7, 65:5, 66:6, 78:25, 101:1, 117:6, 122:3, 134:15, 138:4, 154:22, 163:18, 173:9, 175:10, 177:19, 183:16, 198:3, 198:8
**lasted** - 97:9
**late** - 24:10, 188:21
**law** - 103:11, 139:6
**lawn** - 195:6
**lawyer** - 173:4

**leading** - 43:18, 49:12, 55:16, 133:23, 133:25, 138:22, 139:3, 161:9, 165:23, 189:10, 189:15, 204:16, 205:13
**learn** - 66:17, 96:25, 97:3, 146:25
**learned** - 230:7
**least** - 33:17, 125:6, 143:15
**Leave**- 154:14, 160:23, 211:1
**leave** - 9:16, 10:10, 28:6, 46:10, 47:19, 48:16, 49:4, 49:7, 49:23, 50:12, 50:14, 51:7, 52:14, 52:16, 52:20, 53:3, 53:14, 54:23, 69:20, 82:21, 87:14, 94:17, 110:8, 113:15, 116:19, 125:17, 127:18, 129:24, 131:8, 133:22, 134:25, 137:23, 138:6, 153:11, 154:22, 154:25, 155:2, 155:5, 155:17, 157:18, 158:4, 158:16, 159:2, 159:6, 159:11, 159:16, 159:21, 160:24, 161:25, 162:2, 163:14, 174:18, 180:16, 182:4, 184:25, 185:2, 185:7, 187:23, 191:16, 199:22, 211:8, 211:21, 218:6, 233:18
**leaving** - 36:5, 36:11, 38:15, 38:18, 48:11, 49:8, 50:25, 52:7, 53:10, 53:22, 54:12, 126:14, 158:5, 180:17, 185:14
**led** - 144:8
**leeway** - 139:3
**left** - 27:13, 31:12, 37:10, 37:18, 38:24, 38:25, 41:11, 42:4, 43:15, 45:17, 50:23, 52:4, 52:15, 53:7, 66:13, 82:17, 82:20, 82:24, 83:1, 83:10, 84:25, 86:17, 89:11, 105:16, 108:2, 109:5, 110:2, 155:14, 166:13, 167:11, 167:15, 167:21, 187:21, 192:4, 211:10, 212:6, 214:18, 223:20, 223:22, 223:23, 226:14
**legal** - 136:18, 136:22, 138:24
**legitimate** - 19:9, 19:25, 70:6
**length** - 103:5
**less** - 28:17, 84:11
**letter** - 3:12, 3:14, 3:21, 5:3, 19:18, 21:19, 22:15, 22:24
**Letter**- 233:3
**letters** - 23:1, 23:12, 23:15
**Library**- 1:8
**license** - 188:18
**Lieutenant**- 5:13, 5:20, 6:2, 6:6, 6:8, 6:10, 6:11, 6:21, 6:23, 7:10, 8:24, 11:18, 12:13, 14:12, 14:24, 16:9, 17:13, 20:14, 21:21, 21:24, 24:6, 25:7, 26:12, 32:1, 35:6, 40:24, 42:24, 44:17, 45:1, 48:20, 56:19, 56:22, 64:13, 69:25, 80:14, 81:19, 84:6, 84:24, 91:8, 106:4, 107:22, 116:6, 116:25, 128:15, 129:3, 129:20, 133:6, 133:11, 135:13, 136:9, 137:10, 144:4, 144:11, 149:13, 150:13, 152:16, 152:17, 153:16, 160:25, 161:24, 164:4, 165:21, 166:3, 166:5, 167:2, 167:4, 167:8, 167:10, 167:18, 167:22, 167:24, 168:8, 168:14, 168:18, 168:23, 169:25, 170:11, 176:22, 179:7, 180:13, 184:8, 184:12, 185:10, 185:16, 185:20, 185:24, 186:16, 186:19, 187:4, 187:5, 187:10, 187:21, 189:1, 190:6, 190:24, 191:2, 191:3, 191:6, 191:16, 191:21, 191:23, 191:25, 192:15, 193:9, 198:12, 198:17, 208:14, 210:2, 210:15, 212:5, 212:13, 214:15, 216:13, 216:21, 216:23, 217:6, 217:15, 218:8, 219:1, 219:7, 220:19, 221:22, 223:4, 226:20, 226:24, 230:19, 232:8, 232:17, 234:3, 234:5, 234:7, 234:9, 234:11, 234:13, 234:15, 234:17, 234:19, 234:21, 234:23, 235:3, 235:5
**Lieutenant's**- 100:3, 102:23, 190:16, 214:8, 216:10
**lighting** - 102:4
**limited** - 27:23, 134:20
**line** - 32:23, 86:1, 107:24, 109:3, 110:20, 112:9, 119:1, 119:23, 145:5, 193:11, 194:5
**lines** - 106:2, 119:1, 134:8
**lips** - 44:11
**List**- 8:19
**list** - 97:8
**listed** - 114:3, 117:13, 209:8
**listen** - 45:2, 70:8, 171:21, 172:4, 205:6, 207:1
**listened** - 171:23
**listening** - 151:12
**litigate** - 131:25
**litigation** - 148:14
**lived** - 115:12
**lives** - 126:18, 127:2, 127:3
**Llc**- 2:17
**loaner** - 51:16
**locate** - 91:1
**located** - 121:4, 186:3, 186:12
**location** - 90:13, 187:21, 226:22, 227:15, 230:24
**log** - 16:6, 16:18, 233:13
**logs** - 48:9, 48:16, 49:5, 49:23, 119:14, 233:19
**long-term** - 20:15, 70:3
**look** - 5:9, 8:25, 11:19, 14:25, 16:10, 17:14, 18:1, 31:25, 40:25, 48:21, 59:12, 59:14, 79:2, 84:19, 100:19, 102:2, 107:22, 111:14, 111:19, 113:16, 120:10, 122:2, 122:8, 133:2, 157:17, 158:10, 158:20, 161:24, 170:19, 171:1, 179:13, 180:2, 180:25, 193:11, 204:8, 209:9, 210:16, 220:8, 225:8
**looked** - 67:4, 79:9
**looking** - 57:19, 77:19, 106:4, 152:15, 225:23
**looks** - 10:14, 102:4, 157:7
**losing** - 148:15, 148:17
**lost** - 25:1, 149:3
**loud** - 67:7
**lousy** - 136:22
**Lovett**- 2:2, 2:4, 3:19, 4:1, 4:18, 5:2, 5:18, 5:19, 8:10, 8:13, 11:1, 12:2, 12:6, 13:8, 13:19, 15:22, 17:1, 18:12, 18:14, 19:15, 20:2, 20:17, 20:22, 21:5, 22:2, 22:6, 22:17, 23:4, 24:18, 24:22, 25:2, 26:6, 26:17, 28:1, 28:7, 28:13, 28:16, 29:23, 30:2, 31:4, 32:19, 32:21, 33:13, 33:16, 33:21, 33:24, 34:6, 34:10, 34:19, 34:25, 35:20, 36:2, 37:4, 38:5, 39:12, 41:20, 42:11, 42:19, 42:25, 43:18, 43:24, 44:7, 44:14, 44:15, 44:20, 44:24, 45:6, 49:12, 50:4, 55:2, 55:16, 56:1, 61:10, 62:10, 62:12, 74:9, 81:11, 81:17, 81:21, 81:25, 82:8, 83:20, 84:10, 84:16, 84:22, 91:5, 95:23, 98:20, 99:8, 99:12, 99:18, 100:1, 101:4, 101:8, 101:14, 101:20, 102:2, 102:11, 102:16, 103:10, 103:21, 104:2, 104:5, 104:8, 106:6, 106:15, 106:19, 106:24, 107:4, 107:9, 107:14, 110:15, 112:3, 112:6, 114:8, 115:2, 116:3, 116:13, 117:1, 117:2, 128:13, 129:1, 129:6, 129:15, 130:1, 131:23, 132:23, 133:23, 133:25, 134:5, 134:9, 134:11, 135:15, 136:14, 137:8, 137:19, 138:22, 139:5, 140:10, 140:16, 141:4, 141:14, 142:5, 142:21, 143:6, 143:9, 143:19, 144:8, 144:10, 145:7, 149:9, 149:21, 150:2, 151:8, 153:24, 154:4, 154:7, 154:8, 155:23, 156:3, 156:7, 156:18, 156:25, 157:3, 157:4, 160:13, 161:9, 161:23, 162:11, 162:13, 163:17, 163:24, 165:23, 170:6, 170:7, 170:8, 172:1, 172:20, 172:25, 173:7, 174:20, 176:16, 177:18, 177:21, 177:25, 181:16, 181:20, 181:21, 182:9, 182:10, 186:2, 186:5, 186:11, 189:10, 189:15, 189:22, 193:19, 193:24, 197:10, 201:16, 203:12, 203:16, 204:13, 205:13, 206:1, 206:12, 206:20, 207:12, 207:13, 228:25, 229:11, 229:13, 229:16, 229:17, 230:2, 230:5, 230:25, 231:13, 231:21, 232:2, 232:10, 232:19, 234:6, 234:10, 234:14, 234:18, 234:22, 234:24, 235:6, 235:10, 235:12, 235:18
**Ltd**- 1:21
**lunch** - 52:16, 52:17

## M

**machine** - 27:14, 31:12, 82:11, 83:11, 85:1, 86:9, 86:10, 86:13, 86:17, 105:17, 108:3, 108:12, 109:5, 109:19, 166:13, 166:14, 167:7, 167:15, 211:9
**machine's** - 82:13
**Macquesten** - 40:8, 191:11, 224:5
**Mail** - 62:19
**mail** - 31:16, 31:22, 32:9, 32:23, 33:2, 33:5, 57:3, 57:7, 57:21, 59:13, 62:21, 63:1, 63:2, 63:21, 65:12, 65:15, 65:18, 65:20, 67:6, 68:7, 69:6, 69:10, 69:11, 69:12, 69:13, 72:8, 72:9, 72:22, 73:4, 73:11, 73:15, 73:18, 76:1, 76:23, 83:12, 83:17, 83:23, 84:6, 94:2, 104:25, 105:19, 105:20, 108:10, 110:23, 111:7, 111:20, 122:16, 122:18, 122:19, 122:24, 123:2, 166:7, 166:8, 166:24, 166:25, 168:21, 168:25, 169:11, 233:15
**mailbox** - 21:12, 22:8, 23:19, 25:12, 56:5, 57:6, 57:8, 57:11, 57:17, 57:24, 58:11, 58:16, 58:17, 58:18, 58:24, 59:2, 59:5, 59:7, 59:8, 59:14, 59:24, 60:3, 60:20, 61:3, 61:14, 62:6, 62:7, 62:20, 62:21, 63:9, 63:13, 63:22, 63:24, 64:3, 64:6, 64:14, 64:18, 64:22, 65:2, 65:5, 65:9, 65:14, 65:18, 66:24, 67:5, 67:13, 67:15, 67:16, 67:20, 67:24, 68:5, 71:13, 72:9, 72:12, 72:19, 73:7, 73:11, 73:15, 73:20, 74:3, 75:5, 75:19, 75:25, 76:3, 76:22, 76:25, 77:6, 77:10, 77:14, 77:18, 78:22, 79:1, 79:10, 79:15, 93:23, 97:15, 97:18, 97:21, 104:12, 109:17, 110:18, 111:2, 111:6, 111:9, 111:13, 111:14, 111:20, 122:9, 122:12, 122:14, 123:6, 168:22, 168:25, 169:9, 169:12, 169:24, 170:19, 171:2, 171:5, 171:7, 171:10, 171:14, 177:7, 199:23, 200:13, 200:17, 200:22, 201:8, 201:11, 202:16, 203:4, 233:23, 233:25
**mailboxes** - 69:19, 71:24, 73:24, 76:24, 176:25
**mails** - 25:12, 56:10, 57:9, 57:12, 57:13, 57:14, 68:10, 68:14, 68:21, 68:22, 69:15, 71:17, 71:20, 75:19, 94:3, 94:9, 104:24, 105:7, 105:12, 109:18, 110:18, 110:23, 140:7, 171:7, 171:20, 171:21, 171:24, 172:2, 172:6, 172:8
**main** - 211:1, 211:6
**major** - 143:1
**majority** - 177:4
**man** - 24:10

**managed** - 34:14
**management** - 105:5
**manager** - 40:14, 42:9, 42:19, 191:22, 191:24
**March** - 8:20, 9:10, 9:24, 10:6, 10:9, 180:1, 180:11, 181:7, 181:9, 182:5
**mark** - 4:22, 107:17, 192:21, 199:25, 202:14
**marked** - 3:14, 4:19, 4:24, 4:25, 5:4, 7:11, 7:24, 8:1, 11:9, 11:11, 11:15, 11:19, 14:10, 14:18, 14:21, 14:25, 16:1, 16:4, 16:7, 16:10, 17:5, 17:8, 17:10, 17:15, 24:4, 28:11, 31:20, 31:23, 32:1, 35:2, 40:18, 40:21, 40:25, 41:24, 48:14, 48:17, 48:21, 50:8, 106:4, 106:8, 106:9, 106:12, 106:14, 107:5, 107:10, 107:13, 107:15, 107:20, 180:20, 180:23, 181:1, 181:25, 192:24, 194:3, 200:3, 200:11, 202:12, 202:17, 204:6, 212:22
**marking** - 10:14
**Marvin** - 2:14, 3:1, 3:9, 3:24, 4:2, 4:11, 4:17, 4:21, 5:6, 11:4, 11:6, 12:12, 12:16, 13:18, 14:1, 14:4, 14:7, 15:23, 17:2, 20:10, 21:18, 21:23, 21:25, 23:8, 23:22, 24:1, 25:1, 26:24, 27:3, 28:4, 28:23, 30:3, 31:6, 31:9, 32:20, 33:14, 34:23, 35:24, 36:3, 37:6, 37:9, 38:6, 38:9, 39:13, 39:16, 41:21, 42:13, 42:17, 43:21, 44:2, 44:6, 44:16, 49:13, 50:5, 55:6, 55:9, 55:17, 55:20, 55:25, 62:11, 62:15, 62:18, 64:7, 64:10, 77:25, 100:12, 100:15, 101:6, 101:22, 102:18, 104:5, 116:8, 116:16, 116:23, 128:17, 132:21, 134:13, 136:23, 137:1, 137:16, 138:14, 139:8, 139:11, 140:14, 140:18, 141:9, 141:13, 143:22, 143:25, 150:5, 150:12, 153:21, 157:8, 157:11, 161:11, 165:24, 172:15, 177:14, 177:17, 177:20, 181:22, 182:13, 182:15, 189:11, 189:16, 189:25, 193:25, 197:23, 198:1, 202:6, 202:9, 203:25, 204:3, 204:17, 204:20, 205:18, 206:11, 229:6, 230:15, 232:14, 232:20, 232:23
**Mary** - 2:14
**material** - 73:7, 206:25
**matter** - 20:6, 26:21, 57:13, 57:14, 123:12, 134:1, 139:6, 143:7, 205:16
**Matter** - 1:2
**matters** - 197:21
**Mayor** - 2:14, 3:1, 3:9, 3:21, 3:24, 4:2, 4:11, 4:17, 4:21, 5:6, 11:4, 11:6, 12:12, 12:16, 13:18, 14:1, 14:4, 14:7, 15:23, 17:2, 20:10, 21:18, 21:23, 21:25, 23:8, 23:22, 24:1, 25:1, 26:24, 27:3, 28:2, 28:4, 28:18, 28:23, 30:3, 31:6, 31:9, 32:20, 33:14, 34:23, 35:24, 36:3, 37:6, 37:9, 38:6, 38:9, 39:13, 39:16, 41:21, 42:13, 42:17, 43:2, 43:21, 44:2, 44:6, 44:9, 44:16, 45:3, 49:13, 50:5, 55:6, 55:9, 55:17, 55:20, 55:25, 62:11, 62:15, 62:18, 64:7, 64:10, 77:25, 100:12, 100:15, 101:6, 101:22, 102:18, 104:5, 116:8, 116:16, 116:23, 128:17, 132:21, 134:13, 136:23, 137:1, 137:16, 138:14, 139:8, 139:11, 140:14, 140:18, 141:9, 141:13, 141:16, 142:24, 143:22, 143:25, 150:5, 150:12, 153:21, 157:8, 157:11, 161:11, 165:24, 172:15, 177:14, 177:17, 177:20, 181:22, 182:13, 182:15, 189:11, 189:16, 189:25, 193:25, 197:23, 198:1, 202:6, 202:9, 203:25, 204:3, 204:17, 204:20, 205:18, 206:11, 229:6, 230:15, 232:14, 232:20, 232:23
**meadow** - 136:18, 137:20, 197:10
**mean** - 28:21, 71:13, 76:11, 106:19, 163:8, 197:6, 198:10
**meaning** - 67:12, 114:20, 163:1, 163:3, 170:23, 198:11, 214:19, 224:18
**Meaning** - 163:2
**means** - 78:3, 95:12, 111:19, 114:5
**meant** - 111:18, 121:1, 176:21
**meet** - 46:18, 51:4
**meeting** - 3:4, 46:3, 46:5, 46:7, 46:25, 47:12, 49:10, 49:18, 51:5, 75:11, 93:15, 93:22, 94:1, 94:20, 95:3, 95:15, 124:9, 168:10, 168:16, 230:20
**Melissa** - 1:22, 5:24, 51:22, 164:15, 178:9, 182:24, 236:14
**Melissa's** - 51:4
**member** - 56:25, 63:22, 69:6, 76:18, 111:17, 117:10, 118:5, 146:15, 152:1, 153:3, 155:12, 157:23, 158:4
**Member** - 151:9
**member's** - 159:10
**members** - 3:11, 53:18, 75:12, 75:16, 87:4, 120:13, 150:21, 153:1, 154:22
**Members** - 154:1, 154:5, 176:20, 229:4
**memo** - 97:5, 97:7, 124:10, 148:16, 149:2, 162:5, 162:17, 162:22
**memorandum** - 11:14, 11:24, 12:14
**Memorandum** - 233:9
**memorialized** - 225:4
**memory** - 32:25, 105:21, 105:25, 120:11, 144:23, 145:20, 173:18, 214:6, 223:3, 225:10, 225:18, 225:22, 226:6
**memos** - 124:10, 124:23, 125:6, 125:25, 126:3, 147:2, 147:4
**men** - 165:9
**mention** - 124:8, 216:16
**mentioned** - 52:22, 129:21, 138:18, 205:24
**message** - 27:13, 31:12, 37:11, 82:13, 82:17, 82:20, 82:21, 82:25, 83:1, 83:2, 83:10, 84:25, 86:14, 86:17, 89:10, 105:16, 108:2, 109:5, 166:13, 166:21, 167:16, 167:21, 184:25, 185:1, 185:2, 185:7, 185:10, 185:13, 185:15, 189:19, 210:21, 211:1, 211:11, 211:17, 211:21, 212:7
**met** - 45:24, 89:3, 94:13, 121:19, 125:12, 184:24, 187:4, 187:5
**meted** - 133:1, 138:10
**Michael** - 178:15
**middle** - 21:22, 205:4
**might** - 48:3
**military** - 194:11
**mind** - 12:10, 18:25, 44:25, 148:25
**minimal** - 141:20, 141:24
**minute** - 164:8, 229:18
**minutes** - 29:10, 38:20, 40:2, 43:11, 65:8, 93:19, 101:9, 101:11, 109:18, 141:7, 143:15, 169:9, 184:23, 186:22, 191:18, 192:3, 212:10, 213:11
**missing** - 103:10
**misspeak** - 120:23, 222:24
**misspoke** - 120:22, 198:16, 222:17, 222:22, 223:1, 225:17
**mistake** - 134:12, 154:12
**mistakes** - 156:17, 156:22
**misunderstanding** - 115:4
**misunderstood** - 151:16
**Mitchell** - 25:10, 25:25, 26:1, 26:7, 26:11, 26:16, 26:19, 27:16, 30:19, 30:25, 31:14, 32:10, 33:2, 33:7, 35:6, 36:11, 45:15, 45:22, 67:11, 67:12, 67:15, 67:17, 70:19, 71:9, 75:23, 80:2, 80:3, 82:9, 83:8, 83:24, 84:24, 85:15, 105:15, 108:2, 109:4, 109:16, 132:17, 135:3, 135:4, 135:5, 135:21, 164:21, 164:22, 169:19, 177:3, 177:8, 178:2, 233:16, 235:7, 235:9, 235:11
**Mitchell's** - 25:13, 84:6
**model** - 188:21
**moment** - 169:20, 193:1, 200:6, 202:20
**Monday** - 201:4, 201:5, 203:6
**money** - 205:16
**month** - 75:1, 78:11, 78:17
**months** - 74:18, 176:7
**moralize** - 199:11
**morning** - 16:22, 32:14, 46:19, 50:23, 75:20, 94:21, 166:5, 216:12, 219:2, 219:13, 221:2, 221:6, 221:12, 221:23, 222:3, 222:11, 222:18, 222:21, 223:6, 223:12, 224:18, 225:12, 225:16, 225:18, 226:8
**most** - 130:14, 132:25, 138:9
**Mostly** - 183:20
**Mount** - 39:23, 40:8, 41:8, 191:10, 224:6
**mouthed** - 43:25
**move** - 10:22, 13:5, 18:9, 21:2, 23:20, 32:15, 50:2, 181:18, 193:22, 201:14, 203:9
**Move** - 20:17, 55:2
**muffin** - 136:18, 137:20, 197:11
**Multiple** - 21:21
**Murray** - 70:14, 71:3, 132:16, 133:18, 133:21, 135:20, 146:21, 147:14, 147:19, 148:7, 148:15
**Murray's** - 147:23
**must** - 53:9, 92:13, 103:10, 103:11, 231:7

## N

**naked** - 196:13
**name** - 9:9, 40:15, 84:2, 164:19, 178:14, 179:14, 183:2, 191:14
**named** - 51:22
**names** - 69:18, 70:12
**narrative** - 18:2, 18:4, 19:19
**nature** - 46:7, 147:8, 158:23
**naughty** - 137:22
**near** - 42:3
**necessary** - 23:11, 104:14
**necessity** - 76:2, 90:14
**need** - 53:13, 54:3, 54:6, 81:22, 100:21, 103:25, 116:9, 117:3, 133:12, 133:14, 189:25, 190:6, 219:2, 219:7, 227:10
**needed** - 65:19, 77:10, 90:9, 103:8, 190:16, 196:17, 198:21, 204:14, 220:18
**needs** - 49:7, 65:15, 67:5, 67:13
**negative** - 121:19, 125:12
**negligence** - 158:7
**never** - 73:9, 97:22, 98:4, 125:16, 131:1, 131:9, 131:21, 160:10, 172:19
**New** - 1:24, 2:3, 2:8, 2:18, 5:24, 164:16, 178:10, 182:25
**Next** - 117:9
**next** - 5:14, 9:6, 9:9, 16:4, 21:17, 30:15, 40:1, 43:13, 46:23, 46:24, 80:12, 85:1, 85:8, 89:13, 91:2, 122:2, 130:5, 145:21, 145:25, 155:16, 158:20, 159:5, 179:19, 185:15, 187:11, 191:2, 192:5, 197:1, 212:9
**nice** - 114:17
**night** - 138:2, 195:4
**Niko's** - 51:6, 51:8
**nine** - 74:18
**ninth** - 119:23
**nobody** - 30:8, 121:5
**Nobody** - 88:5, 133:8
**non** - 20:17, 125:7
**None** - 92:8, 118:8, 152:3

**none** - 73:14, 73:17, 73:23, 74:8, 150:15
**normal** - 210:14
**North** - 1:23
**Notary** - 5:24, 164:15, 178:9, 182:24
**note** - 17:9, 17:24, 18:3, 19:7, 19:9, 19:12, 19:21, 19:24, 21:8, 21:15, 58:3, 70:8, 112:18, 112:20, 112:23, 112:25, 153:7, 158:22, 225:23, 233:14
**noted** - 128:18, 188:18
**Noted** - 232:24
**notes** - 8:8, 95:15, 106:15, 193:12, 214:8, 220:6, 225:6, 225:7, 225:8, 225:25, 227:14
**nothing** - 54:18, 55:1, 98:17, 98:22, 99:18, 114:16, 119:13, 119:17, 128:13, 133:5, 133:7, 138:2, 149:10, 176:17, 197:12, 197:15, 201:22, 229:1
**Nothing** - 150:24, 176:19, 207:6, 229:5
**Notice** - 4:7
**notice** - 13:21, 77:10
**noticed** - 52:14, 79:15
**notification** - 158:4
**notified** - 53:21, 127:3
**notify** - 53:9, 53:12, 126:13
**notwithstanding** - 97:21
**November** - 52:12
**number** - 10:15, 11:3, 15:17, 15:18, 32:22, 32:24, 33:7, 33:11, 33:17, 33:20, 33:23, 34:7, 34:8, 34:14, 42:5, 53:12, 68:7, 79:19, 80:6, 80:9, 83:17, 83:23, 83:25, 84:3, 84:5, 84:9, 105:18, 108:4, 108:9, 108:13, 108:14, 108:24, 109:1, 109:6, 109:21, 109:23, 109:24, 109:25, 122:25, 128:5, 151:18, 166:17, 183:5, 186:10, 193:15, 207:25, 208:1, 208:5, 208:8, 208:13, 208:14, 208:17, 208:20, 209:3, 209:9, 209:14, 209:19, 209:21, 209:24, 210:1, 210:4, 210:16, 211:2, 211:6
**numbered** - 157:22
**numbers** - 194:9
**numerous** - 119:24, 120:1, 120:3
**nuns** - 30:4, 30:5

**O**

**O'** - 102:9, 103:20, 229:2
**O'neil** - 2:8, 3:5, 3:8, 4:3, 4:14, 5:6, 5:13, 5:16, 5:20, 6:1, 7:5, 7:22, 8:12, 8:14, 8:17, 8:21, 10:22, 11:7, 11:11, 12:4, 12:9, 13:5, 13:15, 14:17, 15:19, 16:3, 16:23, 17:7, 18:9, 19:17, 20:20, 22:20, 22:22, 23:10, 23:20, 24:21, 26:9, 27:8, 28:11, 28:23, 28:24, 29:25, 30:4, 31:19, 32:15, 33:19, 33:22, 34:1, 34:21, 35:4, 35:22, 40:17, 41:17, 42:5, 45:1, 48:13, 50:2, 55:23, 61:6, 61:8, 61:13, 64:4, 74:5, 77:23, 78:1, 81:13, 81:14, 81:23, 82:3, 83:19, 84:14, 84:18, 95:22, 98:13, 99:2, 99:11, 99:17, 99:20, 100:6, 100:21, 100:24, 102:19, 102:21, 106:7, 106:17, 106:23, 111:25, 112:5, 114:1, 114:22, 120:24, 128:19, 129:5, 129:17, 129:18, 129:19, 130:6, 132:15, 133:14, 133:24, 134:2, 134:8, 135:8, 135:17, 135:18, 137:4, 137:13, 138:13, 138:23, 141:7, 141:11, 141:21, 141:23, 142:8, 142:15, 143:3, 143:8, 143:14, 144:6, 145:4, 148:4, 149:11, 149:12, 149:19, 150:8, 151:3, 151:14, 152:12, 155:22, 156:1, 156:6, 156:14, 156:20, 157:2, 160:14, 160:16, 160:17, 160:18, 161:21, 162:8, 162:12, 163:18, 163:22, 164:1, 172:19, 172:22, 178:12, 179:8, 180:19, 181:18, 182:7, 192:21, 197:18, 202:2, 202:14, 203:21, 229:12, 229:23, 230:3, 230:18, 231:1, 231:3, 232:18, 234:4, 234:8, 234:12, 234:16, 234:20, 235:4, 235:14
**O'neill** - 35:25, 62:8
**O'reilly** - 2:17, 2:19, 3:17, 4:5, 4:9, 4:15, 4:24, 5:8, 5:15, 5:18, 8:20, 11:5, 13:15, 14:6, 17:17, 18:13, 20:24, 22:5, 22:20, 27:4, 28:9, 28:14, 34:3, 34:8, 34:16, 42:1, 42:7, 42:22, 43:25, 44:8, 44:13, 45:3, 45:5, 61:7, 81:13, 82:5, 84:13, 84:15, 100:10, 100:17, 101:10, 101:18, 101:23, 102:14, 102:19, 104:6, 106:3, 107:8, 107:11, 107:16, 116:9, 116:15, 116:18, 117:3, 128:18, 129:12, 129:16, 133:10, 135:17, 137:11, 149:11, 150:6, 150:10, 154:2, 154:6, 160:14, 164:4, 164:7, 164:19, 164:23, 170:6, 172:3, 176:18, 176:20, 178:1, 178:3, 178:13, 181:20, 182:9, 182:14, 182:18, 183:2, 186:8, 197:17, 198:5, 202:1, 203:15, 203:20, 206:17, 206:23, 207:8, 207:12, 218:23, 229:4, 229:8, 229:15, 230:11, 230:23, 232:15, 232:22
**oath** - 172:17, 222:20
**object** - 19:15, 99:7, 145:4, 151:3, 155:22, 156:14, 201:16
**objecting** - 45:7, 143:5, 143:6
**objection** - 11:1, 13:8, 13:17, 14:2, 14:4, 15:22, 17:1, 22:19, 25:3, 26:25, 31:7, 31:9, 33:13, 34:22, 37:7, 41:20, 42:14, 42:17, 44:25, 50:4, 55:7, 55:20, 62:16, 77:24, 81:14, 81:20, 98:13, 98:22, 98:24, 99:17, 100:13, 100:15, 106:25, 107:4, 116:10, 116:24, 132:22, 136:24, 137:12, 137:17, 138:12, 138:15, 139:9, 140:15, 141:10, 142:25, 143:23, 156:2, 156:5, 157:9, 172:21, 172:23, 181:21, 189:17, 193:24, 197:24, 202:7, 203:13, 203:15, 203:16, 203:22, 204:1, 204:18, 206:13, 206:22
**Objection** - 12:2, 23:4, 24:18, 26:6, 29:23, 31:4, 37:4, 37:9, 38:5, 38:9, 39:12, 39:16, 42:11, 43:18, 44:6, 44:20, 49:12, 55:9, 55:16, 61:6, 62:8, 62:18, 64:4, 64:10, 74:5, 83:19, 95:22, 111:25, 114:1, 120:24, 130:1, 133:23, 137:1, 138:22, 139:11, 140:10, 140:18, 141:13, 142:21, 143:25, 148:4, 157:11, 161:9, 161:11, 162:8, 165:23, 181:16, 186:2, 189:10, 189:15, 189:22, 197:10, 198:1, 202:9, 204:3, 204:20, 205:18, 206:11
**objections** - 141:15
**objective** - 67:23, 68:3, 68:8
**observations** - 71:24
**observe** - 62:5, 195:1
**observed** - 59:18
**obtain** - 124:21
**obtained** - 190:12
**obvious** - 44:10, 65:9, 143:7
**obviously** - 131:15
**occasion** - 58:1, 58:6, 58:8, 58:9, 58:12, 60:4, 60:6, 60:8, 60:10, 60:12, 60:15, 60:18, 60:21, 60:24, 73:16, 120:6, 170:11, 170:17, 175:2, 175:24, 194:19, 203:5
**occasions** - 25:22, 175:18
**occur** - 39:8, 173:15, 207:2
**occurred** - 38:21, 60:21, 98:16, 98:18, 146:2, 204:11, 204:23
**October** - 118:24, 179:4, 179:5
**offender** - 131:9
**offense** - 138:9
**offer** - 135:25
**offered** - 130:9, 227:9
**office** - 21:9, 39:3, 39:5, 40:4, 43:14, 47:4, 109:4, 201:9, 214:1
**Officer** - 1:7, 2:2, 3:12, 3:22, 5:12, 19:21, 20:10, 20:14, 22:24, 23:2, 23:5, 23:13, 24:7, 24:16, 25:18, 25:25, 27:17, 27:24, 29:11, 30:11, 30:16, 30:21, 35:8, 35:14, 36:6, 36:12, 36:19, 36:22, 37:13, 37:15, 38:4, 38:11, 38:15, 38:16, 39:6, 39:11, 39:18, 40:11, 43:4, 43:17, 44:19, 45:13, 45:15, 45:24, 46:4, 46:11, 46:21, 47:6, 47:8, 47:15, 47:25, 49:10, 49:18, 50:18, 52:1, 52:6, 52:13, 52:25, 53:20, 65:21, 68:10, 70:13, 70:14, 70:16, 75:24, 76:2, 85:2, 86:24, 88:12, 89:2, 89:4, 91:10, 92:22, 96:11, 101:3, 108:3, 108:24, 108:25, 109:6, 109:16, 109:22, 112:10, 126:7, 129:22, 131:18, 131:20, 132:16, 132:17, 133:18, 133:20, 134:24, 135:3, 135:22, 138:21, 139:14, 139:18, 139:25, 140:22, 142:10, 143:17, 149:15, 161:5, 165:22, 166:5, 166:11, 166:15, 167:12, 167:22, 168:1, 168:3, 168:9, 168:12, 168:20, 170:10, 177:22, 181:14, 184:14, 184:17, 184:22, 185:6, 185:25, 187:9, 187:17, 188:4, 188:5, 188:11, 188:13, 188:23, 189:2, 189:4, 189:8, 189:13, 190:2, 190:13, 191:5, 192:12, 194:14, 194:21, 195:14, 195:19, 196:2, 196:20, 197:1, 197:5, 198:20, 199:19, 200:25, 204:12, 204:24, 205:2, 207:3, 207:17, 208:15, 209:10, 212:1, 212:7, 213:1, 214:12, 215:23, 216:7, 217:7, 217:22, 217:24, 220:20, 225:15, 233:4
**officer** - 6:18, 49:5, 49:6, 56:4, 56:9, 67:25, 68:4, 69:19, 93:8, 116:2, 118:11, 118:19, 119:18, 133:3, 152:2, 155:24, 157:12, 158:21, 161:1, 175:24, 183:15
**Officer's** - 233:12
**officer's** - 16:18
**Officers** - 135:20
**officers** - 15:9, 48:9, 48:10, 70:2, 70:5, 70:12, 87:13, 87:21, 87:24, 88:3, 104:10, 105:4, 129:20, 140:6, 181:11, 212:19, 213:14
**old** - 133:9, 137:20
**omission** - 155:9, 155:19, 156:12, 157:14, 157:19, 157:25, 158:6, 159:12
**once** - 115:13, 117:21, 117:23, 121:24, 132:8, 136:20, 222:25
**Once** - 79:6
**one** - 7:25, 10:15, 11:3, 15:18, 25:2, 27:7, 27:12, 33:4, 54:24, 62:14, 70:24, 74:1, 74:2, 74:4, 74:7, 74:21, 94:4, 100:10, 101:6, 106:18, 106:20, 106:24, 107:12, 108:12, 121:20, 122:19, 122:24, 123:1, 132:3, 133:3, 138:10, 152:10, 152:22, 168:3, 176:21, 177:18, 187:12, 187:15, 214:17, 215:3, 215:5, 215:21, 216:2
**ones** - 47:18

**ongoing** - 97:11, 147:6, 148:13
**open** - 57:20
**opened** - 68:11, 192:15, 197:20
**opinion** - 114:5
**opportunity** - 73:3, 95:1
**opposed** - 127:23, 131:12, 143:18, 163:15
**order** - 40:20, 41:8, 43:6, 66:23, 79:23, 118:18, 119:9, 144:15, 166:9, 167:18, 167:19, 169:2, 171:10, 184:19, 186:19, 207:14, 222:1, 233:17
**ordered** - 66:23, 69:19, 111:5, 168:24, 192:11, 192:16, 194:14, 194:18, 194:20, 195:7, 195:13
**orders** - 165:22, 166:3, 167:9, 168:19, 184:8, 184:10, 187:7, 190:17, 195:8, 199:17, 200:23, 201:2
**original** - 81:17, 81:22
**originally** - 9:23, 53:6, 196:4
**Otherwise** - 156:7
**otherwise** - 174:6
**outcome** - 167:5
**outlined** - 154:23
**outreach** - 183:21
**outside** - 66:20, 140:7, 212:19, 227:2, 227:4, 227:6
**outweighs** - 130:21
**overrule** - 14:2, 25:2, 26:23, 26:25, 31:7, 37:7, 38:7, 39:14, 42:14, 43:22, 44:3, 55:7, 55:18, 62:16, 100:13, 116:24, 132:22, 136:24, 137:17, 139:9, 140:15, 141:10, 141:15, 142:25, 143:23, 157:9, 189:16, 197:24, 202:7, 203:14, 204:1
**Overruled** - 27:2, 62:11
**overruled** - 14:5, 27:3, 31:10, 37:9, 38:9, 39:16, 42:18, 44:6, 44:11, 55:9, 55:21, 62:18, 100:16, 137:1, 138:15, 139:11, 140:18, 141:13, 143:25, 157:11, 161:11, 198:1, 202:9, 204:3
**overruling** - 203:19
**oversee** - 6:25, 7:1
**overtime** - 77:22
**own** - 66:4, 85:19

**P**

**Page** - 234:2, 235:2
**page** - 53:16, 105:25, 107:23, 113:18, 113:24, 122:3, 154:14, 155:16
**pages** - 106:13
**paid** - 52:20, 63:22, 76:5, 76:12, 76:14, 76:18, 87:21, 131:11
**panel** - 84:18
**Panzarino** - 47:7, 47:9, 70:16, 92:23, 132:17, 134:24, 135:20
**paragraph** - 122:3
**parallel** - 92:8, 93:5
**Pardon** - 56:20, 170:21, 176:14, 208:22
**Park** - 1:23
**park** - 35:18
**parked** - 35:22, 121:10
**Parkway** - 40:8, 191:11, 224:5
**Part** - 13:3, 87:17, 87:20, 135:24
**part** - 26:13, 28:9, 28:14, 28:17, 53:1, 68:21, 109:20, 115:4, 121:14, 136:11
**participant** - 26:15, 26:18
**particular** - 4:18, 27:25, 187:18
**Particular** - 231:14
**particularly** - 170:20, 170:22, 170:23
**parties** - 104:4, 164:12
**pass** - 105:1, 105:3
**password** - 33:3
**past** - 127:15, 136:2
**patrol** - 80:15, 87:15, 87:20, 90:6
**Patrol** - 6:19, 6:24, 6:25, 91:8
**patrolman** - 165:6, 179:4
**pay** - 77:21, 79:7, 96:23, 97:1, 97:8, 98:3, 115:7, 148:16, 148:18, 149:3, 166:8, 176:24, 177:23
**paycheck** - 69:9, 72:9, 72:11, 79:1, 79:10, 122:12, 122:20, 122:22, 122:23, 176:25
**paychecks** - 58:17, 58:19, 58:24, 59:2, 59:5, 59:11, 59:25, 72:8
**paying** - 80:18
**payroll** - 97:4, 97:5, 97:7, 97:14
**Pba** - 47:10, 71:6, 94:19, 94:24, 124:10
**Pd** - 183:11
**penalty** - 19:1, 206:16, 217:4, 222:23
**pending** - 28:25, 206:17
**people** - 71:12, 84:3, 114:25, 123:21, 130:22, 131:5, 131:12, 177:9, 177:10, 177:11, 213:15
**people's** - 176:25
**per** - 150:25, 185:10, 188:25, 190:5, 190:16, 196:18, 216:10, 219:1, 219:7, 220:19
**perform** - 6:23, 25:19
**performing** - 143:16
**perhaps** - 158:7
**period** - 6:16, 30:19, 56:14, 57:1, 63:2, 70:25, 73:25, 74:2, 74:20, 78:5, 97:17, 117:18, 152:21, 161:13, 161:17, 167:17, 179:2, 228:21
**periodically** - 21:7, 104:11
**periods** - 129:22
**perjury** - 19:1, 206:16, 217:5, 222:24
**person** - 18:15, 33:5, 34:17, 51:24, 79:22, 87:7, 119:11, 224:13
**person's** - 18:21
**personal** - 18:24, 22:15, 71:24
**personally** - 89:2, 147:20, 147:25, 148:3, 148:25, 188:13, 195:14
**pertain** - 144:20
**pertained** - 148:14
**pertinent** - 102:7
**peruse** - 16:14
**peruses** - 15:3, 18:6, 32:3, 41:3, 48:25, 120:14, 169:22, 193:3, 200:7, 202:23, 205:10, 220:11, 225:13
**ph** - 51:6
**phone** - 27:13, 32:22, 33:7, 33:10, 36:20, 37:11, 37:12, 37:17, 42:5, 79:24, 83:17, 85:17, 85:19, 85:20, 85:25, 88:12, 89:4, 108:8, 109:1, 109:23, 128:5, 166:17, 167:5, 168:19, 169:4, 169:10, 170:9, 184:17, 184:24, 185:1, 189:9, 200:24, 201:4, 201:7, 207:20, 207:22
**phones** - 184:13
**phrase** - 205:5
**physical** - 25:12, 57:10, 177:6
**physically** - 196:18
**pickup** - 166:7
**piece** - 122:19, 123:1, 228:12, 228:23
**pieces** - 68:7, 95:24, 122:24
**pink** - 45:9
**pizza** - 51:19, 189:6, 219:17, 223:18, 227:10, 227:12, 228:12, 228:15, 228:23
**place** - 8:16, 46:25, 47:3, 47:12, 53:14, 79:23, 128:1, 134:9, 164:10, 178:6, 182:21, 195:22, 207:11, 213:19, 226:14, 227:10, 227:12, 228:15
**placed** - 189:9, 193:23, 203:10, 204:4
**places** - 151:18
**plain** - 106:17, 114:20
**Plains** - 2:3, 194:22, 194:24, 195:17
**planning** - 159:2
**plate** - 188:18
**play** - 129:10, 136:20
**Pllc** - 2:6
**plural** - 121:22
**Pm** - 1:10, 14:16, 24:11, 25:16, 180:14, 184:3, 185:23, 194:12, 195:4, 232:24
**point** - 6:25, 30:12, 72:18, 90:25, 97:13, 102:1, 103:24, 129:2, 129:14, 143:2, 147:22, 151:20, 162:22, 168:2, 168:3, 187:20, 194:13, 196:7, 198:20, 205:3, 218:11, 221:19, 227:9
**poison** - 132:9
**poisoned** - 132:8
**poisoning** - 130:3
**poisons** - 130:20
**police** - 6:18, 15:10, 29:9, 30:20, 35:17, 38:13, 39:19, 45:14, 45:16, 53:21, 69:17, 110:22, 110:24, 167:11, 175:22, 177:1, 181:6, 183:15, 186:25, 190:24, 198:11, 213:13, 231:22
**Police** - 1:1, 1:7, 2:13, 3:3, 6:6, 7:17, 9:17, 11:25, 12:15, 27:17, 27:24, 29:11, 30:16, 66:5, 75:6, 75:9, 96:3, 96:18, 125:25, 138:7, 160:22, 165:2, 178:18, 178:21, 179:2, 183:8, 194:20, 233:9
**policies** - 47:21, 129:24, 155:17, 180:16
**Policies** - 154:14
**policy** - 9:16, 10:10, 10:19, 10:21, 46:10, 47:19, 53:3, 53:9, 53:11, 53:16, 54:4, 54:6, 54:11, 54:18, 54:20, 54:21, 54:23, 55:1, 55:3, 56:3, 56:8, 56:13, 94:18, 95:11, 104:22, 113:15, 114:10, 114:23, 115:5, 115:8, 115:11, 115:20, 115:22, 118:9, 118:17, 118:21, 119:9, 119:14, 119:15, 123:19, 125:17, 127:18, 130:8, 130:12, 130:24, 131:1, 131:22, 134:25, 136:2, 152:19, 153:12, 153:13, 153:19, 154:13, 154:21, 174:19, 175:22, 182:4
**polled** - 14:3, 23:24, 27:1, 31:8, 37:8, 38:8, 39:15, 42:15, 43:23, 55:8, 55:19, 62:17, 64:9, 100:14, 136:25, 137:18, 139:10, 140:17, 141:12, 143:24, 157:10, 161:10, 197:25, 202:8, 204:2, 204:19
**polluted** - 13:24
**Poorman** - 2:15
**porch** - 120:8, 120:17, 141:17
**portion** - 18:2, 18:4, 41:11
**posed** - 219:6
**position** - 90:5, 178:23, 232:6
**positioned** - 188:10
**positions** - 179:1
**Positive** - 146:19
**possible** - 96:13, 139:7
**possibly** - 24:19
**post** - 185:25, 213:22
**Posted** - 12:24
**posted** - 149:17, 149:23
**practice** - 118:10, 119:9
**pre** - 103:12, 103:14, 231:7
**pre-trial** - 231:7
**preceding** - 76:15, 77:7, 89:19, 122:21, 123:3
**precipitated** - 26:13
**precise** - 112:1
**preferred** - 1:5
**prejudice** - 132:10
**prejudicial** - 201:17
**preordained** - 203:18
**prepare** - 52:18
**prepared** - 3:6, 14:1, 15:12, 19:23, 21:25, 23:22, 26:24, 31:6, 37:6, 38:6, 39:13, 42:13, 43:21, 44:2, 55:6, 55:18, 62:15, 64:7, 100:12, 128:10, 132:21, 136:23, 137:16, 139:8, 140:14, 141:9, 143:22, 157:8, 197:23, 202:6, 203:7, 203:25, 204:17
**prepares** - 15:11
**presence** - 81:19, 92:25, 94:6, 118:7, 124:15, 147:24, 170:11, 170:15
**Present** - 2:13
**present** - 18:18, 46:2, 63:23, 92:21
**presented** - 19:8
**President** - 47:10, 71:6
**presto** - 138:6
**presume** - 26:7
**pretty** - 26:20, 58:20
**prevent** - 226:17, 228:7
**prevented** - 13:20, 220:17
**previous** - 52:22, 173:24, 174:15
**Previously** - 225:21, 225:24
**previously** - 11:9,

14:10, 16:1, 17:5, 21:20, 24:4, 29:3, 35:2, 41:24, 49:15, 50:8, 51:10, 115:21, 181:25, 194:3, 202:12, 204:6, 226:10, 226:11
**price** - 201:23
**printed** - 90:22
**Privacy** - 34:6
**privacy** - 34:17
**problem** - 232:7
**procedurally** - 93:8
**procedure** - 56:3, 56:8, 95:10, 113:25, 114:14, 118:18, 123:20, 130:8, 148:13, 151:25, 152:7, 155:7, 159:6, 176:12
**Procedure** - 113:21
**Procedures** - 150:19, 154:15
**procedures** - 9:17, 10:10, 46:10, 47:20, 53:4, 53:17, 54:24, 94:18, 114:11, 125:18, 129:24, 135:1, 147:1, 147:2, 147:4, 152:11, 154:23, 155:18, 160:2, 160:7, 180:16, 182:4
**proceed** - 116:7
**proceeding** - 27:23, 125:15, 125:17, 147:6, 147:9, 147:11, 236:8
**proceedings** - 231:9, 231:10
**process** - 231:25
**produce** - 229:21, 232:11
**produced** - 81:12, 82:6, 100:4, 128:22
**product** - 136:21, 148:22
**production** - 101:24
**productive** - 230:10
**promoted** - 6:19, 6:20
**prompted** - 59:5, 60:21, 62:6, 76:21
**prompting** - 184:25, 190:14
**proof** - 135:25
**proper** - 134:6
**properly** - 28:17, 159:17
**prosecuting** - 114:18
**prosecution** - 132:3
**prosecution's** - 201:19
**protecting** - 213:14
**protocol** - 93:2
**prove** - 13:12
**provided** - 41:15, 43:6, 106:25
**provision** - 138:20, 144:2
**Public** - 5:24, 164:15, 178:9, 182:24
**pulled** - 187:3, 188:11, 216:7
**punished** - 136:3
**punishment** - 133:1, 133:8
**Purpose** - 150:18
**purpose** - 53:15, 53:16, 114:2, 114:25, 152:18, 152:24, 153:13, 207:18
**purposely** - 110:2, 110:8
**purposes** - 27:22, 152:6
**pursuant** - 42:1
**put** - 22:12, 28:19, 68:6, 78:25, 79:10, 81:6, 97:14, 97:21, 108:21, 109:10, 112:18, 122:11, 122:20, 122:22, 123:2, 128:22, 130:4, 136:20, 138:7, 144:11, 144:13, 154:18, 159:8, 159:13, 176:24, 177:6
**puts** - 123:6
**putting** - 144:14

## Q

**quarter** - 195:3
**questioning** - 82:2, 82:7, 92:4, 102:15, 103:6, 145:5, 186:9
**questions** - 22:3, 22:21, 55:24, 92:14, 98:21, 102:6, 107:12, 114:19, 116:5, 129:17, 139:4, 144:7, 149:20, 150:7, 150:9, 150:13, 153:21, 153:25, 154:6, 157:23, 160:15, 161:22, 163:23, 164:1, 177:15, 182:8, 182:14, 182:15, 218:24, 220:2, 220:10, 220:14, 220:15, 220:17, 220:24, 229:3, 229:6, 229:7
**quicker** - 74:3
**quite** - 65:10, 78:5, 114:15, 167:1
**quote** - 207:2
**quoted** - 205:21, 205:22, 217:12
**quotes** - 206:25

## R

**ran** - 45:9
**rang** - 29:15, 29:16, 29:20, 29:24, 29:25, 38:18, 38:21, 88:7, 89:22, 121:23, 187:14, 214:20, 215:7, 215:11, 215:15
**Rang**- 29:24, 85:5
**rank** - 26:6, 26:19, 31:4, 42:11
**ranks** - 6:15, 165:5, 183:13
**rants** - 99:3
**rather** - 128:11, 131:9, 177:5, 201:3, 226:22
**re** - 134:1, 229:18
**Re**- 149:12, 149:21, 154:8, 160:17, 161:23, 173:5, 234:19, 234:21, 234:23, 235:3, 235:5
**reach** - 119:24, 121:11, 121:18, 195:19, 197:3
**reached** - 72:18
**Read**- 226:5
**read** - 3:20, 12:10, 27:8, 27:11, 44:11, 73:3, 92:18, 92:21, 93:12, 100:22, 100:24, 101:2, 103:3, 110:4, 110:18, 110:22, 117:4, 117:7, 119:1, 133:13, 133:15, 134:14, 134:16, 150:23, 163:19, 163:20, 173:7, 173:10, 198:6, 198:9, 217:13, 226:2, 231:18
**reading** - 193:20
**ready** - 5:7, 82:4
**realized** - 139:6
**really** - 28:16, 205:6, 207:1
**rear** - 30:8, 85:9, 120:13, 120:18, 120:20, 121:2, 121:4, 142:13
**reason** - 4:19, 15:17, 34:2, 34:4, 48:12, 52:20, 54:8, 65:8, 70:10, 77:13, 77:16, 111:10, 118:10, 131:7, 131:18, 136:6, 147:18, 148:11, 149:7, 176:9, 210:23, 211:18, 211:19, 211:21
**reasons** - 135:24, 203:23
**recalled** - 51:3
**receipt** - 10:6, 10:8, 19:15, 27:15
**receive** - 7:19, 13:16, 21:12, 89:2, 133:16, 166:2, 177:10, 177:11, 185:19, 191:24, 199:17, 200:23, 211:11, 211:17
**Received**- 14:6, 89:1
**received** - 3:11, 5:3, 10:23, 11:5, 11:6, 11:10, 11:15, 13:6, 14:8, 14:11, 14:21, 15:20, 15:23, 16:2, 16:6, 16:24, 17:2, 17:6, 17:10, 18:10, 20:13, 21:11, 21:15, 21:19, 23:21, 24:1, 24:5, 29:19, 30:22, 31:11, 31:22, 32:16, 35:3, 40:21, 41:18, 41:21, 41:25, 47:21, 48:17, 50:3, 50:6, 50:9, 50:10, 51:16, 73:15, 88:15, 88:17, 88:20, 94:10, 107:19, 158:11, 166:12, 167:6, 167:14, 180:22, 181:19, 181:22, 182:1, 184:12, 185:13, 186:19, 189:18, 192:23, 194:4, 200:2, 202:13, 202:17, 204:7, 212:7
**receives** - 177:23
**receiving** - 31:13, 69:6, 152:3, 155:24, 156:11, 157:13, 158:4, 184:7, 210:21
**recess** - 104:3, 164:11
**recognize** - 181:3, 185:3, 185:5, 188:16, 193:5
**recollection** - 61:23, 125:5, 204:10, 204:14, 206:5, 208:21, 208:23, 208:24, 210:7, 210:10, 220:3, 220:5, 220:9, 225:3
**record** - 3:10, 3:20, 8:14, 8:15, 13:21, 13:23, 16:19, 28:10, 28:15, 31:17, 48:9, 78:2, 78:7, 84:8, 85:22, 85:24, 102:22, 103:19, 103:22, 104:7, 104:19, 108:17, 112:4, 123:12, 123:17, 123:21, 123:22, 129:13, 130:3, 130:20, 132:12, 145:14, 157:1, 157:7, 164:8, 164:9, 164:20, 178:3, 178:5, 178:14, 182:18, 182:20, 183:3, 193:21, 200:15, 207:9, 207:10, 229:16
**recorded** - 84:4, 86:1, 95:4, 95:6, 95:8, 95:12
**recording** - 123:20, 124:2, 186:6
**records** - 105:5, 166:19
**recovered** - 94:3
**recreate** - 51:9
**Recross**- 144:10, 149:21, 154:8, 161:23, 177:21, 234:17, 234:21, 234:23, 235:5, 235:11
**recuperate** - 70:7
**redact** - 34:2, 34:23
**redacted** - 33:17, 34:5
**Redirect**- 129:19, 149:12, 160:17, 234:15, 234:19, 235:3
**redirect** - 132:20, 133:24, 134:1, 135:16, 135:22, 136:16, 137:9, 139:3, 141:5, 142:24, 143:13, 143:21
**redundant** - 99:7
**reevaluated** - 21:13, 113:2
**refer** - 9:11, 15:7, 47:15, 144:15, 150:17, 152:4, 225:7, 227:14
**reference** - 10:24, 20:5, 28:19, 32:17, 51:21, 52:24, 81:5, 110:5, 112:10, 119:24, 120:18, 121:7, 121:9, 122:4, 124:17, 125:6, 125:24, 151:6, 151:17, 159:15, 160:8, 176:23, 225:9, 225:11
**referenced** - 83:17, 125:25, 136:15, 141:18, 159:17, 160:2, 201:22
**references** - 150:22
**referencing** - 138:8
**referred** - 18:4, 46:25, 48:6, 49:9, 49:18, 53:8
**referring** - 49:25, 54:17, 57:10, 57:12, 162:9
**reflect** - 169:12, 194:6
**reflected** - 9:24
**reflective** - 194:10
**refresh** - 214:6, 220:5, 220:9, 225:18
**refreshed** - 223:3, 225:23, 226:6
**refreshes** - 204:10
**refreshing** - 204:14
**refuse** - 92:6
**regard** - 21:2, 25:9, 26:5, 27:17, 29:13, 29:22, 36:13, 37:15, 38:4, 40:6, 40:10, 43:16, 48:1, 50:20, 98:15, 131:16, 133:20, 133:21, 138:21, 140:24, 199:18, 202:3, 231:19
**regarding** - 124:11, 157:19, 199:5, 199:24, 201:7, 203:5
**regardless** - 160:5
**regular** - 52:19, 57:2
**regularity** - 57:4
**regularly** - 69:5
**regulation** - 54:18, 56:3, 56:7, 118:18
**Regulations**- 7:17
**regulations** - 91:16, 124:22, 144:3, 144:12, 144:18, 145:3
**Rehearing**- 4:7
**Reilly**- 102:9, 103:20, 229:2
**reiterated** - 54:22, 198:21
**relate** - 98:16
**related** - 161:7, 197:11
**relevance** - 20:1, 100:1
**relevancy** - 98:14, 99:24, 130:18, 130:21
**relevant** - 131:2
**relieve** - 37:19, 37:22, 88:16, 89:22, 90:1, 185:24, 186:20, 212:11, 213:21, 213:24, 214:10, 214:12, 215:18, 216:23, 217:5, 217:16
**relieved** - 89:14, 90:2
**relive** - 186:15
**remain** - 38:10, 38:11, 92:12, 175:24, 187:8, 187:15, 188:3, 217:20
**remained** - 30:18, 35:8, 121:10, 126:11, 215:25
**remember** - 27:6, 40:15, 58:14, 61:12, 72:1, 72:4, 77:11, 142:9, 145:13, 146:7, 156:3, 162:4, 162:15, 166:22, 176:3,

209:13, 211:25, 212:1, 221:7, 221:8
**remembers** - 162:14
**remind** - 125:15
**remotely** - 141:5
**removed** - 64:2
**Rep**- 124:10
**repeat** - 27:7, 197:7, 198:3
**repeated** - 138:8, 219:9
**repeatedly** - 163:14
**rephrase** - 23:8, 49:13, 61:10, 74:9, 165:24, 189:11, 190:1
**report** - 10:19, 48:16, 49:5, 50:12, 50:13, 84:1, 102:23, 106:1, 108:22, 109:11, 112:11, 112:14, 112:20, 113:16, 114:13, 120:10, 152:3, 155:25, 156:11, 156:13, 157:13, 157:18, 158:11, 158:17, 158:18, 159:2, 159:3, 159:16, 159:18, 159:21, 159:22, 159:24, 160:24, 161:4, 161:5, 161:15, 161:18, 192:17, 192:19, 193:8, 194:7, 199:20, 233:18, 233:22
**Report**- 160:23
**reported** - 66:2, 108:2, 109:4, 109:18, 112:10, 158:22, 190:24, 191:1, 191:15
**reporter** - 27:11, 101:2, 117:7, 134:16, 143:10, 163:21, 173:10, 198:5, 198:9
**Reporting**- 113:21, 150:20
**reporting** - 53:17, 113:25, 114:11, 114:15, 117:10, 117:15, 151:25, 152:2, 153:3, 155:8, 155:13, 157:24, 161:2
**reports** - 52:14, 96:13, 99:23, 133:7, 161:25
**representation** - 83:20
**represented** - 46:14, 94:19
**representing** - 84:8, 128:24
**reputation** - 129:11
**request** - 81:24, 103:6, 231:13
**requested** - 61:24, 62:1, 86:17, 103:1
**requests** - 102:24
**require** - 153:5, 153:8
**required** - 117:15
**requirement** - 93:8, 95:11, 231:7
**requires** - 56:9, 118:18, 119:10, 119:18
**rereading** - 164:2
**reserved** - 131:24
**reserving** - 128:14
**residence** - 35:8, 35:13, 36:6, 38:15, 120:12, 121:10, 126:17, 126:24, 127:11, 127:12, 127:17, 127:23, 127:24, 128:6, 128:11, 143:18, 166:6, 166:16, 167:13
**resolution** - 136:12
**respect** - 36:18, 39:6, 104:24, 108:1, 141:23, 146:14, 157:12, 157:25, 165:22, 168:19, 171:5, 192:12, 195:9, 200:24
**respond** - 42:23, 43:1, 45:16, 46:16, 85:6, 166:6, 167:14, 196:3, 196:20, 203:22
**responded** - 230:4
**responding** - 230:3
**response** - 29:19, 29:21, 30:22, 38:23, 46:12, 54:15, 82:10, 89:23, 137:12, 137:13, 202:2, 232:5
**responsibility** - 94:25
**responsive** - 20:18
**rest** - 198:14, 198:19, 229:11, 229:12
**result** - 63:24, 66:2, 99:23, 148:20, 155:3, 174:4, 203:18
**results** - 121:19, 125:12
**retroactive** - 66:5, 162:18
**retroactively** - 162:6
**return** - 45:24, 86:24, 159:10, 159:20, 168:14, 188:6, 188:24
**returned** - 38:12, 39:18, 45:13, 66:16, 70:9, 73:4, 90:24, 188:4, 192:10, 199:21, 200:18, 212:6, 218:25
**returning** - 39:4, 73:2, 159:6, 228:4
**returns** - 153:2
**revealed** - 120:12
**reversed** - 137:25
**reversible** - 13:9
**review** - 81:8, 81:23, 81:25, 96:5, 99:15, 101:7, 101:8, 101:12, 101:15, 101:19, 102:1, 102:4, 102:13, 102:16, 103:22, 105:24, 111:20, 169:20, 193:2, 200:6, 202:21, 205:7, 213:17
**reviewed** - 96:7, 99:23, 103:16, 105:23, 160:7
**reviewing** - 52:14, 81:15, 96:11, 202:25
**revision** - 9:24, 180:5
**ridiculous** - 103:17
**ridiculousness** - 130:10
**rights** - 131:25, 231:11
**Riley**- 156:4
**ring** - 29:25, 66:19, 214:24
**ringing** - 30:14, 119:25, 121:12, 121:18, 145:10
**riveted** - 11:3
**Road**- 2:3, 2:18, 188:11, 216:4
**road** - 87:13, 88:3
**Robert**- 2:16, 51:5
**roll** - 14:20, 15:8, 15:14, 181:7, 213:17, 233:11, 233:20
**Room**- 1:9
**room** - 5:9, 45:10, 103:13, 230:24
**route** - 128:2
**rule** - 56:2, 56:7, 118:18, 119:9, 124:1, 124:6, 125:7, 137:22, 176:11, 197:15
**rules** - 91:15, 116:2, 123:24, 124:21, 141:20, 141:25, 142:4, 144:3, 144:11, 144:18, 145:3
**Rules**- 7:17
**ruling** - 116:9, 133:10, 230:16
**rulings** - 43:2, 141:24
**run** - 45:11
**rung** - 30:1, 30:2, 30:3

**S**

**sale** - 195:6
**Sasso**- 1:22, 5:24, 164:15, 178:9, 182:24, 236:14
**Satriale**- 5:13, 5:21, 6:2, 7:10, 8:24, 11:18, 14:12, 14:24, 16:9, 17:13, 20:11, 20:14, 21:21, 21:24, 24:6, 26:12, 32:2, 35:7, 40:24, 48:20, 84:7, 116:25, 129:20, 133:6, 135:13, 136:9, 137:10, 144:4, 149:13, 152:17, 153:16, 160:25, 164:5, 164:6, 165:21, 166:3, 166:5, 167:2, 167:4, 167:8, 167:10, 167:19, 167:23, 167:24, 168:8, 168:14, 168:18, 169:25, 170:12, 171:4, 176:22, 184:8, 184:12, 185:10, 186:16, 186:20, 187:4, 187:6, 187:11, 187:21, 189:1, 190:25, 191:2, 191:6, 191:17, 191:23, 198:12, 198:17, 198:18, 207:15, 208:16, 210:4, 211:3, 212:12, 212:13, 213:7, 213:13, 213:18, 215:15, 224:7, 224:16, 224:20, 229:20, 230:19, 232:8, 232:12, 232:17, 234:3, 234:5, 234:7, 234:9, 234:11, 234:13, 234:15, 234:17, 234:19, 234:21, 234:23, 235:3, 235:5
**Satriale's**- 81:19, 168:23
**save** - 229:13
**saw** - 121:4, 149:2, 162:17, 172:9, 188:23, 215:1
**schedule** - 15:9, 104:13
**scheduled** - 24:7, 24:8, 29:7, 53:15, 78:3, 78:8, 78:12, 78:18, 87:22, 87:25, 153:9, 165:10, 165:13, 183:22, 183:25
**Schoeneck**- 2:6
**School**- 230:22
**scribbled** - 159:13
**se** - 150:25
**season** - 146:10
**second** - 32:23, 58:6, 58:9, 59:23, 60:2, 60:8, 88:8, 110:20, 115:14, 150:17, 157:22, 167:15, 167:16, 167:19, 167:21, 169:3, 169:10, 203:3, 207:9, 219:11, 229:21
**seconds** - 32:14
**section** - 51:18, 124:25, 125:12, 126:1, 139:13, 159:1, 205:7
**Section**- 53:12, 124:11, 138:19, 138:20, 153:2
**see** - 5:10, 5:16, 12:20, 12:22, 13:2, 19:5, 30:11, 40:1, 40:3, 45:16, 57:6, 63:6, 84:17, 84:21, 85:11, 93:23, 94:2, 105:12, 105:24, 106:11, 106:24, 108:1, 113:17, 117:9, 118:20, 120:7, 120:10, 121:6, 122:5, 129:2, 130:3, 150:18, 151:22, 156:10, 157:7, 168:1, 172:10, 179:14, 180:5, 187:23, 188:5, 188:13, 191:21, 195:14, 196:18, 198:22, 207:20, 214:25, 227:11
**See**- 220:8
**selective** - 132:3
**self** - 13:22
**send** - 33:5, 91:11, 201:9
**sense** - 76:14
**sent** - 3:22, 3:23, 3:24, 4:21, 32:10, 33:2, 66:18, 68:22, 169:25
**sentence** - 154:22, 205:7
**Separate**- 33:6
**separate** - 161:14, 161:18
**September**- 178:24, 179:7
**Sergeant**- 6:20, 6:21, 25:10, 25:13, 25:15, 25:18, 25:25, 26:1, 26:11, 26:16, 27:16, 30:19, 30:25, 31:14, 32:10, 34:13, 35:6, 36:11, 45:14, 45:22, 67:11, 70:19, 75:23, 80:2, 83:24, 84:6, 85:15, 87:13, 88:5, 105:15, 109:4, 109:15, 135:4, 135:5, 135:21, 164:21, 164:24, 165:7, 165:8, 169:19, 173:3, 173:23, 175:7, 177:3, 177:8, 178:1, 178:2, 179:6, 198:17, 199:23, 201:6, 203:4, 208:9, 233:16, 235:7, 235:9, 235:11
**sergeant** - 156:10
**series** - 21:23, 98:20, 107:6, 201:18
**serious** - 130:14, 131:15, 132:25, 133:8, 138:9
**Seriously**- 100:6
**service** - 39:24, 40:14, 40:20, 41:8, 42:9, 42:19, 43:5, 43:6, 43:8, 189:6
**Service**- 51:6, 51:8, 233:17
**set** - 13:14, 94:20, 94:22, 123:24
**seven** - 106:1
**several** - 52:15, 68:25, 70:2
**shall** - 156:11, 158:16, 158:22, 159:11
**sheet** - 14:20, 15:15, 233:11
**Shield**- 183:5
**shift** - 76:6, 88:6, 165:15, 165:18, 165:20, 168:2, 180:15, 183:25, 184:2, 184:6, 212:14, 212:17, 212:18, 213:14
**Shop**- 51:2
**shop** - 51:4
**short** - 104:3, 164:11
**shortest** - 74:20
**shortly** - 191:18
**shot** - 132:14
**shots** - 44:9
**show** - 24:12, 106:10, 106:23, 112:4, 130:9, 130:11, 168:4
**showed** - 54:10, 168:9
**showing** - 8:10
**shown** - 7:6, 7:11, 7:23, 8:18, 78:4, 135:9, 137:5, 142:16, 160:19, 169:15, 179:9
**shuffle** - 45:8
**shuffling** - 28:2
**Sick**- 113:21, 150:20, 154:14, 160:5, 160:22, 233:18
**sick** - 9:16, 10:9, 39:22, 46:10, 47:19, 48:10, 48:16, 49:4, 49:6, 49:23, 50:12, 52:14, 53:3, 53:8, 53:10, 53:17, 53:18,

54:8, 54:23, 56:4, 56:9, 57:1, 67:25, 69:20, 70:22, 94:17, 104:11, 112:10, 112:11, 113:7, 113:15, 113:25, 114:11, 114:13, 114:15, 115:1, 117:10, 117:15, 118:6, 118:11, 118:19, 119:2, 125:17, 126:25, 127:17, 127:18, 129:24, 131:8, 133:22, 134:25, 137:23, 138:5, 148:21, 149:7, 150:21, 150:22, 150:24, 151:25, 152:2, 152:3, 152:5, 152:10, 152:20, 153:4, 154:22, 155:2, 155:8, 155:13, 155:17, 155:25, 156:11, 157:13, 157:18, 157:24, 158:4, 158:11, 158:16, 158:22, 159:2, 159:6, 159:11, 159:16, 159:21, 160:3, 160:11, 160:24, 161:2, 161:25, 162:1, 162:2, 162:5, 162:23, 163:9, 163:10, 163:14, 173:13, 174:1, 174:18, 175:11, 175:23, 180:16, 182:3, 190:7
**sign** - 84:15, 93:9, 180:11, 193:15, 195:6
**signature** - 9:3, 9:7, 9:25, 10:2, 179:17, 179:20
**signed** - 3:12, 10:5, 92:24, 170:1, 180:17
**silent** - 92:12
**similar** - 25:19, 148:16, 231:4
**Similarly** - 231:19
**single** - 152:20, 153:4
**sit** - 80:24, 87:8
**site** - 123:20
**sitting** - 73:11, 87:16, 87:19, 87:25, 90:8, 231:16
**six** - 106:1, 176:7
**sixth** - 107:23
**skip** - 121:6
**skirt** - 26:20
**slacked** - 116:7
**slice** - 51:19, 189:6, 219:17, 223:17
**slide** - 57:20
**slipped** - 72:11
**slipping** - 72:9
**sloppy** - 132:2
**slot** - 110:23, 111:7, 166:8, 166:25
**smart** - 129:10
**smoke** - 51:9, 51:12
**someone** - 51:22, 119:2, 119:8, 119:25, 121:11, 121:18, 122:7, 130:23, 131:1, 131:9, 136:8, 138:5, 138:10, 147:14, 147:19, 147:23, 160:3, 173:13, 215:3
**sometimes** - 99:4
**somewhere** - 225:4
**soon** - 96:13
**sorry** - 8:1, 13:15, 17:21, 37:1, 46:15, 84:14, 135:5, 139:22, 147:12, 152:14, 177:20, 197:7, 200:14
**Sorry** - 28:21, 48:4
**sort** - 84:25, 132:2, 143:7, 197:19
**sounds** - 44:11
**source** - 22:14, 61:20, 209:23, 210:13
**speaking** - 67:7, 157:3, 224:17
**Speaking** - 20:2
**speaks** - 114:2, 205:14
**specific** - 15:10, 104:13, 105:20, 118:22, 119:4, 146:7, 186:7
**specifically** - 78:14, 105:8, 117:20, 198:11, 199:4, 199:10
**specifics** - 147:10, 226:22
**specified** - 211:12, 218:10, 227:8
**specify** - 227:10
**speeches** - 232:10
**spelled** - 152:23
**spend** - 80:15
**spending** - 143:17
**spent** - 141:7, 143:8
**spoken** - 36:10, 75:16
**square** - 206:3
**stake** - 129:11
**stamped** - 10:14
**standard** - 67:23, 68:3, 68:8, 93:2
**standing** - 172:21
**Staring** - 216:4
**start** - 3:1
**started** - 97:13
**starting** - 153:7
**starts** - 205:5
**state** - 3:10, 165:1, 178:13
**State** - 5:24, 164:16, 164:19, 178:10, 182:24, 183:2
**statement** - 129:3
**statements** - 92:16
**Station** - 51:6, 51:8
**stationary** - 185:25, 213:22
**Status** - 137:24, 138:5
**status** - 54:14, 65:22, 66:5, 66:9, 68:1, 69:20, 70:23, 104:11, 119:19, 157:15, 157:20, 159:8, 159:13, 160:8, 162:1, 162:6, 162:7, 162:18, 162:19, 162:23, 162:24, 163:1, 163:3
**statute** - 231:6
**stay** - 36:6, 126:24, 136:10, 215:21
**staying** - 131:11
**stenographer** - 186:6, 186:9
**stenographically** - 95:4, 95:13
**Steven** - 36:16, 183:4
**sticker** - 10:21
**still** - 21:16, 33:19, 33:22, 69:8, 97:11, 100:5, 116:5, 136:14, 177:10, 218:5
**stipulate** - 26:17
**stipulation** - 42:2
**stop** - 99:4
**stopped** - 54:9, 121:16, 156:6
**story** - 91:10, 91:12
**straight** - 192:7
**street** - 212:23
**strike** - 20:17, 21:3, 55:2
**stub** - 176:24, 177:5
**stubs** - 166:8, 177:12
**stuck** - 10:20
**sub** - 87:2
**subheading** - 119:23
**subject** - 26:10, 26:21, 128:23, 135:15, 137:8, 142:23, 143:7, 143:11, 143:12, 144:9, 176:5, 229:24
**Subject** - 200:22
**submit** - 97:5, 97:7
**submitted** - 10:20, 19:21, 19:24, 23:1, 23:5, 23:12, 23:16, 203:4
**Submitted** - 96:2
**subordinate** - 86:25, 91:11
**subpoena** - 33:25, 129:7, 229:18, 229:25, 230:8, 231:22
**subpoenaed** - 129:4, 129:5
**subpoenaing** - 128:21
**subpoenas** - 230:17, 231:20
**subsection** - 138:18, 156:24
**Subsection** - 139:17, 142:20
**subsections** - 151:23
**subsequent** - 142:12
**substance** - 47:24, 52:10, 83:9, 98:6, 98:9, 119:18, 144:24, 148:7, 176:8, 204:25, 217:19
**substitutable** - 151:1, 152:8
**successful** - 134:10
**sufficient** - 79:15
**Suite** - 2:7
**sum** - 204:25
**summary** - 137:14
**supervise** - 87:23
**supervising** - 87:15, 87:20, 88:3
**supervision** - 165:9
**supervisor** - 158:11, 158:16, 158:21
**supervisory** - 143:16
**supplemental** - 192:17, 192:18, 193:8, 194:7, 233:21
**supply** - 231:7
**suppose** - 13:24
**supposed** - 56:5, 67:24, 79:20, 101:4, 118:12, 137:21, 149:6, 154:25, 155:9, 174:11, 213:2
**supposedly** - 88:21, 96:7
**Supreme** - 129:8
**surgeries** - 70:5
**surgery** - 70:3, 70:10
**surrounding** - 131:14
**suspend** - 98:2
**suspended** - 69:16, 96:12, 96:15, 101:3
**suspending** - 96:16, 96:20
**suspension** - 97:9, 98:14, 98:18, 139:21, 139:23
**sustain** - 64:8, 204:18
**sustained** - 64:11, 66:1, 204:20, 205:18, 206:11
**swear** - 19:4, 172:13, 206:14
**swearing** - 172:12
**swore** - 61:21
**sworn** - 5:23, 61:16, 160:1, 164:15, 178:9, 182:23
**Synopsis** - 233:5
**synopsis** - 105:22, 106:1, 107:23, 109:3, 110:2, 110:21, 112:9, 119:23, 122:4, 201:4
**system** - 15:13, 16:19, 21:15, 31:17, 104:25, 105:5, 118:10

**T**

**table** - 144:12
**tailor** - 206:2
**tainting** - 13:21
**talks** - 12:7, 114:24
**tape** - 123:12, 123:20, 123:21, 123:22, 124:2
**tape-record** - 123:12, 123:21, 123:22
**tape-recording** - 123:20, 124:2
**tasks** - 25:19
**Taxter** - 2:18
**telephone** - 30:21, 31:18, 33:17, 33:23, 34:7, 36:12, 83:23, 83:25, 105:18, 108:4, 108:13, 108:14, 108:23, 109:6, 184:12, 184:14, 185:12, 189:14, 195:13, 195:17, 207:17, 207:25, 210:20, 211:1, 212:2, 229:14
**Telephone** - 210:25
**telephoned** - 207:16
**temporary** - 167:11
**ten** - 65:17, 81:4, 195:4
**Terence** - 2:8
**term** - 20:15, 70:3, 157:25
**testified** - 5:25, 23:15, 35:21, 49:15, 50:12, 63:8, 103:4, 146:6, 164:16, 178:10, 182:25, 202:5, 206:5, 210:3, 216:19, 216:22, 221:5
**testify** - 61:1, 65:8, 112:1, 114:6, 120:5, 172:16, 217:4, 222:15
**testifying** - 18:25, 26:8, 61:12, 78:7, 81:9, 120:25
**testimony** - 33:25, 51:22, 52:23, 61:9, 61:16, 64:5, 74:6, 74:7, 114:9, 160:1, 163:20, 189:23, 204:21, 205:9, 206:2, 216:25, 218:21
**themselves** - 84:20, 131:12
**theory** - 201:19
**thereafter** - 98:19
**thin** - 20:7
**third** - 38:19, 59:20, 60:4, 60:10, 60:18, 105:25, 107:23, 110:20, 118:23
**Thomas** - 1:7, 3:25, 43:5
**three** - 6:11, 9:25, 58:16, 58:19, 58:21, 58:24, 59:1, 59:4, 59:11, 59:24, 61:4, 61:17, 65:13, 65:17, 65:24, 70:1, 72:16, 76:15, 113:18, 121:15, 121:20, 177:9, 184:23, 222:24, 225:20
**Three** - 120:4
**three-fifths** - 113:18
**throughout** - 183:14
**throw** - 156:8
**Thursday** - 79:3, 79:4, 79:6, 79:7, 79:9, 122:9, 122:11, 122:21, 123:4, 176:24
**Thursdays** - 79:5
**tiny** - 95:24
**title** - 160:21
**Today** - 120:25
**today** - 69:15, 81:9, 94:10, 152:22, 216:19, 216:22, 222:4, 226:10, 226:11
**together** - 81:6, 216:15
**Tom** - 52:1, 185:1
**Tom's** - 51:25
**tomorrow** - 94:20
**tonight** - 101:15, 101:21, 102:13, 106:13, 138:4, 204:22, 205:9, 205:25, 217:4, 222:24, 229:23, 231:16
**tonight's** - 3:2
**took** - 8:16, 47:12, 80:23, 115:13, 164:10, 178:6, 182:21, 207:11, 223:14, 224:1, 228:11, 232:6
**top** - 42:4, 53:16, 154:13, 155:17, 193:11, 194:5

**topic** - 150:24
**Total**- 35:11
**total** - 192:1
**totally** - 130:2, 201:20, 204:15
**Totally**- 141:4
**tour** - 24:8, 24:11, 24:12, 24:17, 25:7, 29:7, 52:19, 53:15, 158:21, 165:14, 165:15, 181:10, 181:12, 181:14, 184:2
**Tour**- 165:9, 181:7, 181:8, 212:16
**towards** - 188:11
**town** - 27:25
**track** - 156:8
**transcript** - 236:8
**transmitted** - 23:17
**traveling** - 191:4
**treat** - 130:25, 136:7
**treated** - 130:23, 131:3, 131:4, 131:19, 132:19, 135:23, 136:1, 136:8
**treatment** - 135:19, 152:8
**trial** - 231:7
**tried** - 66:23, 125:13, 208:9, 214:17, 214:19
**truck** - 35:17, 35:23, 36:8
**true** - 63:10, 72:15, 83:21, 210:6, 210:9, 216:22, 236:7
**truly** - 173:2
**trust** - 131:10
**Trustee**- 2:15, 2:16
**truth** - 142:3
**try** - 114:17, 122:8, 141:22, 209:24
**trying** - 124:20, 125:20, 136:5, 152:5
**Tuckahoe**- 51:2
**Tuesday**- 118:24
**turn** - 92:15, 113:14, 142:19
**turned** - 67:14, 92:10
**twice** - 221:5, 222:15, 222:19
**two** - 31:17, 65:12, 79:5, 84:19, 87:13, 125:6, 125:24, 177:9, 184:23, 212:22
**type** - 21:8, 151:24, 188:19, 188:20
**typo** - 154:18, 154:24, 155:4, 155:18, 158:17, 159:7
**typographical** - 156:16

## U

**unaware** - 106:12
**unclear** - 115:19
**uncorroborated** - 42:21
**Under**- 29:5, 34:21, 155:21, 159:15
**under** - 13:1, 18:25, 20:12, 70:7, 73:1, 92:15, 106:1, 107:23, 110:21, 117:14, 119:23, 124:6, 125:16, 125:17, 141:3, 150:18, 153:6, 154:21, 156:10, 158:15, 159:1, 159:10, 159:20, 172:17, 173:24, 206:16, 217:4, 222:20, 222:23, 231:6
**Underhill** - 2:16, 23:25, 27:2, 42:16, 44:5, 150:15, 177:16, 229:5
**underline** - 130:4
**underlines** - 107:6
**understood** - 127:10, 173:6, 198:10, 208:1, 222:8, 222:13
**undue** - 103:5
**unenforceable** - 232:1
**uniformed** - 53:17
**units** - 212:23
**unknown** - 34:17
**unless** - 3:20, 33:3, 214:7, 218:5
**unmarked** - 186:25
**unresponsive** - 20:23
**unusual** - 151:4
**up** - 8:8, 10:3, 24:12, 26:20, 36:22, 37:19, 53:24, 55:11, 68:13, 71:13, 73:19, 73:21, 73:24, 74:3, 78:4, 78:22, 87:21, 88:16, 94:20, 94:22, 101:16, 102:5, 106:9, 106:12, 106:14, 107:5, 114:3, 114:17, 115:12, 130:16, 132:15, 132:18, 141:5, 141:22, 144:8, 150:20, 153:25, 154:23, 162:21, 163:25, 164:1, 168:4, 168:9, 183:20, 196:16, 206:8, 214:21, 220:24, 221:19
**update** - 21:10
**updates** - 21:8
**upper** - 41:11
**usage** - 50:14
**utilization** - 133:22
**utilized** - 161:15

## V

**vacancies** - 152:25
**vacation** - 136:4, 139:15, 139:20
**vague** - 115:19
**validity** - 230:16
**vehicle** - 35:16, 189:1, 190:23, 216:5
**vehicles** - 214:17
**verbal** - 56:16, 124:6
**verify** - 64:16, 118:12, 196:3, 196:10, 207:19
**Vernon** - 39:24, 40:8, 41:9, 191:10, 224:6
**versus** - 54:13, 65:14
**video** - 95:8, 95:13
**Village** - 1:1, 6:4, 7:16, 75:12, 178:18, 183:8, 183:11, 213:15, 229:11
**village** - 63:7, 63:19, 87:14
**violated** - 28:2, 115:8, 124:25, 130:24, 131:1, 131:10, 134:25, 136:2, 139:16
**violating** - 54:25, 127:18, 129:23, 131:22, 137:22
**violation** - 46:9, 55:3, 94:17, 176:11, 197:16
**virtue** - 177:10
**visit** - 43:12, 147:6, 194:14, 194:20, 194:23, 195:7, 201:7, 213:9
**visited** - 133:21, 134:20
**voice** - 89:5, 185:1, 185:3, 185:5
**voicemail** - 37:10, 37:19, 88:15, 88:17, 88:21, 88:25, 89:1, 89:3, 89:4, 184:25, 212:7
**voir** - 22:3
**Voir**- 18:12, 18:14, 22:6, 32:19, 32:21, 234:5, 234:9
**volume** - 65:18
**volunteer** - 189:20, 227:20
**volunteered** - 189:23

## W

**Wait**- 156:4
**wait** - 77:13, 80:20, 168:7, 168:9, 168:12
**waited** - 86:22, 185:17
**waiting** - 54:20, 188:1, 231:17
**walk** - 120:11, 215:1
**Walked**- 85:9
**walked** - 30:7, 30:9, 121:3, 144:9, 187:13, 214:21
**walking** - 30:14, 163:5
**wandering** - 131:13
**wants** - 81:17, 99:20, 105:7, 107:2, 206:2, 206:7, 206:20
**Warning**- 91:24, 92:2, 92:3, 92:19, 93:9, 93:12, 110:6, 110:11
**warning** - 92:3
**waste** - 203:17
**wasting** - 87:1, 205:15
**wear** - 84:15
**Wednesday**- 181:7
**week** - 72:8, 76:9, 77:7, 79:12, 163:7
**weeks** - 58:22, 65:13, 65:17
**weight** - 68:7
**whack** - 115:13
**whatsoever** - 119:17, 197:12, 220:21
**whereabouts** - 27:18, 29:14, 29:22, 30:16, 36:13, 36:21, 37:16, 38:4, 38:17, 39:6, 39:11, 40:11, 43:17, 45:18, 48:1, 50:21, 127:24, 173:13, 175:14, 175:20, 189:3, 218:6, 218:9, 225:16
**White**- 2:3, 194:22, 194:24, 195:16
**whoever's** - 34:6
**whole** - 98:20, 150:23, 156:21
**William**- 2:15
**wish** - 101:18, 102:20, 116:10
**withdraw** - 206:12
**withdrawing** - 116:11, 116:13
**Withdrawn**- 91:5, 110:15, 172:1
**Witness**- 5:22, 164:14, 178:8, 182:23
**witness** - 3:7, 5:11, 5:14, 7:6, 7:9, 7:23, 8:18, 8:23, 15:3, 16:14, 18:6, 19:20, 20:25, 26:8, 32:3, 41:3, 42:20, 48:25, 55:24, 59:17, 78:7, 83:22, 100:18, 103:3, 103:16, 114:19, 120:14, 128:21, 131:17, 133:5, 135:9, 135:12, 137:5, 137:7, 140:11, 142:16, 142:18, 144:7, 160:19, 169:15, 169:18, 169:22, 174:20, 174:23, 179:9, 179:12, 182:8, 193:3, 200:7, 202:23, 205:10, 206:2, 206:4, 220:11, 225:13, 229:20, 229:21
**witnesses** - 230:9, 231:20
**word** - 11:2, 11:3, 54:5, 105:1, 151:22, 158:7, 158:13, 158:24, 225:2
**words** - 83:9, 98:6, 98:8, 105:20, 111:16, 111:21, 112:2, 119:18, 148:6, 151:2, 152:8, 176:8, 206:1, 217:14, 217:18, 224:22, 225:20
**Workers'**- 39:21, 54:7, 54:10, 161:18
**worse** - 138:12
**worthy** - 84:12
**write** - 19:6, 188:16
**writing** - 104:20, 138:7, 146:12, 225:5
**written** - 8:7, 56:13, 118:17, 118:22, 119:9, 119:13, 124:5, 125:6, 126:21, 126:22, 126:23, 127:1, 127:2, 145:14, 206:3
**Written**- 8:19, 124:4
**wrote** - 18:15, 18:19, 19:1, 19:6, 162:5, 162:16

## Y

**yard** - 120:13, 120:19, 120:21, 121:2, 121:4, 121:5, 142:13
**Yeager**- 1:9
**year** - 25:5, 60:6, 60:8, 60:10, 65:23, 66:6, 69:4, 73:18, 73:23, 74:1, 74:2, 74:4, 74:7, 74:8, 74:14, 74:16, 145:17, 146:8, 147:11, 175:4
**year's** - 73:20
**years** - 6:9, 6:10, 6:11, 6:12, 6:14, 65:24, 68:25, 70:1, 76:15, 109:22, 165:4, 175:10, 176:4, 183:12, 183:16
**Yonkers**- 51:7
**York**- 1:24, 2:3, 2:8, 2:18, 5:25, 164:16, 178:10, 182:25
**yourself** - 20:7, 190:13, 204:12, 219:9
**yourselves** - 230:12

## Z

**Zuccarelli's**- 50:24, 51:1

VILLAGE OF BRONXVILLE
BOARD OF POLICE COMMISSIONERS

-----------------------------------------x

IN THE MATTER OF DISCIPLINARY CHARGES
DATED AUGUST 21, 2006,

- preferred against-

POLICE OFFICER THOMAS KEMPKES,

-----------------------------------------x

177 Pondfield Road
Bronxville, New York
January 10, 2007
6:30 p.m.

D I S C I P L I N A R Y H E A R I N G

CARBONE & ASSOCIATES, LTD.
Melissa Sasso
111 North Central Park Avenue
Hartsdale, New York 10530
(914) 684-0201



A P P E A R A N C E S:

LOVETT & GOULD, ESQS.
Attorneys for OFFICER KEMPKES
222 Bloomingdale Road
White Plains, New York 10605
BY: JONATHAN LOVETT, ESQ.

BOND, SCHOENECK & KING, PLLC
Attorneys for THE VILLAGE OF BRONXVILLE POLICE DEPARTMENT
1399 Franklin Avenue
Garden City, New York 11530
BY: TERENCE M. O'NEIL, ESQ. and
CHRISTOPHER KURTZ, ESQ.

ALSO PRESENT:
THE BOARD OF POLICE COMMISSIONERS -
MARY C. MARVIN - MAYOR
GLENN D. BELLITTO - DEPUTY MAYOR
WILLIAM BARTON, JR. - TRUSTEE
ANNE POORMAN - TRUSTEE
ROBERT UNDERHILL - TRUSTEE

HITSMAN, HOFFMAN & O'REILLY, LLC.
COUNSEL TO THE BOARD
570 Taxter Road
Elmsford, New York 10523
BY: JOHN F. O'REILLY, ESQ.

MAYOR MARVIN: Okay, I'm going to reopen the Village of Bronxville disciplinary hearing that was begun on December 13th. I am just going to double-check, Mr. O'Neil, that the Village's direct case is completed.

MR. O'NEIL: That is correct.

MAYOR MARVIN: Okay, then we will proceed with Officer Kempkes' case. Mr. Lovett, would you like to begin?

MR. LOVETT: Yes, I would. We call Chief Downey.

MR. O'REILLY: Would you re swear the witness, please?

C H I E F B R I A N M I C H A E L D O W N E Y, the Witness herein, after having been first duly sworn by Melissa Sasso, a Notary Public of the State of New York, was examined and testified as follows:

DIRECT EXAMINATION BY MR. LOVETT:

Q Are you employed, sir?

A Yes, I am.

Q By whom?

A The Village of Bronxville.

Q In what capacity?

A Chief of Police.

Q How long have you held that position?

A Six years.

Q Prior to being Chief what did you do for a living?

A A Lieutenant.

Q A Lieutenant where?

A Village of Bronxville.

Q How long were you a Lieutenant for, approximately?

A Two years.

Q Pardon me?

A Two years.

Q Prior to that what did you do?

A Detective Sergeant.

Q How long did you hold that rank?

A Six years.

Q Was that an administrative title or a civil service title?

A Detective Sergeant was an administrative title.

Q Did you hold the rank of Sergeant at the time you were a Detective Sergeant?

A Yes.

Q When were you appointed first as a Sergeant?

A Same time as I was appointed Detective Sergeant.

Q And you joined the department when?

A 1986.

Q During the period of time that you have been Chief of Police did you have occasion to familiarize yourself with the departmental rules and regulations?

A Yes.

Q Is there a rule or regulation, to your knowledge, that specifically governs Section 207C proceedings or applications?

A Not that I'm aware of.

Q Well, have you ever seen such a rule or regulation in this department?

A Not that I recall.

Q Is there anything you could use to refresh your memory?

A The rules and regulations, possibly.

Q Now, according to Lieutenant Satriale, you told him, meaning the Lieutenant, that you suspended Officer Kempkes, is that true?

A At what time, sir?

Q In 2006 did you tell that to the Lieutenant?

A Yes.

Q And had you in fact suspended my client?

A Yes.

Q You preferred charges that are at issue under Section 5711-Q of the Unconsolidated Laws, didn't you?

A Yes.

Q Have you ever looked at that section of law?

A No.

Q What was your authority to your then knowledge for suspending my client without pay?

A Consultation with my Counsel.

Q Well, I'm going to read you something from Section 5711-Q, and then I have a question for you. It's Section 5711-Q of Unconsolidated Laws of New York, Subdivision 9 which pertains to discipline and charges, and it provides for, the end of Subsection 9, such Board of Trustees or municipal board shall have the power

to suspend without pay pending the trial of charges by any member of such police force. Have you ever read that language?

A No.

Q With respect to the payless suspension that you put my client on, did you have the approval, to your knowledge, of the Village Board, or the Board of Police Commissioners?

A No.

Q After you put my client on a payless suspension did you then secure the approval of the Village Board or Board of Police Commissioners?

A No.

Q Did you tell the Board of Police Commissioners or Village Board when you suspended my client that you had done so?

A No.

Q At some point in time you changed my client's status from suspended without pay to suspended with pay, right?

A Yes.

Q Why did you do that?

MR. O'NEIL: I'm going to object. In terms of any suspensions that occurred,

I don't know what relevancy they have to the charges, or which involvement preceded the suspension.

MR. O'REILLY: Mr. Lovett?

MR. LOVETT: He dropped his voice and I couldn't hear the last melodic strand of his statement.

MR. O'NEIL: The last melodic strands?

MR. O'REILLY: Okay. Could you read it back, please?

(Whereupon, the testimony was read back by the reporter.)

MR. LOVETT: Well, the relevance is that the Chief of Police violated my client's right by suspending him without pay. The Chief had no authority to do that. It was only the power of the Village Board of Police Commissioners who could suspend without pay, and we intend to show in our post hearing submission that the Chief violated the law wholesale in several respects, but I think it is germane so you know what you are dealing with here.

MR. O'NEIL: If in fact the suspension did violate the law, Mr. Lovett has read only one portion of the statute. There are other provisions in that statute which we believe authorized the Chief to make the suspension, but if in fact there is an allegation that that suspension was illegal, it has nothing to do with this proceeding. That would be a separate issue that ought to be pursued, frankly, in another form.

MR. LOVETT: It will be, but if you like I can give you 5711-Q and $100.00 right here if you can find anything in here where it says the Chief can suspend any member without pay.

MAYOR MARVIN: I'm prepared to overrule the objection.

(Whereupon the Board was polled.)

MAYOR MARVIN: All right, objection overruled.

MR. LOVETT: Thank you.

Q Now would you answer my question, why did you change the status from suspended without pay to suspended with pay?

A On advice from Counsel.

Q Forgetting what Counsel said, did something happen factually with respect to my client on the basis of which you changed his status to suspended with pay?

A Again, on the advice of Counsel.

Q I'm not asking you what Counsel said.

A On the advice of Counsel.

MR. O'NEIL: I'm going to object to any testimony about what we told him. It is privileged.

MR. LOVETT: I concur. I'm not asking for that. I'm asking whether there was some fact that the Chief became aware of concerning my client or his conduct that prompted him to change the status, and I'm not asking what you said to him.

MR. O'NEIL: Objection. There is nothing in the record that he is the one that changed the status.

MR. LOVETT: Okay, I withdraw the question.

Q Didn't you just testify, Chief, that you changed my client's status from suspended

without pay to suspended with pay?

A Yes.

Q You are familiar with some of the rules and regulations of your department, aren't you?

A Yes.

Q Have you ever told my client that he was required to remain in his house on the date we have been discussing in this proceeding because of the provision of Chapter 19, Section 2.0 of the department rules and regulations?

MR. O'NEIL: Objection. Just so we make it clear, there are a lot of dates that have been discussed during the course of this proceeding, and just so the record is clear, what date is he talking about?

Q Okay. Chief, you charged my client with leaving his house, amongst other things, to get a slice of pizza on what date?

A I believe it was July 6th of 2006.

Q Of what year?

A 2006.

Q Okay. And did you ever tell my client based on his, amongst other things, getting a slice of pizza instead of staying in his house

that that was improper because of the provisions contained in Chapter 19, Section 2.0 of the department rules and regulations?

MR. O'NEIL: Objection. There is no foundation that he had any conversation with Officer Kempkes about this incident at all.

MR. LOVETT: That is why I'm asking him, because the answer is going to be no, and then it's going to turn out that he wrote it in a memo which I'm going to show him, and put into evidence to show you that the Chief and Lieutenant have been making this case up from day one, because he said that the requirement that my client stay at his house was under Chapter 19, Section 2.0, and there is no such chapter or section. So I'll tell you what, we will save Mr. O'Neil his voice. I would like marked as Charged Party's A, I guess --

MR. O'REILLY: That's right.

MR. LOVETT: -- a memorandum dated May 26th of '05 from the Chief to my client.

(Whereupon, a memo was received and marked as Charged Party's Exhibit A, for identification, as of this date.)

Q Chief, would you take a look at what we've marked as Charged Party's A for identification and tell me if you recognize that memorandum.

(Whereupon, the witness peruses a document.)

A Yes, I do.

Q Is that something that you wrote?

A Yes, it is.

Q Next to your printed name and the reference to Chief of Police, did you put that initial and circle it?

A Yes, I did.

Q Did you cause this memo to be given to my client?

A Yes, I did.

Q Take a look at the second paragraph where it states --

MR. LOVETT: Well, actually, I move it into evidence.

MR. O'NEIL: No objection.

MAYOR MARVIN: Okay, this document

will be in evidence.

(Whereupon, Charged Party's Exhibit A, previously marked for identification was received in evidence.)

Q Calling your attention to the second paragraph, you see where it says "as you have been reminded in the past pursuant to Chapter 19, Section 2.0 of the department rules and regulations, if you are absent from work due to illness or injury you must remain at your residence during the hours of your regularly scheduled tour," do you see that?

A Yes, sir.

Q What is your factual basis for reference Chapter 19, Section 2.0?

A It is rules and regulations of the department.

Q Did you know there is no chapter or section of that nature?

A I know there is a chapter and section of that nature.

Q Oh. The rules and regulations of the department are in evidence, and I would like whatever they are to be shown to the Chief. I think it's --

MR. O'REILLY: 2.

MR. LOVETT: 4.

MR. O'NEIL: Would you refer to the whole title of that document when you are making reference to it?

MR. LOVETT: Really.

MR. O'NEIL: Rules and Regulations Duties Rules of Conduct is the title.

MR. LOVETT: Oh, forgive me, Counsel. Have you got that?

MR. O'REILLY: It's Department's 2.

MR. LOVETT: 2.

(Whereupon, a document was handed to the witness.)

A Thank you.

Q Do you have Department's 2 there, Chief?

A Yes, I do.

Q Would you turn to Chapter 19, Section 2.0, please?

A This is the supplement of the rules and regulations. I would need to refer to a copy of the rules and regulations of the department.

Q So what you are holding, Department's 2, is not the rules and regulations of

the department?

A It's a supplement to the rules and regulations of the department.

Q Did my client ever ask you to provide him with a copy of Chapter 19, Section 2.0?

A Yes, he did.

Q How many times?

A I don't recall.

Q Did he do it in writing or verbally, or both?

A Writing.

Q And on the first occasion he did that what did you give him?

A I don't recall.

MR. O'NEIL: I'm going to object to this line of questioning. The charges at issue allege violations of the rules and regulations, duties rules of conduct which you do have before you in evidence. They also allege violations of the orders that are also in evidence. It's not making any reference to the section that Mr. Lovett is making reference to now.

MR. LOVETT: That is my point. My client was charged with violating a sick

leave policy, which I think members of this Village Board of Police Commissioners will probably full well appreciate has nothing to do with the charges, because the language about staying home and calling in sick is limited to circumstances where somebody is sick, S-I-C-K, and nothing to do with job disability. What the Chief said in the memorandum that we've offered as A for ID now in evidence says that the requirement to remain in the residence derives not from Exhibit 3A in evidence, but from Chapter 19, 2.0 of the rules and regulations.

MR. O'NEIL: Actually --

MR. LOVETT: And, excuse me, I didn't finish. If that is the case you've got to wonder why he didn't charge that in the written charges that are the predicate of this proceeding, and why in God's name they did not give you a copy of the rules and regulations that they claim required my client to stay in his house during his tours of duty when he was "sick or

injured. "

MAYOR MARVIN: I'm prepared to overrule the objection.

MR. O'NEIL: Could I just be heard briefly on that?

MAYOR MARVIN: Yes.

MR. O'NEIL: Just so it's clear, as you try to follow along, the charges that are in evidence as Department's Exhibit 1 are not making reference to the rules and regulations. They are making reference to Section A6 of the sick leave policies and procedures, which Officer Kempkes signed for. They are very specific about this issue. There is no reference in any of these charges in the sections of the rules and regulations he is making reference to.

MR. LOVETT: And the reason is the Chief's memo, Exhibit A in evidence, contained a con calculatedly false reference to a non existing chapter and section in the rules. My client will show you where he asked three times in writing to be given that, because the rules, not the supplement, don't have it, and the

Chief ignored him, and my client right now is going to get the rules that the Chief says contained Chapter 19, Section 2.0. They don't. What I want you to see is that the Chief, perhaps with the help of Counsel, is trying to hoodwink you, because he believed, or falsely asserted in writing in Exhibit A that the source of the you must stay home provision is in Chapter 19, 2.0, not in the sick leave policy 3A in evidence, because on its face, no matter how you read it it does not require anyone to stay home unless, A, they call in, which my client didn't do on July 6th, and B, they call in sick, which he didn't do, because he was not sick. This is a smoke and mirrors routine attempt to purpurate a fraud on you, and I don't think you ought to allow it, whether Mr. O'Neil objects or not.

MAYOR MARVIN: I'm prepared to overrule the objection.

(Whereupon the Board was polled.)

MAYOR MARVIN: Objection overruled.

MR. LOVETT: Thank you. Could you

read back the question?

(Whereupon, the testimony was read back by the reporter.)

MR. LOVETT: Lets mark as Charged Party's B for ID a July 21, 2005 memo from my client, and I'll stop at that for the moment.

(Whereupon, a memo was received and marked as Charged Party's Exhibit B, for identification, as of this date.)

Q Chief, would you take a look at Charged Party's B for ID and tell me if you have seen that before?

(Whereupon, the witness peruses a document.)

A I don't recall.

Q Okay, why don't you take a look at what we are going to mark as Charged Party's C for ID?

(Whereupon, a memo was received and marked as Charged Party's Exhibit C, for identification, as of this date.)

Q Chief, take a look at Charged Party's C for ID and tell me if you recognize that.

(Whereupon, the witness peruses a

document.)

Q Do you recognize it?

A I don't recall.

MR. LOVETT: Okay, let's mark as Charged Party's D for as ID a memo dated 9/6/05. It has your name on there. It's from my client.

(Whereupon, a memo was received and marked as Charged Party's Exhibit D, for identification, as of this date.)

Q Could I have the rules and regulations back?

(Whereupon, a document was handed to Counsel.)

Q Take a look at Charged Party's D for ID and tell me if you recognize that.

(Whereupon, the witness peruses a document.)

A Yes, I do.

Q You recognize that?

A Yes, I do.

Q What do you recognize D to be?

A A departmental electronic e-mail sent to me from Officer Kempkes.

MR. O'REILLY: Excuse me a second.

Did Mr. Lovett, did you say you intend to call Lieutenant Satriale?

MR. LOVETT: No, I told him and I told Chris that I don't need him.

MR. O'REILLY: You don't need him? Because I saw him sitting here and I became concerned.

MR. LOVETT: No, that is not a problem. He can stay if he wants. Thank you.

Q I'm sorry, did you answer?

A Yes.

Q What is it?

A A Bronxville Police Department departmental electronic e-mail sent to me from Officer Kempkes.

Q You received that from him?

A Yes, I did.

Q When?

A I don't know. I can't tell you that.

MR. LOVETT: I offer D into evidence.

MR. O'NEIL: No objection.

MAYOR MARVIN: Okay, that document

will be in evidence, D.

(Whereupon, Charged Party's Exhibit D, previously marked for identification was received in evidence.)

Q Now, the Village of Bronxville Police Department Rules and Regulations Duties and Rules of Conduct which are in evidence as Department's 2 you say is a supplement?

A Yes, sir.

Q The supplement is the only thing that has been distributed to the sworn members of the department, isn't that true?

A No.

Q When was what you call the underlying rules distributed?

A I'm sorry?

Q You say there is an underlying rules that this is a supplement to, Exhibit 2.

A Right.

Q When was the underlying set of rules distributed to anybody?

A I can only tell you when I received mine.

Q When did you get yours?

A May 19, 1986.

Q Thereafter, have you ever distributed that or an underlying set of rules to anybody?

A No.

Q Has anybody such as my client ever said to you that the underlying set of rules does not contain the provision that you said it does in your memo, which is Charged Party's A, that is that the Section 2.0 of Chapter 19 does not require someone to stay in their home if they call in sick?

A No.

Q No what?

A The answer to your question. No one has ever said that to me, other than your client right now.

Q And it's your sworn testimony then that Chapter 19, Section 2.0 says in words or substance that if a member of the department, sworn member is absent from work due to illness or injury that person must remain in their residence during the hours of their regularly scheduled tour?

MR. O'NEIL: I object. Obviously the best evidence of what that document says is the document, itself. I renew the objection to this line of questioning,

Department's Exhibit 4, which is in evidence which goes back to 2003 is a document signed by Officer Kempkes, wherein he accepted the forfeiture of 20 hours of compensatory time, and a 12 day suspension not for violating any rules and regulations, for violating the same sick leave policy and procedures that is contained in the charges in this proceeding. It doesn't go back to stay at home, you can't leave your home which relates to paragraph 6, not calling before you leave, and leaving the home without the call.

The procedures that Mr. Lovett is making reference to are not mentioned in these charges, because that is not what these charges are about. There are other rules in the document that he has made reference to that were in effect and had relevance in 2005, but they certainly don't have any relevance to the charges he settled, or to the charges that are at issue in these proceedings. Those are related to a specific sick leave policy

and procedure. It was put into effect. It was acknowledged as being received by Officer Kempkes, and in fact it was violated. So I don't know why we would be going back to 2005 when we are talking about a 2006 case, or going back to rules and regulations that are nowhere mentioned in these charges.

MR. LOVETT: I'm surprised Counsel can keep a straight face when he tells you that. The reason I'm urging you to go back and look at, first of all, I'm sure Counsel can produce that document for you so you can look at what the Chief claims to be the underlying rules and regulations so that we can find out what his answer would be if he hadn't had that last interjection interposed, because there is no way in the world that the underlying rules which have in fact not been distributed to the members of the department provides what the Chief falsely asserted in Charged Party's A. That is why all the bluster and trying to go back to this command discipline to compound the

meadow muffin, as I referred, to divert your attention. 3A in evidence does not require someone calling in sick. I'm sorry, it does not require somebody such as my client who is not calling in sick to remain in their home. It does specifically provide in the language if you call in sick then you are obligated under that policy to remain in your home, and it also says what happens when you are calling in or you are returning to work. It has nothing to do with the false representation made by Downey, Chief Downey in Charged Party's Exhibit A.

So why don't you direct the Chief to produce the underlying supposed rules and regulations so this bluff can be called, because I'm telling you from what I understand of Chapter 19, Section 2.0, it does not say where the Chief falsely wrote, perhaps with the assistance of Counsel, and that is why the charges are based on something which on its face does not require anybody in my client's position to stay in their house. They know

it. If you want to let them slide a fraud by you don't follow-up on my suggestion, but I think you ought to look at the underlying rules and regulations, because the Chief is lying to you, as he lied to my client in Charged Party's A.

MAYOR MARVIN: I'm prepared to overrule the objection.

(Whereupon the Board was polled.)

MAYOR MARVIN: Objection overruled.

MR. LOVETT: Thank you.

Q So, Chief, tell the Board under penalty of perjury whether in Chapter 19, Section 2.0 of the department rules and regulations it says in words or substance that if a sworn member of the department is absent from work due to illness or injury that individual must remain at their residence during the hours of their regularly scheduled tour, yes or no?

MR. O'NEIL:: Just so it's clear to me, I have an objection. Are you going to allow him to testify about what is in a written document? Is that the objection that is overruled?

MR. O'REILLY: No, he's allowed to

answer the question as asked.

MR. O'NEIL: He's going to testify as to what is in a written document?

MR. LOVETT: No, what it says in words or substance, as he managed to paraphrase himself in Exhibit A.

MR. O'REILLY: He's going to answer the question he was asked.

Q Would you answer the question, Chief? It's a yes or a no.

A I can't answer that question.

Q Why not?

A Because I don't recall in words or substance what it says, at this point in time.

Q Well, take a look at Exhibit A, second paragraph where you, yourself, said to my client, "as you have been reminded in the past pursuant to Chapter 19, Section 2.0, etc.," doesn't that jog your memory as to what actually is contained in Chapter 19, Section 2.0?

MR. O'NEIL: Seriously, this is exactly why the rule exists. To ask somebody to try to remember what is in a written document when the written document exists, and you can all look at it, is the

reason why the best evidence rule exists, so someone doesn't have to remember what is written when you can look at the written document and see what it says. If you're going to allow him to testify about this have him produce the document.

MR. LOVETT: Why don't you do that and put an end to this charade.

MR. O'NEIL: Don't --

MR. LOVETT: Excuse me, don't interrupt me. He has the underlying rules, and he has not produced them because he knows perfectly well I'm right, and the Chief's pretense at memory failure is strategic. How in God's name could he write what is in Exhibit A if he didn't understand what was supposedly in Chapter 19, 2.0? He wrote it. He signed it. He sent it. So now we are supposed to believe that Alzheimer's has suddenly kicked in and he doesn't remember what's in the document that he paraphrased?

MR. O'REILLY: All right. Do you have the document, Mr. Lovett?

MR. LOVETT: I thought I might, but

my client doesn't have it with him.

MR. O'REILLY: Do you have it, Mr. O'Neil?

MR. LOVETT: If you do let me have it. I will offer it as an exhibit.

MR. O'NEIL: If you tell me to give it to him I will, otherwise I'm not giving him anything.

MR. O'REILLY: Would you please give him the document?

MR. O'NEIL: Excuse me, Mr. Lovett, go sit down and I'll bring it to you when I find it.

MR. LOVETT: No, that's all right. I'll wait for you to find it. I wouldn't want you to have to get up and --

MR. O'NEIL: Excuse me, but could you ask him to please sit down and I will bring it over to him when I find it?

MR. LOVETT: You said you got it, so c'mon, hand it over. Now we are going to play shovel the papers?

MR. O'REILLY: Mr. Lovett, would you please take your seat and he will bring you the document when he finds it?

MR. LOVETT: I'm sitting down. This charade is coming back to bite you, Counselor, not me.

(Whereupon, a document was handed to the witness.)

MR. LOVETT: Can we have a minute, please?

MAYOR MARVIN: Yes.

MR. O'REILLY: Sure.

MR. LOVETT: Thank you.

(Whereupon, a short recess was taken.)

MR. LOVETT: I would like to have marked as E for identification a multi-page document, the first page of which makes reference to Police Manual under cover of a November 25, 1964 memo, and the document, itself, is bait stamped, that is B-A-I-T, as 003, and nothing else has got a stamp on it at all.

(Whereupon, a document was received and marked as Charged Party's Exhibit E, for identification, as of this date.)

Q Do you have Exhibit 4 there, Chief?

MR. O'REILLY: Department's 4 you

are talking about?

MR. LOVETT: Board's 4 or Department's 4, the rules and regulations.

MR. O'REILLY: I believe that 2.

A 2.

Q Yes, do you have that?

A Yes.

Q Would you tell the Board where it says in that document that that is a supplement to the rules and regulations?

A Well, I don't see anywhere where this says it's a supplement.

Q Pardon me?

A I said I don't see anywhere where it says supplement.

Q Then why did you call it a supplement?

A Because it is.

Q Who adopted the supplement, to your knowledge?

A It was given as a supplement to the original rules and regulations by Chief Steinmuller.

Q It's not your belief, I take it, that Exhibit 2 was intended to supercede Exhibit E?

A No, I know it's not.

Q What?

A I know it's not to supercede. It's the supplement.

Q And is there a reason that the supplement doesn't exist in Exhibit 2, right?

A I didn't issue it, sir. I don't know why.

Q And is there a reason why when Exhibit 2 was offered into evidence it was not offered in as a supplement? It was offered in as the department rules and regulations, don't you remember that?

A I don't know how it was offered in, no.

Q You were here, present, when that document was offered, weren't you?

A Yes.

Q And you don't recall how it was offered in?

A No, I don't recall.

Q You don't recall thinking that is incorrect, it's just a supplement?

A I don't recall how it was offered in.

Q I'm going to read you something from what you claim are the underlying rules, Exhibit E, Chapter 19, Section 2.0, the heading of which says --

MR. O'NEIL: I'm going to object to you reading anything that is not in evidence, or identified by the witness.

MR. LOVETT: Oh, you're right. Forgive me. Forgive me.

Q Take a look at what your attorney represents are the underlying rules and regulations, Chief, and tell me if he spoke truthfully?

A They appear to be a copy of the Bronxville Police Department Rules and Regulations.

Q It is a copy, isn't it?

A It appears to be, yes.

Q You have somewhere in your possession, custody, and control a signed receipt signed by my client for a copy of that, right?

A No.

MR. O'NEIL: Objection.

Q No?

MR. O'NEIL: Of what?

MR. LOVETT: He already answered no.

MR. O'NEIL: Objection.

MR. LOVETT: To what? He already answered. He said no.

Q How is it, Chief --

MR. O'NEIL: I have an objection. Can I get a ruling so we don't get into a confused record?

MR. O'REILLY: Can we hear Mr. O'Neil, please?

MR. O'NEIL: Can you read back the last question where he said something about a receipt for a copy of that?

(Whereupon, the last question was read back by the reporter.)

MR. O'NEIL: He has in his hand right now, or in front of him, or in his lap, two different document.

MR. LOVETT: I'm talking about E. I believe everyone understood that.

MR. O'NEIL: You know, I know she can't take us both down.

MR. LOVETT: No, excuse me.

MR. O'NEIL; I'm not finished speaking, Mr. Lovett.

MR. LOVETT: Excuse me.

MR. O'NEIL: Can I please have --

MR. LOVETT: It is perfectly clear that you want to create confusion on the record. Let me rephrase the question where he --

MR. O'NEIL: I want to create confusion?

MR. O'REILLY: All right, hold on. Can we hear from Mr. O'Neil first, and then you?

MR. LOVETT: Fine, I'll withdraw my last question so he can babble about nothing.

Q My question is, Chief, take a look at Exhibit E which you are holding, not the Exhibit 2 which you are not holding, and tell me whether you have a receipt signed by my client for Exhibit E?

MR. O'NEIL: I have an objection. Just so it's clear, at some point in this proceeding there has to be an explanation as to how someone puts up with what he does here.

MR. LOVETT: It's easy. They don't want to hear you lie. You said the Chief

is holding two documents. Exhibit 2 is not in his hand, Counselor. It's on the floor. It's on the stoop.

MR. O'NEIL: You know, I've remained quiet while he babbles on and on. I do it because this is very valuable time for everybody on this panel. There is lots of conduct that he has engaged in that is incredibly objectionable. I remain quiet because I think this Board's time is valuable. I can make this into an eight day proceeding if I objected to all of it. He makes the most outrageous accusations because he's covered by a privilege, perhaps. If he's not covered by the privilege then the outrageous comments he makes he will be held responsible to answer to. I will take care of that in a separate proceeding --

MR. LOVETT: Oh, you think you can intimidate me?

MR. O'NEIL: Excuse me.

MR. LOVETT: You're out of your mind.

MR. O'NEIL: Excuse me.

MR. O'REILLY: Mr. Lovett, please.

MR. LOVETT: No, I'm not going to take that crap from him.

MR. O'REILLY: You will have your turn.

MR. LOVETT: You're damn right I will.

MR. O'NEIL: He does it because he is protected by privilege. He does it because he is protected by a suit. If he engaged in this conduct outside of this proceeding he knows what it would subject him to --

MR. LOVETT: Yeah, absolutely nothing.

MR. O'NEIL: He's protected by doing it in a proceeding like this. He doesn't do it in the hallway. He doesn't do it out in the street, and there is a reason he does that, because here he is privileged. Out there he has to tell the truth --

MR. LOVETT: Read the civil rights law, my friend. Anybody --

MR. O'NEIL: Don't misread his --

MR. LOVETT: Do you think you're intimidating me, please? Yeah, keep talking.

MR. O'REILLY: All right, okay, please.

MAYOR MARVIN: One at a time, please.

MR. LOVETT: Like this cannot purposely --

MR. O'NEIL: -- no grown adult would behave this way. It's not appropriate. It's not --

MR. LOVETT: Are you done? Are you finished babbling yet?

MR. O'NEIL: He would not engage in this type of behavior anywhere outside, believe me.

Q Chief --

MR. O'NEIL: Excuse me, stop interrupting me already, would you?

MR. LOVETT: Are you done? Are you done?

MR. O'REILLY: Mr. Lovett, please. Let Mr. O'Neil finish.

MR. LOVETT: Oh, please. Enough

already. He is in love with his own voice. It's never ending. Are you done? Okay, good.

Q Chief, here is a question for you, your attorney said that you were holding Exhibit E, and you were holding Exhibit 2 when I asked you the question. Would you tell the Board where Exhibit 2 was?

MR. O'NEIL: Objection. Objection. I still have an objection.

MR. LOVETT: No, because you lied again.

Q Chief, would you tell the Board where Exhibit 2 is? It's not in your hand, is it?

MR. O'REILLY: I'm going to ask the witness to answer the question.

A I don't know which question to answer first.

MR. O'REILLY: All right, the Board is going to caucus. Chief, don't speak to anybody about your testimony.

CHIEF DOWNEY: I will separate myself from everyone.

MR. O'REILLY: Good.

Q Why don't you start with the

question as to --

MR. O'REILLY: Mr. Lovett?

Q -- where was Exhibit 2 --

MR. O'REILLY: Mr. Lovett, we are going to caucus. Thank you.

(Whereupon the Board conducts a caucus.)

MR. O'REILLY: Before we proceed the Mayor wants to say something.

MR. LOVETT: Pardon me?

MR. O'REILLY: The Mayor is going to make a statement.

MAYOR MARVIN: I would just ask both Counsel to please behave more civilly out of respect for all of us, and we are here tonight to hear only the facts, and please don't speak over each other, as well, so our stenographer can't get a complete record. Thank you. I believe it is Mr. Lovett, at this point.

Q My question was, Chief, when I asked you about that document, the one you are holding, you have got Exhibit E in your hand, right?

A Yes, sir.

Q When I asked you the question that Mr. O'Neil objected to where was Exhibit 2?
A Exhibit 2 is in front of me.
Q On the stairs?
A On the first stair leading up to the stage.
Q And you are not holding it?
A I'm not holding it.
Q And you were not holding it when I asked the question Mr. O'Neil objected to, right?
A No, I wasn't.
Q So let me ask you again, with respect to the document you are holding, Exhibit E, do you have a receipt from my client that he was ever given a copy of that?
A No, not that I'm aware of, no.
Q Do you have a receipt from any member of the department that they received a copy of Exhibit E?
A I can't answer that question. I don't know.
Q I call your attention to page 28 of the transcript of this hearing as of December 13 '06. Page 28 at line 11, it says Mr. O'Neil, and then he's attributed to saying, I would ask that

this be marked as Department's Exhibit 2, and then it indicates in parentheses, (whereupon a rules and regulations of the document was received and marked as Department's Exhibit 2 for identification, as of this date.) Is it your testimony that what was marked as 2 is a supplement to Exhibit E?

A Yes.

Q Do you know under Section 5711-Q who, alone, has the power to document rules and regulations for your department?

MR. O'NEIL: Objection. That is asking for a legal conclusion.

MR. LOVETT: No, I'm asking if he knows.

MR. O'NEIL: Mayor, I thought you asked that we not speak over one another? With all do respect, I don't believe I was guilty of that, so I think if you are going to address that to someone you should do it to the person who is doing it. When he talks I stop. I have an objection. It is still my turn to talk, so if I can be asked to complete what I was saying? You are asking a question of a Police Chief to give a legal

interpretation.

MAYOR MARVIN: Objection sustained.

MR. LOVETT: Well, what he said, though, was not quite true, because he falsely represented the Chief was holding Exhibit E and 2 at the time I asked the earlier question. That is why I wanted the record cleared up. Your client did a good job of doing that.

MR. O'NEIL: Actually, Mr. Lovett, in response to that objection, I said they were in front of him, which he did clear it up. They were both in front of him.

MR. LOVETT: Okay.

Q Now, do you know, Chief, as a matter of fact whether the Board of Police Commissioners of the Village of Bronxville adopted as the rules and regulations for the department that you head Exhibit E?

A No.

Q Do you know if the Board of Police Commissioners or the Village Board for the Village of Bronxville adopted as the department rules and regulations what is in evidence as Exhibit 2?

A No.

Q Did you promulgate and document Exhibit E?

MR. O'NEIL: I'm going to have an objection. If there is going to be any more questions as to Exhibit E I ask that it be moved into evidence.

MR. LOVETT: I move it into evidence.

MR. O'NEIL: No objection.

MAYOR MARVIN: Exhibit E will be in evidence.

(Whereupon, Charged Party's Exhibit E, previously marked for identification was received in evidence.)

Q Chief, with respect to Exhibit 2, was that ever adopted by anybody, to your knowledge?

A No, not that I'm aware of.

Q Do you know whether Exhibit 2 ever became effective?

A It's part of the rules and regulations. It's the duties of rules of conduct of the Bronxville Police Department. Yeah, they are effective.

Q How do you know they are effective?

A Because that is how they were represented to me back when I received them in 1988, I imagine.

Q Have you ever seen anything in writing that evidences an effective date for Exhibit E?

A No.

Q Have you ever been shown a resolution of the Village Board or the Village Board of Police Commissioners documenting Exhibit 2 and making if effective?

MR. O'NEIL: Objection. So that we don't get lost in this maze, I think it's important, I know you only have one copy of that document, Exhibit E, but if you were to look at the document, perhaps Mr. O'Reilly can take a look at it in order to advise the Board, there is a reference in the forward on the second page of that document where it appears to have been adopted by the Mayor and Trustees at the time it was implemented. There is also a paragraph in that document, a paragraph three that says, and I'm quoting from the document that is in evidence now, "these

rules and manual of procedures are not all inclusive. Periodic orders and directives of the Chief of Police will provide a constant supplementary guide to me challenging conditions." Changing conditions, I'm sorry.

Now, the documents are what they are. The legal effect of those documents are something that is not a factual thing to be inquired of this witness. They are what they are, and were adopted when they were adopted, whether they were supplementary or whatever way they came in, and, in any event, they are irrelevant. The charges are about an order that was issued, received, pled guilty to once before, and now violated again. So what relevance all of this has, at this point, at least if you can see these connections I'm going to renew my objection to this line of questioning.

MR. O'REILLY: Mr. Lovett?

MR. LOVETT: Well, I think the issue can be resolved in our post hearing submissions. If in fact Exhibit E was

adopted by the Board of Police Commissioners of the Village Board, and by contrast Exhibit 2 was not, then Exhibit 2 isn't the supplement to anything. It is a nullity, and if Exhibit 2 was adopted by the Village Board there has got to be a resolution on file evidencing the adoption, which I'm sure Mr. O'Neil can produce for us in a heartbeat, and the issue to be resolved in the post hearing submissions is, if there is a department set of rules that is in effect, was Exhibit E superceded by something, and if so by what? Is Exhibit E still in effect? Was Exhibit 2 ever adopted with an effective date by the Village? If not this is as much to do about absolutely nothing. So I would suggest that we rest, and we want 30 days, unless of course there is a rebuttal case, from the date we get the last transcript to post Memorandum of Law. In the meantime, I'm going to foil from the Village, unless Mr. O'Neil wants to save some time, the resolution of the Village documenting and putting into

effect Exhibit E, and whatever there may be, if anything, that makes effective Exhibit 2.

MR. O'REILLY: Just so the record is clear, you are withdrawing the pending question?

MR. LOVETT: Yes.

MR. O'REILLY: And you have no more questions of this witness?

MR. LOVETT: That is right. We rest.

MR. O'REILLY: Well, Mr. O'Neil gets a chance to ask him some questions.

MR. LOVETT: Oh, okay.

MAYOR MARVIN: Mr. O'Neil?

CROSS EXAMINATION BY MR. O'NEIL:

Q Chief, Exhibit 2, do you recall when you first received a copy of that document?

MR. LOVETT: Objection. It's irrelevant. It's bonafide.

MAYOR MARVIN: I'm prepared to overrule the objection.

(Whereupon the Board was polled.)

MAYOR MARVIN: Objection overruled.

A Specifically, no. The exact date I do not recall.

Q Do you recall what rank you were when you received that document?

MR. LOVETT: Objection. It's irrelevant. Who cares what his rank was.

(Whereupon the Board was polled.)

MAYOR MARVIN: Objection overruled.

A Yes, I do.

Q What rank did you hold?

A Patrolman.

Q Do you recall whether it was near the beginning of your career in the department?

MR. LOVETT: Objection, leading.

MR. O'NEIL: It's cross-examination.

MR. LOVETT: So what. It's your client. You can't lead on cross or direct.

MR. O'NEIL: He's not my client.

MR. LOVETT: Oh, I see.

MR. O'NEIL: He's the Chief.

MR. LOVETT: Who do you represent again, the Village Board?

MAYOR MARVIN: Overruled. Chief, you may answer the question.

A It was within the first two years of my career. I was appointed in '86, and appointed to Detective in '88.

Q Chief, when you first were made aware of Officer Kempkes' whereabouts on July the 6th of 2006, what, if anything, did you do with regard to that incident?

MR. LOVETT: Objection. It's improper cross. What he did is not the subject of direct-examination, and it's not a proper subject for cross. If we are thumbing around for something to fill a gap it's a waste of everybody's time.

MR. O'NEIL: He inquired as to the suspension and what he did immediately after the incident. That is what I'm inquiring about.

MR. LOVETT: No, I didn't. I asked for the date, July 6 '06, that's it. I didn't ask what the Chief did or didn't do.

MAYOR MARVIN: I'm going to prepare to overrule that objection.

(Whereupon the Board was polled.)

MAYOR MARVIN: Objection overruled.

A I'm sorry, can you repeat the question?

(Whereupon, the last question was

read back by the reporter.)

A I instructed Lieutenant Satriale to conduct an investigation.

Q And was it at that time that you suspended Officer Kempkes?

A No.

Q How soon after that?

A The next day.

Q Did there come a time when Lieutenant Satriale completed his investigation?

A Yes.

Q And when that investigation was completed, what, if anything, did you do with regard to Officer Kempkes' pay status?

A I changed his suspension without pay to suspension with pay.

MR. O'NEIL: I have no further questions.

MR. LOVETT: Nor do I.

CHIEF DOWNEY: If I may? If I may?

MR. O'REILLY: No, there is no pending question.

CHIEF DOWNEY: I would like to clear a question that was asked of me earlier by Mr. Lovett that I know recall.

MR. LOVETT: No, there is no pending question.

MR. O'REILLY: Well, yes, he can if it is to clear up a prior question that he gave. If it needs clarification he can certainly clarify it for the record.

MR. LOVETT: Well, he can't clear up a question. He can clear up an answer.

MR. O'REILLY: I change my statement. If it is to clarify an answer he previously gave.

MR. LOVETT: Fine.

A The exact question I don't recall. It was whether or not I have any knowledge of any members of the police department signing for, I don't know the exhibit, because Mr. Lovett has it, but it was the Charged Party's --

MR. O'REILLY: E, I believe.

A Yes, I believe the rules and regulations of the department, and my answer I would like to change to yes, I do have direct knowledge of that.

MR. O'REILLY: Thank you.

Q Who is that?

A Officer Anderson and Officer

Addimando.

Q And when were those officers hired, Chief?

A I believe August of 2006.

Q Both of them?

A Both of them.

MR. O'NEIL: Just one second.

(Whereupon Counsel confer.)

MR. O'NEIL: I have no further questions.

MR. O'REILLY: Mr. Lovett?

REDIRECT EXAMINATION BY MR. LOVETT:

Q How is it, Chief, that in August of 2006 two new hires were given Exhibit E?

A Because I had conversations with Lieutenant Satriale after an arbitration case on an arbitration case that the PBA brought on behalf of Officer Kempkes. Officer Panzarino had made, his attorneys made statements to the arbitrator that they did not have copies of the rules and regulations, that Officer Panzarino did not have a copy of that. I had subsequently asked Lieutenant Satriale if that were true, knowing nothing that I had received a copy back in 1986, and he had said that he was not issued a copy, either.

Q So why was Exhibit E only given to two newly hired officers as opposed to everybody on the job?

A That is all I had prepared at the time when the officers came on.

Q What is all you had prepared?

A I prepared two copies for the new officers as they came on, and I will distribute it to everybody between those two officers and myself. Officer Kempkes has a copy that he foiled.

Q He made a written request that he be provided it, and how long did it take before he was given a copy of Exhibit E?

A The request he made of me, he had received several responses back from me advising him to bring to me what he had so we could discuss it. He refused to have a meeting with me. My last e-mail to him said do not contact me any further on this issue unless you are willing to meet on it. He saw no reason to meet.

Q So why when you gave the two new hires Exhibit E didn't you distribute it department-wide with some kind of cover memo?

A I have yet to determine who doesn't have a copy of it.

Q How are you going to do that?

A Everyone prior to me should have it. I'm going to have each officer come in and meet with me to discuss the matter, as I offered Officer Kempkes.

Q And the arbitration you referenced occurred when in relationship to August of '06?

A I would probably say I could not answer that, because I can only tell you what I believe.

Q Well, it was before my client was brought up on charges by you, wasn't it?

A Correct.

Q And so after my client was brought up on charges for the first time you distributed Exhibit E to only two members of the department, right?

A After July 6th, yeah. I didn't hire them until after your -- I didn't hire the two officers until after your client violated the sick leave policy.

Q No, you didn't hire them at all, did you?

A I recommended to the Board that they be hired.

Q When you gave those two new hires Exhibit E, was that under cover of some kind of writing?

A Yes.

Q What did the writing say?

A It's the distribution list that I believe there is a copy of in evidence.

Q The distribution list that relates to?

A For the sick leave policy.

Q Exhibit 2?

A I'm sorry?

Q When are you planning to distribute to all of the sworn members of the department Exhibit E?

A When I meet with them individually and ask them if they received a copy.

Q So when are you planning on doing that?

A As soon as my health gets better and I'm back to work full-time and I can schedule a meeting with each and every member of the department.

MR. LOVETT: I have nothing further. Thank you.

RECROSS EXAMINATION BY MR. O'NEIL:

Q Chief, at the arbitration involving Officer Kempkes' grievance, did the PBA Attorney request a copy of the rules and regulations that are now in evidence as Exhibit E?

MR. LOVETT: Objection, leading.

MAYOR MARVIN: I'm prepared to overrule that objection.

(Whereupon the Board was polled.)

MAYOR MARVIN: Objection overruled. Answer, please.

A Not directly to me, no. Through my attorneys.

Q And did we request a copy of you to provide to the PBA Attorney?

A Yes.

Q Did you provide that to us?

A Yes.

Q Did you receive a copy of a letter that we sent to Attorney Harold enclosing a copy of those rules and the regulations?

A Yes.

Q And was that before the charges were instituted in this proceeding?

A Yes.

Q Do you recall how long before the charges that that occurred?

A I can only guess. I would say within a year, though.

Q I'm going to show you a document.

MR. O'NEIL: I'm going to ask that the document be marked for identification as Department's Exhibit 20.

(Whereupon, a letter was received and marked as Department's Exhibit 20, for identification, as of this date.)

Q Chief, I'm going to ask you to look at a document that has been marked for identification as Department's Exhibit 20 and ask you whether you can identify that document for us?

A Yes, I can.

Q Can you tell us what it is?

A It's a copy of a letter that I received from Chris Kurtz with Bond, Schoeneck & King with regard to a request for the department rules and regulations of Chris Harold.

Q Did you receive a copy of that letter?

A Yes, I did.

Q Did you receive it on or about --

MR. LOVETT: Just offer it. I have no objection.

MR. O'NEIL: Sorry?

MR. LOVETT: Just offer it. I have no objection.

MR. O'NEIL: Okay. Can we offer that it be received in evidence?

MAYOR MARVIN: All right, it will be received in evidence.

(Whereupon, Department's Exhibit 20, previously marked for identification was received in evidence.)

MR. O'NEIL: We have nothing further of this witness.

RE REDIRECT EXAMINATION BY MR. LOVETT:

Q Chief, when you got Exhibit 20 did you contact Mr. Kurtz and ask him why he does not say that the department rules and regulations that are referenced were in effect?

A No.

MR. O'NEIL: Objection as to any attorney/client communications.

MR. LOVETT: Well, I don't want the Board to be misled by putting in a letter that doesn't say whatever is covered in

was in effect, at any point in time, ever. I will withdraw the question, okay?

MAYOR MARVIN: All right.

MR. LOVETT: I have nothing further.

MR. O'REILLY: Okay, do you have anything more?

MR. O'NEIL: Nothing further.

MR. O'REILLY: Before the witness is excused the Board is going to caucus. Chief, again, please don't discuss your testimony with anybody.

CHIEF DOWNEY: I will keep myself separated from everybody in the hall.

MR. LOVETT: Before you caucus I have one request that may save everyone time. Presumably, those who can probably most quickly get their hands on a resolution, if there is one, adopting and putting in effect Exhibit 2 is the Village Board, or its clerk. Perhaps that can be produced and copied by Mr. O'Reilly to Counsel.

MR. O'REILLY: Okay, we will discuss your request while we caucus.

MR. O'NEIL: Exhibit 2 or Exhibit E?

MR. LOVETT: Well, let's make it both, because I suspect that if there were two resolutions one is going to supercede the other.

MR. O'REILLY: Okay, so the request is as to Exhibit 2 and --

MR. LOVETT: And E, yes. If there is a resolution let's see it, all right, or both of them.

MR. O'REILLY: Thank you.

(Whereupon the Board conducts a caucus.)

MR. O'REILLY: The Board has asked me to speak to the two matters, or one matter that is pending, and to ask a question of Chief Downey. With respect to your request, Mr. Lovett, the Board, the Mayor is going to make inquiry about the resolutions that you asked about.

MR. LOVETT: Thank you.

MR. O'REILLY: And we will advise the parties accordingly, and we will provide the parties with an opportunity, if they deem it necessary, to reopen the hearing to address the two resolutions, if

necessary.

MR. LOVETT: Okay.

MR. O'REILLY: The questions for you, Chief Downey, is would you please tell the Board what a police officer's entitlement is when the officer is unable to work due to non job related reasons.

MR. DOWNEY: It is spelled out in the sick leave policy. They must stay at home and call in.

MR. O'REILLY: The entitlement, sir, is pay, benefits, and so on. Is there a defined period of time? Define sick leave.

CHIEF DOWNEY: For a non job related injury?

MR. O'REILLY: Non job related reasons. You can't work.

CHIEF DOWNEY: Right.

MR. O'REILLY: What is it?

CHIEF DOWNEY: Define the period of time.

MR. O'REILLY: What does an officer get in terms of pay?

CHIEF DOWNEY: Beyond sick leave, at that point he would get full pay.

MR. O'REILLY: For what duration?

MR. DOWNEY: Until I removed him from service. One year, I would say, continuous year of service of that job injury.

MR. O'REILLY: And that would be pursuant to procedures under the civil service law?

CHIEF DOWNEY: I believe so.

MR. O'REILLY: Okay, thank you. We have no further questions.

MR. O'NEIL: Can I just follow-up on that?

RE RECROSS EXAMINATION BY MR. O'NEIL:

Q Just so it's clear, so they are not given an annual number of sick leave days per year, correct?

A The contract is unlimited.

MR. O'NEIL: Unlimited, thank you.

MR. O'REILLY: Do you have any questions, Mr. Lovett, on this subject?

MR. LOVETT: No.

MR. O'REILLY: All right, thank you, Chief.

CHIEF DOWNEY: Thank you.

MR. O'REILLY: Mr. Lovett, any other witnesses?

MR. LOVETT: No.

MR. O'NEIL: We have no further witnesses, unless, though, we are required to do something that is unaccustomed as to some common ground with Mr. Lovett. There are prior disciplinary actions against Officer Kempkes unrelated to the one included in the charges that we believe the Board is sophisticated enough to take into evidence for penalty purposes, only. There are a number of them over the years that have been administered, and there are various ways you can handle that. You can take them now, consider it for penalty, only, or you can reserve your right to take that evidence. Following as they sometimes do under Section 75, sometimes they will bifurcate and have another hearing, and they will take the evidence that is in someone's personnel file, give the other side an opportunity to respond to it, so I'm open to any suggestions that suit the Board.

MR. O'REILLY: Mr. Lovett, your thoughts on that.

MR. LOVETT: Well, one, the reference that Counsel just made I think is another impermissible one. Now we've got repeated disciplinary floating around, and that shouldn't have been made referenced to on the record. Secondly, it seems to me that what we ought to do is first see what there is, if anything, by way of resolutions with respect to the two rules and regulations, and/or the supplement, and once we've had that to review and we've got the final transcript, if either Mr. O'Neil or I, or the Board for that matter wants anything further with respect to what is or isn't the rules and regulations we can reconvene, if it can't be done on paper, and with respect to the supposed other disciplinaries, I would suggestion a bifurcation.

MR. O'REILLY: Do you want to talk about this?

MAYOR MARVIN: No. What is your judgment on this?

MR. O'REILLY: What I would suggest is that you, Mr. O'Neil, show Mr. Lovett what it is that you propose to have the Board consider, and if, or when it becomes necessary to assess a penalty you can either do that now or you can do that at another time that is mutually convenient, and if there is no dispute about that, that you provide that to the Board in a sealed envelope with a representation by yourself that you conducted with Mr. Lovett, and this is an agreed upon submission to be looked at, only for purposes of penalty.

MR. LOVETT: What I would ask in that connection is that I don't want -- if Mr. O'Neil can send me whatever he made reference to, let me take a look at it, and there may be no dispute as to what is contained in the documentation. If there is then we can notify you. It may be a non issue.

MR. O'REILLY: I understand, but what I'm suggesting is that what be done in advance of the close of the hearing be

provided to us in a sealed envelope, and we will represent to you that it will not be looked at, unless and until it becomes necessary to decide what, if any, penalty to be imposed.

MR. LOVETT: If you want to do that, that is fine with me, so long as before somebody opens up the mayonnaise jar and sees what's in it you've gotten some feedback from us, collectively, as to whether or not there are any charges to the accuracy or authenticity of the contents.

MR. O'REILLY: That is what I meant to say.

MR. LOVETT: That is fine with me.

MR. O'REILLY: Okay, anything else?

MR. O'NEIL: We can certainly do that after the close of the hearing tonight, probably even before briefs are submitted.

MR. O'REILLY: Okay. So you have nothing else?

MR. O'NEIL: Nothing further.

MR. O'REILLY: All right, so what I

propose then is that the Mayor will respond to your requests.

MAYOR MARVIN: Right.

MR. O'REILLY: That we will endeavor to do that before the transcript of tonight's hearing is forwarded to you. Assuming that is accomplished, before then we would ask the parties to promptly notify the Board as to whether or not they wish for the hearing to be, I'll say reopened for purposes of addressing the response given by the Mayor, and secondly, as to whether or not there is a need to hear from the parties with respect to any dispute concerning the submission of purposes of penalty.

MR. LOVETT: Well, with respect to the latter, I think we would all be a little safer if we communicated with you, Mr. O'Reilly, so that we don't, you know, objecting if we do to the substantive contents.

MR. O'REILLY: Yes, I'll be doing the writing and asking you to respond to me.

MR. LOVETT: Fine.

MR. O'REILLY: And depending on the result of all that I'm assuming that the parties wish to make written submissions.

MR. LOVETT: Yes.

MR. O'REILLY: We will give you a date certain as to when it is that we will ask the submissions to be provided to the Board. That will be no sooner than 30 days after receipt of the transcripts, the final transcript. Thank you very much.

MR. O'NEIL: Thank you.

MR. O'REILLY: Mayor, anything else?

MAYOR MARVIN: No.

MR. O'REILLY: Okay, so the hearing is adjourned for now as a result of any further action.

MAYOR MARVIN: All right, hearing adjourned. Thank you. Good night, everyone.

MR. O'NEIL: Thank you.

(Time Noted: 8:20 p.m.)

E X H I B I T S

| CHARGED PARTY'S EXHIBITS | DESCRIPTION | ID/EVD. |
|---|---|---|
| A | 5/26/05 memorandum from the Chief of Police to Officer Kempkes | 13/14 |
| B | 7/21/05 memo from Officer Kempkes | 20 |
| C | Memo | 20 |
| D | 9/6/05 departmental electronic e-mail from Officer Kempkes | 21/23 |
| E | Multi-page document Police manual under cover of an 11/25/64 memo | 32/46 |

| DEPARTMENT'S EXHIBITS | DESCRIPTION | ID/EVD. |
|---|---|---|
| 20 | Letter from Bond, Schoeneck & King | 60/61 |

I N D E X

| EXAMINATION BY | PAGE |
|---|---|
| DIRECT EXAMINATION OF CHIEF DOWNY BY MR. LOVETT | 3-50 |
| CROSS EXAMINATION OF CHIEF DOWNEY BY MR. O'NEIL | 50-55 |
| REDIRECT EXAMINATION OF CHIEF DOWNEY BY MR. LOVETT | 55-59 |
| RECROSS EXAMINATION OF CHIEF DOWNEY BY MR. O'NEIL | 59-61 |
| RE REDIRECT EXAMINATION OF CHIEF DOWNEY BY MR. LOVETT | 61-62 |
| RE RECROSS EXAMINATION OF CHIEF DOWNEY BY MR. O'NEIL | 65-65 |

C E R T I F I C A T I O N

Certified to be a true and accurate transcript of the aforesaid proceeding.

Melissa Sasso

---------------------

Melissa Sasso

**$**

**$100.00** - 372:13

**'**

**'05** - 375:24
**'06** - 406:24, 415:16, 420:7
**'86** - 414:24
**'88** - 414:25

**0**

**003** - 395:19

**1**

**1** - 381:9
**10** - 364:10
**10523** - 365:20
**10530** - 364:24
**10605** - 365:4
**11** - 406:24
**11/25/64** - 435:13
**111** - 364:23
**11530** - 365:9
**12** - 388:5
**13** - 406:23
**13/14** - 435:4
**1399** - 365:9
**13th** - 366:4
**177** - 364:9
**19** - 374:10, 375:2, 375:17, 377:8, 377:15, 378:19, 379:5, 380:14, 382:3, 382:10, 386:25, 387:9, 387:17, 390:19, 391:13, 392:18, 392:20, 393:18, 398:3
**1964** - 395:17
**1986** - 368:6, 386:25, 418:24
**1988** - 410:3

**2**

**2** - 378:1, 378:11, 378:12, 378:16, 378:25, 386:8, 386:18, 396:4, 396:5, 396:25, 397:6, 397:10, 400:16, 401:1, 404:6, 404:7, 404:14, 405:3, 406:2, 406:3, 407:1, 407:4, 407:6, 408:6, 408:24, 409:15, 409:19, 410:10, 412:3, 412:5, 412:15, 413:3, 413:16, 421:11, 425:19, 425:25, 426:6
**2.0** - 374:10, 375:2, 375:17, 377:8, 377:15, 378:20, 379:5, 380:14, 382:3, 382:10, 387:9, 387:17, 390:19, 391:14, 392:18, 392:20, 393:18, 398:3
**20** - 388:4, 423:8, 423:10, 423:14, 424:11, 424:16, 435:6, 435:9, 435:18
**2003** - 388:2
**2005** - 383:5, 388:21, 389:5
**2006** - 364:3, 369:2, 374:20, 374:22, 389:6, 415:3, 418:4, 418:14
**2007** - 364:10
**207c** - 368:14
**21** - 364:3, 383:5
**21/23** - 435:10
**222** - 365:4
**25** - 395:17
**26th** - 375:24
**28** - 406:22, 406:24

**3**

**3-50** - 436:7
**30** - 412:19, 434:9
**32/46** - 435:12
**3a** - 380:13, 382:11, 390:2

**4**

**4** - 378:2, 388:1, 395:24, 395:25, 396:2, 396:3

**5**

**5/26/05** - 435:4
**50-55** - 436:10
**55-59** - 436:13
**570** - 365:19
**5711-q** - 369:9, 369:20, 369:21, 372:13, 407:8
**59-61** - 436:16

**6**

**6** - 388:12, 415:16
**60/61** - 435:18
**61-62** - 436:19
**65-65** - 436:22
**684-0201** - 364:24
**6:30** - 364:10
**6th** - 374:20, 382:15, 415:3, 420:18

**7**

**7/21/05** - 435:6
**75** - 429:19

**8**

**8:20** - 434:22

**9**

**9** - 369:22, 369:24
**9/6/05** - 384:6, 435:10
**914** - 364:24

**A**

**A6** - 381:12
**absent** - 377:9, 387:19, 391:16
**absolutely** - 402:14, 412:17
**accepted** - 388:4
**accomplished** - 433:7
**according** - 368:23
**accordingly** - 426:22
**accuracy** - 432:12
**accurate** - 437:7
**accusations** - 401:13
**acknowledged** - 389:2
**action** - 434:17
**actions** - 429:8
**Addimando** - 418:1
**address** - 407:19, 426:25
**addressing** - 433:11
**adjourned** - 434:16, 434:19
**administered** - 429:14
**administrative** - 367:19, 367:22
**adopted** - 396:19, 408:17, 408:23, 409:16, 410:21, 411:11, 411:12, 412:1, 412:5, 412:15
**adopting** - 425:18
**adoption** - 412:8
**adult** - 403:10
**advance** - 431:25
**advice** - 373:1, 373:6, 373:9
**advise** - 410:18, 426:21
**advising** - 419:15
**aforesaid** - 437:8
**agreed** - 431:12
**allegation** - 372:7
**allege** - 379:17, 379:20
**allow** - 382:19, 391:22, 393:5
**allowed** - 391:25
**alone** - 407:9
**Alzheimer's** - 393:20
**Anderson** - 417:25
**Anne** - 365:16
**annual** - 428:16
**Answer** - 422:11
**answer** - 372:23, 375:9, 385:11, 387:13, 389:16, 392:1, 392:7, 392:9, 392:11, 401:18, 404:16, 404:18, 406:20, 414:22, 417:8, 417:10, 417:20, 420:9
**answered** - 398:25, 399:3
**appear** - 398:14
**applications** - 368:14
**appointed** - 368:1, 368:3, 414:24, 414:25
**appreciate** - 380:3
**appropriate** - 403:11
**approval** - 370:7, 370:11
**arbitration** - 418:16, 418:17, 420:6, 422:2
**arbitrator** - 418:19
**asserted** - 382:7, 389:23
**assess** - 431:5
**assistance** - 390:21
**Associates** - 364:22
**Assuming** - 433:7
**assuming** - 434:3
**attempt** - 382:18
**attention** - 377:5, 390:2, 406:22
**Attorney** - 422:3, 422:15, 422:20
**attorney** - 398:10, 404:5
**attorney/client** - 424:22
**Attorneys** - 365:3, 365:8
**attorneys** - 418:19, 422:13
**attributed** - 406:25
**August** - 364:3, 418:4, 418:13, 420:7
**authenticity** - 432:12
**authority** - 369:15, 371:17
**authorized** - 372:5
**Avenue** - 364:23, 365:9
**aware** - 368:15, 373:15, 406:16, 409:18, 415:2

**B**

**babble** - 400:12
**babbles** - 401:5
**babbling** - 403:14
**bait** - 395:18
**Bait** - 395:19
**Barton** - 365:15
**based** - 374:24, 390:23
**basis** - 373:4, 377:14
**became** - 373:15, 385:7, 409:20
**becomes** - 431:4, 432:3
**begin** - 366:10
**beginning** - 414:11
**begun** - 366:3
**behalf** - 418:17
**behave** - 403:11, 405:14
**behavior** - 403:16
**belief** - 396:24
**Bellitto** - 365:15
**benefits** - 427:12
**best** - 387:23, 393:1
**better** - 421:20
**between** - 419:9
**Beyond** - 427:24
**bifurcate** - 429:20
**bifurcation** - 430:21
**bite** - 395:2
**Bloomingdale** - 365:4
**bluff** - 390:17
**bluster** - 389:24
**board** - 369:25
**Board** - 364:1, 365:14, 365:19, 369:24, 370:8, 370:12, 370:15, 370:16, 371:19, 372:19, 380:2, 382:23, 391:9, 391:12, 396:8, 404:7, 404:13, 404:19, 405:6, 408:16, 408:21, 408:22, 410:9, 410:10, 410:18, 412:1, 412:2, 412:6, 413:22, 414:5, 414:20, 415:21, 420:24, 422:9, 424:24, 425:9, 425:20, 426:11, 426:13, 426:17, 427:5, 429:11, 429:25, 430:15, 431:4, 431:9, 433:9, 434:9
**Board's** - 396:2, 401:10
**bonafide** - 413:19
**Bond** - 365:7, 423:19, 435:18
**briefly** - 381:5
**briefs** - 432:20
**bring** - 394:12, 394:19, 394:24, 419:16
**Bronxville** - 364:1, 364:9, 365:8, 366:2, 366:24, 367:9, 385:14, 386:5, 398:15, 408:17, 408:23, 409:23
**brought** - 418:17, 420:12, 420:14

**C**

**c'mon** - 394:21
**calculatedly** - 381:20
**cannot** - 403:8
**capacity** - 366:25
**Carbone** - 364:22
**care** - 401:18
**career** - 414:11, 414:24
**cares** - 414:4
**case** - 366:6, 366:9, 375:14, 380:18, 389:6, 412:20, 418:16, 418:17
**caucus** - 404:20, 405:5, 405:7, 425:9, 425:14, 425:24, 426:12
**Central** - 364:23
**certain** - 434:7
**certainly** - 388:21, 417:6, 432:18
**Certified** - 437:7
**challenging** - 411:5
**chance** - 413:12
**change** - 372:24, 373:17, 417:9, 417:21
**changed** - 370:19, 373:4, 373:21, 373:25, 416:15
**Changing** - 411:5
**chapter** - 375:18, 377:18, 377:20, 381:21
**Chapter** - 374:10, 375:2, 375:16, 377:7, 377:15, 378:19, 379:5, 380:14, 382:3, 382:10, 387:9, 387:17, 390:19, 391:13, 392:18, 392:20, 393:17, 398:3
**charade** - 393:8, 395:2
**charge** - 380:19
**Charged** - 375:20, 376:2, 376:5, 377:2, 383:4, 383:9, 383:12, 383:18, 383:21, 383:23, 384:5, 384:9, 384:15, 386:2, 387:8, 389:23, 390:14, 391:6, 395:22, 409:12, 417:17, 435:2

**charged** - 374:17, 379:25
**Charges** - 364:2
**charges** - 369:8, 369:23, 370:1, 371:2, 379:16, 380:4, 380:20, 381:8, 381:16, 388:9, 388:17, 388:18, 388:22, 388:23, 389:8, 390:22, 411:15, 420:12, 420:15, 422:23, 423:2, 429:10, 432:11
**check** - 366:5
**Chief** - 366:12, 367:1, 367:5, 368:8, 371:15, 371:17, 371:22, 372:5, 372:15, 373:15, 373:24, 374:17, 375:13, 375:24, 376:4, 376:14, 377:24, 378:17, 380:9, 382:1, 382:2, 382:5, 383:11, 383:23, 389:14, 389:22, 390:13, 390:15, 390:20, 391:5, 391:12, 392:10, 395:24, 396:22, 398:12, 399:4, 400:14, 400:25, 403:18, 404:4, 404:13, 404:20, 404:22, 405:21, 407:25, 408:5, 408:15, 409:15, 411:3, 413:16, 414:18, 414:21, 415:1, 415:17, 416:20, 416:23, 418:3, 418:13, 422:2, 423:12, 424:16, 425:10, 425:12, 426:16, 427:4, 427:14, 427:18, 427:20, 427:24, 428:9, 428:24, 428:25, 435:4, 436:7, 436:10, 436:13, 436:16, 436:19, 436:22
**Chief's** - 381:19, 393:14
**Chris** - 385:4, 423:19, 423:21
**Christopher** - 365:10
**circle** - 376:15
**circumstances** - 380:7
**City** - 365:9
**civil** - 367:20, 402:23, 428:7
**civilly** - 405:14
**claim** - 380:23, 398:2
**claims** - 389:14
**clarification** - 417:5
**clarify** - 417:6, 417:10
**clear** - 374:13, 374:16, 381:7, 391:20, 400:2, 400:20, 408:12, 413:5, 416:23, 417:4, 417:7, 417:8, 428:15
**cleared** - 408:8
**clerk** - 425:20
**client** - 369:6, 369:16, 370:6, 370:10, 370:17, 373:4, 373:16, 374:7, 374:17, 374:24, 375:16, 375:25, 376:18, 379:4, 379:25, 380:24, 381:22, 382:1, 382:14, 383:6, 384:7, 387:5, 387:15, 390:5, 391:6, 392:17, 394:1, 398:20, 400:17, 406:14, 408:8, 414:15, 414:16, 420:11, 420:14, 420:20
**client's** - 370:20, 371:16, 373:25, 390:24
**close** - 431:25, 432:19
**collectively** - 432:10
**coming** - 395:2
**command** - 389:25
**comments** - 401:16
**Commissioners** - 364:1, 365:14, 370:8, 370:13, 370:16, 371:19, 380:2, 408:17, 408:22, 410:10, 412:2
**common** - 429:7
**communicated** - 433:19
**communications** - 424:22
**compensatory** - 388:5
**complete** - 405:18, 407:23
**completed** - 366:6, 416:10, 416:13
**compound** - 389:25
**con** - 381:20
**concerned** - 385:7
**concerning** - 373:16, 433:15
**conclusion** - 407:12
**concur** - 373:13
**conditions** - 411:5, 411:6
**Conduct** - 378:8, 386:7
**conduct** - 373:16, 379:18, 401:8, 402:11, 409:22, 416:3
**conducted** - 431:11
**conducts** - 405:6, 426:11
**confer** - 418:8
**confused** - 399:7
**confusion** - 400:3, 400:7
**connection** - 431:16
**connections** - 411:20
**consider** - 429:16, 431:4
**constant** - 411:4
**Consultation** - 369:18
**contact** - 419:18, 424:17
**contain** - 387:7
**contained** - 375:2, 381:20, 382:3, 388:9, 392:20, 431:20
**contents** - 432:13, 433:22
**continuous** - 428:4
**contract** - 428:18
**contrast** - 412:3
**control** - 398:19
**convenient** - 431:7
**conversation** - 375:5
**conversations** - 418:15
**copied** - 425:21
**copies** - 418:20, 419:7
**copy** - 378:22, 379:5, 380:22, 398:14, 398:16, 398:20, 399:12, 406:15, 406:18, 410:14, 413:17, 418:22, 418:24, 418:25, 419:10, 419:13, 419:25, 421:7, 421:17, 422:4, 422:14, 422:19, 422:20, 423:18, 423:22
**correct** - 366:7, 428:17
**Correct** - 420:13
**Counsel** - 365:19, 369:18, 373:1, 373:2, 373:6, 373:7, 373:9, 378:10, 382:6, 384:14, 389:9, 389:13, 390:22, 405:14, 418:8, 425:22, 430:4
**Counselor** - 395:3, 401:2
**course** - 374:14, 412:19
**cover** - 395:17, 419:23, 421:2, 435:13
**covered** - 401:14, 401:15, 424:25
**crap** - 402:3
**create** - 400:3, 400:6
**Cross** - 413:15, 436:10
**cross** - 414:13, 414:15, 415:6, 415:8
**cross-examination** - 414:13
**custody** - 398:19

## D

**damn** - 402:6
**date** - 374:8, 374:16, 374:19, 376:3, 383:10, 383:22, 384:10, 395:23, 407:5, 410:5, 412:16, 412:20, 413:24, 415:16, 423:11, 434:7
**Dated** - 364:3
**dated** - 375:23, 384:5
**dates** - 374:13
**days** - 412:19, 428:16, 434:9
**dealing** - 371:24
**December** - 366:4, 406:23
**decide** - 432:4
**deem** - 426:24
**Define** - 427:13, 427:20
**defined** - 427:13
**department** - 368:5, 368:17, 374:4, 374:11, 375:3, 377:8, 377:17, 377:23, 378:23, 379:1, 379:3, 386:12, 387:18, 389:22, 391:14, 391:16, 397:12, 406:18, 407:10, 408:18, 408:23, 412:11, 414:11, 417:15, 417:20, 419:23, 420:16, 421:14, 421:23, 423:20, 424:18
**Department** - 365:8, 385:14, 386:6, 398:15, 409:23
**Department's** - 378:11, 378:16, 378:25, 381:9, 386:8, 388:1, 395:25, 396:3, 407:1, 407:4, 423:8, 423:10, 423:14, 424:10, 435:16
**department-wide** - 419:23
**departmental** - 368:9, 384:23, 385:15, 435:10
**Deputy** - 365:15
**derives** - 380:12
**Description** - 435:3, 435:17
**Detective** - 367:16, 367:21, 367:24, 368:4, 414:25
**determine** - 419:24
**different** - 399:17
**direct** - 366:6, 390:15, 414:15, 415:7, 417:21
**Direct** - 366:20, 436:7
**direct-examination** - 415:7
**directives** - 411:2
**directly** - 422:12
**disability** - 380:9
**disciplinaries** - 430:20
**disciplinary** - 366:3, 429:8, 430:6
**Disciplinary** - 364:2
**discipline** - 369:23, 389:25
**discuss** - 419:16, 420:4, 425:10, 425:23
**discussed** - 374:14
**discussing** - 374:9
**dispute** - 431:8, 431:19, 433:15
**distribute** - 419:8, 419:22, 421:13
**distributed** - 386:11, 386:15, 386:21, 387:2, 389:21, 420:15
**distribution** - 421:6, 421:8
**divert** - 390:1
**document** - 376:9, 376:25, 378:4, 378:13, 383:15, 384:1, 384:13, 384:18, 385:25, 387:23, 387:24, 388:3, 388:19, 389:13, 391:23, 392:3, 392:24, 393:4, 393:6, 393:22, 393:24, 394:10, 394:25, 395:4, 395:15, 395:18, 395:21, 396:9, 397:17, 399:17, 405:22, 406:13, 407:3, 407:9, 409:1, 410:15, 410:16, 410:20, 410:23, 410:25, 413:17, 414:2, 423:5, 423:7, 423:13, 423:15, 435:12
**documentation** - 431:20
**documenting** - 410:10, 412:25
**documents** - 401:1, 411:7, 411:8
**done** - 370:17, 403:13, 403:21, 403:22, 404:2, 430:19, 431:24
**double** - 366:5
**double-check** - 366:5
**down** - 394:12, 394:18, 395:1, 399:21
**Downey** - 366:12, 390:13, 390:14, 404:22, 416:20, 416:23, 425:12, 426:16, 427:4, 427:8, 427:14, 427:18, 427:20, 427:24, 428:2, 428:9, 428:25, 436:11, 436:14, 436:17, 436:20, 436:23
**Downy** - 436:8
**dropped** - 371:5
**due** - 377:9, 387:19, 391:16, 427:7
**duly** - 366:16
**duration** - 428:1
**during** - 374:14, 377:11, 380:24, 387:20, 391:18
**During** - 368:7
**duties** - 379:18, 409:22
**Duties** - 378:8, 386:6
**duty** - 380:25

## E

**e-mail** - 384:23, 385:15, 419:18, 435:11
**easy** - 400:24
**effect** - 388:20, 389:1, 411:8, 412:12, 412:14, 413:1, 424:19, 425:1, 425:19
**effective** - 409:20, 409:24, 409:25, 410:5, 410:11, 412:16, 413:2
**eight** - 401:11
**either** - 418:25, 430:15, 431:6
**electronic** - 384:23, 385:15, 435:11
**Elmsford** - 365:20

**employed** - 366:21
**enclosing** - 422:20
**end** - 369:24, 393:8
**endeavor** - 433:4
**ending** - 404:2
**engage** - 403:15
**engaged** - 401:8, 402:11
**entitlement** - 427:6, 427:11
**envelope** - 431:10, 432:1
**Esq** - 365:5, 365:10, 365:20
**Esqs** - 365:3
**etc** - 392:18
**event** - 411:14
**evidence** - 375:12, 376:23, 377:1, 377:4, 377:23, 379:19, 379:21, 380:11, 380:13, 381:9, 381:19, 382:11, 385:23, 386:1, 386:4, 386:7, 387:23, 388:2, 390:2, 393:1, 397:10, 398:7, 408:24, 409:6, 409:8, 409:11, 409:14, 410:25, 421:7, 422:5, 424:7, 424:9, 424:12, 429:12, 429:18, 429:21
**evidences** - 410:5
**evidencing** - 412:7
**exact** - 413:24, 417:13
**exactly** - 392:22
**examination** - 414:13, 415:7
**Examination** - 366:20, 413:15, 418:12, 422:1, 424:15, 428:14, 436:4, 436:7, 436:10, 436:13, 436:16, 436:19, 436:22
**examined** - 366:18
**excuse** - 380:17, 399:22
**Excuse** - 384:25, 393:10, 394:11, 394:17, 399:25, 401:22, 401:25, 403:19
**excused** - 425:9
**exhibit** - 394:5, 417:16
**Exhibit** - 376:2, 377:2, 380:13, 381:9, 381:19, 382:8, 383:9, 383:21, 384:9, 386:2, 386:18, 388:1, 390:14, 392:6, 392:15, 393:16, 395:22, 395:24, 396:25, 397:6, 397:10, 398:3, 400:15, 400:17, 401:1, 404:5, 404:6, 404:7, 404:14, 405:3, 405:23, 406:2, 406:3, 406:13, 406:19, 407:1, 407:4, 407:6, 408:6, 408:19, 408:24, 409:2, 409:5, 409:10, 409:12, 409:15, 409:19, 410:6, 410:10, 410:15, 411:25, 412:3, 412:5, 412:13, 412:14, 412:15, 413:1, 413:3, 413:16, 418:14, 419:1, 419:13, 419:22, 420:16, 421:2, 421:11, 421:15, 422:5, 423:8, 423:10, 423:14, 424:10, 424:16, 425:19, 425:25, 426:6
**Exhibits** - 435:3, 435:17
**exist** - 397:6
**existing** - 381:21
**exists** - 392:22, 392:25, 393:1
**explanation** - 400:21

**F**

**face** - 382:12, 389:10, 390:23
**fact** - 369:5, 372:1, 372:6, 373:15, 389:3, 389:20, 408:16, 411:25
**facts** - 405:16
**factual** - 377:14, 411:9
**factually** - 373:3
**failure** - 393:14
**false** - 381:20, 390:12
**falsely** - 382:7, 389:22, 390:20, 408:5
**familiar** - 374:3
**familiarize** - 368:9
**feedback** - 432:10
**file** - 412:7, 429:22
**fill** - 415:9
**final** - 430:14, 434:11
**Fine**- 400:11, 417:12, 434:1
**fine** - 432:7, 432:16
**finish** - 380:18, 403:24
**finished** - 399:23, 403:14
**first** - 366:16, 368:1, 379:12, 389:12, 395:15, 400:9, 404:18, 406:5, 413:17, 414:23, 415:1, 420:15, 430:10
**floating** - 430:6
**floor** - 401:2
**foil** - 412:22
**foiled** - 419:10
**follow** - 381:8, 391:2, 428:12
**follow-up** - 391:2, 428:12
**Following**- 429:18
**follows** - 366:19
**force** - 370:2
**forfeiture** - 388:4
**Forgetting**- 373:2
**Forgive**- 398:9
**forgive** - 378:9
**form** - 372:11
**forward** - 410:19
**forwarded** - 433:6
**foundation** - 375:5
**Franklin**- 365:9
**frankly** - 372:10
**fraud** - 382:18, 391:1
**friend** - 402:24
**front** - 399:16, 406:3, 408:12, 408:13
**full** - 380:3, 421:21, 427:25
**full-time** - 421:21

**G**

**gap** - 415:10
**Garden** - 365:9
**germane** - 371:24
**given** - 376:17, 381:24, 396:21, 406:15, 418:14, 419:1, 419:13, 428:16, 433:12
**Glenn** - 365:15
**God's** - 380:21, 393:15
**Gould** - 365:3
**governs** - 368:13
**grievance** - 422:3
**ground** - 429:7
**grown** - 403:10
**guess** - 375:21, 423:3
**guide** - 411:4
**guilty** - 407:18, 411:16

**H**

**hall** - 425:13
**hallway** - 402:18
**hand** - 394:21, 399:15, 401:2, 404:14, 405:23
**handed** - 378:13, 384:13, 395:4
**handle** - 429:15
**hands** - 425:17
**Harold** - 422:20, 423:21
**Hartsdale** - 364:24
**head** - 408:19
**heading** - 398:3
**health** - 421:20
**hear** - 371:6, 399:8, 400:9, 400:25, 405:16, 433:14
**heard** - 381:4
**hearing** - 366:3, 371:21, 406:23, 411:24, 412:10, 426:25, 429:21, 431:25, 432:19, 433:6, 433:10, 434:15, 434:18
**heartbeat** - 412:9
**held** - 367:2, 401:17
**help** - 382:5
**herein** - 366:16
**himself** - 392:6
**hire** - 420:19, 420:22
**hired** - 418:2, 419:2, 420:25
**hires** - 418:14, 419:22, 421:1
**Hitsman** - 365:18
**Hoffman** - 365:18
**hold** - 367:17, 367:23, 400:8, 414:8
**holding** - 378:24, 400:15, 400:16, 401:1, 404:5, 404:6, 405:23, 406:7, 406:8, 406:9, 406:13, 408:5
**home** - 380:5, 382:9, 382:13, 387:10, 388:11, 388:13, 390:6, 390:9, 427:10
**hoodwink** - 382:6
**hours** - 377:11, 387:21, 388:5, 391:18
**house** - 374:8, 374:18, 374:25, 375:16, 380:24, 390:25

**I**

**Id** - 380:10, 383:5, 383:12, 383:19, 383:24, 384:5, 384:16
**Id/evd** - 435:3, 435:17
**identification** - 376:3, 376:6, 377:3, 383:10, 383:22, 384:10, 386:3, 395:14, 395:23, 407:4, 409:13, 423:7, 423:11, 423:14, 424:11
**identified** - 398:7
**identify** - 423:15
**ignored** - 382:1
**illegal** - 372:8
**illness** - 377:10, 387:19, 391:16
**imagine** - 410:3
**immediately** - 415:12
**impermissible** - 430:5
**implemented** - 410:22
**important** - 410:14
**imposed** - 432:5
**improper** - 375:1, 415:6
**incident** - 375:6, 415:4, 415:13
**included** - 429:10
**inclusive** - 411:2
**incorrect** - 397:23
**incredibly** - 401:9
**indicates** - 407:2
**individual** - 391:17
**individually** - 421:16
**initial** - 376:15
**injured** - 381:1
**injury** - 377:10, 387:19, 391:17, 427:15, 428:5
**inquired** - 411:10, 415:11
**inquiring** - 415:14
**inquiry** - 426:18
**instead** - 374:25
**instituted** - 422:24
**instructed** - 416:2
**intend** - 371:20, 385:1
**intended** - 396:25
**interjection** - 389:18
**interposed** - 389:18
**interpretation** - 408:1
**interrupt** - 393:11
**interrupting** - 403:20
**intimidate** - 401:21
**intimidating** - 403:2
**investigation** - 416:3, 416:10, 416:12
**involvement** - 371:2
**involving** - 422:2
**irrelevant** - 411:15, 413:19, 414:4
**issue** - 369:9, 372:9, 379:17, 381:15, 388:24, 397:7, 411:23, 412:10, 419:19, 431:22
**issued** - 411:16, 418:25
**itself** - 387:24, 395:18

**J**

**January**- 364:10
**jar** - 432:8
**job** - 380:8, 408:9, 419:3, 427:7, 427:14, 427:16, 428:4
**jog** - 392:19
**John**- 365:20
**joined** - 368:5
**Jonathan**- 365:5
**Jr**- 365:15
**judgment** - 430:25
**July**- 374:20, 382:15, 383:5, 415:2, 415:16, 420:18

**K**

**keep** - 389:10, 403:2, 425:12
**Kempkes** - 364:7, 365:3, 368:25, 375:6, 381:13, 384:24, 385:16, 388:3, 389:3, 416:5, 418:18, 419:10, 420:5, 429:9, 435:5, 435:7, 435:11
**Kempkes'** - 366:9, 415:2, 416:14, 422:3
**kicked** - 393:20
**kind** - 419:23, 421:2
**King** - 365:7, 423:20, 435:19
**knowing** - 418:23
**knowledge** - 368:13, 369:16, 370:7, 396:20, 409:17, 417:14, 417:22
**knows** - 393:13, 402:12, 407:14
**Kurtz** - 365:10, 423:19, 424:17

**L**

**language** - 370:3, 380:5, 390:7
**lap** - 399:17
**last** - 371:6, 371:8, 389:17, 399:11, 399:13, 400:12, 412:21, 415:25, 419:17
**latter** - 433:18
**Law**- 412:21
**law** - 369:13, 371:22, 372:2, 402:24, 428:8
**Laws**- 369:10, 369:22
**lead** - 414:15
**leading** - 406:5,

414:12, 422:6
**least** - 411:19
**leave** - 380:1, 381:12, 382:10, 388:8, 388:11, 388:13, 388:25, 420:21, 421:10, 427:9, 427:13, 427:24, 428:16
**leaving** - 374:18, 388:13
**legal** - 407:12, 407:25, 411:8
**letter** - 422:19, 423:9, 423:18, 423:23, 424:24
**Letter**- 435:18
**lie** - 400:25
**lied** - 391:5, 404:11
**Lieutenant**- 367:7, 367:8, 367:10, 368:23, 368:24, 369:3, 375:13, 385:2, 416:2, 416:10, 418:16, 418:22
**limited** - 380:6
**line** - 379:16, 387:25, 406:24, 411:21
**list** - 421:6, 421:8
**living** - 367:6
**Llc**- 365:18
**look** - 376:4, 376:20, 383:11, 383:17, 383:23, 384:15, 389:12, 389:14, 391:3, 392:15, 392:25, 393:3, 398:10, 400:14, 410:16, 410:17, 423:12, 431:18
**looked** - 369:12, 431:13, 432:3
**lost** - 410:13
**love** - 404:1
**Lovett**- 365:3, 365:5, 366:10, 366:11, 366:20, 371:4, 371:5, 371:14, 372:2, 372:12, 372:22, 373:13, 373:22, 375:8, 375:23, 376:22, 378:2, 378:6, 378:9, 378:12, 379:22, 379:24, 380:17, 381:18, 382:25, 383:4, 384:4, 385:1, 385:3, 385:8, 385:22, 388:15, 389:9, 391:11, 392:4, 393:7, 393:10, 393:24, 393:25, 394:4, 394:11, 394:14, 394:20, 394:23, 395:1, 395:6, 395:10, 395:13, 396:2, 398:8, 398:25, 399:2, 399:18, 399:22, 399:24, 399:25, 400:2, 400:11, 400:24, 401:20, 401:23, 402:1, 402:2, 402:6, 402:14, 402:23, 403:1, 403:8, 403:13, 403:21, 403:23, 403:25, 404:11, 405:2, 405:4, 405:10, 405:20, 407:13, 408:3, 408:10, 408:14, 409:7, 411:22, 411:23, 413:7, 413:10, 413:13, 413:18, 414:3, 414:12, 414:14, 414:17, 414:19, 415:5, 415:15, 416:19, 416:25, 417:1, 417:7, 417:12, 417:16, 418:11, 418:12, 421:24, 422:6, 424:1, 424:4, 424:15, 424:23, 425:4, 425:14, 426:1, 426:7, 426:17, 426:20, 427:2, 428:21, 428:22, 429:1, 429:3, 429:7, 430:1, 430:3, 431:2, 431:12, 431:15, 432:6, 432:16, 433:17, 434:1, 434:5, 436:8, 436:14, 436:20
**Ltd**- 364:22
**lying** - 391:5

## M

**mail** - 384:23, 385:15, 419:18, 435:11
**managed** - 392:5
**Manual** - 395:16
**manual** - 411:1, 435:13
**mark** - 383:4, 383:18, 384:4
**marked** - 375:20, 376:2, 376:5, 377:3, 383:9, 383:21, 384:9, 386:3, 395:14, 395:22, 407:1, 407:3, 407:6, 409:13, 423:7, 423:10, 423:13, 424:11
**Marvin** - 365:14, 366:1, 366:8, 372:17, 372:20, 376:25, 381:2, 381:6, 382:21, 382:24, 385:25, 391:7, 391:10, 395:8, 403:6, 405:13, 408:2, 409:10, 413:14, 413:20, 413:23, 414:6, 414:21, 415:19, 415:22, 422:7, 422:10, 424:8, 425:3, 430:24, 433:3, 434:14, 434:18
**Mary** - 365:14
**Matter** - 364:2
**matter** - 382:12, 408:16, 420:4, 426:15, 430:16
**matters** - 426:14
**mayonnaise** - 432:8
**Mayor** - 365:14, 365:15, 366:1, 366:8, 372:17, 372:20, 376:25, 381:2, 381:6, 382:21, 382:24, 385:25, 391:7, 391:10, 395:8, 403:6, 405:9, 405:11, 405:13, 407:15, 408:2, 409:10, 410:21, 413:14, 413:20, 413:23, 414:6, 414:21, 415:19, 415:22, 422:7, 422:10, 424:8, 425:3, 426:18, 430:24, 433:1, 433:3, 433:12, 434:13, 434:14, 434:18
**maze** - 410:13
**meadow** - 390:1
**meaning** - 368:24
**meant** - 432:14
**meantime** - 412:22
**meet** - 419:19, 419:20, 420:4, 421:16
**meeting** - 419:17, 421:22
**Melissa** - 364:23, 366:17, 437:15
**melodic** - 371:6, 371:8
**member** - 370:2, 372:16, 387:18, 387:19, 391:15, 406:18, 421:22
**members** - 380:1, 386:11, 389:21, 417:15, 420:16, 421:14
**Memo** - 435:9
**memo** - 375:11, 376:1, 376:17, 381:19, 383:5, 383:8, 383:20, 384:5, 384:8, 387:8, 395:17, 419:23, 435:6, 435:13
**memorandum** - 375:23, 376:7, 380:10, 435:4
**Memorandum** - 412:21
**memory** - 368:20, 392:19, 393:14
**mentioned** - 388:16, 389:7
**might** - 393:25
**mind** - 401:24
**mine** - 386:23
**minute** - 395:6
**mirrors** - 382:17
**misled** - 424:24
**misread** - 402:25
**moment** - 383:7
**most** - 401:13, 425:17
**move** - 376:22, 409:7
**moved** - 409:6
**muffin** - 390:1
**Multi** - 435:12
**multi** - 395:15
**Multi-page** - 435:12
**multi-page** - 395:15
**municipal** - 369:25
**must** - 377:10, 382:9, 387:20, 391:17, 427:9
**mutually** - 431:7

## N

**name** - 376:13, 380:21, 384:6, 393:15
**nature** - 377:19, 377:21
**near** - 414:10
**necessary** - 426:24, 427:1, 431:5, 432:4
**need** - 378:22, 385:4, 385:5, 433:13
**needs** - 417:5
**never** - 404:2
**New** - 364:9, 364:24, 365:4, 365:9, 365:20, 366:18, 369:22
**new** - 418:14, 419:7, 419:21, 421:1
**newly** - 419:2
**Next** - 376:13
**next** - 416:8
**night** - 434:19
**non** - 381:21, 427:7, 427:14, 431:21
**Non** - 427:16
**North** - 364:23
**Notary** - 366:17
**Noted** - 434:22
**Nothing** - 425:7, 432:24
**nothing** - 372:8, 373:20, 380:4, 380:8, 390:12, 395:19, 400:13, 402:15, 412:17, 418:23, 421:24, 424:13, 425:4, 432:23
**notify** - 431:21, 433:9
**November** - 395:17
**nowhere** - 389:7
**nullity** - 412:5
**number** - 428:16, 429:13

## O

**O'neil** - 365:10, 366:5, 366:7, 370:24, 371:8, 372:1, 373:10, 373:19, 374:12, 375:4, 375:19, 376:24, 378:3, 378:7, 379:15, 380:16, 381:4, 381:7, 382:20, 385:24, 387:22, 391:20, 392:2, 392:21, 393:9, 394:3, 394:6, 394:11, 394:17, 398:5, 398:22, 398:24, 399:1, 399:5, 399:9, 399:10, 399:15, 399:20, 399:23, 400:1, 400:6, 400:9, 400:19, 401:4, 401:22, 401:25, 402:8, 402:16, 402:25, 403:10, 403:15, 403:19, 403:24, 404:9, 406:2, 406:10, 406:24, 407:11, 407:15, 408:10, 409:3, 409:9, 410:12, 412:8, 412:23, 413:11, 413:14, 413:15, 414:13, 414:16, 414:18, 415:11, 416:17, 418:7, 418:9, 422:1, 423:6, 424:3, 424:6, 424:13, 424:21, 425:7, 425:25, 428:12, 428:14, 428:19, 429:4, 430:15, 431:2, 431:17, 432:18, 432:24, 434:12, 434:21, 436:11, 436:17, 436:23
**O'reilly** - 365:18, 365:20, 366:13, 371:4, 371:10, 375:22, 378:1, 378:11, 384:25, 385:5, 391:25, 392:7, 393:23, 394:2, 394:9, 394:23, 395:9, 395:25, 396:4, 399:8, 400:8, 402:1, 402:4, 403:4, 403:23, 404:15, 404:19, 404:24, 405:2, 405:4, 405:8, 405:11, 410:17, 411:22, 413:4, 413:8, 413:11, 416:21, 417:3, 417:9, 417:18, 417:23, 418:11, 425:5, 425:8, 425:21, 425:23, 426:5, 426:10, 426:13, 426:21, 427:3, 427:11, 427:16, 427:19, 427:22, 428:1, 428:6, 428:10, 428:20, 428:23, 429:1, 430:1, 430:22, 431:1, 431:23, 432:14, 432:17, 432:22, 432:25, 433:4, 433:20, 433:23, 434:2, 434:6, 434:13, 434:15
**object** - 370:24, 373:10, 379:15, 387:22, 398:5
**objected** - 401:12, 406:2, 406:10
**objecting** - 433:21
**objection** - 372:18, 372:20, 376:24, 381:3, 382:22, 385:24, 387:25, 391:8, 391:21, 391:23, 399:5, 400:19, 404:10, 407:22, 408:11, 409:4, 409:9, 411:21, 413:21, 415:20, 422:8, 424:2, 424:5
**Objection** - 373:19, 374:12, 375:4, 382:24, 391:10, 398:22, 399:1, 404:9, 407:11, 408:2, 410:12, 413:18, 413:23, 414:3, 414:6, 414:12, 415:5, 415:22, 422:6, 422:10, 424:21
**objectionable** - 401:9
**objects** - 382:20
**obligated** - 390:8
**Obviously** - 387:22
**occasion** - 368:8, 379:12
**occurred** - 370:25, 420:7, 423:2
**offer** - 385:22, 394:5, 424:1, 424:4, 424:6
**offered** - 380:10, 397:10, 397:11, 397:14, 397:17, 397:20, 397:24, 420:4
**officer** - 420:3, 427:6, 427:22
**Officer** - 364:7, 365:3, 366:9, 368:25,

375:6, 381:13, 384:24, 385:16, 388:3, 389:3, 415:2, 416:5, 416:14, 417:25, 418:18, 418:21, 419:10, 420:5, 422:3, 429:9, 435:5, 435:7, 435:11
**officer's** - 427:5
**officers** - 418:2, 419:2, 419:5, 419:8, 419:9, 420:20
**once** - 411:17, 430:13
**One** - 403:6, 428:3
**one** - 372:3, 373:20, 375:14, 387:14, 405:22, 407:16, 410:14, 418:7, 425:15, 425:18, 426:3, 426:14, 429:9, 430:3, 430:5
**open** - 429:24
**opens** - 432:8
**opportunity** - 426:23, 429:23
**opposed** - 419:2
**order** - 410:17, 411:15
**orders** - 379:20, 411:2
**original** - 396:22
**otherwise** - 394:7
**ought** - 372:10, 382:19, 391:3, 430:9
**outrageous** - 401:13, 401:16
**outside** - 402:11, 403:16
**overrule** - 372:18, 381:3, 382:22, 391:8, 413:21, 415:20, 422:8
**Overruled** - 414:21
**overruled** - 372:21, 382:24, 391:10, 391:24, 413:23, 414:6, 415:22, 422:10
**own** - 404:1

**P**

**Page** - 406:24, 436:4
**page** - 395:15, 406:22, 410:19, 435:12
**panel** - 401:7
**Panzarino** - 418:18, 418:21
**paper** - 430:19
**papers** - 394:22
**paragraph** - 376:20, 377:6, 388:12, 392:16, 410:23
**paraphrase** - 392:6
**paraphrased** - 393:22
**Pardon** - 367:13, 396:13, 405:10
**parentheses** - 407:2
**Park** - 364:23
**part** - 409:21
**parties** - 426:22, 426:23, 433:8, 433:14, 434:4
**Party's** - 375:20, 376:2, 376:5, 377:2, 383:5, 383:9, 383:12, 383:18, 383:21, 383:24, 384:5, 384:9, 384:15, 386:2, 387:8, 389:23, 390:14, 391:6, 395:22, 409:12, 417:17, 435:2
**past** - 377:7, 392:17
**Patrolman** - 414:9
**pay** - 369:17, 370:1, 370:20, 370:21, 371:17, 371:20, 372:16, 372:25, 373:5, 374:1, 416:14, 416:16, 427:12, 427:23, 427:25
**payless** - 370:5, 370:11
**Pba** - 418:17, 422:3, 422:15
**penalty** - 391:13, 429:12, 429:16, 431:5, 431:14, 432:4, 433:16
**pending** - 370:1, 413:5, 416:22, 417:1, 426:15
**per** - 428:16
**perfectly** - 393:13, 400:2
**Perhaps** - 425:20
**perhaps** - 382:5, 390:21, 401:15, 410:16
**period** - 368:7, 427:13, 427:20
**Periodic** - 411:2
**perjury** - 391:13
**person** - 387:20, 407:20
**personnel** - 429:22
**pertains** - 369:23
**peruses** - 376:8, 383:14, 383:25, 384:17
**pizza** - 374:19, 374:25
**Plains** - 365:4
**planning** - 421:13, 421:18
**play** - 394:22
**pled** - 411:16
**Pllc** - 365:7
**Pm** - 364:10, 434:22
**point** - 370:19, 379:24, 392:14, 400:20, 405:20, 411:19, 425:1, 427:25
**Police** - 364:1, 364:7, 365:8, 365:14, 367:1, 368:8, 370:8, 370:12, 370:15, 371:15, 371:19, 376:14, 380:2, 385:14, 386:6, 395:16, 398:15, 407:25, 408:16, 408:21, 409:23, 410:10, 411:3, 412:1, 435:5, 435:13
**police** - 370:2, 417:15, 427:5
**policies** - 381:12
**policy** - 380:1, 382:11, 388:8, 388:25, 390:9, 420:21, 421:10, 427:9
**polled** - 372:19, 382:23, 391:9, 413:22, 414:5, 415:21, 422:9
**Pondfield** - 364:9
**Poorman** - 365:16
**portion** - 372:3
**position** - 367:3, 390:25
**possession** - 398:19
**possibly** - 368:22
**post** - 371:21, 411:24, 412:10, 412:21
**power** - 369:25, 371:18, 407:9
**preceded** - 371:2
**predicate** - 380:20
**preferred** - 364:5, 369:8
**prepare** - 415:19
**prepared** - 372:17, 381:2, 382:21, 391:7, 413:20, 419:4, 419:6, 419:7, 422:7
**present** - 397:16
**Present** - 365:13
**Presumably** - 425:16
**pretense** - 393:14
**previously** - 377:3, 386:3, 409:13, 417:11, 424:11
**printed** - 376:13
**privilege** - 401:14, 401:16, 402:9
**privileged** - 373:12, 402:21
**problem** - 385:9
**procedure** - 389:1
**procedures** - 381:13, 388:8, 388:15, 411:1, 428:7
**proceed** - 366:9, 405:8
**proceeding** - 372:9, 374:9, 374:15, 380:21, 388:10, 400:21, 401:12, 401:19, 402:12, 402:17, 422:24, 437:8
**proceedings** - 368:14, 388:24
**produce** - 389:13, 390:16, 393:6, 412:9
**produced** - 393:12, 425:21
**prompted** - 373:17
**promptly** - 433:8
**promulgate** - 409:1
**proper** - 415:8
**propose** - 431:3, 433:1
**protected** - 402:9, 402:10, 402:16
**provide** - 379:5, 390:7, 411:3, 422:15, 422:17, 426:23, 431:9
**provided** - 419:12, 432:1, 434:8
**provides** - 369:24, 389:22
**provision** - 374:10, 382:9, 387:7
**provisions** - 372:4, 375:1
**Public** - 366:17
**purposely** - 403:9
**purposes** - 429:12, 431:14, 433:11, 433:16
**purpurate** - 382:18
**pursuant** - 377:7, 392:18, 428:7
**pursued** - 372:10
**put** - 370:6, 370:10, 375:12, 376:14, 389:1, 393:8
**puts** - 400:22
**putting** - 412:25, 424:24, 425:19

**Q**

**questioning** - 379:16, 387:25, 411:21
**questions** - 409:5, 413:9, 413:12, 416:18, 418:10, 427:3, 428:11, 428:21
**quickly** - 425:17
**quiet** - 401:5, 401:9
**quite** - 408:4
**quoting** - 410:24

**R**

**rank** - 367:17, 367:23, 414:1, 414:4, 414:8
**Re** - 424:15, 428:14, 436:19, 436:22
**re** - 366:13
**Read** - 402:23
**read** - 369:19, 370:3, 371:10, 371:12, 372:3, 382:12, 383:1, 383:2, 398:1, 399:10, 399:14, 416:1
**reading** - 398:6
**Really** - 378:6
**reason** - 381:18, 389:11, 393:1, 397:5, 397:9, 402:19, 419:20
**reasons** - 427:7, 427:17
**rebuttal** - 412:20
**receipt** - 398:19, 399:12, 400:17, 406:14, 406:17, 434:10
**receive** - 422:19, 423:22, 423:25
**received** - 376:1, 377:4, 383:8, 383:20, 384:8, 385:17, 386:4, 386:22, 389:2, 395:21, 406:18, 407:3, 409:14, 410:2, 411:16, 413:17, 414:2, 418:24, 419:15, 421:17, 423:9, 423:19, 424:7, 424:9, 424:12
**recess** - 395:11
**recognize** - 376:6, 383:24, 384:2, 384:16, 384:20, 384:22
**recommended** - 420:24
**reconvene** - 430:18
**record** - 373:20, 374:15, 399:7, 400:4, 405:19, 408:8, 413:4, 417:6, 430:8
**Recross** - 422:1, 428:14, 436:16, 436:22
**Redirect** - 418:12, 424:15, 436:13, 436:19
**refer** - 378:3, 378:22
**reference** - 376:14, 377:15, 378:5, 379:22, 379:23, 381:10, 381:11, 381:15, 381:17, 381:21, 388:16, 388:20, 395:16, 410:18, 430:4, 431:18
**referenced** - 420:6, 424:19, 430:8
**referred** - 390:1
**refresh** - 368:20
**refused** - 419:17
**regard** - 415:4, 416:14, 423:20
**regularly** - 377:11, 387:21, 391:18
**regulation** - 368:12, 368:17
**Regulations** - 378:7, 386:6, 398:15
**regulations** - 368:10, 368:21, 374:4, 374:11, 375:3, 377:9, 377:16, 377:22, 378:22, 378:23, 378:25, 379:3, 379:18, 380:15, 380:23, 381:11, 381:17, 384:12, 388:7, 389:7, 389:15, 390:17, 391:4, 391:14, 396:3, 396:10, 396:22, 397:12, 398:12, 407:3, 407:10, 408:18, 408:24, 409:22, 417:20, 418:21, 422:4, 422:21, 423:21, 424:18, 430:12, 430:18
**related** - 388:25, 427:7, 427:14, 427:16
**relates** - 388:12, 421:8
**relationship** - 420:7
**relevance** - 371:14, 388:21, 388:22, 411:18
**relevancy** - 371:1
**remain** - 374:8, 377:10, 380:12, 387:20, 390:6, 390:9, 391:17, 401:9
**remained** - 401:4
**remember** - 392:23, 393:2, 393:21, 397:13
**reminded** - 377:7, 392:17
**removed** - 428:2
**renew** - 387:24, 411:20
**reopen** - 366:2, 426:24
**reopened** - 433:11
**repeat** - 415:23
**repeated** - 430:6
**rephrase** - 400:4
**reporter** - 371:13, 383:3, 399:14, 416:1
**represent** - 414:19, 432:2
**representation** - 390:13, 431:10
**represented** - 408:5, 410:2
**represents** - 398:11
**request** - 419:11,

419:14, 422:4, 422:14, 423:20, 425:15, 425:24, 426:5, 426:17
**requests** - 433:2
**require** - 382:13, 387:9, 390:3, 390:4, 390:24
**required** - 374:8, 380:23, 429:5
**requirement** - 375:15, 380:11
**reserve** - 429:17
**residence** - 377:10, 380:12, 387:20, 391:18
**resolution** - 410:9, 412:7, 412:24, 425:18, 426:8
**resolutions** - 426:3, 426:19, 426:25, 430:11
**resolved** - 411:24, 412:10
**respect** - 370:5, 373:3, 405:15, 406:13, 407:17, 409:15, 426:16, 430:11, 430:17, 430:19, 433:14, 433:17
**respects** - 371:23
**respond** - 429:23, 433:2, 433:24
**response** - 408:11, 433:12
**responses** - 419:15
**responsible** - 401:17
**rest** - 412:18, 413:10
**result** - 434:3, 434:16
**returning** - 390:11
**review** - 430:14
**rights** - 402:23
**Road**- 364:9, 365:4, 365:19
**Robert**- 365:16
**routine** - 382:17
**rule** - 368:12, 368:17, 392:22, 393:1
**Rules**- 378:7, 378:8, 386:6, 386:7, 398:15
**rules** - 368:9, 368:21, 374:4, 374:11, 375:3, 377:8, 377:16, 377:22, 378:21, 378:23, 378:25, 379:2, 379:17, 379:18, 380:14, 380:22, 381:10, 381:16, 381:22, 381:24, 382:2, 384:11, 386:15, 386:18, 386:21, 387:2, 387:6, 388:6, 388:19, 389:6, 389:15, 389:20, 390:16, 391:4, 391:14, 393:11, 396:3, 396:10, 396:22, 397:12, 398:2, 398:11, 407:2, 407:9, 408:18, 408:23, 409:21, 409:22, 411:1, 412:12, 417:19, 418:20, 422:4, 422:21, 423:21, 424:18, 430:12, 430:17
**ruling** - 399:6

## S

**safer** - 433:19
**Sasso** - 364:23, 366:17, 437:15
**Satriale** - 368:24, 385:2, 416:2, 416:10, 418:16, 418:23
**save** - 375:19, 412:24, 425:15
**saw** - 385:6, 419:20
**schedule** - 421:21
**scheduled** - 377:11, 387:21, 391:19
**Schoeneck** - 365:7, 423:19, 435:18
**sealed** - 431:10, 432:1
**seat** - 394:24
**second** - 376:20, 377:6, 384:25, 392:16, 410:19, 418:7
**Secondly** - 430:8
**secondly** - 433:12
**Section** - 368:13, 369:9, 369:20, 369:21, 374:10, 375:2, 375:17, 377:8, 377:15, 378:20, 379:5, 381:12, 382:3, 387:9, 387:17, 390:19, 391:13, 392:18, 392:20, 398:3, 407:8, 429:19
**section** - 369:13, 375:18, 377:19, 377:21, 379:22, 381:22
**sections** - 381:16
**secure** - 370:11
**see** - 377:6, 377:12, 382:4, 393:4, 396:11, 396:14, 411:19, 414:17, 426:8, 430:10
**sees** - 432:9
**send** - 431:17
**sent** - 384:24, 385:15, 393:19, 422:20
**separate** - 372:9, 401:19, 404:22
**separated** - 425:13
**Sergeant** - 367:16, 367:21, 367:23, 367:24, 368:2, 368:4
**Seriously** - 392:21
**service** - 367:20, 428:3, 428:4, 428:8
**set** - 386:20, 387:2, 387:6, 412:12
**settled** - 388:23
**several** - 371:23, 419:15
**shall** - 369:25
**short** - 395:11
**shovel** - 394:22
**show** - 371:20, 375:11, 375:12, 381:22, 423:5, 431:2
**shown** - 377:24, 410:8
**sick** - 379:25, 380:6, 380:7, 380:25, 381:12, 382:10, 382:15, 382:16, 387:10, 388:7, 388:25, 390:3, 390:5, 390:8, 420:20, 421:10, 427:9, 427:13, 427:24, 428:16
**Sick** - 380:8
**side** - 429:23
**signed** - 381:13, 388:3, 393:18, 398:19, 398:20, 400:17
**signing** - 417:15
**sit** - 394:12, 394:18
**sitting** - 385:6, 395:1
**Six** - 367:4, 367:18
**slice** - 374:19, 374:25
**slide** - 391:1
**smoke** - 382:17
**someone** - 387:10, 390:3, 393:2, 400:22, 407:19
**sometimes** - 429:19
**somewhere** - 398:18
**soon** - 416:7, 421:20
**sooner** - 434:9
**sophisticated** - 429:11
**Sorry** - 424:3
**sorry** - 385:11, 386:16, 390:4, 411:6, 415:23, 421:12
**source** - 382:8
**speaking** - 399:24
**specific** - 381:14, 388:25
**specifically** - 368:13, 390:6
**Specifically** - 413:24
**spelled** - 427:8
**stage** - 406:6
**stair** - 406:5
**stairs** - 406:4
**stamp** - 395:20
**stamped** - 395:18
**start** - 404:25
**State** - 366:18
**statement** - 371:7, 405:12, 417:10
**statements** - 418:19
**states** - 376:21
**status** - 370:20, 372:24, 373:4, 373:17, 373:21, 373:25, 416:14
**statute** - 372:3, 372:4
**stay** - 375:16, 380:24, 382:9, 382:13, 385:9, 387:10, 388:10, 390:25, 427:9
**staying** - 374:25, 380:5
**Steinmuller** - 396:23
**stenographer** - 405:18
**still** - 404:10, 407:22, 412:14
**stoop** - 401:3
**stop** - 383:6, 403:19, 407:21
**straight** - 389:10
**strand** - 371:7
**strands** - 371:9
**strategic** - 393:15
**street** - 402:19
**Subdivision** - 369:22
**subject** - 402:12, 415:7, 415:8, 428:21
**submission** - 371:21, 431:13, 433:15
**submissions** - 411:25, 412:11, 434:4, 434:8
**submitted** - 432:21
**Subsection** - 369:24
**subsequently** - 418:22
**substance** - 387:18, 391:15, 392:5, 392:14
**substantive** - 433:21
**suddenly** - 393:20
**suggest** - 412:18, 431:1
**suggesting** - 431:24
**suggestion** - 391:2, 430:21
**suggestions** - 429:24
**suit** - 402:10, 429:25
**supercede** - 396:25, 397:3, 426:3
**superceded** - 412:13
**supplement** - 378:21, 379:2, 381:25, 386:8, 386:10, 386:18, 396:9, 396:12, 396:15, 396:17, 396:19, 396:21, 397:4, 397:6, 397:11, 397:23, 407:6, 412:4, 430:13
**supplementary** - 411:4, 411:13
**supposed** - 390:16, 393:19, 430:20
**supposedly** - 393:17
**surprised** - 389:9
**suspect** - 426:2
**suspend** - 370:1, 371:20, 372:15
**suspended** - 368:25, 369:5, 370:16, 370:20, 370:21, 372:24, 372:25, 373:5, 373:25, 374:1, 416:5
**suspending** - 369:16, 371:16
**suspension** - 370:6, 370:11, 371:3, 372:2, 372:6, 372:7, 388:6, 415:12, 416:15, 416:16
**suspensions** - 370:25
**sustained** - 408:2
**swear** - 366:13
**sworn** - 366:17, 386:11, 387:16, 387:18, 391:15, 421:14

## T

**talks** - 407:21
**Taxter**- 365:19
**Terence**- 365:10
**terms** - 370:25, 427:23
**testified** - 366:18
**testify** - 373:24, 391:22, 392:2, 393:5
**testimony** - 371:12, 373:11, 383:2, 387:16, 404:21, 407:5, 425:11
**Thereafter**- 387:1
**thinking** - 397:22
**Thomas**- 364:7
**thoughts** - 430:2
**three** - 381:23, 410:24
**thumbing** - 415:9
**title** - 367:19, 367:20, 367:22, 378:4, 378:8
**tonight** - 405:16, 432:20
**tonight's** - 433:6
**tour** - 377:11, 387:21, 391:19
**tours** - 380:25
**transcript** - 406:23, 412:21, 430:14, 433:5, 434:11, 437:8
**transcripts** - 434:10
**trial** - 370:1
**true** - 368:25, 386:12, 408:4, 418:23, 437:7
**Trustee**- 365:15, 365:16
**Trustees**- 369:25, 410:21
**truth** - 402:22
**truthfully** - 398:13
**try** - 381:8, 392:23
**trying** - 382:6, 389:24
**turn** - 375:10, 378:19, 402:5, 407:22
**Two**- 367:12, 367:14
**two** - 399:17, 401:1, 414:23, 418:14, 419:2, 419:7, 419:9, 419:21, 420:16, 420:19, 421:1, 426:3, 426:14, 426:25, 430:11
**type** - 403:16

## U

**unable** - 427:6
**unaccustomed** - 429:6
**Unconsolidated** - 369:9, 369:22
**under** - 369:9, 375:16, 390:8, 391:12, 395:17, 407:8, 421:2, 428:7, 429:19, 435:13
**Underhill** - 365:16
**underlying** - 386:15, 386:17, 386:20, 387:2, 387:6, 389:15, 389:19, 390:16, 391:4, 393:11, 398:2, 398:11
**understood** - 399:19
**unless** - 382:13, 412:19, 412:23,

419:19, 429:5, 432:3
**unlimited** - 428:18
**Unlimited** - 428:19
**unrelated** - 429:9
**up** - 375:14, 391:2, 394:16, 400:22, 406:5, 408:8, 408:13, 417:4, 417:7, 417:8, 420:12, 420:15, 428:12, 432:8
**urging** - 389:11

V

**valuable** - 401:6, 401:11
**various** - 429:15
**verbally** - 379:10
**Village** - 364:1, 365:8, 366:2, 366:24, 367:9, 370:7, 370:12, 370:16, 371:18, 380:2, 386:5, 408:17, 408:22, 410:9, 412:2, 412:6, 412:16, 412:23, 412:25, 414:20, 425:19
**Village's** - 366:6
**violate** - 372:2
**violated** - 371:15, 371:22, 389:4, 411:17, 420:20
**violating** - 379:25, 388:6, 388:7
**violations** - 379:17, 379:20
**voice** - 371:5, 375:19, 404:1

W

**wait** - 394:15
**wants** - 385:9, 405:9, 412:23, 430:16
**waste** - 415:10
**ways** - 429:15
**whereabouts** - 415:2
**wherein** - 388:4
**White** - 365:4
**whole** - 378:4
**wholesale** - 371:22
**wide** - 419:23
**William** - 365:15
**willing** - 419:19
**wish** - 433:10, 434:4
**withdraw** - 373:22, 400:11, 425:2
**withdrawing** - 413:5
**witness** - 366:14, 376:8, 378:14, 383:14, 383:25, 384:17, 395:5, 398:7, 404:16, 411:10, 413:9, 424:14, 425:8
**Witness** - 366:16
**witnesses** - 429:2, 429:5
**wonder** - 380:19
**words** - 387:17, 391:15, 392:5, 392:13
**world** - 389:19
**write** - 393:16
**writing** - 379:9, 381:23, 382:8, 410:5, 421:3, 421:5, 433:24
**Writing** - 379:11
**written** - 380:20, 391:23, 392:3, 392:24, 393:3, 393:4, 419:11, 434:4
**wrote** - 375:11, 376:11, 390:21, 393:18

Y

**year** - 374:21, 423:4, 428:3, 428:4, 428:16
**years** - 367:4, 367:12, 367:14, 367:18, 414:23, 429:13
**York** - 364:9, 364:24, 365:4, 365:9, 365:20, 366:18, 369:22
**yourself** - 368:9, 392:16, 431:11

CERTIFICATE OF SERVICE

I hereby certify that on August 8, 2008, the foregoing document was filed with the Clerk of the Court and served in accordance with the Federal Rules of Civil Procedure, and/or the Southern District's Local Rules, and/or the Southern District's Rules on Electronic Service, and/or the individual rules of practice of District Court Judge Kenneth M. Karas upon the following parties and participants:

LOVETT & GOULD, LLP
222 Bloomingdale Road
White Plains, New York 10605

Howard M. Miller (HMM4538)
BOND, SCHOENECK & KING, PLLC
*Attorneys for Defendants*
1399 Franklin Avenue, Suite 200
Garden City, New York 11530
(516) 267-6300
hmiller@bsk.com